No. 24-6144

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF OKLAHOMA, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:24-cv-00511-J

## JOINT APPENDIX

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

**ORAL ARGUMENT IS REQUESTED**

/s/ *Maxwell A. Baldi*
Maxwell A. Baldi
Leif Eric Overvold
Daniel Tenny
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Direct: 202-532-0211
Email: Maxwell.Baldi@usdoj.gov

*Counsel for Plaintiff-Appellee*

# INDEX

**DOCUMENTS**                                                                          **PAGE**

Docket Sheet – 09/18/2024....................................................................................... J.A. 004

Plaintiff's Complaint
filed 05/21/2024 at Dkt. #1.....................................................................................J.A. 015

Plaintiff's Motion for Preliminary or Permanent Injunction and Opening
Brief in Support with attached exhibits filed 05/22/2024 at Dkt. #4...................J.A. 032

Exhibit - Declaration of Eric Jacobstein filed 05/22/2024 at Dkt. #4.1.............J.A. 067

Exhibit - Declaration of Russell Hott filed 05/22/2024
at Dkt. #4.2 ...........................................................................................................J.A. 078

Defendants' Combined Response in Opposition with attached exhibits
filed 06/13/2024 at Dkt. #21 .................................................................................J.A. 086

Exhibit 1 - Attorney General Gentner Drummond's Written Testimony
Submitted to the U.S. House Homeland Security Committee
on Wednesday, January 10, 2024, filed 05/22/2024 at Dkt. #21.1.......................J.A. 130

Exhibit 2 - Declaration of Donnie Anderson filed 05/22/2024
at Dkt. #21.2.........................................................................................................J.A. 138

Exhibit 3 - Declaration of Rodney S. Scott filed 05/22/2024
at Dkt. #21.3.........................................................................................................J.A. 143

Exhibit 4 - Declaration of Christopher Landau filed 05/22/2024
at Dkt. #21.4.........................................................................................................J.A. 148

Plaintiff's Reply in Support of Its Motion for Preliminary or Permanent
Injunction filed 06/18/2024 at Dkt. #28.................................................................J.A. 152

Order Granting Defendants' Motion for Preliminary or Permanent
Injunction filed 06/28/2024 at Dkt. #39.................................................................J.A. 174

Notice of Appeal filed 07/17/2024 at Dkt. #43 ....................................................J.A. 205

APPEAL,GREEN,_TLC

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:24-cv-00511-J

| | |
|---|---|
| United States of America v. Oklahoma State of et al | Date Filed: 05/21/2024 |
| Assigned to: Judge Bernard M. Jones | Jury Demand: None |
| Case in other court: Tenth Circuit, 24-06144 | Nature of Suit: 950 Constitutional - State Statute |
| Cause: 28:2201 Constitutionality of State Statute(s) | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**United States of America**       represented by    **Christopher A. Eiswerth**
DOJ-Civ
1100 L St. NW
Ste 4062
Washington, DC 20005
202-305-0568
Email: christopher.a.eiswerth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jean Lin**
DOJ-Civ
1100 L St. NW
Ste 4062
Washington, DC 20005
202-514-3716
Email: jean.lin@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Padres Unidos de Tulsa**      represented by    **Cody Wofsy**
American Civil Liberties Union Foundation
425 California Street
Ste 7th Floor
San Francisco, CA 94104
415-343-0785
Email: cwofsy@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Devraat Awasthi**
ACLU of Oklahoma Foundation
PO Box 13327
Oklahoma City, OK 73113
405-286-1291
Email: dawasthi@acluok.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elissa Stiles**
Rivas & Associates
PO Box 470348
Tulsa, OK 74147
918-419-0166

**J.A.004**

Fax: 918-513-6724
Email: estiles@rivasassociates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
ACLU of Oklahoma Foundation
PO Box 13327
Oklahoma City, OK 73113
405-525-3831
Email: mlambert@acluok.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Noor Zafar**
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
469-301-5991
Email: nzafar@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Jadwat**
American Civil Liberties Union
125 Broad St., 18th Floor
New York, NY 10004
212-549-2620
Fax: 212-549-2654
Email: ojadwat@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
American Civil Liberties Union Foundation
425 California Street
Ste 7th Floor
San Francisco, CA 94104
916-813-7891
Email: osarabia@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
American Civil Liberties Union Foundation
425 California Street
Ste 7th Floor
San Francisco, CA 94104
212-549-2500
Email: samdur@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wafa Junaid**
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
646-256-2274

**J.A.005**

Email: wjunaid@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas David Espiritu**
National Immigration Law Center
3450 Wilshire Boulevard
Ste # 108-62
Los Angeles, CA 90010
213-639-3900
Fax: 213-639-3911
Email: espiritu@nilc.org
*ATTORNEY TO BE NOTICED*

**Tanya Broder**
National Immigration Law Center
3450 Wilshire Boulevard
Ste # 108-62
Los Angeles, CA 90010
510-663-8282
Fax: 213-639-3911
Email: broder@nilc.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ximena Monserrat Lopez Mena**            represented by    **Cody Wofsy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Devraat Awasthi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elissa Stiles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Noor Zafar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Jadwat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*LEAD ATTORNEY*

J.A.006

*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wafa Junaid**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas David Espiritu**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tanya Broder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jordy Madrigal Martinez**       represented by    **Cody Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Devraat Awasthi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elissa Stiles**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas David Espiritu**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noor Zafar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tanya Broder**

**J.A.007**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Wafa Junaid**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Antonio Marquez**, OK                    represented by **Cody Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Devraat Awasthi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elissa Stiles**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas David Espiritu**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noor Zafar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tanya Broder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wafa Junaid**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rene Doroteo Hernandez**                    represented by **Cody Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Devraat Awasthi**

**J.A.008**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Elissa Stiles**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas David Espiritu**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noor Zafar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Spencer Elijah Wittmann Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tanya Broder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wafa Junaid**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Oklahoma State of**                    represented by  **Cullen D Sweeney**
                                         Office of Oklahoma Attorney General
                                         313 N.E. 21st Street
                                         Oklahoma City, OK 73105
                                         405-521-3921
                                         Email: Cullen.Sweeney@oag.ok.gov
                                         *ATTORNEY TO BE NOTICED*

                                         **Garry M Gaskins , II**
                                         Drummond Law PLLC
                                         1500 S Utica Ave
                                         Suite 400
                                         Tulsa, OK 74104
                                         918-749-7378
                                         Fax: 918-749-7869
                                         Email: gmg@drumlaw.com

**J.A.009**

*ATTORNEY TO BE NOTICED*

**Zachary P West**
Attorney General's Ofc-NE 21STREET-OKC
313 NE 21st St
Oklahoma City, OK 73105
405-521-3021
Fax: 405-521-4518
Email: zach.west@oag.ok.gov
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Kevin Stitt**                         represented by   **Cullen D Sweeney**
*in his official capacity as Governor of*                (See above for address)
*Oklahoma*                                               *ATTORNEY TO BE NOTICED*

                                                         **Garry M Gaskins , II**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Zachary P West**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Gentner Drummond**                    represented by   **Cullen D Sweeney**
*in his official capacity as Attorney General of*        (See above for address)
*Oklahoma*                                               *ATTORNEY TO BE NOTICED*

                                                         **Garry M Gaskins , II**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Zachary P West**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Oklahoma Department of Public Safety**  represented by   **Cullen D Sweeney**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Garry M Gaskins , II**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Zachary P West**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Tim Tipton**                          represented by   **Cullen D Sweeney**
*in his official capacity as Commissioner of*            (See above for address)
*Oklahoma Department of Public Safety*                   *ATTORNEY TO BE NOTICED*

                                                         **Garry M Gaskins , II**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**J.A.010**

                                                    **Zachary P West**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Vicki Behenna**                     represented by   **Cullen D Sweeney**
*in her official capacity as District Attorney of*     (See above for address)
*Oklahoma County*                                      *ATTORNEY TO BE NOTICED*

                                                    **Garry M Gaskins , II**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Zachary P West**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Steve Kunzweiler**                  represented by   **Cullen D Sweeney**
*in his official capacity as District Attorney of*     (See above for address)
*Tulsa County*                                         *ATTORNEY TO BE NOTICED*

                                                    **Garry M Gaskins , II**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Zachary P West**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**JOHN ANDREW CHAFFIN**               represented by   **John A Chaffin**
6232 HIGHWAY 7W                                        Law Office of John Andrew Chaffin
PO BOX 250                                             P O Box 3051
DAVIS, OK 73030                                        Oklahoma City, OK 73101
4058886148                                             405-888-6148
                                                    Email: john.chaffin@cox.net
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/21/2024 | 1 | COMPLAINT against Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton filed by United States of America. (Attachments: # 1 Exhibit 1 - DOJ Letter re HB 4156, # 2 Exhibit 2 - IJ Ketter re HB 4156, # 3 Civil Cover Sheet)(naa) (Entered: 05/21/2024) |
| 05/21/2024 | 2 | Summons Issued Electronically as to Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton. (naa) (Entered: 05/21/2024) |
| 05/22/2024 | 3 | ENTRY of Appearance by Christopher A. Eiswerth on behalf of United States of America (Eiswerth, Christopher) (Entered: 05/22/2024) |
| 05/22/2024 | 4 | MOTION for Preliminary Injunction *Or*, MOTION for Permanent Injunction *and Opening Brief in Support* by United States of America. (Attachments: # 1 Exhibit 1 -- Jacobstein Declaration, # 2 Exhibit 2 -- Hott Declaration)(Eiswerth, Christopher) (Entered: 05/22/2024) |
| 05/22/2024 | 5 | ENTRY of Appearance by Jean Lin on behalf of United States of America (Lin, Jean) (Entered: 05/22/2024) |

**J.A.011**

| 05/29/2024 | 6 | SUMMONS Returned Executed by United States of America. Oklahoma State of served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
|---|---|---|
| 05/29/2024 | 7 | SUMMONS Returned Executed by United States of America. Kevin Stitt served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 8 | SUMMONS Returned Executed by United States of America. Gentner Drummond served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 9 | SUMMONS Returned Executed by United States of America. Oklahoma Department of Public Safety served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 10 | SUMMONS Returned Executed by United States of America. Tim Tipton served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 06/05/2024 | 11 | ENTRY of Appearance by Garry M Gaskins, II on behalf of Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton (Gaskins, Garry) (Entered: 06/05/2024) |
| 06/05/2024 | 12 | ENTRY of Appearance by Zachary P West on behalf of Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton (West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 13 | UNOPPOSED MOTION to Consolidate Cases by All Defendants. (Attachments: # 1 Exhibit A - 014 Amended Complaint (2024.05.24))(West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 14 | UNOPPOSED MOTION for Extension of Time to File Answer re 1 Complaint, by All Defendants. (Attachments: # 1 Attachment Proposed Order Mtn to Stay 2024.06.05)(West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 15 | JOINT MOTION to Extend Deadlines or Hearings by All Defendants. (Attachments: # 1 Attachment Proposed Order Joint Mtn for Briefing Sched. 2024.06.05)(West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 16 | **ORDER** ~ Defendants' Unopposed Motion for a Stay of Their Deadline to Respond to the Complaint 14 is GRANTED. The Court will set any deadlines for responding to the complaint after ruling on Plaintiffs pending motion for injunctive relief. Joint Motion for Briefing Schedule 15 is GRANTED, as more fully set out in the Order. Signed by Judge Bernard M. Jones on 6/5/2024. (dwl) (Entered: 06/05/2024) |
| 06/05/2024 | 17 | **ORDER** ~ Granting 13 Defendants' Unopposed Motion to Consolidate. The files of each consolidated case shall be maintained in United States of America v. State of Oklahoma, et al., CIV-24-511-J, and all filings shall reflect the Court's style heading in that case. Signed by Judge Bernard M. Jones on 6/5/2024. (dwl) (Entered: 06/05/2024) |
| 06/05/2024 | 18 | ENTRY of Appearance by Cullen D Sweeney on behalf of All Defendants (Sweeney, Cullen) (Entered: 06/05/2024) |
| 06/06/2024 | 19 | ENTRY of Appearance by Devraat Awasthi on behalf of Jordy Madrigal Martinez, Antonio Marquez, Rene Doroteo Hernandez (Awasthi, Devraat) Modified on 6/6/2024: document flattened to optimize CM/ECF display; no other changes made (ekw). (Entered: 06/06/2024) |
| 06/07/2024 | 20 | ENTRY of Appearance by Megan E Lambert on behalf of Rene Doroteo Hernandez, Antonio Marquez, Jordy Madrigal Martinez (Lambert, Megan) Document flattened to optimize CM/ECF display; no other changes made . Modified on 6/10/2024 (naa). (Entered: 06/07/2024) |
| 06/13/2024 | 21 | RESPONSE in Opposition re 4 MOTION for Preliminary Injunction *Or* MOTION for Permanent Injunction *and Opening Brief in Support* filed by All Defendants. (Attachments: # 1 Exhibit 1 - AG Drummond's Written Testimony, # 2 Exhibit 2 - Decl. of Donnie Anderson, # 3 Exhibit 3 - Decl. of Rodney S. Scott, # 4 Exhibit 4 - Decl. of Christopher Landau)(Gaskins, Garry) (Entered: 06/13/2024) |

**J.A.012**

| | | |
|---|---|---|
| 06/17/2024 | 22 | UNOPPOSED MOTION to Add Party *Immigration Reform Law Institute* by JOHN ANDREW CHAFFIN. (Attachments: # 1 Attachment Amicus Brief, # 2 Attachment Proposed Order)(Chaffin, John) (Entered: 06/17/2024) |
| 06/17/2024 | 23 | ENTRY of Appearance by John A Chaffin on behalf of JOHN ANDREW CHAFFIN (Chaffin, John) (Entered: 06/17/2024) |
| 06/17/2024 | 24 | UNOPPOSED MOTION for Leave to Appear Pro Hac Vice *Immigration Reform Law Institute* Filing fee $ 100, receipt number AOKWDC-4455768 by JOHN ANDREW CHAFFIN. (Attachments: # 1 Attachment, # 2 Attachment, # 3 Attachment, # 4 Attachment)(Chaffin, John) (Entered: 06/17/2024) |
| 06/17/2024 | 25 | ENTRY of Appearance by Elissa Stiles on behalf of Rene Doroteo Hernandez, Antonio Marquez, Jordy Madrigal Martinez (Stiles, Elissa) (Entered: 06/17/2024) |
| 06/17/2024 | 26 | MOTION for Leave to Appear Pro Hac Vice *for Nicholas Espiritu* Filing fee $ 100, receipt number AOKWDC-4455849 by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Attachments: # 1 Attachment PHV Application Form)(Stiles, Elissa) (Entered: 06/17/2024) |
| 06/17/2024 | 27 | MOTION for Leave to Appear Pro Hac Vice *for Tanya Broder* Filing fee $ 100, receipt number AOKWDC-4455860 by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Attachments: # 1 Attachment PHV Application Form)(Stiles, Elissa) (Entered: 06/17/2024) |
| 06/18/2024 | 28 | REPLY by Plaintiff United States of America *in Support of Motion for Preliminary or Permanent Injunction* filed by United States of America. (Attachments: # 1 Exhibit 1: Order Granting Prelim Inj, US v. Iowa)(Eiswerth, Christopher) (Entered: 06/18/2024) |
| 06/18/2024 | 29 | RESPONSE in Support re 4 MOTION for Preliminary Injunction *Or* MOTION for Permanent Injunction *and Opening Brief in Support* filed by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Zafar, Noor) (Entered: 06/18/2024) |
| 06/27/2024 | 30 | **ORDER** ~ Granting 26 , 27 Motions to Appear Pro Hac Vice. Nicholas Espritu and Tanya Broder are hereby admitted to practice before this Court for the limited purpose of participating in this case. Signed by Judge Bernard M. Jones on 6/27/2024. (dwl) (Entered: 06/27/2024) |
| 06/27/2024 | 31 | ENTRY of Appearance by Noor Zafar on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Zafar, Noor) (Entered: 06/27/2024) |
| 06/27/2024 | 32 | ENTRY of Appearance by Omar Jadwat on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Jadwat, Omar) (Entered: 06/27/2024) |
| 06/27/2024 | 33 | ENTRY of Appearance by Spencer Elijah Wittmann Amdur on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Amdur, Spencer) (Entered: 06/27/2024) |
| 06/27/2024 | 34 | ENTRY of Appearance by Oscar Sarabia Roman on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Sarabia Roman, Oscar) (Entered: 06/27/2024) |
| 06/27/2024 | 35 | ENTRY of Appearance by Wafa Junaid on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Junaid, Wafa) (Entered: 06/27/2024) |
| 06/27/2024 | 36 | ENTRY of Appearance by Cody Wofsy on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Wofsy, Cody) (Entered: 06/27/2024) |
| 06/28/2024 | 37 | ENTRY of Appearance by Nicholas David Espiritu on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Espiritu, Nicholas) Document flattened to optimize CM/ECF display; no other changes made . |

**J.A.013**

| | | |
|---|---|---|
| | | Modified on 6/28/2024 (naa). (Entered: 06/28/2024) |
| 06/28/2024 | 38 | **ORDER** ~ Denying 22 , 24 Motions for leave to file briefs as amicus curiae of Immigration Reform Law Institute. Signed by Judge Bernard M. Jones on 6/28/2024. (dwl) (Entered: 06/28/2024) |
| 06/28/2024 | 39 | **ORDER** ~ Granting 4 United States Motion for Preliminary Injunction. Oklahoma is hereby ENJOINED from enforcing H.B. 4156 pending further proceedings. Signed by Judge Bernard M. Jones on 6/28/2024. (dwl) (Entered: 06/28/2024) |
| 06/28/2024 | 40 | **ORDER** ~ The Padres Unidos Plaintiffs' motion for a preliminary injunction, see Padres Unidos de Tulsa v. Drummond, No. CIV-24-526-J, 15 , is DENIED AS MOOT. Signed by Judge Bernard M. Jones on 6/28/2024. (dwl) (Entered: 06/28/2024) |
| 07/02/2024 | 41 | ENTRY of Appearance by Cullen D Sweeney on behalf of All Defendants (Sweeney, Cullen) (Entered: 07/02/2024) |
| 07/08/2024 | 42 | ENTRY of Appearance by Tanya Broder on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Broder, Tanya) (Entered: 07/08/2024) |
| 07/17/2024 | 43 | NOTICE OF APPEAL as to 39 Order on Motion for Preliminary Injunction, Order on Motion for Permanent Injunction by Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton. Filing fee $ 605, receipt number AOKWDC-4476242. (Sweeney, Cullen) (Entered: 07/17/2024) |
| 07/17/2024 | 44 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 43 Notice of Appeal, (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(naa) (Entered: 07/17/2024) |
| 07/17/2024 | 45 | Tenth Circuit USCA Case Number 24-6144 for 43 Notice of Appeal, filed by Tim Tipton, Gentner Drummond, Kevin Stitt, Oklahoma Department of Public Safety, Oklahoma State of. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/17/2024 Docketing statement, Notice of Appearance, and Transcript order form due 07/31/2024 for Gentner Drummond, Oklahoma Department of Public Safety, State of Oklahoma, Kevin Stitt and Tim Tipton. Transcript order form due 07/31/2024 for Gentner Drummond, Oklahoma Department of Public Safety, State of Oklahoma, Kevin Stitt and Tim Tipton. Notice of appearance due on 07/31/2024 for Rene Doroteo Hernandez, Jordy Madrigal Martinez, Antonio Marquez, Ximena Monserrat Lopez Mena, Padres Unidos de Tulsa, and United States of America. [24-6144] (naa) (Entered: 07/17/2024) |
| 07/26/2024 | 46 | TRANSCRIPT Order Form by Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton re 43 Notice of Appeal, that transcripts are not necessary. See order form for dates and proceedings. (Gaskins, Garry) (Entered: 07/26/2024) |
| 07/26/2024 | 47 | TRANSCRIPT LETTER advising no transcripts are necessary re 43 Notice of Appeal, filed by Tim Tipton, Gentner Drummond, Kevin Stitt, Oklahoma Department of Public Safety, Oklahoma State of. The record is ready for appeal purposes. (naa) (Entered: 07/26/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/18/2024 16:17:34 | | | |
| **PACER Login:** | indianawest | **Client Code:** | Immigration |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-00511-J Start date: 1/1/1974 End date: 9/18/2024 |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

**J.A.014**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| (1) UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>(1) THE STATE OF OKLAHOMA;<br>(2) KEVIN STITT, in his official capacity as Governor of Oklahoma;<br>(3) GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma;<br>(4) OKLAHOMA DEPARTMENT OF PUBLIC SAFETY; and<br>(5) TIM TIPTON, in his official capacity as Commissioner of Oklahoma Department of Public Safety,<br><br>    *Defendants.* | Case No. CIV-24-511-J |

## COMPLAINT

1.      The United States brings this action to preserve its exclusive authority under federal law to regulate the entry, reentry, and presence of noncitizens. Oklahoma's House Bill 4156 (HB 4156), like Texas's preliminarily enjoined Senate Bill 4 and Iowa's recently enacted Senate File 2340, impermissibly creates a state-specific immigration system that effectively seeks to regulate noncitizens' entry, reentry, and presence in the United States.

2.      "The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Indeed, "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Congress has established a comprehensive scheme governing noncitizens' entry and reentry into the United States—including penalties for unlawful entry and reentry, *see* 8 U.S.C. §§ 1325, 1326—and removal from the country, *see id.* § 1229a. HB 4156 intrudes on that scheme, frustrates the United States' immigration operations, and interferes with U.S. foreign relations. It is preempted by federal law and thus violates the Supremacy Clause of the United States Constitution. HB 4156 also violates the dormant Foreign Commerce Clause, which limits the power of the States to regulate the international movement of persons. Accordingly, the United States seeks a declaration invalidating, and an order enjoining the enforcement of, HB 4156.

## JURISDICTION & VENUE

3.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants reside within this district and because a substantial part of the acts or omissions giving rise to this action occurred within this judicial district.

**PARTIES**

5.      Plaintiff, the United States, regulates immigration and conducts foreign relations under its constitutional and statutory authorities and through its Executive Branch agencies, including the Department of Homeland Security (DHS) and its component agencies—U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS)—the Department of Justice, and the Department of State.

6.      Defendant State of Oklahoma is a State of the United States.

7.      Defendant Kevin Stitt is the Governor of Oklahoma.  He is sued in his official capacity.

8.      Defendant Gentner Drummond is the Attorney General of Oklahoma. He is the "chief law officer of the state." Okla. Stat. tit. 74, § 18.  He has the authority to prosecute any case under Oklahoma law and has general supervisory authority over Oklahoma criminal prosecutions.  Okla. Stat. tit. 74, § 18b.  He is sued in his official capacity.

9.      Defendant Oklahoma Department of Public Safety (DPS) is an agency of Oklahoma, responsible for enforcing the laws protecting the public safety and providing for the prevention and detection of crimes.  Okla. Stat. tit. 47, § 2-117(A).

10.      Defendant Tim Tipton is the Commissioner of DPS.  He is sued in his official capacity.

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

11.      Under the Supremacy Clause, the Constitution and federal immigration laws, including the Immigration and Nationality Act (INA), are—like all federal laws—"the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Through the Supremacy Clause, state laws may be preempted in various ways.

2

12.    Under the doctrine of field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Corp.*, 331 U.S. 218, 230 (1947)).

13.    State laws are also "preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. "This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*.

14.    The Constitution tasks the federal government with regulating immigration, foreign commerce, and foreign affairs. It grants the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, to "regulate Commerce with foreign Nations," *id.* art. I § 8, cl. 3, and to exercise authority inherent in the United States' national sovereignty, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936). Thus, as the Supreme Court recognized, the "Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." *Arizona*, 567 U.S. at 394.

15.    Congress has exercised its authority over immigration by enacting the INA, 8 U.S.C. § 1101 *et seq.*, and other laws to comprehensively govern the entry, admission, presence, and status of noncitizens.[1]

_____

[1] This complaint uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 599 U.S. 222, 226 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

J.A. 018

16.     As relevant here, Congress has established an integrated framework governing the entry of noncitizens into the United States.[2]  It has identified who may enter, *see*, *e.g.*, 8 U.S.C. §§ 1181-82, 1188, and how they may enter, *see*, *e.g.*, 8 U.S.C. §§ 1223-25.  Congress has also imposed federal criminal penalties on noncitizens who unlawfully enter or reenter the United States.  For example, 8 U.S.C. § 1325, titled "Improper entry by [noncitizens]," states that "[a]ny [noncitizen] who . . . enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined . . . or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined . . . or imprisoned not more than 2 years, or both."  Likewise, 8 U.S.C. § 1326, titled "Reentry of removed [noncitizens]," states that, subject to certain exceptions, "any [noncitizen] who . . . has been denied admission . . . or removed or has departed the United States while an order of . . . removal is outstanding, and thereafter . . . enters, attempts to enter, or is at any time found in, the United States . . . shall be fined . . . or imprisoned not more than 2 years, or both."

17.     Moreover, Congress has established an enforcement apparatus to address unlawful entry and reentry into the United States.  For example, CBP, "in coordination with" ICE and USCIS, is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter . . . the United States" and "the detection [and] interdiction … of persons unlawfully entering, or who have recently unlawfully entered, the United States."  6 U.S.C. § 211(c)(8).  And U.S. Border Patrol has "primary responsibility for

---

[2] Following the Homeland Security Act of 2002, many references to the "Attorney General" are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

J.A. 019

interdicting persons attempting to illegally enter . . . the United States . . . at a place other than a designated port of entry." *Id.* § 211(e)(3).

18.     Federal law also gives DHS "the power and duty to control and guard" the border against illegal entry and to "perform such other acts as . . . necessary for carrying out [such] authority." 8 U.S.C. § 1103(a)(3), (5).  In doing so, immigration officers enforce prohibitions on unlawful entry.  *See id.* § 1357(a) (detailing the authority of federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States"); *see also id.* § 1357(a)(3) (authorizing access to certain private lands "for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States"); H.R. Rep. No. 82-1377, at 3 (1952), 1952 U.S.C.C.A.N. 1358, 1360 (explaining that § 1357(a)(3) was designed to prevent illegal entries, protect "the national security," and preserve "the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens]").

19.     Congress has also comprehensively regulated the removal of noncitizens. Federal law specifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed.  *See* 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1231(a)-(b).  Congress has provided for judicial review of final removal orders, *see id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009), and instructed that, "unless otherwise specified [in the INA]," removal proceedings under 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed from the United States," *id.* § 1229a(a)(3).  Noncitizens may apply for relief or protection from removal, such as asylum, *see id.* § 1158(a)-(b), or withholding of removal, *see id.* § 1231(b).

## HOUSE BILL 4156

20.    On April 30, 2024, the Governor of Oklahoma signed HB 4156 into law, adding a Section 1795 to Title 21 of the Oklahoma Statutes.  HB 4156 will become effective on July 1, 2024.  This new law purports to create new state crimes and impose state penalties on noncitizens in Oklahoma who have unlawfully entered or reentered the United States.

21.    HB 4156 contains two principal provisions.  First, under HB 4156, a noncitizen commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States" (the "Impermissible Occupation" provision).  HB 4156 § 2(B), (C)(1) (codified at Okla. Stat. tit. 21, § 1795(B), (C)(1)).  This provision effectively makes it a state criminal offense to be present in Oklahoma without having obtained legal authorization to enter the United States.  Whereas the federal unlawful entry provision, 8 U.S.C. § 1325(a), generally bars noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers," HB 4156 extends beyond § 1325 in criminalizing the presence in Oklahoma of those noncitizens who previously entered the United States unlawfully.  That is, Oklahoma seeks to enforce a criminal prohibition on unlawful entry to the United States against those noncitizens who also enter and continue to be present in Oklahoma.

22.    Closely tracking Texas's SB 4, the Impermissible Occupation provision contains several affirmative defenses.  It provides that "[i]t shall be an affirmative defense to prosecution" for violating the Impermissible Occupation provision if (i) "[t]he federal government has granted the defendant . . . lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code"; or  (ii) "[t]he defendant was approved for benefits under the federal Deferred Action for

Childhood Arrivals [("DACA")] program between June 15, 2012, and July 16, 2021."
HB 4156 § 2(F) (codified at Okla. Stat. tit. 21, § 1795(F)).

23.    A violation of the Impermissible Occupation provision is generally a
misdemeanor "punishable by imprisonment" for up to one year and/or a fine of up to
$500, but could, under certain circumstances, constitute a "felony punishable by
imprisonment" for up to two years and/or a fine of up to $1,000.  HB 4156 § 2(C)(1)-
(2) (codified at Okla. Stat. tit. 21, § 1795(C)(1)-(2)).  Neither probation nor delayed
sentencing is available.  HB 4156 § 2(G) (codified at Okla. Stat. tit. 21, § 1795(G)).
Any noncitizen convicted under this provision—regardless of whether the violation is
considered a misdemeanor or a felony—"shall be required to leave [Oklahoma] within
seventy-two (72) hours following his or her conviction or release from custody,
whichever comes later." *Id.*

24.    Second, HB 4156 makes it a state crime for noncitizens to "enter[],
attempt[] to enter, or . . . at any time [be] found in Oklahoma" if they previously have
been "denied admission, excluded, deported, or removed" or have "departed the
United States while an order of exclusion, deportation, or removal is outstanding" (the
"Unlawful Reentry" provision).  HB 4156 § 2(D) (codified at Okla. Stat. tit. 21,
§ 1795(D)).  This provision effectively imposes state criminal penalties on those who
violate 8 U.S.C. § 1326(a), which generally bars noncitizens from "enter[ing],
attempt[ing] to enter, or" being "found in, the United States" if they previously have
been "denied admission, excluded, deported, or removed" or "ha[ve] departed the
United States while an order of exclusion, deportation, or removal is outstanding."

25.    The Unlawful Reentry provision contains two exceptions.  It does not
apply to a noncitizen if (i) "[p]rior to reembarkation of the [noncitizen] at a place
outside the United States or application by the [noncitizen] for admission from a
foreign contiguous territory, the United States Attorney General has expressly
consented to such [noncitizen's] reapplying for admission," or (ii) if the noncitizen was

"previously denied admission and removed," the noncitizen "established that he or she was not required to obtain such advance consent under" Section 2 of HB 4156 "or any prior statute."  HB 4156 § 2(D) (codified at Okla. Stat. tit. 21, § 1795(D)).

26.    A violation of HB 4156's Unlawful Reentry provision is a felony punishable by imprisonment for up to two years and/or a fine of up to $1,000.  *See* HB 4156 § 2(C)(2) (codified at Okla. Stat. tit. 21, § 1795(C)(2)).  Neither probation nor delayed sentencing is available.  HB 4156 § 2(G) (codified at Okla. Stat. tit. 21, § 1795(G)). Furthermore, a person convicted of violating the Unlawful Reentry provision "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later."  HB 4156 § 2(C)(2), (D) (codified at Okla. Stat. tit. 21, § 1795(C)(2), (D)).

### HB 4156'S EFFECTS ON IMMIGRATION OPERATIONS, FEDERAL LAW ENFORCEMENT, AND FOREIGN RELATIONS

27.    If HB 4156 takes effect, it would interfere with the exclusive authority of the federal government to control noncitizens' entry and reentry into, and presence in, the United States and to conduct foreign relations.

28.    The United States must speak with one voice in immigration matters. *Arizona*, 567 U.S. at 409.  The Supreme Court has long held that the "authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see Mathews v. Diaz*, 426 U.S. 67, 84 (1976) (recognizing "the exclusive federal power over the entrance and residence of [noncitizens]"); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (the formulation of "[p]olicies pertaining to the entry of aliens . . . is entrusted exclusively to Congress"), just as "the removal process is entrusted to the discretion of the Federal Government," *Arizona*, 567 U.S. at 409.  "The dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy[.]" *Arizona*, 567 U.S. at 397. "It is fundamental that

J.A. 023

foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 395. "If it be otherwise, a single State [could], at her pleasure, embroil us in disastrous quarrels with other nations." *Chy v. Freeman*, 92 U.S. 275, 280 (1875).

29.     By imposing criminal penalties and immigration consequences on noncitizens based on their entry or reentry into, or presence in, the United States, HB 4156 will interfere with the federal government's ability to conduct foreign relations. HB 4156 risks the "unnecessary harassment" of noncitizens, *Arizona*, 567 U.S. at 408, and will antagonize foreign governments. Mexico has already expressed concern about HB 4156. *See* Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W. Further, HB 4156 risks undermining the United States' international partnerships dedicated to reducing irregular migration throughout North and Central America. And it risks exposing United States citizens to reciprocal or retaliatory treatment.

30.     HB 4156 will also interfere with the comprehensive statutory scheme Congress enacted to govern noncitizen entry, reentry, and presence. Indeed, in some cases, it would prevent the Executive Branch from executing that scheme at all. Even assuming HB 4156 "has the same aim as federal law and adopts its substantive standards," "[w]ere [HB 4156] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402. Moreover, HB 4156 would improperly impose a unique scheme of state penalties essentially for violations of federal immigration laws. *See id.* at 402-03 (noting "an inconsistency between [state law] and federal law with respect to penalties").

31.     Further, by permitting state officials to effectively exile noncitizens from the State, *see* HB 4156 §2(C)(1)-(2) (codified at Okla. Stat. tit. 21, § 1795(C)(1)-(2)), HB 4156 risks international controversy and possible retaliation against United States citizens in foreign countries.

32.     The United States sent a letter to Oklahoma on May 15, 2024, explaining that HB 4156 violates the Supremacy Clause and the Foreign Commerce Clause of the United States Constitution, and that "the United States intends to file suit to enjoin the enforcement of HB 4156 unless Oklahoma agrees to refrain from enforcing the law." Ex. 1.  On May 17, 2024, Oklahoma responded that it intends to implement HB 4156.  Ex. 2.

## COUNT I — PREEMPTION

33.     Plaintiff realleges paragraphs 1 - 32.

34.     Under the Supremacy Clause, federal law is "the supreme Law of the Land," preempting any contrary state laws.  *See* U.S. Const. art. VI, cl. 2.  "States are precluded from regulating conduct in a field" that Congress commits to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399.  And a state law is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*.

35.     Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399.

36.     The federal government has a dominant interest in deciding "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976).  The allocation of this authority to the federal government is necessary because "the power to regulate immigration" is "an attribute of sovereignty essential to the preservation of any

10

nation," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982), and because the United States' "policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Indeed, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395.

37.   "Federal governance of immigration and [noncitizen] status" is also so "extensive and complex," *Arizona*, 567 U.S. at 395, that it leaves "no room for the States to supplement it," *id.* at 399.  Federal law delineates when it is unlawful for noncitizens to enter or reenter the United States and imposes consequences for violating those proscriptions, including removal. Federal law also establishes a comprehensive apparatus for the federal government to enforce those rules.  *See generally* 6 U.S.C. §§ 202, 211, 252, 271; 8 U.S.C. §§ 1103, 1225, 1229a, 1325, 1326. And a "principal feature" of that apparatus "is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

38.   HB 4156 unconstitutionally intrudes on the federal government's exclusive authority to regulate noncitizens' entry and reentry into, and presence in, the United States and, therefore, is field preempted.  Oklahoma's law seeks to punish conduct already proscribed by federal law—unlawful entry and reentry, *see* 8 U.S.C. §§ 1325, 1326—and to give state officials authority to impose penalties without federal involvement, including removing noncitizens from the State of Oklahoma.  Under *Arizona*, even if HB 4156 were "complementary state regulation," it is preempted. *Arizona*, 567 U.S. at 401.

39.   HB 4156 further intrudes on the federal government's exclusive authority to remove noncitizens from the United States.  *See Arizona*, 567 U.S. at 409.  HB 4156 purports to require noncitizens convicted of violating HB 4156 to leave Oklahoma

J.A. 026

within 72 hours following their conviction or release from custody, whichever is later. *See* HB 4156 § 2(C)(1)-(2). Under the carefully calibrated federal immigration scheme (and indeed, the Constitution), States have no authority to exile noncitizens from the State because if all States enact such a provision, then noncitizens would effectively be forced out of the country. But *Arizona* made clear that removal is "entrusted to the discretion of the Federal Government," 567 U.S. at 409; *see also United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) (holding indirect efforts to expel noncitizens from Alabama preempted). Were HB 4156 valid, "every State could give itself independent authority" to banish noncitizens, effectively requiring them to leave the country entirely and thereby "diminish[ing] the [Federal Government's] control over enforcement and detract[ing] from the integrated scheme of regulation created by Congress." *Id.* at 402 (brackets in original).

40.     HB 4156's provisions also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. Congress granted the federal government the responsibility under federal law to regulate the entry of noncitizens and granted federal officers broad discretion in how those provisions are enforced. By purporting to empower state officials to police unlawful entry and reentry, HB 4156 interferes with the federal government's statutory authority to enforce the entry and re-entry provisions of federal law.

41.     HB 4156's criminal provisions also are preempted by various other federal statutory provisions, which together form a framework for state assistance with the federal government's immigration enforcement in certain respects. Congress has mandated that state officials may assist in the enforcement of immigration law only with adequate training and supervision by the federal government, 8 U.S.C. § 1357(g), and in specified circumstances, *see, e.g.*, *id.* § 1103(a)(10) (allowing the federal government to designate state officers for certain immigration enforcement functions in the face of an "imminent mass influx of" noncitizens); *id.* § 1252c(a) (state officers

J.A. 027

"are authorized to arrest and detain an individual who . . . is [a noncitizen] illegally present in the United States," but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody"); *id.* § 1324(c) (allowing state officers to arrest individuals for certain crimes of human smuggling).  None of these statutory provisions, however, permits a State to impose criminal penalties for illegal entry or reentry by noncitizens.

42.    Further, HB 4156 effectively criminalizes unlawful presence in Oklahoma for those noncitizens who previously entered the United States unlawfully. That is, HB 4156 does not punish unlawful entry itself—which will almost invariably take place in a State other than Oklahoma—but rather seeks to punish the noncitizen's subsequent presence in Oklahoma.  Federal law, by contrast, criminalizes the unlawful entry itself, *see* 8 U.S.C. § 1325(a), but not unlawful presence in the United States, *see Arizona*, 567 U.S. at 402-03, 405-06.  HB 4156 thus parallels federal law only to the extent that it asserts authority to punish, belatedly, a federal crime that occurred in a different State at a different time.

43.    To the extent Oklahoma seeks to arrest, detain, and prosecute unaccompanied children, such actions would conflict with the unique protections Congress has afforded such noncitizens.[3]  *See* 8 U.S.C. § 1232; 6 U.S.C. § 279.  Under federal law, an unaccompanied child generally must be transferred to the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS), which generally must place the child with a care provider in the least restrictive setting that is in the best interest of the child, 8 U.S.C. § 1232(c)(2)(A).

---

[3] This complaint uses the term "unaccompanied child" as equivalent to the statutory term "unaccompanied alien child."  *See* 6 U.S.C. § 279(g)(2).

J.A. 028

## COUNT II — FOREIGN COMMERCE CLAUSE

44.    Plaintiff realleges paragraphs 1 - 43.

45.    The Commerce Clause allows Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  "One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased."  *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976).  Under the Constitution, "[f]oreign commerce is pre-eminently a matter of national concern."  *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448 (1979).  And the Foreign Commerce Clause is one of the sources of Congress's power to regulate immigration through the INA and other statutes.  The Foreign Commerce Clause thus strongly reinforces the preemptive force of the federal immigration scheme as discussed above.

46.    Here, HB 4156 improperly regulates foreign commerce itself, which has long been understood to encompass the regulation of both persons and commodities.  *See United States v. Guest*, 383 U.S. 745, 758-59 (1966).  HB 4156 regulates *solely* the international movement of noncitizens into the United States (and ultimately into Oklahoma). "As to matters within the scope of the Commerce Clause power, Congress may choose to regulate, thereby preempting the states from doing so or to authorize the states to regulate."  *United States v. Durham*, 902 F.3d 1180, 1204 (10th Cir. 2018).  Even when "Congress is silent," the Supreme Court has interpreted the Commerce Clause to limit state regulation "by applying the negative implications of the Commerce Clause."  *Id.*

47.    HB 4156 "prevents this Nation from 'speaking with one voice' in regulating foreign commerce," which "risk[s] . . . retaliation" and places "impediments before this Nation's conduct of its foreign relations."  *Japan Line, Ltd.*, 441 U.S. at 452-

14

53.  For example, by penalizing noncitizens who unlawfully enter or reenter the United States, and displacing them from Oklahoma regardless of their circumstances, HB 4156 "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with [foreign countries]." *Biden v. Texas*, 597 U.S. 785, 806 (2022).

* * *

48.   Beyond the Impermissible Occupation and Unlawful Reentry provisions—which, as explained in Counts I and II, are both unlawful—the remaining, material HB 4156 provisions (Section 2(a) through (g) and Section 3) are ancillary to, and thus not severable from, the Impermissible Occupation and Unlawful Reentry provisions.[4]

## PRAYER FOR RELIEF

The United States respectfully requests that this Court:

a) Declare that HB 4156 violates the Supremacy Clause and Foreign Commerce Clause and is therefore invalid;

b) Preliminarily or permanently enjoin Defendants—as well as their successors, officers, agents, servants, employees, attorneys, and any other persons in active concert or participation with those individuals—from enforcing HB 4156;

c) Award the United States its costs in this action; and

d) Grant any other relief this Court deems just and proper.

---

[4] Section 2(h), by contrast, does not appear to be ancillary to the preempted provisions of HB 4156 and thus may be severable.

J.A. 030

DATED:  May 21, 2024            Respectfully submitted,

                                BRIAN M. BOYNTON
                                Principal Deputy Assistant Attorney General

                                ALEXANDER K. HAAS
                                Director, Federal Programs Branch

                                JEAN LIN
                                Special Litigation Counsel, Federal Programs
                                Branch

                                /s/  *Christopher A. Eiswerth*
                                CHRISTOPHER EISWERTH
                                Trial Attorney
                                U.S. Department of Justice
                                Civil Division, Federal Programs Branch
                                1100 L Street, NW
                                Washington, DC  20005
                                Phone: (202) 305-0568
                                Email:  christopher.a.eiswerth@usdoj.gov

                                *Counsel for the United States*

J.A. 031

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

THE STATE OF OKLAHOMA, *et al.*,

    Defendants.

Case No. 5:24-cv-00511-J

## UNITED STATES' MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION AND OPENING BRIEF IN SUPPORT

# TABLE OF CONTENTS

MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION .................. 1

OPENING BRIEF IN SUPPORT OF MOTION .................................................. 1

BACKGROUND .......................................................................................... 2

I.     Federal Immigration Scheme Governing Noncitizens' Entry and Removal .... 2

II.    Federal Efforts to Reduce and Deter Illegal Entry to the United States .......... 6

III.   Oklahoma's House Bill 4156 ........................................................................ 7

LEGAL STANDARDS ................................................................................ 10

ARGUMENT .............................................................................................. 10

I.     The United States Is Likely to Succeed on the Merits. ................................ 10

        A.    HB 4156 is preempted under the Supremacy Clause. ............... 10

        1.    Field preemption bars HB 4156's regulation of noncitizens' entry into, presence in, and removal from the United States. ........................................................................ 11

        2.    HB 4156 is conflict preempted by the federal immigration scheme. ................................................................................. 15

        B.    HB 4156 violates the Foreign Commerce Clause by regulating international movement of persons and by interfering with foreign relations. ........................................... 20

II.    Enforcement of HB 4156 Would Cause Irreparable Harm to the United States and the Public. ......................................................................................... 21

III.   Oklahoma Has No Countervailing Interest in Maintaining An Unconstitutional Law. ................................................................................. 23

IV.   The Court Should Enter A Permanent Injunction Because There Are No Material Facts in Dispute. ......................................................................... 25

CONCLUSION ........................................................................................... 25

J.A. 033

## TABLE OF AUTHORITIES

**Cases**

*Alfwear, Inc. v. Mast-Jägermeister, Inc.*,
   2020 WL 5943957 (D. Utah Oct. 7, 2020) ........................................................ 25

*Arizona v. United States*,
   567 U.S. 387 (2012) ...................................................................................*passim*

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875) .................................................................................... 15, 20

*Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*,
   628 F.2d 1289 (10th Cir. 1980) .......................................................................... 25

*Clark v. Martinez*,
   543 U.S. 371 (2005) ........................................................................................... 3

*DeCanas v. Bica*,
   424 U.S. 351 (1976) .......................................................................................3, 11

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) .....................................................................12, 13

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) ............................................................................... 20

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ........................................................................... 23

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ......................................................................................... 11

*Henderson v. Mayor of New York*,
   92 U.S. 259 (1875) ........................................................................................... 20

*Japan Line, Ltd. v. Los Angeles Cnty.*,
   441 U.S. 434 (1979) .............................................................................. 1, 19, 20

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ......................................................................................... 24

ii

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ........................................................ 24

*Mathews v. Diaz*,
    426 U.S. 67 (1976) .......................................................... 11

*Nat'l Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999) ..........................................20, 21

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989) ........................................................ 21

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................4, 10

*Osage Nation ex rel. Osage Minerals Council v. Wind Capital Grp., LLC*,
    2011 WL 5864368 (N.D. Okla. Nov. 22, 2011) ................................. 25

*Patel v. Garland*,
    596 U.S. 328 (2022) ........................................................ 12

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................ 18

*Prairie Band Potawatomi Nation v. Wagnon*,
    476 F.3d 818 (10th Cir. 2007) .............................................. 10

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .............................................. 10

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ........................................................ 12

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .............................................. 23

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ........................................................ 23

*Schrader v. Dist. Att'y of York Cnty.*,
    74 F.4th 120 (3d Cir. 2023) ................................................ 23

iii

*Truax v. Raich,*
    239 U.S. 33 (1915) ................................................................ 11

*United States v. Rosales-Aguilar,*
    818 F.3d 965 (9th Cir. 2016) ............................................... 9

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) ................................... 14, 19

*United States v. Durham,*
    902 F.3d 1180 (10th Cir. 2018) ......................................... 20

*United States v. Guest,*
    383 U.S. 745 (1966) .......................................................... 20

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ....................................... 13, 23

*United States v. Texas,*
    97 F.4th 268 (5th Cir. 2024) .......................................*passim*

*United States v. Texas,*
    599 U.S. 670 (2023) .......................................................... 12

*United States v. Texas,*
    --- F. Supp. 3d. ---, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) ..................*passim*

*United States v. Valenzuela-Bernal,*
    458 U.S. 858 (1982) .......................................................... 11

*United States v. Vasquez-Alvarez,*
    176 F.3d 1294 (10th Cir. 1999) ......................................... 13

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ........................................... 13

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ..................................... 17, 18, 19

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................ 10

J.A. 036

*Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
  475 U.S. 282 (1986) ............................................................. 18

*Zschernig v. Miller*,
  389 U.S. 429 (1968) ............................................................. 15

**Statutes**

6 U.S.C. § 202 .......................................................................... 3

6 U.S.C. § 205 ........................................................................ 15

6 U.S.C. § 211 ................................................................ 3, 4, 15

6 U.S.C. § 252 .......................................................................... 3

6 U.S.C. § 271 .......................................................................... 3

6 U.S.C. § 557 .......................................................................... 3

8 U.S.C. § 1103 ............................................................... *passim*

8 U.S.C. § 1158 .......................................................................... 4

8 U.S.C. § 1181 .................................................................. 3, 12

8 U.S.C. § 1182 ............................................................... *passim*

8 U.S.C. § 1188 .................................................................. 3, 12

8 U.S.C. § 1223 .......................................................................... 3

8 U.S.C. § 1224 .......................................................................... 3

8 U.S.C. § 1225 .............................................................. 3, 4, 19

8 U.S.C. § 1227 ............................................................. 4, 15, 19

8 U.S.C. § 1229 ................................................................. 4, 19

8 U.S.C. § 1229a .................................................... 3, 4, 12, 15

J.A. 037

8 U.S.C. § 1229b ........................................................................................ 15

8 U.S.C. § 1231 ....................................................................................4, 19

8 U.S.C. § 1252 ................................................................................ 4, 15, 24

8 U.S.C. § 1252c ..................................................................................5, 13

8 U.S.C. § 1253 ........................................................................................ 15

8 U.S.C. § 1324 ...............................................................5, 7, 17, 18, 24

8 U.S.C. § 1325 ................................................................................*passim*

8 U.S.C. § 1326 ................................................................................*passim*

8 U.S.C. § 1327 ..................................................................................7, 18

8 U.S.C. § 1328 ..................................................................................7, 18

8 U.S.C. § 1357 ................................................................................*passim*

8 U.S.C. § 1373 ...........................................................................................5

Okla. Stat. tit. 21, § 1795 .........................................................................1

**Constitutional Provisions**

U.S. Const. art. I, § 8 ...............................................................................3

U.S. Const. art. II, § 2 ..............................................................................3

U.S. Const. art. VI .............................................................................3, 10

**Rules**

Fed. R. Civ. P. 65 .................................................................................... 25

**Executive Materials**

Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 5, 2021) ....................... 6

J.A. 038

**Other Authorities**

142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) ................... 16

CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023),
  https://perma.cc/XQW4-55XW ........................................................................ 6

CBP, *Southwest Land Border Encounters*,
  https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters ......... 7

Cong. Rsch. Serv., *The 287(g) Program: State and Local Immigration Enforcement* (Aug.
  12, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11898 ................. 5

Oklahoma House Bill 4156 (to be codified at Okla. Stat. tit. 21, § 1795)
  (HB 4156) .................................................................................................*passim*

Press Release, Secretaría de Relaciones Exteriores (Apr. 10, 2024),
  https://perma.cc/36R4-JXHE ........................................................................ 9

Press Release, Secretaría de Relaciones Exteriores (April 30, 2024),
  https://perma.cc/E6Z4-HS7W ................................................................. 2, 9, 22

Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023),
  https://perma.cc/RP7H-JXZR ........................................................................ 9

The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023),
  https://perma.cc/92CW-APKE. ...................................................................... 6

J.A. 039

**MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION**

The United States moves for a preliminary or permanent injunction prohibiting the enforcement of Oklahoma House Bill 4156 (to be codified at Okla. Stat. tit. 21, § 1795) (HB 4156), which seeks to regulate noncitizens' entry into and presence in the United States by imposing state criminal penalties on noncitizens who have unlawfully entered or reentered the United States and are subsequently found in Oklahoma.  As explained in the supporting brief, HB 4156 violates the Supremacy and Foreign Commerce Clauses of the United States Constitution.  Because HB 4156 is set to take effect on July 1, 2024, the United States respectfully requests that the Court decide this motion as soon as possible to allow time for potential appellate review.

**OPENING BRIEF IN SUPPORT OF MOTION**

This Court should enjoin the enforcement of HB 4156 because admitting and removing noncitizens are core responsibilities of the federal government, as recognized by the Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012), and more than a century of precedent.  Recent rulings from the Western District of Texas and the Fifth Circuit addressing a similar Texas law confirm that HB 4156 is preempted because it intrudes into a field that Congress reserved exclusively for the federal government and conflicts with the federal immigration scheme.  *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (*Texas SB 4*) (denying stay pending appeal); *United States v. Texas*, --- F. Supp. 3d. ---, 2024 WL 861526, at *1 (W.D. Tex. Feb. 29, 2024) (*Texas SB 4*) (granting preliminary injunction).  HB 4156 also violates the Foreign Commerce Clause by seeking to regulate the international movement of persons and by impeding the United States' ability to "speak with one voice" in foreign relations.  *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 449 (1979).

Enforcement of HB 4156 would irreparably harm the United States at home and abroad and conflicts with the public interest.  As the Supreme Court has recognized, immigration policy can "affect trade, investment, tourism, and diplomatic relations for

1

the entire Nation," and "[p]erceived mistreatment of" noncitizens "in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395. HB 4156 would interfere with the United States' relations with other countries in at least three ways. First, it would antagonize foreign governments. The Government of Mexico, for example, has already expressed concern about HB 4156, *see* Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W, as it has done with Texas's and Iowa's recently enacted analogous laws. Second, it would undermine the United States' international efforts to address regional irregular migration. Third, it would risk reciprocal and retaliatory treatment of U.S. citizens abroad. Domestically, HB 4156 would frustrate Congress's objectives in establishing the comprehensive federal immigration scheme.

To the extent Oklahoma wishes to help with immigration enforcement, it can do so by working with the federal government through the statutory framework Congress established, *see* 8 U.S.C. § 1357(g), or by urging Congress to change the law. It may not usurp the federal government's authority in core areas of federal control. HB 4156 is the latest attempt by a State to create state-specific immigration laws, but it "is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona,* 567 U.S. at 395. HB 4156 contravenes that principle and should be enjoined.

## BACKGROUND

## I.     Federal Immigration Scheme Governing Noncitizens' Entry and Removal

The federal government has the "inherent power as sovereign to control and conduct relations with foreign nations." *Id.* Under the Constitution, the national government "make[s] Treaties," commissions and receives "Ambassadors, other public Ministers and Consuls," "regulate[s] Commerce with foreign Nations," and "establish[es] a[] uniform Rule of Naturalization." U.S. Const. art. I, § 8; *id.* art. II,

J.A. 041

§ 2.  These constitutional provisions and the federal laws enacted thereunder are "the supreme Law of the Land," preempting any contrary state laws.  U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399.

Congress has exercised its constitutional authority by codifying a "comprehensive federal statutory scheme for [the] regulation of immigration." *DeCanas v. Bica*, 424 U.S. 351, 353 (1976).  The Immigration and Nationality Act (INA) sets forth detailed rules governing the entry and reentry of noncitizens.[1]  It identifies who may enter, *see*, *e.g.*, 8 U.S.C. §§ 1181-82, 1188, and how they may enter, *see*, *e.g.*, 8 U.S.C. §§ 1223-25.  It imposes both criminal and civil penalties on those who unlawfully enter the United States.  Section 1325 of Title 8, for example, makes it a crime for "[a]ny [noncitizen]" to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers," and violators may be fined and/or imprisoned for up to two years.  Similarly, § 1326 mandates fines, imprisonment "not more than 2 years, or both" for any noncitizen "who has been denied admission" or "removed" and subsequently "enters, attempts to enter, or is at any time found in, the United States."

In addition, Congress has established a comprehensive enforcement apparatus to address unlawful entry and reentry into the United States.  *See generally* 6 U.S.C. §§ 202, 211, 252, 271; 8 U.S.C. §§ 1103(a), 1225, 1229a, 1325, 1326.  The Secretary of Homeland Security, for example, is given "the power and duty to control and guard" against illegal entry and to "perform such other acts" as "necessary for carrying out [such] authority."  8 U.S.C. § 1103(a)(3), (5); *see* 6 U.S.C. § 202 (tasking the Secretary with "[e]stablishing national immigration enforcement policies and priorities"); *see also*

---

[1] After the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

3

8 U.S.C. § 1357(a) (authorizing federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States" or already "in the United States").  The Department of Homeland Security's component agency, U.S. Customs and Border Protection—in coordination with U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services—is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of "persons unlawfully entering, or who have recently unlawfully entered, the United States."  6 U.S.C. § 211(c)(8); *see id.* § 211(e)(3) (assigning Border Patrol "primary responsibility for interdicting persons attempting to illegally enter . . . the United States . . . at a place other than a designated port of entry").

Congress has also comprehensively regulated the removal of noncitizens. Federal law identifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed.  *See* 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1231(a)-(b).  Congress has provided for judicial review of final removal orders, *see id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009), and instructed that, "unless otherwise specified [in the INA]," removal proceedings under 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed from the United States," *id.* § 1229a(a)(3).  Noncitizens may apply for relief or protection from removal.  *See, e.g.*, *id.* §§ 1158(a)-(b) (asylum), 1231(b)(3) (withholding of removal).

Under this comprehensive framework, States have specific avenues for participating in immigration enforcement.  For example, the federal government may "authorize any State or local law enforcement officer" to perform immigration duties in the face of an "imminent mass influx of" noncitizens.  8 U.S.C. § 1103(a)(10).  And

4

state officers are given the "authority" to arrest individuals for certain crimes of human smuggling. *See id.* § 1324(c). State officers are also "authorized to arrest and detain an individual" who "is [a noncitizen] illegally present in the United States" but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody." *Id.* § 1252c. And under 8 U.S.C. § 1357(g), "the [Secretary of Homeland Security] may enter into a written agreement with a State" allowing state officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" as consistent with state law. The State must "certif[y]" that such state officers "performing the function under the agreement have received adequate training" and, "[i]n performing [that] function," the officers "shall be subject to the direction and supervision of the [Secretary]." *Id.* § 1357(g)(2)-(3). Historically, many state and local law enforcement entities have used § 1357(g) agreements to assist in immigration enforcement. By 2020, there were 150 such agreements. Cong. Rsch. Serv., *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11898.

Beyond formal agreements, § 1357(g) also allows States to "communicate with the [Secretary] regarding the immigration status of any individual" and "to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A)-(B); *see id.* § 1373 (addressing communication between DHS and state and local governments regarding citizenship and immigration status). Such cooperation could include participation in a "joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.

## II.     Federal Efforts to Reduce and Deter Illegal Entry to the United States

The federal government has been using its enforcement authority to address unlawful entry and reentry.  "Individuals and families without a legal basis to remain in the U.S. continue to be subject to removal," and from May to November 2023, "DHS removed or returned over 400,000 individuals."  CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW.  These removal numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceed[] the annual totals for each year 2015-2018."  *Id.*  "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014-2019)."  *Id.*

However, sustainably reducing irregular migration in, from, and through North and Central America requires cooperation between the United States and other foreign governments.  As part of its comprehensive strategy to address the root causes of irregular migration, *see* Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 5, 2021), the United States has established long-term strategic partnerships with governments in the region.  Declaration of Eric Jacobstein Decl. ¶¶ 17-23 (attached as Exhibit 1).  To that end, for example, in late December 2023, senior U.S. officials, including the Secretary of State and the Secretary of Homeland Security met with the President of Mexico.  The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE.  The two countries "affirm[ed] their existing commitments to fostering orderly, humane, and regular migration, including reinforcing the countries' root causes partnership and cooperating to disrupt human smuggling, trafficking, and criminal networks."  Jacobstein Decl. ¶ 21.  The Mexican President has also "stressed the need to continue the diplomatic and political engagement with all countries in the region."  *Mexico-U.S. Joint Communique*.  The Secretary of State and the Mexican Foreign Secretary have continued to meet to pursue cooperative efforts on migration.  Jacobstein Decl. ¶ 21.

These efforts have yielded results not only in the United States but also in the broader region. Border Patrol has encountered fewer migrants at the U.S.-Mexico border in the first months of 2024 than the same months in 2023. *See* CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited May 22, 2024). As of August 2023, countries in Latin America and the Caribbean have been able to host 6.5 million of 7.7 million displaced Venezuelans. Jacobstein Decl. ¶ 22. Colombia alone has granted temporary protected status to more than 2 million Venezuelans, and Brazil has resettled more than 200,000 refugees and migrants. *Id.*

## III.    Oklahoma's House Bill 4156

Despite the existence of a comprehensive federal immigration framework, as well as the current enforcement and diplomatic efforts by the United States, Oklahoma enacted HB 4156 seeking to regulate noncitizens' entry and reentry into, and presence in, the United States. The new law contains two principal provisions, each of which is similar to analogous provisions of Texas's now-enjoined law, SB 4.

First, under HB 4156, a noncitizen commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States" (the "Impermissible Occupation" provision). HB 4156 § 2(B), (C)(1). This provision effectively makes it a state crime for a noncitizen to be present in Oklahoma if they did not have authorization to enter the United States. HB 4156 tracks the federal unlawful-entry provision, 8 U.S.C. § 1325(a) (barring noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers"), but punishes only those noncitizens who subsequently enter and continue to be present in Oklahoma.

The Impermissible Occupation provision contains affirmative defenses. It provides that "[i]t shall be an affirmative defense to prosecution" for violating the

Impermissible Occupation provision if (i) "[t]he federal government has granted the defendant . . . lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code"; or  (ii) "[t]he defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals [("DACA")] program between June 15, 2012, and July 16, 2021."  HB 4156 § 2(F).

A violation of the Impermissible Occupation provision is generally a misdemeanor "punishable by imprisonment" for up to one year and/or a fine of up to $500, but could, under certain circumstances, constitute a "felony punishable by imprisonment" for up to two years and/or a fine of up to $1,000.  HB 4156 § 2(C)(1)-(2).  HB 4156 requires a convicted noncitizen "to leave [Oklahoma] within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

Second, HB 4156 makes it a state crime for noncitizens to "enter[], attempt[] to enter, or . . . at any time [be] found in Oklahoma" if they previously have been "denied admission, excluded, deported, or removed" or have "departed the United States while an order of exclusion, deportation, or removal is outstanding" (the "Unlawful Reentry" provision).  HB 4156 § 2(D).  This provision effectively imposes state criminal penalties on those who violate 8 U.S.C. § 1326(a), which generally bars noncitizens from "enter[ing], attempt[ing] to enter, or" being "found in, the United States" if they previously have been "denied admission, excluded, deported, or removed" or "ha[ve] departed the United States while an order of  exclusion, deportation, or removal is outstanding."

The Unlawful Reentry provision contains two exceptions, which appear to be attempts to track those in 8 U.S.C. § 1326(a)(2).  The provision does not apply if (i) prior to departing for the United States, "the United States Attorney General has

expressly consented to such [noncitizen's] reapplying for admission,"[2] or (ii) if the noncitizen was "previously denied admission and removed," the noncitizen "established that he or she was not required to obtain such advance consent under" Section 2 of HB 4156 "or any prior statute." HB 4156 § 2(D). A violation of HB 4156's Unlawful Reentry provision is a felony punishable by imprisonment for up to two years and/or a fine of up to $1,000. *See* HB 4156 §§ (C)(2), (D). And a person convicted of violating the Unlawful Reentry provision must "leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." HB 4156 § 2(C)(2), (D).

Mexico has "expresse[d] its concern over the signing into law of Oklahoma HB4156," Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), https://perma.cc/E6Z4-HS7W, as it did when Texas enacted SB 4, *see* Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR, and when Iowa enacted another analogous law, Senate File 2340, *see* Press Release, Secretaría de Relaciones Exteriores (Apr. 10, 2024), https://perma.cc/36R4-JXHE.

On May 15, 2024, the United States sent a letter to Oklahoma, explaining that HB 4156 violates the United States Constitution, and notifying Oklahoma of its intent "to bring a lawsuit to enforce the supremacy of federal law and to enjoin the enforcement of HB 4156." *See* ECF No. 1-1. In response, Attorney General Drummond stated that Oklahoma would not refrain from enforcing HB 4156. *See* ECF No. 1-2. In his view, the law "supplement[s] federal prohibitions with robust state penalties," *id.* at 2, and Oklahoma can enforce federal immigration "restrictions more effectively," *id.* (quoting *Arizona*, 567 U.S. at 437 (Scalia, J., dissenting in part)).

---

[2] Although the federal statutory counterpart to this exception still refers to the U.S. Attorney General, *see* 8 U.S.C. § 1326(a)(2)(A), the Secretary of Homeland Security has been substituted for the Attorney General. *See, e.g., U.S. v. Rosales-Aguilar*, 818 F.3d 965, 971 n.1 (9th Cir. 2016); *see also* 8 U.S.C. § 1182(a)(9)(C)(ii).

The United States then filed this suit on May 21, 2024, and now moves for an order enjoining enforcement of HB 4156.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the federal government seeks a preliminary injunction, the second and fourth factors merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken,* 556 U.S. at 436. Obtaining a permanent injunction requires a "remarkably similar" showing, but the movant must establish actual success on the merits. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

## ARGUMENT

**I.    The United States Is Likely to Succeed on the Merits.**

**A.  HB 4156 is preempted under the Supremacy Clause.**

Under the Supremacy Clause, federal law is "the supreme Law of the Land," preempting any contrary state laws. U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399. While the Constitution or Congress can explicitly preempt state law, they can also do so implicitly in two ways. *Arizona*, 567 U.S. at 399. First, through field preemption, they can preclude States "from regulating conduct in a field that" Congress commits to the federal government's "exclusive governance." *Id.* Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* (cleaned up). Second, "state laws are preempted when they conflict with federal law," either because compliance with both "is a physical

impossibility" or because the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Because HB 4156 intrudes into a field of exclusive federal control and conflicts with the federal immigration scheme, it is both field and conflict preempted.

### 1. Field preemption bars HB 4156's regulation of noncitizens' entry into, presence in, and removal from the United States.

HB 4156 is field preempted because it seeks to regulate conduct—the entry, continued presence, and removal of noncitizens in the United States—that Congress has committed to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399. There is both a dominant federal interest at stake and a comprehensive legislative scheme "so pervasive that Congress left no room for the States to supplement it." *Id.* (cleaned up).

The federal government has a dominant interest in deciding "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355. The Supreme Court has long held that the "authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal [G]overnment," *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also Mathews v. Diaz*, 426 U.S. 67, 84 (1976) (recognizing "the exclusive federal power over the entrance and residence of [noncitizens]"), just as "the removal process is entrusted to the discretion of the Federal Government," *Arizona*, 567 U.S. at 409. "[T]he power to regulate immigration" is "an attribute of sovereignty essential to the preservation of any nation," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982), and the United States' "policy toward [noncitizens] is vitally and intricately interwoven with . . . the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Indeed, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws."

*Arizona*, 567 U.S. at 395.   Thus, the "discretionary decisions" on immigration regulation "involve policy choices that bear on this Nation's international relations," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Id.* at 396-97.

In an exercise of the National Government's paramount authority in this area, Congress enacted the INA, which today comprehensively regulates the entry and removal of noncitizens. *See Patel v. Garland*, 596 U.S. 328, 331 (2022).  Congress has provided that unless otherwise specified in the INA, 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizens] has been so admitted, removed from the United States."  8 U.S.C. § 1229a(a)(3); *see also id.* §§ 1181-88, 1201-04, 1225, 1228, 1231(a)(5).  Congress has specified when a noncitizen's entry or reentry into the United States is a crime. *Id.* §§ 1324-28; *see Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("*GLAHR*") (recognizing a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States).  And Congress has provided immigration officers with broad and often unreviewable discretion in exercising the authorities it has vested in them.  *See* Background § I, *supra*; *see also United States v. Texas*, 599 U.S. 670, 679-80 (2023); *Arizona*, 567 U.S. at 396, 409; *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84, 485 n.9 (1999).  It intentionally left States only a specified and narrow role.  *See* Background § I, *supra*.

Because Congress has thus fully occupied the field of noncitizen entry and removal, there is "no room for the States to supplement it," even with "complementary state regulation." *Arizona*, 567 U.S. at 399, 401.  Oklahoma's effort to do so is field preempted just as the state noncitizen-registration statute was in *Arizona*.  There, the State attempted to "add[] a state-law penalty for conduct proscribed by federal law,"

12

J.A. 051

*id.* at 400, where "[t]he federal statutory directives [had] provide[d] a full set of standards," including "the punishment for noncompliance," and the statutory framework "was designed as a harmonious whole," *id.* at 401. The Supreme Court concluded that "[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with the careful framework Congress adopted." *Id.* at 402.

The same is true here. HB 4156 seeks to criminalize conduct already proscribed by federal law—the unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325 and 1326—despite the comprehensive federal immigration scheme governing such conduct. Under *Arizona*, therefore, HB 4156 is "impermissible" even if it is a "complementary state regulation." 567 U.S. at 401. Otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even [when] federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. Indeed, since *Arizona*, courts have repeatedly held that state immigration crimes paralleling their federal counterparts are field preempted. *See, e.g.*, *GLAHR*, 691 F.3d at 1263-64; *United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013).[3]

HB 4156 further intrudes on the federal government's exclusive authority to remove noncitizens from the United States. *See Arizona*, 567 U.S. at 409. HB 4156

---

[3] The Tenth Circuit's decision in *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1300 (10th Cir. 1999), is not to the contrary. That case upheld a state officer's authority to arrest a noncitizen for a suspected violation of 8 U.S.C. § 1326 despite the authorization in 8 U.S.C. § 1252c permitting state officer arrests in a narrower set of circumstances. Notably, in that case, a federal officer had requested that the state officer arrest the noncitizen and the state officer thereafter turned the noncitizen over to the federal government for prosecution. *See* 176 F.3d at 1296. The court did not address efforts by state officers to enforce immigration law independent of the federal government—a topic that was subsequently addressed by the Supreme Court in *Arizona*—much less suggest that a State could prosecute and impose penalties for immigration violations.

13

J.A. 052

purports to require noncitizens convicted of violating HB 4156 to leave Oklahoma within 72 hours following their conviction or release from custody, whichever is later. *See* HB 4156 § 2(C)(1)-(2). But *Arizona* made clear that removal is "entrusted to the discretion of the Federal Government," 567 U.S. at 409, and States cannot interfere with the federal government's authority to remove noncitizens. *United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) (holding indirect efforts to expel noncitizens from Alabama preempted). If "every State could give itself independent authority" to exile noncitizens from its territory, it would "diminish" the federal government's exclusive control over removal and "detract[] from the integrated scheme of regulation." *Arizona*, 567 U.S. at 402 (cleaned up). Oklahoma's provision is no more lawful as the first state law to be enacted than if it were the 50th.

Recent rulings concerning Texas's similar law, SB 4, confirm that HB 4156 is field preempted. SB 4—which likewise criminalized illegal entry and reentry—was preliminarily enjoined by the U.S. District Court for the Western District of Texas. The court explained that "the federal government has a dominant and supreme interest in the field of" noncitizen entry and removal and that "[t]he country's immigration laws are massive, sprawling, detailed, complex, and pervasive." *Texas SB 4*, 2024 WL 861526, at *11-14. And after comparing Texas's analogous law with the state law at issue in *Arizona*, the court concluded that Texas's law was likely field preempted. *Id.* at *15-16. The Fifth Circuit, in denying a stay pending appeal, conducted a similarly detailed analysis and echoed the district court's ruling: "there is strong support for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation." *Texas SB 4*, 97 F.4th at 287-88.

At bottom, allowing a single State to make determinations regarding noncitizen entry and continued presence would permit a State "at her pleasure" to "embroil us in disastrous quarrels with other nations." *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875);

*accord Arizona*, 567 U.S. at 395.  There could be no "great[er] potential for disruption or embarrassment" than the chaos that would ensue from 50 different immigration systems with varying (and likely conflicting) provisions for illegal entry and noncitizen removal.  *Zschernig v. Miller*, 389 U.S. 429, 435 (1968).  HB 4156's intrusion into the field of noncitizen entry, continued presence, and removal is preempted.

## 2. HB 4156 is conflict preempted by the federal immigration scheme.

Oklahoma's law also stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.

First, as an overarching matter, HB 4156 would undermine the United States's ability to "ensure that enforcement policies are consistent with this Nation's foreign policy," *id.* at 397, 402, and to speak with "one voice" in matters involving foreign relations, *id.* at 409.  The prosecution of noncitizens for immigration offenses necessarily has consequences for the United States' relationship with other countries, and "[p]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* at 395.  It is paramount that the federal government determines whether to impose immigration consequences, just as it is "fundamental" that foreign governments must be able to "confer and communicate on this subject with one national sovereign, not the 50 separate States," *id.*  For these reasons, Congress has comprehensively defined immigration offenses and their consequences, *see, e.g.*, 8 U.S.C. §§ 1182(a), 1227(a), 1229a, 1253, 1325, 1326, and granted the Executive Branch significant discretion to enforce that scheme, with judicial review in federal courts, *see, e.g.*, 6 U.S.C. §§ 205(5), 211(c)(8); 8 U.S.C. §§ 1103, 1229a(c)(4), 1229b, 1252.  *See generally Arizona*, 567 U.S. at 395-96, 407-10.

Oklahoma's attempt to punish foreign nationals for immigration violations and to exile them from the State without regard to the interests of the Nation is patently inconsistent with the framework Congress enacted.  *See Arizona*, 567 U.S. at 406 (holding that even though Arizona's law "attempts to achieve one of the same goals

as federal law," it "would interfere with the careful balance struck by Congress"); *Texas SB 4*, 2024 WL 861526, at *21. As the Fifth Circuit explained, "[t]he INA provides the federal government discretion to decide whether to initiate criminal proceedings or civil immigration proceedings once a noncitizen is apprehended." *Texas SB 4*, 97 F.4th at 289. Yet Oklahoma's "scheme blocks this exercise of discretion" because a noncitizen apprehended for allegedly violating HB 4156 "is charged with a crime, and the federal government has no voice in further proceedings." *Id.* Put simply, "[a]n arrest or conviction [under HB 4156] would interfere with federal law because the [Oklahoma] process for arrests and convictions suppresses or subverts federal authority over a noncitizen's status in the United States." *Id.*

Second, HB 4156 exceeds the limited role that Congress assigned state officers in enforcing immigration law. Consistent with the paramount national interests discussed above, Congress provided for only "limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408, 409. In each of those circumstances, state officers are subject to the oversight of federal officials, who take the lead in fashioning enforcement priorities and techniques that the state officers must respect. *See* Background § I, *supra*. Most prominently, States may enter into an agreement with DHS to allow qualified state officers to carry out functions of an immigration officer "subject to the direction and supervision of the [Secretary of Homeland Security]," and only after they have "received adequate training." 8 U.S.C. § 1357(g)(2)-(3); *see Arizona*, 567 U.S. at 408-09; 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (statement of Rep. Cox) (recognizing that such agreements ensure that "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards"). Outside formal agreements, state officers may "cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not lawfully present in the United States." 8 U.S.C.

§ 1357(g)(10)(B).  But "no coherent understanding of the term ['cooperate'] would incorporate the unilateral decision of state officers to arrest a[] [noncitizen] for being [illegally present in the United States] absent any request, approval, or other instruction from the Federal Government."  *Arizona*, 567 U.S. at 410.  And even in circumstances where Congress authorizes state officers to arrest noncitizens unlawfully present in the United States, any detention may last only until the noncitizen could be delivered into federal custody for appropriate proceedings under federal law.  *See* 8 U.S.C. § 1252c(a).

Oklahoma's law flouts these narrow provisions for state participation.  *See* Background § I, *supra*; 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c).  Those provisions mean nothing if States can enact their own immigration crimes and then arrest, detain, prosecute, and punish noncitizens without federal authorization, without any special training, and without being "subject to the direction and supervision of the" United States.  *Id.* § 1357(g)(3); *see Texas SB 4*, 97 F.4th at 293.  HB 4156 thus conflicts with federal law by "go[ing] far beyond" the measures contemplated by Congress, "defeating any need for real cooperation" and "allow[ing] the State to achieve its own immigration policy."  *Arizona*, 567 U.S. at 408, 410.  Put differently, HB 4156 "and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority."  *Texas SB 4*, 2024 WL 861526, at *23; *see also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc) (plurality) (local ordinance criminalizing the housing of noncitizens preempted, despite claim that ordinance will concurrently enforce federal anti-harboring law, in part because the ordinance purported to give state officials authority to act as immigration officers outside the limited circumstances specified in § 1357(g)).

Third, the specifics of HB 4156 further illustrate the incompatibility of the Oklahoma law and the federal immigration framework.  For example, HB 4156 does

17

not just punish unlawful entry itself—which will almost invariably take place in a State other than Oklahoma—but rather seeks to punish the noncitizen's subsequent presence in Oklahoma.  Unlawful presence is not, as a general matter, a criminal offense, *see Arizona*, 567 U.S. at 407, so HB 4156 parallels federal law only to the extent that it asserts authority to punish, belatedly, a federal crime that occurred in a different State at a different time.  Moreover, even if 4156's Impermissible Occupation and Unlawful Reentry provisions did parallel 8 U.S.C. §§ 1325 and 1326, they authorize different punishments.  *Compare, e.g.*, 8 U.S.C. § 1325(a)-(b) *with* HB 4156 § (C)(1)-(2), (G).  And the Supreme Court has recognized that when "two separate remedies are brought to bear on the same activity," "conflict is imminent." *Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986).[4]

For another example, the Impermissible Occupation provision includes an affirmative defense for when "[t]he federal government has granted" a noncitizen "lawful presence in the United States."  HB 4156 § F(1).  But federal law does not supply one definition of "lawful presence"; it means different things in different contexts.  Allowing state judges to determine noncitizens' immigration status, purportedly based on their reading of federal law, is impermissible because "[t]he federal government alone . . . has the power to classify non-citizens." *Farmers Branch*, 726 F.3d at 536 (citing *Arizona*, 567 U.S. at 409-10).  And there are "significant complexities" in determining immigration status.  *Id.* (quoting *Arizona*, 567 U.S. at 409); *see also Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which [noncitizens] are entitled to residence, and which eventually will be deported.").  State determinations of whether the federal government has "granted" a particular

---

[4] To the extent that Oklahoma seeks to arrest, detain, or prosecute unaccompanied children, HB 4156 also conflicts with the protections Congress has provided to such noncitizens.  *See* 8 U.S.C. § 1232; 6 U.S.C. § 279.

noncitizen "lawful presence" also would "open[] the door to conflicting state and federal rulings." *Farmers Branch*, 726 F.3d at 536.

Fourth, Oklahoma's requirement that any noncitizen convicted of violating HB 4156 must "leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later," HB 4156 § (C)(1)-(2), conflicts with the carefully calibrated federal removal scheme, *e.g.*, 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1229a, 1231(a)-(b). *See Texas SB 4*, 97 F.4th at 291. It is immaterial that HB 4156 requires removal only from the State rather than the United States because only the federal government has authority to preclude a noncitizen from being in the 50 States. Even one state-specific immigration regime upsets the balance Congress struck in addressing the presence, status, and removal of noncitizens. *See Alabama*, 691 F.3d at 1295 & n.21.[5]

In sum, HB 4156 does exactly what the Supreme Court warned against: It conflicts with the federal immigration scheme and undermines the federal government's ability to engage in a sensitive balancing of United States' foreign relations and other interests when making immigration enforcement decisions. *See Arizona*, 567 U.S. at 409-10. It allows state officials' "unilateral enforcement" of the prohibitions on illegal entry and reentry (8 U.S.C. §§ 1325, 1326) without the federal authorization, oversight, or training required by federal law. *See id.* at 410. And it arrogates to state officials the power to expel noncitizens from its territory, without regard to the federal government's exclusive authority to determine a noncitizen's presence in the United States. Accordingly, HB 4156 is conflict preempted.

---

[5] A law prohibiting a noncitizen from being present in Oklahoma also raises additional constitutional problems with respect to the regulation of interstate travel, comity among States, and the central premise that we are one Nation in the field of immigration. *See, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 65-68 (1941).

**B. HB 4156 violates the Foreign Commerce Clause by regulating international movement of persons and by interfering with foreign relations.**

HB 4156 also violates the Foreign Commerce Clause, which recognizes that "[f]oreign commerce is pre-eminently a matter of national concern." *Japan Line*, 441 U.S. at 448. "In international relations and with respect to foreign intercourse and trade[,] the people of the United States act through a single government with unified and adequate national power." *Id.* Simply put, "[t]he commerce of the United States with foreign nations, is that of the whole United States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824); *see United States v. Durham*, 902 F.3d 1180, 1204 (10th Cir. 2018) ("The dormant Commerce Clause doctrine extends to state regulation that may conflict with Congress's foreign commerce regulatory authority."). And the power to regulate commerce has long been understood to encompass the regulation of both *persons* and commodities. *See, e.g.*, *United States v. Guest*, 383 U.S. 745, 758-59 (1966); *Texas SB 4*, 2024 WL 861526, at *24 ("The Supreme Court has repeatedly emphasized that the movement of persons between states is commerce."); *see also Henderson v. Mayor of New York*, 92 U.S. 259, 274 (1875) (holding state statute regulating shipmasters bringing foreign passengers to the United States violated the dormant Foreign Commerce Clause); *Chy Lung*, 92 U.S. at 280.

In assessing state laws implicating foreign commerce rather than interstate commerce, "a more extensive constitutional inquiry is required." *Japan Line*, 441 U.S. at 446. That inquiry is necessary because, if a state law disadvantages foreign countries, those countries may retaliate "so that the Nation as a whole would suffer." *Id.* at 450. The Foreign Commerce Clause analysis must therefore examine whether the law discriminates against or unduly burdens foreign commerce, as well as whether the state law would "prevent[] the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" *Id.* at 451; *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 68 (1st Cir. 1999*), aff'd sub nom. Crosby v.*

*Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  If so, the law is unconstitutional.

Under that analysis, HB 4156 is unconstitutional.  It discriminates against foreign commerce on its face: it imposes criminal penalties only on noncitizens who travel into the United States from abroad and end up in Oklahoma, but says nothing about purely intrastate or interstate travelers—except to the extent it impermissibly banishes noncitizens from the State.[6]  Even if HB 4156 were nondiscriminatory, it still targets only noncitizens, criminalizing their movements and ordering their removal from the State, thereby disrupting the uniform immigration laws and preventing the federal government from conveying a unified message in the sensitive area of foreign affairs.  *See Texas SB 4*, 2024 WL 861526, at \*24 (recognizing that Texas's analogous law facially "discriminates against foreign commerce" and "undermin[es] the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states"); Argument § I.A, *supra*.

## II.    Enforcement of HB 4156 Would Cause Irreparable Harm to the United States and the Public.

The United States and the public will suffer irreparable harm if HB 4156 takes effect.  As courts have explained, irreparable harm necessarily results from enforcement of a preempted state law.  *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989); *Texas SB 4*, 2024 WL 861526, at \*38 (collecting cases and explaining that "the United States has shown irreparable harm as a matter of law" if a preempted state law is enforced).  HB 4156's violation of the Supremacy Clause alone suffices to establish harm.

---

[6] While HB 4156 does not look like the protectionist economic regulations that usually arise under the dormant Commerce Clause, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." *Natsios*, 181 F.3d at 67.  And "[e]ven if [HB 4156] is consistent with federal purposes, it cannot be saved by a showing that it is consistent with the purposes behind federal law." *Texas SB 4*, 2024 WL 861526, at \*24 n.27.

But HB 4156's harm would extend further.  Internationally, HB 4156 would harm the United States' relationship with foreign nations, including Mexico, in multiple ways.  Jacobstein Decl. ¶¶ 8-26.  It would antagonize foreign governments, and indeed, it already has.  Mexico has expressed concern about HB 4156, *see* Press Release, Secretaría de Relaciones Exteriores (April 30, 2024), https://perma.cc/E6Z4-HS7W, just as it did with Texas's and Iowa's comparable laws, *see* p. 9, *supra*.  State laws that unfavorably treat noncitizens strain diplomatic relations and make it more difficult for foreign governments to cooperate with the United States on trade agreements, disaster response arrangements, anti-terrorism and anti-drug trafficking efforts, and other priority U.S. goals.  Jacobstein Decl. ¶¶ 9-16; *see Texas SB 4*, 97 F.4th at 295 ("there is a high risk that enforcement of [such laws] would cause international friction").  HB 4156 also risks undermining the long-term strategic partnerships that the United States has formed or seeks to form with other governments in the region to reduce irregular migration.  These diplomatic efforts, including the establishment and strengthening of other countries' asylum systems, have resulted in a significant reduction of irregular migration into the United States.  Jacobstein Decl. ¶ 22.  HB 4156 undermines the United States' ability to partner with other countries and may weaken other countries' commitment to providing protections to refugees and other vulnerable migrants, ultimately resulting in greater flows of migrants north to the United States.  *Id.* ¶ 23.  And lastly, HB 4156 risks exposing United States citizens abroad to reciprocal and retaliatory treatment and may impair U.S. citizens' ability to travel, conduct business, or live abroad.  *Id.* ¶¶ 24-25; *see Arizona*, 567 U.S. at 395 ("Perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad.").

Domestically, HB 4156 would displace federal officers' exercise of discretion in enforcing the immigration laws, including their choice between criminal prosecution and removal.  And because HB 4156 does not provide for abatement of a state

prosecution despite pending federal immigration proceedings, HB 4156 enforcement proceedings against noncitizens may interfere with those noncitizens' ability to participate in federal immigration proceedings that could ultimately lead to the adjustment of their immigration status in the United States. *See* Declaration of Russell Hott ¶¶ 18-19 (attached as Exhibit 2). "Other forms of irreparable harm will follow from [HB 4156's] enforcement, too numerous to spell out in detail." *Texas SB 4*, 2024 WL 861526, at *39; *see id.* at *38-39 (discussing various other irreparable harms); *see generally* Jacobstein Decl. ¶¶ 8-26; Hott Decl. ¶¶ 18-21.

These harms are compounded by the fact that, if HB 4156 is allowed to stand, other States could be emboldened to impose similar restraints. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same"). This could create a problematic "patchwork" system of laws, *id.*; *see* Jacobstein Decl. ¶ 7; Hott Decl. ¶ 21, and have a disastrous impact on the federal government's ability to carry out its core immigration functions, not to mention undermining the United States' conduct of foreign affairs. *See South Carolina*, 720 F.3d at 533 ("[T]he likelihood of chaos resulting from [a State] enforcing its separate immigration regime is apparent."). For these reasons and others offered in the attached declarations, this Court should find that the United States and the public would suffer irreparable harm from the enforcement of HB 4156.

### III.    Oklahoma Has No Countervailing Interest in Maintaining An Unconstitutional Law.

In contrast to the irreparable harm likely to be suffered by the United States and the public, Oklahoma has no legitimate interest in running its own unconstitutional immigration system; it "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Texas SB 4*, 2024 WL 861526, at *41. And "enforcement of an unconstitutional law is always

contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *accord Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023).

In any event, Oklahoma would not be harmed by an injunction here. Oklahoma is free to assist in the enforcement of federal immigration law by proceeding under the framework Congress established. *See, e.g.*, 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c), 1357(g). It may, for example, enter an agreement with the federal government to aid in the "investigation, apprehension, or detention of [noncitizens] in the United States" if state officers receive adequate training and are "subject to the direction and supervision of the" federal government. *Id.* § 1357(g). But Oklahoma has no lawful interest in encroaching on an exclusive federal domain. This is nothing new for Oklahoma. The United States has been enforcing the *federal* crimes of illegal entry and reentry (§§ 1325 and 1326) since they were enacted in 1952. Oklahoma has gone at least seven decades without an unconstitutional state counterpart like HB 4156. Moreover, Oklahoma remains free to enforce its generally applicable criminal laws that prohibit drug, sex, or labor trafficking, which apply to citizens and noncitizens alike. *See* HB 4156 § 1(B); *Kansas v. Garcia*, 589 U.S. 191, 211-13 (2020).

Finally, in a suit brought by the United States, Oklahoma can assert no legally cognizable interest in protecting its citizens from purported immigration-related harms. As explained above, the entry, presence, and removal of noncitizens is an exclusively federal field. And "[i]n that field it is the United States, and not the [S]tate, which represents" Oklahomans; "to the former, and not to the latter, they must look for such protective measures as flow from that status." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see Texas SB 4*, 97 F.4th at 296 ("[T]he Supreme Court explained in *Hines v. Davidowitz* [312 U.S. at 52] that state and local interests are subservient to those of the nation at large, at least with regard to matters regarding foreign relations."); *Texas SB 4*, 2024 WL 861526, at *40 ("The United States is asserting its sovereign power to regulate a field dedicated to the federal government.

[A State] may disagree with the federal government's policy decisions, but they are the federal government's to make."). At bottom, any interest the State could muster cannot outweigh the imminent and irreparable harm to the United States and the public from enforcing an unconstitutional state statute.

## IV.  The Court Should Enter A Permanent Injunction Because There Are No Material Facts in Dispute.

Because the purely legal issues in this motion are dispositive, the Court could proceed directly to final judgment under either Rule 56 or Rule 65. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."). Rule 65(a)(2) was "designed to efficiently expedite final disposition of an injunctive action" by making "evidence introduced at a [preliminary-injunction] hearing . . . admissible at trial." *Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1298-99 (10th Cir. 1980). "[W]hen the relief demanded by the complaint is the same as the relief in the motion for preliminary injunction, consolidation is warranted." *Alfwear, Inc. v. Mast-Jägermeister, Inc.*, 2020 WL 5943957, at *2 (D. Utah Oct. 7, 2020) (citing *Osage Nation ex rel. Osage Minerals Council v. Wind Capital Grp., LLC*, 2011 WL 5864368, at *1 (N.D. Okla. Nov. 22, 2011)). Here, the Court can, and should, simply apply the Supremacy Clause and the Foreign Commerce Clause to the undisputed facts and enter a permanent injunction in favor of the United States.

## CONCLUSION

For the reasons explained above, the Court should grant the United States' motion for a preliminary or permanent injunction and enjoin the enforcement of HB 4156 or enter any other equitable relief the Court deems appropriate. The United States respectfully requests that the Court rule on this motion as soon as possible to allow for potential appellate review.

DATED: May 22, 2024          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs
Branch

*/s/ Christopher A. Eiswerth*
CHRISTOPHER A. EISWERTH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 305-0568
Email:  christopher.a.eiswerth@usdoj.gov

*Counsel for the United States*

J.A. 065

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the CM/ECF system, which automatically transmits notice of electronic filing to registered participants in the ECF system.  In addition, I caused a copy of the foregoing document to be served via U.S. mail on the following defendants who have not yet entered their appearance in the case:

State of Oklahoma
2300 N. Lincoln Blvd., Suite 212
Oklahoma City, OK 73105

Governor Stitt
Office of the Governor
2300 N. Lincoln Blvd., Suite 212
Oklahoma City, OK 73105

Attorney General Drummond
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Oklahoma Department of Public Safety
3600 N. Martin Luther King Avenue
Oklahoma City, OK 73111

Commissioner Tipton
Oklahoma Department of Public Safety
3600 N. Martin Luther King Avenue
Oklahoma City, OK 73111

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth

Counsel for the United States

J.A. 066

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

STATE OF OKLAHOMA, *et al.*,

    Defendants.

Case No. CIV-24-511-J

DECLARATION OF ERIC JACOBSTEIN

I, Eric Jacobstein, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

**I.      Personal Background**

1.      I am Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs. I have served in this position since June 18, 2023. As Deputy Assistant Secretary, I oversee the Department's work on Central American affairs, regional migration, and Cuban affairs. I engage regularly with our partners throughout the Western Hemisphere, as well as interlocutors across the Department and interagency to advance the administration's regional migration policy.

2.      Before serving as Deputy Assistant Secretary, I served at the White House as the Special Advisor to the Vice President for the Western Hemisphere and as National Security Council Director for Central America and Cuba from 2022 to 2023. From 2021 to 2022, I was a Senior Advisor in the U.S. Agency for International Development's (USAID) Latin America and Caribbean Bureau. I concurrently served as Staff Director of the USAID Northern Triangle Task Force. Before that, I worked in the U.S. Congress for 15 years, including as a Senior Policy Advisor on the House Committee on Foreign Affairs managing the Western Hemisphere portfolio. During my time as a congressional advisor, I also served as Staff Director of the Senate Caucus on International Narcotics Control. I previously worked at the Inter-American Dialogue, a Washington-based think tank focused on U.S.– Latin American relations. I hold a M.A. in Latin American Studies from the Georgetown University School of Foreign Service and a B.A. in Political Science from Haverford College.

3.      I have read and am familiar with Oklahoma's recently enacted law, HB 4156. I am also familiar with the reactions by the Mexican government to recently enacted laws, including Texas SB 4, Iowa SF 2340, and Oklahoma HB 4156. This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

J.A. 068

## II.    Immigration and Foreign Policy Background

4.    Through the Immigration and Nationality Act and other federal laws, the federal government has developed a comprehensive regime of immigration regulation, administration, and enforcement, in which the Department of State participates. This regime is designed to accommodate complex and important U.S. foreign relations priorities that are implicated by immigration policy, including humanitarian and refugee protection, access for diplomats and official foreign visitors, national security and counterterrorism, criminal law enforcement, and the promotion of U.S. human rights policies abroad and compliance with U.S. human rights law obligations domestically. To allow the federal government flexibility in addressing these concerns, federal law provides the Executive Branch with a range of regulatory options governing the entry, treatment, and departure of aliens.

5.    Moreover, foreign governments' reactions to immigration policies and the treatment of their nationals in the United States affect not only immigration matters, but also any other issue in which we seek cooperation with foreign countries, including international trade, tourism, and security cooperation. The federal government takes these foreign-relations priorities and policy impacts into account in order to provide an approach to immigration and foreign policy that is consistent with the interests of the whole United States.

## III.    HB 4156's Impact on Foreign Relations

6.    If allowed to enter into force, HB 4156, like the similar laws recently enacted in Texas (SB 4) and Iowa (SF 2340) would result in significant and ongoing negative consequences for U.S. foreign relations. Federal immigration law incorporates foreign relations considerations by providing a comprehensive range of tools for regulating entry of noncitizens and enforcement. This federal law must be employed with sensitivity to the spectrum of foreign relations interests and priorities of the federal government.

7.    HB 4156 undermines the diverse immigration administration and enforcement tools made available to federal authorities, and establishes a distinct state-specific immigration policy, driven by an individual state's own policy choices. Such a regime risks

2

**J.A. 069**

significant harassment of foreign nationals, is insensitive to U.S. foreign affairs priorities, and has the potential to harm a wide range of delicate U.S. foreign relations interests.

8.      HB 4156 threatens at least three different serious harms to U.S. foreign relations: (1) it antagonizes foreign governments; (2) it threatens to undermine the federal government's comprehensive policy framework to address regional irregular migration; and (3) it risks reciprocal and retaliatory treatment of U.S. citizens abroad.

### A.    Antagonizing Foreign Governments

9.      The United States' immigration policy and treatment of foreign nationals can directly affect its ability to negotiate and implement favorable trade and investment agreements, to coordinate disaster response arrangements, to secure cooperation on counterterrorism or drug trafficking operations, and to obtain cooperation in international bodies on priority U.S. goals. Laws that treat foreign nationals unfavorably, including those that deny migrants the protections afforded under federal law and that may encourage racial profiling like HB 4156, antagonize foreign governments and their populations, both at home and in the United States, likely making them less willing to negotiate, cooperate with, or support the United States across a broad range of important foreign policy issues. Such laws also draw the focus of diplomatic engagements, detracting from other priorities.

10.     This is not just the case for federal laws; state laws can—and have—impeded U.S. foreign policy efforts. For instance, I'm aware of a Massachusetts law from 1996 that prohibited state entities from purchasing goods or services from companies doing business with Burma. The state law embroiled the United States in an international dispute before the World Trade Organization, created significant tension with our allies, and detracted from efforts to promote democracy and human rights in Burma. In striking down the law, the Supreme Court quoted a State Department official's testimony explaining that "the EU's opposition to the Massachusetts law has meant that the U.S. government high level discussions with EU officials often have focused not on what to do about Burma, but on what

to do about the Massachusetts Burma law." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 384 (2000).

11.     Recently enacted state laws, including HB 4156, Texas SB 4, and Iowa SF 2340, have already provoked significant criticism. Shortly after HB 4156's passage, Mexico's Consulate in Oklahoma City expressed its concern about the law and reiterated the valuable economic and other contributions that the Mexican and migrant community make to society in the United States. Press Release, Consulate of Mexico in Oklahoma City, https://www.gob.mx/sre/prensa/the-consulate-of-mexico-in-oklahoma-city-increases-its-consular-services-assistance-and-protection-after-passage-of-hb-4156?idiom=en.

12.     HB 4156 also compounds concerns Mexico has raised regarding Iowa SF 2340 and Texas SB 4. Upon SF 2340's passage, Mexico's Secretariat of Foreign Relations expressed its concern about the law and reiterated that "protecting the rights of its community abroad is a priority." The Secretariat further announced that the Government Mexico will arrange for free legal advice for Mexican nationals targeted by the law and that its consulate in Omaha will be ready to respond to "any violation" of Mexican nationals' rights. Press Release, Secretaría de Relactiones Exteriores (Apr. 10, 2024), https://www.gob.mx/sre/prensa/mexico-reforzara-asistencia-y-proteccion-consular-de-su-comunidad-en-iowa-ante-implementacion-de-la-legislacion-estatal-senate-file-2340. Foreign Secretary Bárcena condemned the law as "criminalizing our immigrants" and pledged that "we will not permit abuses against our community." Alicia Bárcena, X (Twitter), (Apr. 11, 2024), https://twitter.com/aliciabarcena/status/1778285857327161605. High-level Mexican officials have continued to express their concerns about SF 2340 in meetings with the State Department and White House officials.

13.     When Texas SB 4 was enacted, the Mexican government "completely rejected" the law, noting that it would interfere with Mexico's sovereign right to determine who enters its territory and would criminalize, discriminate, and racially profile the migrant community Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-

J.A. 071

JXZR; *see also* Press Release, Secretaría de Relaciones Exteriores (Dec. 19, 2023), https://twitter.com/SRE_mx/status/1737311893427978593. High-level Mexican officials have continued to express their concerns about state-level immigration laws in meetings with the State Department and White House officials. HB 4156 raises similar concerns as Texas SB 4 and Iowa SF 2340 did and will only further complicate and burden our diplomatic relationship with Mexico and any other countries whose nationals enter Oklahoma.

14.     Unlike the Iowa and Texas laws, which permit state judges to order the removal of noncitizens convicted under those laws to the country from which they entered the United States, HB 4156 requires the expulsion of noncitizens convicted of violating HB 4156 from the State of Oklahoma. The proliferation of state laws attempting to regulate the entry and presence of foreign nationals is greatly concerning from a foreign policy perspective. If Oklahoma were permitted to expel noncitizens from the State under HB 4156, such actions would frustrate the United States' relations with other countries regarding the treatment of their nationals and likely other important bilateral issues. Should additional U.S. States attempt to enact similar laws going forward, creating a patchwork of state-level immigration laws, that would only serve to further exacerbate tensions with other countries and detract from U.S. foreign policy goals.

15.     These state laws are premised on the notion that the federal government is not doing enough to address irregular migration. On the contrary, the federal government has taken significant actions aimed at securing the border and stemming irregular migration. Among these actions, the Department has sent a series of high-level delegations to Guatemala both to promote collaborative migration management and to show support for the peaceful transition of power and stability in that country after efforts to discredit 2023's general election. Safe Mobility Offices were opened in 2023 to offer expedited refugee processing in Guatemala, Costa Rica, Colombia, and Ecuador. The Department also worked with countries throughout the region, including by gaining agreement for flights repatriating irregular migrants without a lawful reason to remain in the United States; supporting

**J.A. 072**

enhanced border-enforcement efforts in Colombia, Panama, Costa Rica, Honduras, El Salvador, Guatemala, and Mexico; and leading the Los Angeles Declaration on Migration and Protection Working Group on Countering Human Smuggling and Trafficking. The federal government also brought the governments of Colombia and Panama together to jointly increase efforts to stem the flow of irregular migrants through the Darién Gap.

16.     Diplomatic discussions concerning migration are delicate and cannot be successful if the government does not speak with one voice. Overall, if HB 4156 is allowed to stand, diplomatic engagements may be derailed by discussions about how to address HB 4156, rather than focusing on efforts to stem irregular migration. In addition, foreign governments that are responsive to the concerns of their constituents about the treatment of their nationals abroad may withdraw their cooperation or support for ongoing efforts, including those listed above.

### B.     Undermining Comprehensive Foreign-Policy Strategy

17.     HB 4156, like other state laws attempting to regulate the entry and presence of foreign nationals in the United States, also threatens to undermine the federal government's comprehensive policy framework to address regional irregular migration together with regional partners, namely the Root Causes Strategy and the Collaborative Migration Management Strategy. Addressing regional irregular migration and its root causes is a top U.S. foreign policy priority and requires collaboration. As Secretary Blinken stated on February 2, 2021:

> The United States remains committed to working with governments in the region to address irregular migration and ensure safe, orderly, and humane migration. We are working to establish and expand a cooperative, mutually respectful approach to managing migration across the region that aligns with our national values and respects the rights and dignity of every person.

18.     To sustainably reduce irregular migration in, from, and through North and Central America, the United States must establish long-term strategic partnerships with the governments in the region to catalyze structural change to root out corruption and impunity, improve security and the rule of law, and increase economic opportunity.

J.A. 073

19.     Pursuant to Executive Order 14010, which outlines a comprehensive foreign-policy framework to collaboratively manage migration, the U.S. government has secured commitments from partner governments to advance both the Root Causes Strategy, which focuses on the main challenges that drive irregular migration, and the Collaborative Migration Management Strategy, which is devoted to fostering the international cooperation necessary to enhance safety and economic opportunity, strengthen legal pathways, and reduce irregular migration.

20.     Mexico is an essential partner for the United States in the implementation of the Root Causes Strategy and Collaborative Migration Management Strategy. And the implementation of HB 4156 would undermine ongoing joint efforts by the United States and Mexico. On March 1, 2021, Presidents Biden and López Obrador issued the U.S.-Mexico Joint Declaration in which they committed to immigration policies that recognize the dignity of migrants and the imperative of orderly, safe, and regular migration. They further committed to collaborate on a joint effort to address the root causes of regional migration, improve migration management, and develop legal pathways for migration. They also directed the Department and the Secretariat of Foreign Relations, respectively, to engage with the governments of the northern Central American countries, as well as with civil society and the private sectors, through policies that promote equitable and sustainable economic development, combat corruption, and improve law enforcement cooperation against transnational criminal smuggling networks.

21.     Our two governments have met frequently since that time to take stock of our cooperative efforts, identify new areas of cooperation, and reinforce our joint commitments. Secretary of State Blinken and Secretary of Homeland Security Alejandro Mayorkas met with President López Obrador on December 27, 2023, following which our two countries released a joint communiqué affirming their existing commitments to fostering orderly, humane, and regular migration, including reinforcing the countries' root causes partnership and cooperating to disrupt human smuggling, trafficking, and criminal networks. *See* The White

7

House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), *available at* https://perma.cc/92CW-APKE. Following this meeting, Secretary Blinken has met with Mexican Foreign Secretary Bárcena on several occasions to continue to advance our cooperative efforts on migration. Secretary Blinken hosted the Foreign Secretary at the Department in Washington, D.C. on January 19 and again on February 28 to discuss progress on joint commitments made at the December 27 meeting in Mexico City. Most recently, Secretary Blinken met with the Foreign Secretary on May 7 on the margins of the third Los Angeles Declaration on Migration and Protection Ministerial in Guatemala City, in which both the Secretary and Foreign Secretary participated.

22.     The Department of State supports the Collaborative Migration Management Strategy through assistance and diplomacy with partner countries in the region, including efforts to establish and strengthen asylum systems, regularization programs, and activities aimed at integrating migrants into partner nation communities. As of August 2023, 6.5 million of the more than 7.7 million displaced Venezuelans were hosted in the countries of Latin America and the Caribbean. More than 2.5 million Venezuelans have applied for temporary protected status in Colombia, with more than 2 million already approved. Brazil has resettled more than 200,000 Venezuelan refugees and migrants, providing temporary residency, with more than eight out of ten adults finding employment or starting their own business. The Department of State also supports the development and expansion of asylum systems in Mexico, Guatemala, and Costa Rica. In 2022, Mexico became the third highest recipient of asylum claims in the world, with more than 118,000 asylum applications registered.

23.     As we build capacity within the region to address irregular migration, HB 4156 undermines these efforts by restricting noncitizens movement within the United States. And without the close partnership and cooperation of nations in the region to provide protection and solutions for refugees and vulnerable migrants in other countries, we could see even greater flows of migrants north. It would be counter to U.S. interests if implementation of HB

8

4156 were to inspire foreign governments to adopt similar laws or policies in their treatment of irregular migrants.

### C.   Risking Retaliatory Treatment of or Impacts on U.S. Citizens

24.   HB 4156 risks reciprocal and retaliatory treatment of U.S. citizens, whom foreign governments may subject to equivalently rigid or otherwise hostile regulations, with significant potential harm to the ability of U.S. citizens to travel, conduct business, and live abroad. Foreign governments can also take retaliatory measures that impact U.S. citizens at home. For example, in late 2012, just after the United States passed the Magnitsky Act intended to punish Russian officials for the death of a Russian tax lawyer in prison, Russia retaliated by passing a law withdrawing from a just-enacted adoption agreement with the United States and by banning the adoption of Russian children by United States citizens.

25.   Reciprocal treatment is a significant concern in immigration policy, and U.S. immigration laws must always be adopted and administered with sensitivity to the potential for reciprocal or retaliatory treatment of U.S. nationals by foreign governments. By empowering Oklahoma officials to arrest, detain, prosecute, and remove noncitizens who those officials suspect have reentered the country illegally, HB 4156 risks harassment of foreign nationals in Oklahoma and may spur other countries to act unfavorably toward our citizens abroad. In addition, it risks encouraging partner nations in the Western Hemisphere to enact laws and regulations contrary to international treaty obligations. In all activities relating to U.S. foreign relations, including immigration, the United States is constantly engaged in weighing multiple competing considerations and choosing among priorities in order to develop an overall foreign-policy strategy that will most effectively advance U.S. interests. The United States likewise is constantly seeking the support of foreign governments through a delicately navigated balance of interests across the entire range of U.S. national policy goals.

26.   Only the federal government has the necessary information to appropriately evaluate these choices on a continuing basis in response to fluctuating events on the

9

international stage. Because of the broad-based and often unintended ways in which U.S. immigration policies can adversely impact our foreign relations, it is critically important that national immigration policy be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the federal government, so that the United States can speak to the world with one voice.

Executed on this 22nd day of May, 2024

Eric Jacobstein
Deputy Assistant Secretary
Bureau of Western Hemisphere Affairs
U.S. Department of State

10

**J.A. 077**

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>(1) THE STATE OF OKLAHOMA;<br>(2) KEVIN STITT, in his official capacity as Governor of Oklahoma;<br>(3) GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma;<br>(4) OKLAHOMA DEPARTMENT OF PUBLIC SAFETY; and<br>(5) TIM TIPTON, in his official capacity as Commissioner of Oklahoma Department of Public Safety,<br><br>    *Defendants*. | Case No. CIV-24-511-J |

## DECLARATION OF RUSSELL HOTT

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

## I.      Personal Background

1.      I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Deputy Executive Associate Director. I have held this position since January 2024.

2.      ICE's enforcement and removal efforts are conducted by more than 7,600 employees assigned to 25 field offices and headquarters, in more than 200 domestic locations and 30 overseas locations. As Deputy Executive Associate Director, I oversee, direct, and coordinate all enforcement and removal field operations.

3.      Prior to my current position, I have spent 22 years working for ICE and its predecessor agency, the Immigration and Naturalization Service (INS), in various positions. I began my career with the U.S. Government as a detention enforcement officer with the former INS in New York, NY. Throughout my career, I have held a variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, Acting Assistant Field office Director, National Program Manager, Unit Chief, Acting Deputy Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director, Field Office Director, and Acting Deputy Assistant Director, and Assistant Director.

4.      Due to my experience and the nature of my official duties, I am familiar with ICE enforcement and removal operations. I am also familiar with Oklahoma's recently enacted law, HB 4156. This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

1

II.    **ICE Priorities**

5.      Following enactment of the Homeland Security Act of 2002, ICE was created from elements of several legacy agencies, including INS and the U.S. Customs Service. Its primary mission is to promote homeland security and public safety through the enforcement of criminal and civil federal laws governing border control, customs, trade, and immigration.

6.      ICE is charged with enforcement of more than 400 federal statutes, and its mission includes removing noncitizens who lack lawful immigration status or are otherwise removable from the United States under the immigration laws. In pursuit of its mission, The agency has statutory authority to detain noncitizens pending their removal proceedings and/or removal from the United States, and it exercises that authority in appropriate circumstances.

7.      Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove noncitizens with final orders of removal from the United States. This includes domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 190 countries around the world. As part of the removal process, ICE manages a non-detained docket of more than 7.3 million cases, which includes noncitizens currently in removal proceedings and those who have already received removal orders and are pending removal from the United States.  Specifically, that docket consists of noncitizens in various stages of immigration processing released from DHS custody pursuant to an Order of Release on Recognizance, an Order of Supervision, a grant of parole, or a bond.

8.      ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers. ICE's other law enforcement component, Homeland Security Investigations, employs approximately 6,100 Special Agents, who are primarily responsible for

**J.A. 080**

investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and out of the United States.

9.      On September 30, 2021, Secretary of Homeland Security Alejandro Mayorkas issued Department-wide civil immigration enforcement guidance in a memorandum titled Guidelines for the Enforcement of Civil Immigration Law (Mayorkas Memorandum), and on November 29, 2021, the memorandum took effect. The Mayorkas Memorandum calls for the prioritization of DHS's limited law enforcement resources on the apprehension and removal of noncitizens who are a threat to national security, public safety, and border security.[1]

10.      As relevant here, the Mayorkas Memorandum also identifies noncitizens who pose a threat to border security and prioritizes their apprehension and removal. Per the guidance, a noncitizen poses a threat to border security if they are apprehended: (1) at the border or port of entry while attempting to unlawfully enter the United States, or (2) in the United States after unlawfully entering after November 1, 2020. The guidance acknowledges that other border-security cases may present compelling facts that warrant enforcement action. The guidance further provides that mitigating or extenuating facts and circumstances may militate in favor of declining to take enforcement action in border-security cases.

### III.   Immigration Court Proceedings

11.      The Immigration and Nationality Act establishes different avenues by which DHS can remove various categories of noncitizens. These avenues include expedited removal, administrative removal proceedings for certain noncitizens

---

[1] On June 10, 2022, a federal district court vacated the Mayorkas Memorandum. *See Texas v. United States*, 606 F. Supp. 3d 437 (S.D. Tex. June 10, 2022). On June 23, 2023, however, the U.S. Supreme Court reversed the district court's decision. *See United States v. Texas*, 143 S. Ct. 1964 (2023). ICE reinstituted application of the civil immigration enforcement priorities set forth in the Mayorkas Memorandum in July 2023.

convicted of aggravated felonies, and removal proceedings under section 240 of the Immigration and Nationality Act. The latter (referred to as removal proceedings) are conducted by an immigration judge within the DOJ's Executive Office for Immigration Review.

12.     A noncitizen placed into section 240 removal proceedings first receives a notice of the proceedings, a Notice to Appear (also called a Form I-862), which includes, *inter alia*, the nature of the proceedings; the legal authority under which the proceedings are being conducted; the allegations of fact and charges being lodged against the noncitizen, including the statutory provisions alleged to have been violated; the time and place at which the proceedings will be held; and the consequences for failing to appear at such proceedings. In conjunction with the Notice to Appear, ICE must also provide noncitizens with a list prepared by the Department of Justice Executive Office for Immigration Review of persons and organizations available to provide pro bono legal representation.

13.     As indicated, alternatives to removal proceedings include, *inter alia*, expedited removal and, for limited categories of noncitizens, administrative removal orders issued by ICE. For example, noncitizens who are not lawful permanent residents and who have been convicted of an aggravated felony may be subject to proceedings under section 238(b) of the Immigration and Nationality Act. As another example, a noncitizen whose prior order of removal is reinstated after unlawfully re-entering the United States may not be placed into removal proceedings, but instead may receive withholding-only proceedings if he or she establishes a reasonable fear of persecution or torture in the removal country.

14.     In removal proceedings, the immigration judge advises the noncitizen of various rights afforded, such as the right to counsel at the noncitizen's own expense. Interpreters are also provided at no cost to the noncitizen. The noncitizen must be given at least 10 days from the date he or she is served with the Notice to Appear to

4

the date of his or her first hearing to secure counsel—unless the noncitizen requests, in writing, an earlier hearing date. The immigration judge also advises the noncitizen of the possibility to apply for relief and protection from removal, and the noncitizen is given the opportunity to make such an application during his or her removal proceedings. The noncitizen has the right to present evidence, to testify on his or her own behalf, and to cross-examine any witness presented by DHS. If the immigration judge decides that the noncitizen is removable and orders removal, the immigration judge shall advise the noncitizen of that decision and the consequences of failing to depart under the order of removal, including civil and criminal penalties. Furthermore, the immigration judge shall inform the noncitizen of the right to appeal the decision. Appeals are heard by the Board of Immigration Appeals.

15.    Noncitizens may seek asylum in removal proceedings. To establish eligibility, they must establish that they have suffered persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. A grant of asylum gives a noncitizen legal status in the United States. Noncitizens in removal proceedings may also seek withholding of removal under the Immigration and Nationality Act and protection from removal under the regulations implementing Article 3 of the Convention Against Torture. Both protections presuppose that an immigration judge will issue an order of removal but withhold or defer removal only as to the specific country in which the noncitizen fears persecution or torture.

16.    Besides an appeal, a noncitizen may file a motion to reconsider or a motion to reopen their proceedings before the immigration judge or the Board of Immigration Appeals, depending on which entity issued the order that is being challenged.

17.    The noncitizen may also seek judicial review of certain adverse decisions from the Board of Immigration Appeals by filing a petition for review with the U.S.

J.A. 083

Court of Appeals in whose jurisdiction his or her removal proceedings took place. During the appellate process, the noncitizen can request, and the courts can order, a stay of removal that prevents ICE from executing the order of removal until the stay is lifted.

**IV.    Impact on Enforcement and Removal Operations**

18.    Oklahoma's HB 4156 provides defenses to prosecution under its "Impermissible Occupation" provision, HB 4156 § 2(B), (C)(1), if the federal government has granted the noncitizen some form of status in the United States, for example, status in the form of asylum under 8 U.S.C. § 1158 or eligibility under the federal Deferred Action for Childhood Arrivals. HB 4156, however, does not include pending federal immigration applications as an affirmative defense to prosecution, and the law does not address what happens to noncitizens currently in removal proceedings. Prosecution of such individuals could have an impact on noncitizens' ability to attend immigration proceedings or to report to ERO. This could, in turn, result in them being ordered removed even when they have valid claims for protection from removal or other relief.

19.    As of April 28, 2024, ICE has nearly 6,000 cases with a final order of removal with a last claimed address in the State of Oklahoma. ERO also has more than 27,000 non-detained cases of noncitizens who are currently in proceedings or have final orders of removal pending further adjudication with a last claimed address in the State of Oklahoma. The forms of relief and protection from removal and other procedural mechanisms discussed above that delay or preclude removal or removal to specified countries may not be available to noncitizens prosecuted or convicted under Oklahoma law, contrary to the federal immigration scheme, in part, because such noncitizens may be imprisoned by the State and have no freedom of movement.

20.    If Oklahoma imposes criminal penalties for unlawful entry and reentry by noncitizens, noncitizens currently in Oklahoma may seek to depart Oklahoma for

other states. In fact, noncitizens convicted under HB 4156 would be forced to depart Oklahoma within 72 hours of conviction or release from custody, whichever is earlier. This could in turn strain ICE's finite resources by, for example, presenting a need to search for and locate the noncitizens to carry out a removal order.

21.     Oklahoma is among several states that have passed statutes purporting to create their own immigration systems. This creates threats beyond the strain on limited government resources set out above. If such laws are allowed to stand, other states will likely create their own, different regimes, leading to a piecemeal system of immigration—the very situation federal statutes like the Immigration and Nationality Act are designed to avoid. If each state passed an HB 4156-analogue and the laws are permitted to be enforced, the federal government would be forced to navigate an impossible patchwork of regulations affecting the enforcement of federal law. But in the United States, immigration enforcement operates on a nationwide basis, and thus, it is critical that ICE maintain flexibility regarding how and where it conducts enforcement actions.

Executed on May 21, 2024.

_____
Russell Hott
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

THE STATE OF OKLAHOMA, *et al.*,

*Defendants.*

Case No:      CIV-24-511-J

---

## DEFENDANTS' COMBINED RESPONSE IN OPPOSITION

---

GARRY M. GASKINS, II, OBA 20212
*Solicitor General*
ZACH WEST, OBA 30768
*Director of Special Litigation*
CULLEN D. SWEENEY, OBA 30269
*Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov

*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................. 1

BACKGROUND ............................................................. 1

STANDARD OF DECISION ......................................... 11

ARGUMENT ............................................................. 12

   I.  Plaintiffs are not likely to succeed in showing that HB 4156 is unconstitutional when it merely complements federal law. ................................................... 12

     A.  HB 4156 is not preempted because it readily comports—rather than conflicts—with federal immigration laws. .............................................. 13

     B.  No part of HB 4156 is field preempted. ........................................ 21

     C.  The Foreign Commerce Clause does not prohibit states from criminalizing those immigrants who are illegally present because the regulated conduct is illegal and entirely unrelated to foreign commerce. .............................. 25

     D.  Oklahoma is constitutionally entitled to defend itself against invasion when the federal government abdicates its own duties. .................................. 29

     E.  All Plaintiffs' claims are nonjusticiable. ........................................ 30

  II.  The remaining factors weigh against granting an injunction. ........................... 33

CONCLUSION ............................................................. 35

J.A. 087

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ........................................................................................31

*Arizona v. United States,*
567 U.S. 387 (2012) .............................................1, 13, 14, 16, 17, 21, 22, 24, 26, 34

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................................................31

*Ayotte v. Planned Parenthood of N. New England,*
546 U.S. 320 (2006) ........................................................................................35

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ........................................................................................32

*Bronson v. Swensen,*
500 F.3d 1099 (10th Cir. 2007) ....................................................................32

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
520 U.S. 564 (1997) ........................................................................................27

*Chamber of Commerce of U.S. v. Whiting,*
563 U.S. 582 (2011) ..........................................................................14, 15, 17

*City of Philadelphia v. New Jersey,*
437 U.S. 617 (1978) ........................................................................................28

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................................33

*Davis v. Passman,*
442 U.S. 228 (1979) ........................................................................................30

*DeCanas v. Bica,*
424 U.S. 351 (1976) ..........................................................................21, 22, 23

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) ....................................................................35

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001) ....................................................................11

*Edwards v. California,*
314 U.S. 160 (1941) ..................................................................................28, 29

*First W. Capital Mgmt. Co. v. Malamed,*
874 F.3d 1136 (10th Cir. 2017) ....................................................................11

iii

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
 373 U.S. 132 (1963) ..................................................................21

*Florida v. United States,*
 660 F. Supp. 3d 1239 (N.D. Fla. 2023)...............................23

*Free the Nipple–Fort Collins v. City of Fort Collins,*
 916 F.3d 792 (10th Cir. 2019) ...............................................12

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
 505 U.S. 88 (1992) ....................................................................14

*Gen. Motors Corp. v. Tracy,*
 519 U.S. 278 (1997) .................................................................26

*Gilbert v. Minnesota,*
 254 U.S. 325 (1920) .................................................................15

*Gunn v. Minton,*
 568 U.S. 251 (2013) .................................................................31

*Hobby Lobby Stores, Inc. v. Sebelius,*
 723 F.3d 1114 (10th Cir. 2013) .............................................32

*Hunt v. Wash. State Apple Advert. Comm'n,*
 432 U.S. 333 (1977) .................................................................33

*Huron Portland Cement Co. v. City of Detroit,*
 362 U.S. 440 (1960) .................................................................18

*Initiative & Referendum Inst. v. Walker,*
 450 F.3d 1082 (10th Cir. 2006) .............................................33

*Japan Line v. County of Los Angeles,*
 441 U.S. 434 (1979) .................................................................29

*Juidice v. Vail,*
 430 U.S. 327 (1977) .................................................................35

*Kansas v. Garcia,*
 589 U.S. 191 (2020) ...............................14, 16, 17, 19, 21, 22

*Liddell v. Heavner,*
 180 P.3d 1191 (Okla. 2008) ..................................................35

*Mayor of New York v. Miln,*
 36 U.S. (11 Pet.) 102 (1837) .................................................26

*Mazurek v. Armstrong,*
 520 U.S. 968 (1997) .................................................................11

J.A. 089

*Michelin Tire Corp. v. Wages,*
    423 U.S. 276 (1976) ...................................................................................27

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932) ...................................................................................25

*New York v. New Jersey,*
    598 U.S. 218 (2023) ...................................................................................35

*Nken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................34

*Original Invs., LLC v. Oklahoma,*
    542 F. Supp. 3d 1230 (W.D. Okla. 2021) .................................................33

*Panhandle E. Pipeline Co. v. State ex rel. Comm'rs of Land Office,*
    83 F.3d 1219 (10th Cir. 1996) ...................................................................35

*Parker Drilling Mgmt. Servs. v. Newton,*
    139 S. Ct. 1881 (2019) ...............................................................................15

*Parker v. Brown,*
    317 U.S. 341 (1943) ...................................................................................13

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) ...................................................................................26

*Plyler v. Doe,*
    457 U.S. 202 (1982) ...............................................................21, 22, 23, 24

*Prairie Band Potawatomi Nation v. Wagnon,*
    476 F.3d 818 (10th Cir. 2007) ...................................................................12

*Ramos v. Louisiana,*
    590 U.S. 83 (2020) .....................................................................................24

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ...................................................................................13

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
    325 U.S. 761 (1945) ...................................................................................27

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005) .................................................................11

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ...................................................................................29

*Smith v. Turner,*
    48 U.S. (7 How.) 283 (1849)......................................................................30

J.A. 090

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ...............................................................................32

*Tandy v. City of Wichita,*
    380 F.3d 1277 (10th Cir. 2004) ..............................................................32

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
    588 U.S. 504 (2019) ...............................................................................27

*Texas v. DHS,*
    No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ...............3

*U.S. v. California,*
    655 F.2d 914 (9th Cir. 1980) ..................................................................31

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,*
    883 F.2d 886 (10th Cir. 1989) ................................................................11

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) ..............................................................24

*United States v. Hansen,*
    599 U.S. 762 (2023) ...............................................................................12

*United States v. Salerno,*
    481 U.S. 739 (1987) ...............................................................................12

*United States v. Texas,*
    97 F.4th 268 (5th Cir. 2024) ..................................................................27

*Va. Uranium, Inc. v. Warren,*
    587 U.S. 761 (2019) ...............................................................................13

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) .................................................................................31

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................11

*Younger v. Harris,*
    401 U.S. 37 (1971) .................................................................................32

**Statutes**

8 U.S.C § 1101 ...................................................................................16, 22

8 U.S.C. § 1182 ...........................................................................................15

8 U.S.C. § 1225 ...........................................................................................15

8 U.S.C. § 1229 ...........................................................................................15

J.A. 091

8 U.S.C. § 1253 ...............................................................................................15

8 U.S.C. § 1325 ..........................................................................................14, 21

8 U.S.C. § 1326 ..........................................................................................15, 21

8 U.S.C. § 1357 ..........................................................................................16, 17

18 U.S.C. § 758 ..........................................................................................16, 22

18 U.S.C § 3571 .............................................................................................15

18 U.S.C § 3559 .............................................................................................15

22 U.S.C. § 7105 ........................................................................................16, 23

OKLA. STAT. tit. 21, § 1795 ................................................................................8

OKLA. STAT. tit. 75, § 11 ..................................................................................35

**Other Authorities**

Camilo Montoya–Galvez, *Migrant Crossings at the U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 28, 2023)...................................................................3

Garrett Yalch, et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market* THE FRONTIER (March 14, 2024) ........................................................................5

HOUSE JUDICIARY COMM., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement* (Jan. 18, 2024).............................................................................................3

OKLA. BUREAU OF NARCOTICS AND DANGEROUS DRUGS CONTROL, *Position Statement on Medical Marijuana Registrants Providing Certificates of Occupancy* (July 2023) ..................................4

Paul Demko, *'Tokelahoma' at the Crossroads*, POLITICO (March 7, 2023) ........................................4

THE WHITE HOUSE, *A Proclamation on Securing the Border* (June 4, 2024) ...............................................................................................7

U.S. HOUSE HOMELAND SECURITY COMMITTEE, *"Every State Is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023) ...............................................................................................4

**Rules**

86 Fed. Reg. 7225 (Jan. 20, 2021).............................................................................................7

Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021).............................................................................................7

Exec. Order No. GA-41, Governor of State of Texas
(July 7, 2022)...........................................................................................................6

**Constitutional Provisions**

U.S. CONST. amend. X................................................................................................31

U.S. CONST. art. I, § 8................................................................................................37

U.S. CONST. art. I, § 10..............................................................................................36

U.S. CONST. art. II, § 3..............................................................................................29

U.S. CONST. art. VI ........................................................................................19, 27, 37

## INTRODUCTION

Plaintiffs seek to enjoin the enforcement of Oklahoma House Bill 4156 (HB 4156), which makes it a state offense, with state penalties, for a noncitizen who is in the United States illegally to unlawfully enter, re-enter, or remain in Oklahoma. *See* HB 4156, 59th Leg., 2nd Reg. Sess. (2024). This law in no way conflicts with or undermines federal law. Plaintiffs' pre-enforcement, facial challenges to HB 4156 are based on speculative assumptions about how HB 4156 will be implemented, spurious legal conclusions about the law's underpinnings, and fundamental misconceptions about a state's sovereign rights and duties in a federalist system of government. Plaintiffs place almost all their chips on an overbroad interpretation of *Arizona v. United States*, 567 U.S. 387 (2012). But that interpretation would render the states helpless and passive vassals to a federal government that refuses to enforce its own laws in express and misguided deference to the whims of foreign governments. For these reasons and more, the Court should deny Plaintiffs' requests for an injunction.

## BACKGROUND

A crisis exists in our Nation: a crisis of unprecedented and uncontrolled illegal immigration. Although one would not know it from Plaintiffs' submissions, President Biden himself has said so. Indeed, he admitted earlier this year—just before the Oklahoma Legislature began its session—that "we all know the border's been broken" for "too long," which has created a "border crisis." THE WHITE HOUSE, Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations (Jan. 26, 2024).[1] Similar sentiments were proclaimed around the same time by more than half of our State Attorneys General, who

---

[1] *Available at* https://perma.cc/K9S8-TLZV.

1

pointed out that the "federal government has failed to stanch this flow" of "more than six million illegal immigrants," which has "effectively add[ed] the population of Iowa and Utah to our country in less than three years." Letter from Multiple State Attorneys General to President Joseph R. Biden, Jr. (Jan. 29, 2024).[2] In response to this "unprecedented border crisis," *id.*, the Oklahoma Legislature enacted HB 4156. *See* HB 4156, § 1(B) ("[A] crisis exists in Oklahoma."). The law is straightforward: if a person lacks authorization to enter or remain in the United States, then that person may not enter or remain in Oklahoma. But instead of welcoming Oklahoma's efforts to address and correct an untenable situation, the federal government balked at Oklahoma's temerity in asserting its own legitimate sovereignty.

The border crisis has swamped Oklahoma with an unprecedented onslaught of criminal activity. It takes the form of "illegal marijuana grow operations, which have exploded in number in recent years." *Id.* It brings "fentanyl distribution, sex trafficking, and labor trafficking" at the hands of "organized crime, such as drug cartels, [that] have no regard for Oklahoma's laws or public safety." *Id.* (stating that "Oklahoma agents and law enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border"). Oklahoma's communities are being harmed and harassed, while its law enforcement officers are overburdened and overwhelmed. The state's "crisis of unauthorized entry and presence is endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local government entities." *Id.*

---

[2] *Available at* https://www.texasattorneygeneral.gov/sites/default/files/images/press /AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

Again, nearly 6 million migrants unlawfully crossed the southwest land border between January 2021 and September 2023. U.S. HOUSE JUDICIARY COMM., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*, at 2 (Jan. 18, 2024).[3] "The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). And things continue to fall apart. December 2023 saw a new record for monthly encounters with aliens illegally crossing the southwestern border: over 225,000 people, in just one month. Camilo Montoya–Galvez, *Migrant Crossings at the U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 28, 2023).[4] The effects of this ongoing cataclysm reverberate far beyond the river and deserts of the southwest border country: as just discussed, they have found their way to and made an unwelcome home in Oklahoma.

The border crisis is not confined to the massive influx of unlawful immigrants alone. "As expected, organized criminal organizations take advantage of these large numbers." *Texas*, 2023 WL 8285223, at *3. The trafficking of human beings across the United States border "has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* More alarmingly, "the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl." *Id.* Fentanyl "is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *Id.* Oklahoma has

---

[3] *Available at* https://perma.cc/5USD-YX6F.
[4] *Available at* https://www.cbsnews.com/news/migrant-crossings-u-s-southern-border-record-monthly-high-december/.

not been spared from this deadly epidemic. Fentanyl-related deaths in this state "have increased by nearly 500 percent over the past few years." U.S. HOUSE HOMELAND SEC. COMM., *"Every State Is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023) (statement of U.S. Rep. Bice of Oklahoma).[5] As it stands now, the Oklahoma Department of Health reports that "fentanyl is the leading substance involved in drug overdoses in Oklahoma." *Id.* And the Office of National Drug Control Policy has formally designated Oklahoma and Canadian Counties as "high intensity drug trafficking areas," in large part because of their proximity to the intersection of three major interstate highways: Interstates 35, 40, and 44. *Id.*

Although every state in the Nation is threatened by the rampant trafficking activity of the various drug cartels (among others), Oklahoma faces unique problems of its own. The aforementioned explosion of lawless, unchecked, and dangerous marijuana grow operations threatens everyone in Oklahoma—citizen and noncitizen alike. *See, e.g.,* Ex. 2, Decl. of Donnie Anderson ¶ 7 ("violent and deadly altercations occurring at illicit marijuana grows").[6] With the statewide approval of medical marijuana in 2018, Oklahoma "has seen a significant increase in the number of encounters with foreign nationals, both with and without legal status in the United States, operating within medical marijuana facilities." Ex. 2, Anderson ¶ 2. Since that same year, Oklahoma has shut down more than 800 marijuana growing operations that have

---

[5] *Available at* https://perma.cc/HTS5-BP7U.
[6] *See also* OKLA. BUREAU OF NARCOTICS AND DANGEROUS DRUGS CONTROL, *Position Statement on Medical Marijuana Registrants Providing Certificates of Occupancy* (July 2023), ww.obndd.ok.gov/home/showpublisheddocument/430/638252794456800000 ("Since 2021, at least 10 confirmed fires at marijuana manufacturer locations"); *see also* Paul Demko, *'Tokelahoma' at the Crossroads,* POLITICO (March 7, 2023), https://www.politico.com /news/magazine/2023/03/07/oklahoma-marijuana-legalization-00085299.

ties to organized crime and "seized more than 600,000 pounds of illegal weed and made nearly 200 arrests." Demko, *supra* note 6. Many of the illegal grow operations are directly traceable to Chinese organized crime. *See* Garrett Yalch et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market*, THE FRONTIER (March 14, 2024) (describing Oklahoma as the "latest and wildest frontier in the marijuana underworld").[7] The victims of this industry include thousands of Chinese migrants (and those of other nationalities) who are smuggled across the open border in Texas and end up in Oklahoma. *Id.* "These laborers make up the low-cost workforce that allows the black market marijuana trade to persist." Ex. 2, Anderson ¶ 3. Foreign workers suffer from rampant physical abuse, trafficking, wage theft, forced prostitution, and more. Yalch, *supra* note 7.

Not just an urban blight, the illicit marijuana operations also "affect rural communities through introducing banned foreign chemicals to the land, abandoning of grow cites by operators, and the stressing of electrical utilities and water resources." Ex. 2, Anderson ¶ 4. "[R]ural Oklahomans are being increasingly affected and disturbed by illegal operations in the state." *Id.* "The federal response, however, has been muted." Yalch, *supra* note 7.

Oklahoma officials have appealed to the U.S. Department of Justice, seeking assistance in prosecuting the proliferating illegal marijuana operations and the foreign criminal syndicates whose profits depend on the exploitation of a trafficked labor force. *See* Letter from Senator

---

[7] *Available at* https://www.readfrontier.org/stories/gangsters-money-and-murder-how-chinese-organized-crime-is-dominating-oklahomas-illegal-medical-marijuana-market/#:~:text=Gangsters%2C%20money%20and%20murder%3A%20How,Oklahoma's%20illegal%20medical%20marijuana%20market&text=A%20quadruple%20murder%20in%20Oklahoma,ties%20to%20China's%20authoritarian%20regime.

Joni Ernst to Attorney General Merrick Garland (Feb. 2, 2024).[8] This is a matter of both public safety and national security: "investigators in Oklahoma discovered illicit marijuana growers engaged in human trafficking, sex trafficking, ketamine trafficking, illegal gambling, and international money laundering." *Id.* at 2. Rather than providing meaningful and effective enforcement of its many immigration statutes, the United States now responds with litigation against Oklahoma and those charged with enforcing state laws that do nothing more than mirror important federal laws.

The damage to Oklahoma might have been ameliorated had the government made a priority of securing the country's border. But an unprecedented crisis has been met with unconscionable inaction. *See* AG Letter, *supra* note 2, at 1. The current administration's policies "have magnetized the southern border to attract ever greater numbers into attempting illegal immigration." *Id.* at 3–4. The drug cartels even have a word for this "deliberate refusal to enforce immigration law," *id.* at 4: "the cartels refer to these open-border policies as *la invitación* ('the invitation')." Exec. Order No. GA-41, Governor of State of Texas, at 1 (July 7, 2022).[9]

Tellingly, just hours after taking the oath of office, President Biden (1) signed an executive order revoking the prior administration's "Enhancing Public Safety in the Interior of the United States" executive order, thereby massively limiting interior immigration enforcement in states such as Oklahoma; (2) terminated the construction of the southern border wall upon "determin[ing] that the declaration of a national emergency at our southern border ... was unwarranted"; and (3) authorized the Department of Homeland Security to

---

[8] *Available at* https://perma.cc/6K36-YZ3K.
[9] *Available at* https://perma.cc/WJH4-V3RB.

6

impose an immediate 100-day moratorium on most deportations. *See* Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021); Proclamation No. 10142, Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 20, 2021); Memorandum from DHS Acting Secretary David Pekoske on Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities (Jan. 20, 2021). These actions—or, more accurately, refusals to act—have epitomized this Administration's disastrous hands-off policy.

Perhaps reality is finally sinking in. A scant two weeks after the United States filed this lawsuit, President Biden issued an executive proclamation suspending the "entry of any noncitizen into the United States across the southern border" and limiting access to asylum. THE WHITE HOUSE, A Proclamation on Securing the Border (June 4, 2024).[10] The proclamation is noteworthy for its searing depiction of the federal immigration system over which the federal executive presides, and which this lawsuit seeks to enthrone at the expense of Oklahoma's own on-the-ground solutions. According to President Biden, the federal immigration system is not just "simply broken—and not equipped to meet current needs," but also "under-resourced" and plagued by "outdated laws and inadequate resources." *Id.* The federal immigration statutes themselves are "outdated and inadequate." *Id.* And the system in general "has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims."

---

[10] *Available at* https://perma.cc/785C-72KE.

**J.A. 100**

*Id.* Meanwhile, the United States persists in castigating Oklahoma for pursuing constitutionally permissible ways to protect itself in an admittedly broken system.

The Oklahoma Legislature has enacted one such way with HB 4156. In the most basic terms, HB 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry. It contains two principal provisions. First, an alien commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States." HB 4156, § 2(B) (codified at OKLA. STAT. tit. 21, § 1795(B)). A violation of this provision is a misdemeanor punishable by imprisonment for up to one year, or by a fine of up to $500, or both. *Id.* § 2(C)(1) (codified at OKLA. STAT. tit. 21, § 1795(C)(1)). Under this provision, any unlawfully present noncitizen "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

Second, HB 4156 makes it a crime for an alien to "enter[], attempt[] to enter, or ... at any time [be] found in Oklahoma" if he or she has previously been "denied admission, excluded, deported, or removed" or has "departed the United States while an order of exclusion, deportation, or removal is outstanding." *Id.* § 2(D) (codified at OKLA. STAT. tit. 21, § 1795(D)). This provision has two exceptions. It does not apply to an alien (1) if "prior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission," or (2) if the alien was "previously denied admission and removed" and "such alien established that he or she was not required to obtain such advance consent under" HB 4156's Section 2 or "any prior

8

statute." *Id.* A violation of this provision is a felony punishable by imprisonment for up to two years, or by a fine of not more than $1,000. *Id.* § 2(C)(2) (codified at OKLA. STAT. tit. 21, § 1795(C)(2)). Under this provision, like the first, the unlawfully present alien "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* Neither provision requires Oklahoma to deport anyone to a foreign country, *contra Padres Unidos* Mot. at 14 ("states have no business deporting people"), nor do they even require those unlawfully present to leave the country. If another state wishes to open its doors to aliens who are present in our country in stark violation of federal law, they may do so; the convicted individuals just cannot remain in Oklahoma.

Importantly, HB 4156 provides an affirmative defense to prosecution if (1) "[t]he federal government has granted the defendant ... lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code," or (2) "[t]he defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021." HB 4156, § 2(F) (codified at OKLA. STAT. tit. 21, § 1795(F)). In other words, if the alien's conduct does not violate federal illegal-entry or illegal-reentry statutes, or if the federal government has granted the alien lawful presence or asylum in the United States, then HB 4156 plainly disallows a state-law prosecution in Oklahoma. In the meantime, nothing in HB 4156 prevents—or even purports to inhibit in any way—illegal aliens from seeking asylum or other relief under federal law.

On May 21, 2024, the United States filed suit against the State of Oklahoma, along with J. Kevin Stitt, in his official capacity as Governor of Oklahoma; Gentner Drummond, in his official capacity as Attorney General of Oklahoma; the Oklahoma Department of Public

9

Safety; and Tim Tipton, in his official capacity as Commissioner of the Oklahoma Department of Public Safety. On May 23, 2024, Padres Unidos de Tulsa and four private individuals (collectively, the *Padres Unidos* Plaintiffs) filed suit against Attorney General Drummond and Commissioner Tipton, in their official capacities, in *Padres Unidos de Tulsa v. Drummond*, No. 5:24-cv-526 (W.D. Okla.). The *Padres Unidos* Plaintiffs also sued Vicki Behenna and Steve Kunzweiler in their official capacities as the District Attorneys of Oklahoma and Tulsa Counties, respectively. The United States filed a motion for preliminary or permanent injunction on May 22, 2024. Doc. 4. The *Padres Unidos* Plaintiffs filed a motion for preliminary injunction on May 24, 2024. Doc. 15 in *Padres Unidos*. On Defendants' unopposed motion, the Court consolidated the two cases on June 5, 2024.

Both the United States and the *Padres Unidos* Plaintiffs broadly argue on Supremacy Clause grounds that federal immigration law preempts HB 4156 in its entirety. They also maintain that HB 4156 violates the dormant Foreign Commerce Clause's purported prohibition on state regulation of illegal entry and reentry. For the reasons explained below, both arguments fail. Moreover, in response to Plaintiffs' assertions and affiants, Oklahoma offers the testimony of three current and former public officials on the state, national, and international implications of HB 4156: (1) Donnie Anderson, Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control; (2) Rodney S. Scott, Former Chief, U.S. Border Patrol, of U.S. Customs and Border Protection; and (3) Christopher Landau, former United States Ambassador to Mexico. Their statements, along with the sworn congressional testimony of Attorney General Drummond, Exhibit 1, rebut in detail many of the claims made in the respective motions for a preliminary injunction. Those motions should be denied.

10

**J.A. 103**

## STANDARD OF DECISION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To earn a preliminary injunction, a plaintiff must show (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Any successful plaintiff's "right to relief" must be demonstrably "clear and unequivocal." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quotations omitted); *see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established."). And because it is "an extraordinary and drastic remedy," a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" as to each element. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted). Even if a movant manages to satisfy each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). Put simply, granting a preliminary injunction is "the exception rather than the rule." *Id.* at 797 (quotation omitted). In addition, a permanent injunction, as demanded by the United States, "requires showing actual success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

## ARGUMENT

**I.    Plaintiffs are not likely to succeed in showing that HB 4156 is unconstitutional when it merely complements federal law.**

To prevail on a facial challenge, in a context such as this, a plaintiff must normally show "that no set of circumstances exists under which" the challenged statute can be constitutionally applied. *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To start, HB 4156 is not facially preempted because a state law that essentially duplicates federal law does not "conflict" with that law—it comports with it. Likewise, no provision of HB 4156 is field preempted: the Supreme Court has never recognized "exclusive" federal authority over all laws touching on immigration. Oklahoma, like any other state exercising police power, may exclude aliens who violate federal standards.

In addition, HB 4156 does not offend the Foreign Commerce Clause, "dormant" or otherwise. No one contends that Oklahoma's law has anything to do with impermissible economic protectionism—the vice with which the Founders were concerned in relation to interstate-commerce restrictions. The activity regulated by HB 4156 is the *illegal* trespassing by, and trafficking in, human beings and contraband. Oklahoma's valid exercise of its constitutional police power in excluding unlawfully present persons from its territory neither violates federal law nor endangers the national interest.

Finally, the claims of Plaintiffs founder on the shoals of standing and justiciability. The Supremacy Clause does not provide an independent cause of action, either for the United States, for an organizational plaintiff, or for a private individual. And the *Padres Unidos* Plaintiffs lack standing to bring this lawsuit because a contrary ruling would not change their lawful or unlawful status under federal law. Plaintiffs, that is, cannot rely on any alleged illegal

12

presence to attain standing. Because Plaintiffs cannot establish the likelihood that HB 4156 is unconstitutional in *all* its applications, the Court must decline to enjoin the law.

**A.     HB 4156 is not preempted because it readily comports—rather than conflicts—with federal immigration laws.**

Let us begin with first principles: "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398. Under the Supremacy Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Any implied preemption, therefore, "start[s] with the assumption that the historic police powers of the States were not to be superseded ... unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law ...." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., joined by Thomas and Kavanaugh, JJ.). Stated more pointedly, whether express or implied, the "preemption of state laws represents a serious intrusion into state sovereignty." *Id.* at 773 (cleaned up).

Such intrusion is unwarranted in this case. To begin, no provision of HB 4156 is conflict-preempted by federal law. Conflict preemption exists only where it is "impossib[le]" to comply with both state and federal law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotations omitted). This is a high hurdle. "In all cases," the purported "conflict with state law must stem from either the Constitution itself or a valid statute enacted by

Congress." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). It is not enough to say that "a state statute is in tension with federal objectives." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quotation omitted). And "there is no federal preemption *in vacuo*"—that is, "without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas*, 589 U.S. at 202 (quotation omitted); *see also Whiting*, 563 U.S. at 607 (a "freewheeling judicial inquiry" is an insufficient method for finding preemption). Supreme Court precedent makes it clear that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and in the judgment). Federal law preempts state law only when the two stand in irreconcilable contradiction.

Here, Plaintiffs have not demonstrated that HB 4156 contradicts federal law; quite the contrary, the United States has nearly admitted the opposite. HB 4156, the government concedes, "tracks the federal unlawful-entry provision," U.S. Mot. at 7, which generally bars noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers," 8 U.S.C. § 1325(a). Federally, any alien who commits this crime of illegal entry "shall"—not "may"—be fined up to $5,000, imprisoned for up to 6 months, or both. *Id.* (referencing penalties in 18 U.S.C. §§ 3559(a)(7), 3571(b)(6)).

Congress has also criminalized reentry by aliens who have been "denied admission," have been involuntarily "removed," or have departed the country "while an order of exclusion, deportation, or removal is outstanding." 8 U.S.C. § 1326(a). Federally, an alien who illegally reenters "shall"—not "may"—be imprisoned up to two years, fined $250,000, or both. *Id.* (referencing penalty provisions under 18 U.S.C. §§ 3559(a)(5), 3571(b)(3)). Aliens with certain

14

aggravating factors may face harsher penalties. 8 U.S.C. § 1326(b). Yet again, the United States concedes that HB 4156 "effectively imposes state criminal penalties on those who violate 8 U.S.C. § 1326(a)." U.S. Mot. at 8. Further, Congress has directed immigration officers to "order ... removed from the United States without further hearing or review" an alien who lacks a "valid entry document." 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7)(A)(i)(I). In lieu of removal proceedings, an alien may agree to a "stipulated order" of removal or "voluntarily to depart the United States." *Id.* §§ 1229a(d), 1229c(a)(1). The failure to comply with these requirements constitutes a felony. *Id.* § 1253(a)(1); 18 U.S.C. § 3559(a)(5). The text of HB 4156 neither contradicts nor conflicts with any of this, nor with any other portion of federal law. HB 4156 simply mirrors these provisions.

The federal government may adopt state laws for federal-law purposes. *See, e.g.*, *Parker Drilling Mgmt. Servs. v. Newton*, 139 S. Ct. 1881, 1887–88 (2019). And state governments may adopt federal law for state-law purposes. *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325, 331 (1920). "[T]here can by definition be no conflict" between the laws of two sovereigns where state law "trace[s] the federal law." *Whiting*, 563 U.S. at 601–02; *see also Arizona*, 567 U.S. at 429 (Scalia, J., concurring in part and dissenting in part) ("It is beyond question that a State may make violation of federal law a violation of state law as well. We have held that to be so even when the interest protected is a distinctively federal interest ...."). Indeed, "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap." *Kansas*, 589 U.S. at 212. More specifically here, except in matters of alien registration, the Supreme Court has never held that state laws that overlap with federal criminal immigration statutes are impermissible. *See*

15

*Arizona*, 567 U.S. at 402 (concluding that the federal government fully occupied the "field of alien registration"); *accord Kansas*, 589 U.S. at 210 ("In *Arizona*, ... we held that federal immigration law occupied the field of alien registration. 'Federal law,' we observed, 'makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.'") (quoting *Arizona*, 567 U.S. at 401–02) (internal citations omitted)). *Arizona*, that is, provides a narrow exception to the general rule that state and federal criminal laws can readily coexist.

As a practical matter, it is worth observing that the effective implementation of HB 4156 will likely require meaningful cooperation with federal authorities. Oklahoma would have to prove, after all, that an individual lacks legal immigration status, which is difficult to do without consulting the federal government. *See* Ex. 2, Anderson ¶ 8. This is not unusual. As Plaintiffs themselves observe, multiple sections of the federal immigration statutes call for State–federal cooperation in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1101(a)(15)(T)(i)(iii)(aa), 1101(a)(15)(U)(iii), 1324(c), 1357(g)(1)–(10); 18 U.S.C. § 758; 22 U.S.C. § 7105(c)(3)(C)(i). That is to say, the "federal scheme" "leaves room" for enforcement of a state law like HB 4156, much as it did "for a policy requiring state officials to contact ICE as a routine matter." *Arizona*, 567 U.S. at 412–13 (citing *Whiting*, 563 U.S. at 609–10).

Federal law also expressly permits state officials to "'communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" *Arizona*, 567 U.S. at 411–12 (quoting 8 U.S.C. § 1357(g)(10)(A)). They do so regularly. *See* Exhibit 3, Decl. of Rodney Scott, ¶ 12 ("in all prior administrations, DHS, and specifically [ICE Enforcement

16

and Removal Operations Branch], actively encouraged assistance from local law enforcement"). Along the same lines, "Congress has made clear that no formal agreement or special training needs to be in place" for state officers to communicate with the federal government about immigration status. *Arizona*, 567 U.S. at 411–12. In sum, under HB 4156, "Oklahoma law enforcement would be aiding ICE by helping clear their Fugitive Docket and reducing the demand on [enforcement] resources." Ex. 3, Scott ¶ 10.

In other words, HB 4156 comports and harmonizes with federal law; it does not conflict with or obstruct its application. "[T]here are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors." *Kansas*, 589 U.S. at 212. "[I]n the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Id.* HB 4156 does not criminalize under Oklahoma law anything that is not already criminal under federal law. It is no obstacle to federal law to make the violation of federal criminal immigration law a companionate crime in Oklahoma. "To hold otherwise would be to ignore the teaching of [Supreme Court] decisions which enjoin seeking out conflicts between state and federal [law] where none clearly exists." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960). It would also turn the states into little more than federal provinces or vassals, unable to do anything to protect their citizens from lawless intrusions, or even to pick up the slack should the federal government abandon its duty to enforce federal law.

To be sure, Plaintiffs claim there are "multiple 'inconsistenc[ies] between' H.B. 4156's entry and reentry crimes 'and federal law.'" *Padres Unidos* Mot. at 16 n.3 (citation omitted). But the only real difference specified is a six-month increase in the maximum punishment

permissible, *see id.*, and they cite no case indicating that such a minor difference in criminal-law punishments creates a "conflict" of any significance. *See, e.g.*, U.S. Mot. at 18 (relying solely on a civil law case on "remedies"). Regardless, if a minor difference in potential punishment stands as the only impediment to HB 4156's validity, then the Legislature can easily amend the statute during its next session. Defendants doubt Plaintiffs would find that satisfactory.

In truth, the only "obstacle" raised by HB 4156 is political, rather than legal—and therefore is not a valid basis for granting a preliminary injunction. The current presidential administration and its political appointees are loath to enforce federal law and secure the border, thus making their distaste for HB 4156 comprehensible. Indeed, the United States and its witnesses repeatedly make it plain that they have subordinated the enforcement of clear federal law to the whims of foreign governments. *See, e.g.*, U.S. Mot. Ex. 1, Jacobstein Decl. ¶ 6 ("This federal law must be employed with sensitivity to the spectrum of foreign relations interests …."). Given the admitted resemblance between HB 4156 and federal law, Defendants' claim that "HB 4156 would harm the United States' relationship with foreign nations … in multiple ways" and "antagonize foreign governments," U.S. Mot. at 22, can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has enacted because foreign governments will get angry. That is the only way its staunch opposition to HB 4156 makes any sense. If the United States were enforcing the law as it should be, it would have no problem with what Oklahoma is doing, in the same way that the United States has no problem with both the state and federal governments prosecuting fraud, murder, or bank robberies.

Tellingly, the United States concedes that "Oklahoma remains free to enforce its generally applicable criminal laws that prohibit drug, sex, or labor trafficking, *which apply to citizens and noncitizens alike*." U.S. Mot. at 24 (emphasis added). Plainly so: "The mere fact that state laws like the [] provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Id.* at 212. The United States has no choice but concede this point, because it knows that states regulate and prosecute unlawfully present individuals *all the time*. They do so whenever those persons are found in violation of other criminal laws within the jurisdiction. "For instance, the Oklahoma Department of Corrections reports that it currently houses nearly 500 illegal immigrants convicted of state crimes." Ex. 1, Drummond at 3–4; *see also, e.g.*, Ex. 3, Scott ¶ 12 ("It is important to note that having [an illegal alien] ... end up in local law enforcement custody is a regular occurrence around the country and there are already [ICE Enforcement and Removal Operations Branch] processes in place to handle such events."); Ex. 2, Anderson ¶ 8 (noting that Oklahoma Bureau of Narcotics "has no independent mechanism to confirm the legal status of an individual in the United States" and therefore "rel[ies] on federal law enforcement ... to determine legal status, especially in investigations of alleged human trafficking"). "Put differently, HB 4156 does not appear ... designed to operate in opposition to the federal government, but in some form of collaboration with it." Ex. 3, Anderson ¶ 8.

What the United States fails to acknowledge, however, is that Plaintiffs' arguments, if taken to their logical conclusion, would invariably undermine those everyday law enforcement

actions as well, essentially rendering illegal immigrants untouchable by state law. Nothing in Plaintiffs' rationale, that is, can somehow be limited to protecting immigrants from their violations of immigration laws only. Take an illegal immigrant who is arrested in Oklahoma for trespassing on private property. Would that immigrant's arrest and prosecution not risk angering a foreign government just as much as arresting and prosecuting him for unlawfully entering Oklahoma in general? If not, why not? Why can an illegal immigrant be prosecuted by Oklahoma for trespassing on, say, a 50,000-acre private farm but not for essentially trespassing in the State as a whole? And why would a State's initiating the former prosecution not infringe upon or upset the federal government's supposedly carefully crafted and discretionary law enforcement approach in dealing with illegal immigrants? We are not told. The answer to all this, of course, is that enforcing laws like HB 4156 would *not* actually change the way things currently work. Oklahoma and the United States would collaborate just as they currently do when an illegal immigrant is prosecuted for theft, murder, or a violation of countless other statutes that the United States would not dream of claiming are preempted.

In the end, the "Supremacy Clause gives priority to 'the laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Kansas*, 589 U.S. at 212 (quoting U.S. CONST. art. VI, cl. 2). That is to say, the United States cannot create conflict preemption with state laws that duplicate federal law by claiming it has the discretion not to enforce laws that Congress has passed. This is especially so when the federal statutes in question are phrased mandatorily—they both *require* ("shall") punishment for these offenses. *See* 8 U.S.C. §§ 1325(a), 1326(a). Plaintiffs have failed to show conflict preemption here.

**B.     No part of HB 4156 is field preempted.**

Nothing less than an "unambiguous congressional mandate" will support a finding of field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Only "[i]n rare cases" has the Supreme Court held "that Congress has 'legislated so comprehensively' in a particular field that it 'left no room for supplementary legislation.'" *Kansas*, 589 U.S. at 208 (citation omitted). This is not such a case. Oklahoma does not dispute that the federal government has broad power to regulate immigration. Federal immigration law controls "who should or should not be admitted into the country, and conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404, and *Kansas*, 589 U.S. at 195. But the Supreme Court "has never held that every state enactment which in any way deals with aliens" is "pre-empted by this constitutional power, whether latent or exercised." *DeCanas*, 424 U.S. at 355. The Court has also never "conclude[d] that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernable impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982).

Contrary to Plaintiffs' assertions, the federal government lacks exclusive power over the field of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond alien registration. In *Arizona*, the Court stated that the government "has occupied the field of alien registration," and then it proceeded to interpret the other challenged Arizona law sections using a conflict-preemption analysis. *Arizona*, 567 U.S. at 401, 403–13; *see also Kansas*, 589 U.S. at 210 (rejecting argument that *Arizona* requires broad application of immigration field preemption). The fact that the federal

government possesses exclusive power to admit and naturalize aliens does not deprive states of their concurrent and complementary power to take action against aliens who then violate federal standards. Indeed, the Supreme Court has expressly recognized that "the States do have some authority to act with respect to illegal aliens, **at least where such action mirrors federal objectives and furthers a legitimate state goal**." *Plyler*, 457 U.S. at 225 (emphasis added). Both are true here, which eliminates the possibility that Oklahoma is field preempted.

Indisputably, the "central concern" of the Immigration and Nationality Act "is with the terms and conditions of admission to the country and the subsequent treatment of aliens *lawfully* in the country." *DeCanas*, 424 U.S. at 359 (emphasis added). Oklahoma's HB 4156 does not punish aliens lawfully present in the country; instead, it expressly *protects* them. *See* HB 4156, § 1(A) ("it is a compelling public interest of this state to protect its ... lawfully present visitors"). HB 4156's criminal provisions deal solely with the alien who is both *unlawfully* present in the country *and subsequently found in Oklahoma*. Federal immigration law expressly anticipates and acknowledges state authority and involvement in this field. *See, e.g.*, 18 U.S.C. § 758 (making it a crime for alien to "flee[]" from "State[] or local law enforcement" around immigration checkpoints); 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) (contemplating "State[] or local investigation or prosecution" of illegal trafficking); *id.* § 1101(a)(15)(U)(iii) (state and local criminal laws can include trafficking); *id.* § 1324(c) (State law enforcement granted authority to make arrests for violation of alien smuggling prohibition); 22 U.S.C. § 7105(c)(3)(C)(i) (contemplating "State or local" prosecution of alien "trafficking").

HB 4156 does not intrude on a clearly preempted "field"—an area that courts have narrowly and carefully defined. A court "will not presume that Congress, in enacting the

[Immigration and Nationality Act], intended to oust state authority to regulate ... in a manner consistent with pertinent federal laws." *DeCanas*, 424 U.S. at 357. Even if this Court were to define the field more broadly, state law should not be impliedly preempted unless the federal government is actually occupying the field in question. Given the ongoing, unprecedented, and unabated border crisis, it is difficult to conclude anything other than that the federal government is "obviously derelict in enforcing" its "statutory obligations." *Texas*, 2023 WL 8285223, at *14; *see also Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023) (likening the current administration's actions to "posting a flashing 'Come In, We're Open' sign on the southern border"). The federal executive is entrusted to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. As a matter of equity and law, the federal government should not be allowed to invoke field preemption when it has abandoned the field and failed to "take Care" that basic immigration laws are enforced.

Moreover, Plaintiffs' overheated rhetoric notwithstanding, HB 4156 does not interfere with the United States's foreign relations in any coherent or meaningful way. "Every foreign government that negotiates with the United States understands, or should understand, that the Executive Branch of the Federal Government does not dictate all law and policy in this country." Ex. 4, Decl. of Christopher Landau, ¶ 5. Enforcing an illegal alien's compliance with bedrock federal law should have no bearing on relations with other countries, as those other countries have no "right" to insert their citizens into the United State illegally. *Compare* U.S. Mot. Ex. 1, Jacobstein ¶ 12 (indicating that laws like HB 4156 negatively affect "rights"), *with* Ex. 4, Landau ¶ 7 (explaining that a foreign country's "displeasure with federal and state laws and policies" has no "legal force to invalidate any law or policy that was otherwise duly

enacted"). In short, HB 4156 permissibly "mirrors federal objectives and furthers a legitimate state goal." *Plyler*, 457 U.S. at 225. HB 4156 thus avoids *Arizona*'s proscription on a state's entry into "an area the Federal Government has reserved for itself." 567 U.S. at 402.[11] Accordingly, Oklahoma's law permissibly adjoins the field of federal immigration law as valid—and necessary—supplementary legislation.

Plaintiffs' other arguments do not affect this conclusion. For example, the *Padres Unidos* Plaintiffs claim HB 4156 "would effectively banish a large set of immigrants from the State." *Padres Unidos* Mot. at 12. Granted, "a state's decision to impose 'distinct, unusual and extraordinary burdens and obligations upon aliens' *may* constitute an impermissible intrusion into the federal domain." *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) (emphasis added) (citation omitted). But HB 4156 does not deviate from federal law in any novel fashion. Whatever "set of immigrants" is "banish[ed]" from the State will be those whom federal law has deemed banish-able, and not those "lawfully present." HB 4156, § 1(A). And if that number is "large," then it only shows that federal law is currently being violated with impunity and on a massive scale, *in Oklahoma*. Plaintiffs' argument collapses on itself.

The *Padres Unidos* Plaintiffs also claim that Oklahoma threatens thousands of illegal aliens "whom the federal government *may* grant lawful status, permanent residence, and citizenship" at some later time. *Padres Unidos* Mot. at 13 (emphasis added). The contention is purely speculative, and certainly not worthy of facial relief. Oklahoma should not be expected

---

[11] To the extent that *Arizona* sweeps as broadly as the Plaintiffs claim, then the decision should be revisited and overruled by the Supreme Court. In the twelve years since *Arizona*, the illegal-migration crisis has grown ever more unmanageable for the states and ever more threatening to state sovereignty. And "*stare decisis* isn't supposed to be the art of methodically ignoring what everyone knows to be true." *Ramos v. Louisiana*, 590 U.S. 83, 105 (2020).

to stand idly in deference to hypothetical decisions about an individual's citizenship status that will likely take years to resolve. Either someone has permission to be here, or they do not. The Court should also discount Plaintiffs' gibe that complementary state legislation like Oklahoma's will lead to "a chaotic patchwork of 50 separate immigration systems." *Id.* at 14. "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory ... without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *see also* U.S. CONST. amend. X. Moreover, President Biden himself has admitted that the current system is "broken" and in "crisis." *See supra* pp.1–2. Maybe the United States should pay more attention to the current chaos that is of its own making, and not worry about states handling basic criminal law like they have done for hundreds of years.

C.    **The Foreign Commerce Clause does not prohibit states from criminalizing those immigrants who are illegally present because the regulated conduct is illegal and entirely unrelated to foreign commerce.**

Oklahoma is a sovereign entity. It has the power to exclude unlawfully present persons from its territory, subject to the limitations of the U.S. Constitution and applicable federal law. The power predates the Constitution itself, and "the Constitution did not strip states of that authority." *Arizona*, 567 U.S. at 418 (Scalia, J., concurring in part and dissenting in part). In this litigation, Plaintiffs contend that HB 4156 is unconstitutional because it allegedly interferes with the United States's power to regulate foreign commerce. This argument relies on a spectacularly overbroad interpretation of dormant Commerce Clause jurisprudence. Plaintiffs never convincingly explain how a state law that prohibits illegal entry and presence will

**J.A. 118**

negatively impact (or at all affect) international commerce. The reason for their omission is obvious: by its very nature, illegal immigration is not legitimate international commerce.

Historically, the primary function of the dormant Foreign Commerce Clause dealt with the taxation or regulation of entities transporting immigrants to the United States, not regulation of the immigrants themselves. Early on, the Supreme Court identified a difference between the regulation of people as commerce, and the regulation of people as an extension of that state's police power. *See Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102 (1837). *Miln* involved a state immigration statute that required each immigrant arriving at the Port of New York to be listed in a written report to the mayor; the master of the ship would be fined for each unreported immigrant brought into port. *Id.* at 130–32. The Court upheld the statute as "a regulation, ***not of commerce***, but police." *Id.* at 132 (emphasis added).

The Supreme Court has explained that "the dormant Commerce Clause's fundamental objective [is] preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). A state statute is valid, even if it places a burden on foreign commerce, unless the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). States are allowed to regulate local matters, and this includes commerce. *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766 (1945) ("Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation."); *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976) (stating that nondiscriminatory tax, when applied to imported goods, did not impact federal government's

regulation of foreign commerce). Here, Oklahoma's interest far outweighs any potential burden that may be placed on foreign commerce even when viewed through a purely economic lens.

Again, the purpose of the dormant Commerce Clause is to "prevent[] the States from adopting protectionist measures and thus preserve[] a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (stating that "economic isolationism" is "the very evil that the dormant Commerce Clause was designed to prevent"). And at root, HB 4156 "is not about economic protectionism; it is about unlawful immigration." *United States v. Texas*, 97 F.4th 268, 332 (5th Cir. 2024) (Oldham, J., dissenting). In other words, the law is an expression of a state's retained police power to punish those who are within its borders illegally, much in the same way that a state could punish an illegal immigrant for trespassing on the property of a private citizen. And the state may properly deploy its police power to take something undeniably illegal under federal law and criminalize the same act under state law—especially when doing so "protect[s] and enhance[s]" the "essential rights ... of its citizens, authorized residents, and lawfully present visitors." HB 4156, § 1(A). The fact that these actions are criminal under federal law makes it impossible for a dormant Foreign Commerce Clause violation to exist. Nothing is dormant: Congress has spoken, and it has outlawed the behavior.

To be sure, the United States has alleged it will suffer harm should HB 4156 go into effect. Specifically, it complains that Oklahoma's legislation will "antagonize foreign governments," "undermine long-term strategic partnerships," and "expose United States

citizens abroad to reciprocal and retaliatory treatment." U.S. Mot. at 22. But the United States's allegations of harm do not revolve around *commercial* harm, presumably because HB 4156 does not discriminate against foreign commerce. Ultimately, any burden the United States (or any foreign nation) may have due to HB 4156 does not involve commerce and cannot outweigh Oklahoma's interest in public safety.

Separately, the *Padres Unidos* Plaintiffs allege they will be harmed because HB 4156 might impede their free movement into and out of Oklahoma—in their view, a forbidden act of interference with interstate commerce. For this claim, they principally rely on *Edwards v. California*, 314 U.S. 160 (1941). The Court in *Edwards* invalidated a California statute that prohibited "bringing into the State any indigent person who is not a resident of the State," *id.* at 171, holding that such was "an unconstitutional burden upon interstate commerce," *id.* at 177. The Court's reasoning was straightforward: amid the Dust Bowl and the Great Depression, no "single State [could] isolate itself from difficulties common to all of them." *Id.* at 173; *cf. City of Philadelphia v. New Jersey*, 437 U.S. 617, 628 (1978) (disclaiming, in a case about waste disposal, an "attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate *trade*") (emphasis added).

In discussing *Edwards*, the *Padres Unidos* Plaintiffs omit the critical fact that the person California sought to exclude was "a citizen of the United States and a resident of Texas." *Id.* at 170. "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all *citizens* be free to travel throughout the length and breadth of our land ...." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) (emphasis added). Nothing in the Court's decision suggests—and the Court likely would have been astounded to contemplate—that a

noncitizen unlawfully in the country could enjoy unfettered freedom of movement across state lines without any objection from the affected states.

The case of *Japan Line v. County of Los Angeles*, 441 U.S. 434 (1979), is similarly instructive. There, a shipping company was temporarily holding its shipping containers in California. *Id.* at 436–37. The shipping containers were owned by a Japanese company and taxed as property in Japan. *Id.* at 436. California enacted an ad valorem tax against Japan Line's containers. *Id.* at 437. The Supreme Court found the tax unconstitutional because it subjected Japan Line to multiple taxation and violated the United States's ability to "speak with one voice" regarding foreign commerce. *Id.* at 449 (quotation omitted). Here, the bulk of the United States's argument centers on the claim that HB 4156 inhibits it from speaking with one voice on foreign *affairs*, not commerce. Specifically, it alleges that Oklahoma "disrupt[s] the uniform immigration laws and prevent[s] the federal government from conveying a unified message in sensitive area of foreign affairs." U.S. Mot. at 21. *Japan Line* confirms that the sole concern of the Foreign Commerce Clause is commercial relations. *See id.* at 448 (discussing the importance of "the Federal Government [] speaking with one voice when regulating commercial relations with foreign governments).

**D.    Oklahoma is constitutionally entitled to defend itself against invasion when the federal government abdicates its own duties.**

Even if HB 4156 somehow offends federal immigration law or the Commerce Clause, Oklahoma still retains an inherent, sovereign power of self-defense against invasion. *See* U.S. CONST. art. I, § 10, cl. 3 (States may respond when "actually invaded"). Upon entering the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean,

29

J.). Today, Oklahoma is in the throes of a crisis, while the federal government oscillates between neglectful indifference and outright antagonism. This is evidenced by the present lawsuit where the United States is protesting an Oklahoma law reflecting Congress's express priorities even while admitting our immigration system is "broken." *See supra* pp.1–3, 7–8. Oklahoma daily faces a veritable deluge of illegal immigration and criminality: desperate human beings, deadly weapons, dangerous drugs, etc. *See* Ex. 1, Drummond at 2–3. It is not hyperbole to call it an invasion when, as noted above, a population the size of Utah and Iowa has been added to our country in just three years. *See supra* p.2. And it does not violate the Constitution when a state takes steps to repel the invasion. States "may guard against the introduction of anything which may ... endanger the health or lives of their citizens." *Id.*

**E.      All Plaintiffs' claims are nonjusticiable.**

Axiomatically, a plaintiff must show it has a cause of action before it can demonstrate any likelihood of success. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). In this action, both the United States and the *Padres Unidos* Plaintiffs have brought nonjusticiable claims that bar an award of relief from this Court.

To be sure, the government "may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *U.S. v. California*, 655 F.2d 914, 918 (9th Cir. 1980). And "[f]ederal courts are courts of limited jurisdiction possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251 (2013) (cleaned up). Further, equitable relief must be "grounded in traditional equity practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

The United States points to neither a specific statutory authority nor a traditional equitable principle that would allow its claims to go forward. Rather, it relies on the Supremacy Clause, U.S. CONST. art. VI, cl. 2, and the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, for its claims against Oklahoma. *See* Doc. 1, ¶¶ 33–43 (Supremacy Clause-based preemption claims); ¶¶ 44–48 (Foreign Commerce Clause). But the Supremacy Clause does not confer a cause of action. "[T]he Supremacy Clause is not the source of any federal rights," and it "certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. In other words, it "creates a rule of decision" only. *Id.* at 324.

The Supremacy Clause does not "give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States." *Id.* at 325. The same rule holds true when a party other than the United States is the plaintiff: "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). For similar reasons, any claim predicated on Congress's "dormant" Foreign Commerce Clause must also fail because a supposedly dormant power necessarily implies the lack of a positive exercise of congressional authority in creating a cause of action.

Additionally, Padres Unidos de Tulsa (as organizational plaintiff) and the four individual plaintiffs have fallen short of a clear showing that they have the standing necessary to obtain a preliminary injunction. "[A]t the preliminary injunction stage, [plaintiffs] must make a clear showing that they have standing." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring in part and dissenting in part) (cleaned

J.A. 124

up). In a facial pre-enforcement challenge—as here—the *Padres Unidos* Plaintiffs must also show an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). "[T]he plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). The alleged "threatened injury must be certainly impending and not merely speculative." *Id.* (cleaned up); *see also Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007) ("In a plea for injunctive relief, a plaintiff cannot maintain standing by asserting an injury based merely on subjective apprehensions that the defendant might act unlawfully.") (cleaned up); *Younger v. Harris*, 401 U.S. 37, 42 (1971) (it is not enough for plaintiffs to allege that they "fe[lt] inhibited" by a law).

To be sure, "organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Padres Unidos de Tulsa has attempted to do so here. A membership organization has standing to bring suit if, in pertinent part, "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). A dilemma, however, is threaded throughout the *Padres Unidos* filings. In sum, the named individuals and affiants are either openly present in violation of federal law, meaning they are asking this Court to facilitate their illegality, or they are here in compliance with federal law, and thus HB 4156 cannot touch them. Either way, they lack standing. As for the first category, "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative &*

32

*Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc). That is precisely what is happening here. To the extent that any Plaintiffs are admitting they are here unlawfully under federal law, a ruling in their favor will *not* eliminate their unlawfulness, as is the typical case with a plaintiff challenging a law. Rather, they are complaining that Oklahoma's actions will make their "criminal activity more difficult" because—unlike the federal government— they believe Oklahoma may actually prosecute them. This cannot be a ground for standing, as this Court should not use its equitable powers to elude and undermine federal law. *See, e.g.*, *Original Invs., LLC v. Oklahoma*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021) ("[D]efendants argue that the court should not use its equitable power to facilitate conduct that is illegal under federal law. The court agrees."). As for the second possibility, that one or more of the Plaintiffs are here with express federal permission, that would preclude the enforcement of HB 4156.

In any event, Plaintiffs' assertions are speculative. HB 4156 does not become effective until July 1, 2024. Baseless assumptions about how a law might be enforced are insufficient to show actual, imminent harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (for standing, "an injury must be concrete, particularized, and actual or imminent") (cleaned up). It would be premature and inappropriate to enjoin HB 4156 "before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objectives." *Arizona*, 567 U.S. at 416.

## II.    The remaining factors weigh against granting an injunction.

This is pre-enforcement challenge to a law that will not go into effect until July 1, 2024. No harm has been inflicted on any of the Plaintiffs, who have also failed to demonstrate a

likelihood of success on the merits. This fact alone is fatal to their motions. The remaining factors, however, also weigh against granting a preliminary injunction.

Plaintiffs do not face irreparable harm. It could not possibly cause "irreparable harm" to the United States if Oklahoma—a separate sovereign—chooses to enforce a state law that is consistent and congruent with the laws of the United States. *Cf. Original Invs.*, 542 F. Supp. 3d at 1237 ("This Court is bound to follow the law as written and may not depart therefrom based on enforcement decisions made by the executive branch." (citation omitted)). Nor does it suffice to suggest that HB 4156 will hurt the United States' relationship with Mexico. As a former ambassador to Mexico testifies here: "Disagreements between nations are not inimical to diplomacy; they are the very predicate for diplomacy." Ex. 4, Landau ¶ 7. At any rate, the Mexican government's views (or that of any other foreign nation) on the wisdom of HB 4156 should carry no legal weight in this Court's analysis of this case. *See id.* ¶ 6.

The third and fourth factors—"harm to the opposing party and weighing the public interest"—"merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the equities favor Oklahoma because Oklahoma's hardship is greater. The State has a manifest and inviolate interest in addressing the ongoing border crisis. Oklahoma will suffer irreparable harm if its officials are enjoined from acting to protect those who are lawfully within State borders from those who are not. *See New York v. New Jersey*, 598 U.S. 218, 225 (2023) (describing "a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders"); HB 4156, § 1(A) ("protecting the health, safety, welfare, and constitutional rights of its citizens, authorized residents, and lawfully present visitors is of utmost importance"). And the unlawful activity associated with

illegal immigration harms everyone in Oklahoma, citizen and alien alike. *See Juidice v. Vail*, 430 U.S. 327, 335 (1977) (underscoring importance of "the State's interest in the enforcement of its criminal laws"). An injunction is not in the public interest.

Finally, Oklahoma respectfully emphasizes that its statutory enactments are presumed constitutional. *E.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[W]e give all statutes a presumption of constitutionality ...."); *Liddell v. Heavner*, 180 P.3d 1191, 1200 (Okla. 2008) (court presumes that "the Legislature conducts its business with due regard for the framers' and people's intent," and therefore a "statute will be presumed to conform to the state and federal Constitutions and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution"). Furthermore, "a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation omitted). A court should "prefer ... to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact."[12] *Id.* at 328–29 (citations omitted). Plaintiffs have not shown that they are likely to prevail on their claims. If the Court should find otherwise, then it should tailor a narrow remedy and sever only the provisions held invalid instead of preliminarily enjoining HB 4156 in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should deny the motions for a preliminary injunction. *A fortiori*, the Court should also deny the request for a permanent injunction.

---

[12] Moreover, Oklahoma statutes are presumed to be severable. OKLA. STAT. tit. 75, § 11a; *see Panhandle E. Pipeline Co. v. State ex rel. Comm'rs of Land Office*, 83 F.3d 1219, 1229 (10th Cir. 1996) ("The severability of a statute is an issue of state law.").

**J.A. 128**

Respectfully Submitted,

s/ *Garry M. Gaskins, II*

GARRY M. GASKINS, II, OBA 20212
  *Solicitor General*
ZACH WEST, OBA 30768
  *Director of Special Litigation*
CULLEN D. SWEENEY, OBA 30269
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants*

# Exhibit 1

*Attorney General Gentner Drummond's Written Testimony Submitted to the U.S. House Homeland Security Committee on Wednesday, January 10, 2024*

Good morning, Chairman Green, Ranking Member Thompson and members of the Committee. Thank you for inviting me to participate in today's hearing on this critical issue.

I am Gentner Drummond, and I was elected as Oklahoma's Attorney General in 2022.

As the chief law enforcement officer of Oklahoma, it is my duty to protect the people of my state. I am here to testify about the dangers my citizens face due to a porous border and the failure of the federal government to enforce the law.

In the early evening of November 20, 2022, law enforcement responded to a quadruple homicide after a Chinese national allegedly entered a garage on a 10-acre marijuana farm in Kingfisher County, about an hour's drive west of Oklahoma City. According to investigators, the man then pulled out a handgun and kept it trained on a group of people – also Chinese nationals – who were inside. He said they owed him $300,000 that he had invested in the grow operation, and that they had exactly 30 minutes to pay up or he would kill them all.

According to investigators, the assailant killed three men, execution-style, with gunshots to the back of the head, and one woman with two shots to the abdomen. Another man sustained a gunshot wound but survived after being medi-flighted for emergency surgery. It took personnel from six law enforcement agencies to process the gruesome scene.

Much to the credit of law enforcement, police arrested the suspect in Florida two days later.

The carnage of that day is but one tragic example of a failed system plagued by failing leadership. Throughout Oklahoma, law enforcement comes into daily contact with foreign nationals who entered our country illegally or who remain here illegally — or both. This is tragic and common in Oklahoma's illegal marijuana grow operations.

The voters of Oklahoma legalized medical marijuana in 2018. While that legalization led to some legitimate cannabis-related businesses, organized criminals have overtaken the industry.

1

Our law enforcement partners report that the foreign nationals most often involved in these illegal enterprises come from China and Mexico. We have identified individuals from many other countries, to include Cuba, Bulgaria and Russia.

The one thing these criminals have in common is that they have no regard for our laws or public safety. Criminal illegal immigrants are not content with only growing black-market marijuana. They also produce and distribute fentanyl, and they engage in sex trafficking and labor trafficking.

Oklahoma's law enforcement community fights a constant battle against these evils. The Oklahoma Bureau of Narcotics and Dangerous Drugs, the Oklahoma State Bureau of Investigation, and scores of municipal and county law enforcement agencies deserve much praise for their heroic efforts. Thanks to the leadership of Director Donnie Anderson, the director of the Oklahoma Bureau of Narcotics, his agents and law enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers. It should be no surprise to this committee that many of these criminals are foreign nationals who entered this country illegally through our unsecured southern border.

Even the state agency that was created to regulate the legal marijuana market has been forced to combat the explosion of illegal grows. My office has a strong partnership with the Oklahoma Medical Marijuana Authority, led by Director Adria Berry, which provides critical information to our agents and other law enforcement. Thanks to this collaboration, we are able to identify and investigate criminal enterprises that all too often are operated by foreign nationals.

While there have been great successes, the ongoing border crisis ensures a never-ending flood of illegal foreign nationals who continue to perpetrate criminal activities that endanger our people. You may wonder how these foreign nationals have infiltrated the medical marijuana industry in Oklahoma. The pattern is a common one. Foreign operatives conduct a "straw" purchase of rural property just outside city limits. Sometimes they have a front man lease the real estate. Either way, they take steps to conceal their activities. It is common to see that they have pushed up a

2

berm to prevent visibility from the roads. They often will post armed personnel to stand watch and imply threat.

Members, you can imagine the impact these kinds of actions have in communities throughout rural Oklahoma. Families are scared. They feel unsafe. Smaller law enforcement departments are literally out-manned and out-gunned, and they feel ill-equipped to address the threat.

When I was sworn in as Attorney General, I pledged to the people of Oklahoma that I would do everything in my power to protect them from these dangerous criminals. I petitioned our legislature for greater resources and broader authority to combat this threat. They responded with millions of dollars for equipment and personnel, and they granted my office more power to fight this criminal epidemic being fueled by the border crisis.

In response, I established the Organized Crime Task Force. It is the first of its kind for Oklahoma. And, of course, it is needed because federal officials have failed to enforce the law and secure the border. In the short seven months since its creation, the Organized Crime Task Force has investigated and is prosecuting more than 50 complex, multi-jurisdictional criminal cases. The vast majority of these cases involve Mexican or Chinese drug syndicates.

Because these foreign actors have no vested interest in the well-being of our communities, law enforcement officials have discovered rampant building-code violations that, in turn, have led to fires and explosions. In one case alone, fire at an illegal marijuana grow destroyed more than 10,000 acres and necessitated deploying the National Guard and other agencies across Oklahoma and Texas. In the wake of such incidents, my office demanded strict enforcement of building codes against these illegal foreign operators. As a result, approximately one-half of the marijuana grows in the state were found to be out of compliance. That translates to thousands of unsafe operations across Oklahoma, putting lives and communities at risk.

These foreign actors are creating additional costs that cannot fully be quantified. For instance, the Oklahoma Department of Corrections reports that it currently houses nearly 500 illegal

J.A. 133

immigrants convicted of state crimes. At an average cost of $63.53 per inmate per day, the State of Oklahoma pays roughly $11 million per year to incarcerate criminal illegals.

Before those criminal aliens were sent to the Department of Corrections, they were in the custody of a local jail, who have their own costs for housing. Likewise, there is a significant cost for law enforcement to investigate these crimes and for prosecutors to prosecute them.
The unsecure border contributes to costs beyond the criminal justice system as well. Oklahoma's water resource authority reports of strain on the utility grid when these operations – which employ no one legally and give nothing back to the community – demand commercial levels of water consumption. We have seen instances where a lone farmhouse is purchased by a foreign entity and a line that once consumed 3,000 to 4,000 gallons a month began consuming tens or hundreds of thousands of gallons monthly. This can equal the consumption of the entire local grid. Other bad actors drill un-permitted wells and draw down from the subterranean water of legitimate farmers, sometimes eliminating the source supply completely. Once these operations have run their course, the criminals simply pull up stakes overnight, leaving behind dilapidated, unsafe structures that are an environmental blight and a threat to public safety.

Additionally, it is widely understood that Oklahoma, like every other state, bears a significant financial burden related to the routine services that must be provided to those who are here illegally. While it is not possible to ascertain the exact amount of that cost to Oklahoma, it is easy to understand the magnitude of that cost. The State bears the burden for the education, health and welfare of a robust and growing illegal population. It is estimated that well over 100,000 live among us, costing Oklahoma taxpayers more than $750 million each year – with minimal offsetting return.

It is important to note that the illegal immigrant population in Oklahoma is vulnerable to exploitation. My office has observed many instances where members of this population become victims of horrific crimes. Every case being investigated by my Organized Crime Task Force – *every* single case – involves some level of undocumented labor trafficking. Law enforcement is seeing this particularly in operations run by Chinese nationals. Officers see tell-tale signs such as abandoned and substandard living conditions for workers and a complete disregard for human

4

welfare, not to mention countless Occupational Safety and Health Administration (OSHA) violations. We have examples of illegal workers being fed from dog-food bowls, and our agents plan to begin using so-called "cadaver" dogs to find potential unknown victims of these wretched conditions.

During an investigation into illegal drug activities by Chinese nationals, our agents recently coordinated with other law enforcement to serve simultaneous warrants on multiple addresses. At one location, agents found two female Chinese nationals, who spoke no English. Mattresses on the floor of their bedroom were littered with condoms, lotion and other unsavory supplies. The women had been in the country for months, but they could not say where they were and they had not been out of the house since their arrival. They simply awoke every day, worked and went back to sleep. This living horror, which was merely ***incidental*** to the initial investigation, further illustrates the human cost of allowing persons to remain unsafe and undocumented.

These foreign actors are blatant and cavalier in their efforts. Our investigators are finding job advertisements on international websites targeting and recruiting poor and rural Chinese. These ads, in Mandarin, are thinly veiled offerings to engage in criminal activity. One particularly distasteful ad recruits "girls under 50" for "purely formal bed" and "four days off a month." Another offers jobs for a "massage spa" to people who are "able to endure hardships" and who have "good hygiene."

Illegal aliens forced into this clandestine world have nowhere to turn. On the occasions that Oklahoma law enforcement ***does*** find people at these operations, agents resort to Google Translate attempting to communicate with Mandarin-speaking workers. The agents contact HSI, but invariably they are told that the system is too overloaded for the federal government to assist.

In the end, our officers know it doesn't really matter whether HSI responds. We confirm that anyone brought in to HSI will simply be released. Without appropriate recourse, officers typically are forced to leave the victimized illegal aliens where they were found.

The upshot is this: If an immigrant claims he or she has entered the country before November 1

J.A. 135

of 2020, to be deported they must have incurred at least two DUIs or a DUI plus a more egregious crime. This situation puts the criminal in control. The local field office director of HSI has been disempowered from removing persons without convictions, even if they are repeatedly implicated in criminal reports. Illegal immigrants are also taking advantage of VAWA (Violence Against Women Act) programs or DACA (Deferred Action for Childhood Arrivals) participation.

And it is important to remember that the crimes of these foreign actors range from prostitution to money-laundering to underground casinos. Among the Mexican drug cartels, the Oklahoma Bureau of Narcotics and federal authorities have seen increased activity from cartels such as La Familia, the New Generation Jalisco Cartel and the notorious Sinaloa Cartel.

With the cartels harvesting so much marijuana in Oklahoma, the issue is no longer about smuggled marijuana from Mexico. Rather, the contraband of choice is now fentanyl, a narcotic as addictive as it is deadly. In this regard, the director of the Houston High-Intensity Drug Trafficking Area, Mike McDaniel, reports that we are seeing unprecedented levels of partnership between Chinese nationals and the Mexican cartels operating along the southwest border. Chinese and Mexican nationals work alongside the cartels to produce the opioid in labs in Mexico before transporting it across the border. Director McDaniel indicates the cooperation extends to organized distribution schemes to the U.S. The illicit fentanyl industry is incredibly lucrative. One gram, roughly the weight of a single Sweet & Low packet, can produce 500 pills at an expense of about 10 cents. On the street, each pill sells for between $10 and $20.

When Oklahoma law enforcement first interdicted large quantities, we were not seeing an equivalent amount on the street, which led us to believe that the supply was supporting drug habits of insular communities such as foreign-run marijuana grow operations. Tragically, that threat has now invaded our own communities. In 2017, Oklahoma recorded 54 fentanyl overdoses. Only five years later, that number grew to 474. While final figures for this past year are not yet known, we do know there were 317 fentanyl deaths in the first *five* months of 2023 *alone*. The situation has become so dire, in fact, Oklahoma's Department of Mental Health now

J.A. 136

operates vending machines for Naloxone, which is used to treat people who are overdosing on an opioid.

The opioid user is not the only one put in harm's way. In August of last year, law enforcement officers in northern Oklahoma responded to a local residence for a welfare check. An officer checking out the premises unknowingly was exposed to fentanyl. He collapsed to the ground, unconscious. The officer's partner was able to administer a triple dose of Naloxone to bring him back from the brink of death.

Mr. Chairman, members of the committee, I believe it is time for accountability. The people of Oklahoma don't deserve to live under constant threat from criminal foreign nationals. The people of Oklahoma don't deserve to have their communities flooded with illegal drugs that were smuggled across our unsecure border. Oklahoma families don't deserve to have their loved ones ripped away by those same drugs.

Members, once the hearing process is concluded, you will have a very weighty decision to make. I trust that each of you has great respect for that solemn duty, and that you will make your decision with great care and deliberation.

As I conclude my testimony here today, I want to ask you to remember the people of Oklahoma as you deliberate. Remember the murder victims, and the drug overdose victims, and the families who mourn them. And of course, please remember the law enforcement officers who risk their lives every day to protect us from it all.

Thank you, Mr. Chairman, Mr. Ranking Member, and members of the Committee.

J.A. 137

# Exhibit 2

*Declaration of Donnie Anderson*

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.                                                             Case No.      5:24-cv-00511-J

THE STATE OF OKLAHOMA, *et al.*

*Defendants.*

## DECLARATION OF DONNIE ANDERSON

I, Donnie Anderson, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. As the Director, I supervise the staff of the Oklahoma Bureau of Narcotics and am responsible for the administration and enforcement of the Uniform Controlled Dangerous Substances Act pursuant to 63 O.S. 2023, § 2-101 *et seq.* The Bureau was established by the Legislature as a law enforcement agency in 1975 and is presently mandated to exercise civil, criminal, and administrative enforcement and regulatory powers as they relate to controlled dangerous substances, money laundering, and human trafficking.

2.      Since the State of Oklahoma approved medical marijuana in 2018, the Bureau has seen a significant increase in the number of encounters with foreign nationals, both with and without legal status in the United States, operating within medical marijuana facilities. As acknowledged in House Bill 4156, such encounters are "increasingly frequent" and "particularly common in regard to illegal marijuana grow operations, which have exploded in

number in recent years."

3.     Many of these medical marijuana facilities rely on low paid agricultural workers to perform labor for operations. These laborers are often foreign nationals, both with and without legal status. These laborers make up the low-cost workforce that allows the black market marijuana trade to persist. Some of the laborers serve as prime targets for labor exploitation by human traffickers who themselves may also be foreign nationals, both with and without legal status.

4.     The Bureau has conducted several hundred investigations and enforcement actions involving black-market marijuana operations since 2018. Several of our investigations and subsequent enforcement actions taken related to illegal marijuana operations stem from tips made by concerned property owners in rural communities who notice unusual and unsettling activity occurring on neighboring properties. In fact, these tips are one of the primary ways that we learn about black-market operations. These grow operations can also affect rural communities through introducing banned foreign chemicals to the land, abandoning of grow cites by operators, and the stressing of electrical utilities and water resources. It is clear that rural Oklahomans are being increasingly affected and disturbed by illegal operations in the State.

5.     During the course of those investigations, the Bureau has uncovered numerous instances of suspected human trafficking of foreign nationals. Some examples include laborers who were not being paid for their work or continuously being promised future payment upon harvest of the marijuana crop. The Bureau has also observed workers with limited access to food or shelter, and others who were not in possession of their identification documents, such

2

as an official ID card or passport, because these documents were kept by those in charge at another location. In certain investigations, we have documented instances of the same laborers being contacted at successive illegal grow operations. In other words, these laborers move to the next black-market operation after the Bureau shuts down the illegal grow at which they were contacted. These examples can also be indicative of human trafficking and labor exploitation of vulnerable individuals, even if not admitted to by suspected victims.

6.    In sum, these laborers, whether trafficked or not, play a major role in the massive black-market industry by providing the low-paid workforce necessary to perpetuate it. House Bill 4156 could address that problem, both by discouraging persons unlawfully in the United States from coming to Oklahoma, and by providing the Bureau and other Oklahoma law enforcement with an additional tool to use against persons here willingly and unlawfully. The hope is to shrink the black market by shrinking the available labor force. Of course, discerning between those who are trafficked and those who are willingly violating the law is a challenging task, especially when, as occurs, those in charge of black-market grows disguise themselves as mere or even trafficked laborers. But it is a task the Bureau and other Oklahoma law enforcement are capable of tackling.

7.    Because many of these black-market operations are associated with international criminal organizations, we have seen violent and deadly altercations occurring at illicit marijuana grows. A recent tragic example of this occurred at a black-market marijuana farm in Kingfisher County, Oklahoma. A Chinese national, demanding that workers at the grow give him hundreds of thousands of dollars as a return for his investment, ultimately executed four other Chinese nationals. The killer, who was ultimately charged in Oklahoma

3

and pled guilty to murdering the four workers, initially fled to Florida because he feared being killed by others in the criminal organization if he remained in Oklahoma. Many other violent crimes occur that go unreported because the victims or affected grows are also involved in the black-market marijuana trade.

8.     At present, the Oklahoma Bureau of Narcotics has no independent mechanism to confirm the legal status of an individual in the United States. We rely on federal law enforcement, to include Homeland Security Investigations (HSI), the Drug Enforcement Administration (DEA), and the Federal Bureau of Investigation (FBI), to determine legal status, especially in investigations of alleged human trafficking.  Thus, although House Bill 4156 provides another tool in our toolchest for going after criminals, it would necessarily be limited by the resources available to the Bureau and the willingness of the federal government to assist. Put differently, HB 4156 does not appear to me to be designed to operate in opposition to the federal government, but in some form of collaboration with it.

9.     While the Bureau aggressively targets black-market criminals and human traffickers in its enforcement efforts; we will continue to aid victims of human trafficking, with or without legal status, under House Bill 4156 by connecting victims of human trafficking with charities and other local, state, and federal resources available. We will continue to work with federal law enforcement to ensure public safety, enforce the law, and support victims.

Executed on June 12, 2024.

_Donnie Anderson_

Donnie Anderson

4

**J.A. 142**

# Exhibit 3

*Declaration of Rodney S. Scott*

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br><br>v.<br><br>THE STATE OF OKLAHOMA, *et al.*<br>*Defendants.* | Case No.   5:24-cv-00511-J |

## DECLARATION OF RODNEY S. SCOTT

I, Rodney S. Scott, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I served as the Chief, U.S. Border Patrol (USBP), of U.S. Customs and Border Protection (CBP) from February 2, 2020, to August 14, 2021.  My tenure as Chief of USBP spanned portions of Joe Biden's as well as Donald Trump's Presidential Administrations.  I honorably retired on August 14, 2021, after serving more than 29 years as a U.S. Border Patrol agent.  Prior to being the Chief of USBP, I was the Chief of the San Diego Sector.  That Sector (a term for the geographic demarcation of a particular area of responsibility within USBP) includes approximately 60 linear miles of border shared with Mexico and 931 miles of coastal border, with approximately 2,200 Border Patrol Agents.  I have also served in various other leadership positions in USBP, including Chief Patrol Agent of the El Centro Sector; Deputy Chief Patrol Agent at San Diego Sector; Patrol Agent in Charge at the Brown Field Station in San Diego Sector; Assistant Chief in CBP's Office of Anti-Terrorism in Washington, D.C.; and Director/Division Chief for the Incident Management and Operations Coordination Division at CBP Headquarters.

2.      In my position as the Chief of USBP, I was the highest ranking official within USBP, responsible for executing the missions of the Department of Homeland Security (DHS), CBP, and USBP.  The USBP is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons and for preventing the illicit trafficking of people and contraband between ports of entry.  USBP has a workforce of over 21,000 personnel who patrol the border of the United States in-between the legal Ports of Entry.  As Chief, I was also responsible for the daily operations of USBP, including the development and implementation of all nationwide policy decisions.

3.      US Border Patrol interacts with US Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations Branch (ERO) on a daily basis.  Over the past 14 years, I routinely interacted with my counterparts within ERO leadership to include integrated planning that sought to prioritize limited capabilities and resources.

4.      I am familiar with the Operational Priorities memo issued on September 30, 2021, by the Secretary of Homeland Security titled: "Guidance for the Enforcement of Civil Immigration Law."

5.      I am very accustomed to prioritizing operations based on limited resources, as this was a routine aspect of my leadership duties over the last 20 years of my career.

6.      I currently reside in Oklahoma, and I work as a Distinguished Senior Fellow for Border Security for the Texas Public Policy Foundation.

7.      Based on my experience and knowledge, I believe that Oklahoma's HB 4156 is consistent with, and supportive of, federal immigration law enforcement and can be implemented without any measurable impact on ERO functions, resources, or routine

operations.  I see no evidence that HB 4156 will create any significant operational challenges for ERO or any federal government entity.

8.      I have reviewed the declaration submitted by Acting Deputy Executive Associate Director Russell Hott. I disagree with several of Hott's assertions as detailed below.

9.      Hott claims broadly that HB 4156 would affect 27,000 non-detained cases. Hott Decl. ¶ 19.  However, it is unclear from his declaration whether HB 4156 would apply to a portion of or all of these cases/aliens based on the requirements set forth in Section 2(B) of HB 4156. Hott's declaration does not make it clear, for instance, whether any or all of these 27,000 individuals first obtained legal authorization to enter the United States.

10.     Hott also mentions 6,000 non-detained cases with final orders of removal with last claimed addresses in Oklahoma.  Hott Decl. ¶ 19.  If those 6,000 cases/aliens—and the portion of the 27,000 other cases/aliens, if any, subject to HB 4156, *id.*—were located and arrested by state or local authorities, Oklahoma law enforcement would be aiding ICE by helping clear their Fugitive Docket and reducing the demand on ERO resources.

11.     Lastly, any alien that has been convicted of impermissible occupation within the State of Oklahoma, and has thereafter been released, and who chooses to remain in the United States but departs Oklahoma as ordered, can petition ICE ERO or an immigration judge for a change of venue.  If the illegal alien chooses to leave the United States voluntarily, then again, the demand on ERO's limited resources is decreased, improving their capability to focus on the highest threats as they determine appropriate.

12.     It is important to note that having a case/alien on a non-detained docket end up in local law enforcement custody is a regular occurrence around the country and there are

3

already ERO processes in place to handle such events.   Furthermore, in all prior administrations, DHS, and specifically ERO, actively encouraged assistance from local law enforcement and even supported legislation to create the 287(g) program, which authorizes ICE to delegate to state and local law-enforcement officers the authority to perform specified immigration-officer functions under the agency's direction and oversight.  8 U.S.C. § 1357(g). There are currently three such agreements in place with local law enforcement in Oklahoma. In light of this historical perspective and the facts above, it is my professional assessment that HB 4156 will support national security and is complementary of federal law, not in opposition to it.

Executed on June 11, 2024.

_____

Rodney S. Scott

4

# Exhibit 4

*Declaration of Christopher Landau*

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | Case No.    5:24-cv-00511-J |
| THE STATE OF OKLAHOMA, *et al.* | |
| *Defendants.* | |

## DECLARATION OF CHRISTOPHER LANDAU

I, Christopher Landau, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.    I served as the United States Ambassador to Mexico from 2019 to 2021.  In that capacity, I had extensive dealings with Mexican government officials on the entire spectrum of issues in the bilateral relationship.

2.    I have also practiced law for almost thirty-five years, including service as a law clerk to both Justice Antonin Scalia and Justice Clarence Thomas on the United States Supreme Court.  I am a graduate of Harvard College and Harvard Law School.

3.    I submit this Declaration in response to the Declaration of Eric Jacobstein, which asserts that "[i]f allowed to enter into force, HB 4156 . . . would result in significant and ongoing negative consequences for U.S. foreign relations."  Jacobstein Decl. ¶ 6.  In particular, Mr. Jacobstein notes that "Mexico's Consulate in Oklahoma City expressed its concern about the law and reiterated the valuable economic and other contributions that the Mexican migrant community make to society in the United States," *id.* ¶ 11, and that Mexican government officials have expressed concerns about other state laws, *see id.* ¶¶ 12–13.

4.     I take no position on whether HB 4156 is preempted by federal law.  Rather, I respond only to the Jacobstein Declaration's suggestion that a foreign government's reaction to a state law may itself provide a basis for invalidating that law.

5.     Every foreign government that negotiates with the United States understands, or should understand, that the Executive Branch of the Federal Government does not dictate all law and policy in this country.  Rather, the United States Constitution allocates power among the three Branches of the Federal Government, and between the Federal Government and the States.  Accordingly, it is not unusual that the Legislative or Judicial Branches of the Federal Government, or the States, make decisions with which the Executive Branch of the Federal Government disagrees.  For example, Congress may pass a law over the President's veto, the Supreme Court may decide a case against the Executive Branch, or a state may pass a law that does not align with the Federal Executive's policy priorities.  The fact that the Federal Executive alone does not dictate all law and policy in this country is not a flaw in our constitutional system; it is the very essence of our constitutional system.

6.     It follows that, insofar as a state law is not preempted by federal law under the normal rules of preemption, the Federal Executive's antipathy to that law provides no basis for invalidating it.  And it follows *a fortiori* that, insofar as a state law is not preempted by federal law under the normal rules of preemption, a *foreign* government's antipathy to that law provides no basis for invalidating it.

7.     During my tenure as Ambassador to Mexico, representatives of the Mexican government not infrequently expressed displeasure with federal and state laws and policies in the United States.  Similarly, I not infrequently expressed displeasure with federal and state

2

**J.A. 150**

laws and policies in Mexico. But none of us imagined that those expressions would have any legal force to invalidate any law or policy that was otherwise duly enacted under the other country's domestic law. Indeed, everyone in diplomacy understands that foreign governments (except perhaps despotic regimes) operate under domestic legal constraints. Disagreements between nations are not inimical to diplomacy; they are the very predicate for diplomacy.

Executed on June 12, 2024.

_____

Christopher Landau

3

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE STATE OF OKLAHOMA, *et al.*,<br><br>                    Defendants. | Case No. 5:24-cv-00511-J |

## UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ............................................... 1

ARGUMENT ................................................... 2

I.      The United States Has Demonstrated that HB 4156 Is Unconstitutional. ....... 2

        A.     HB 4156 is field preempted. ................................. 2

        B.     HB 4156 is conflict preempted. ............................. 5

        C.     HB 4156 violates the Foreign Commerce Clause. ................ 9

        D.     The United States may sue in equity to enjoin HB 4156. .................... 11

        E.     The State War Clause does not justify HB 4156. ................ 13

II.     The Equitable Factors Support Entering an Injunction. .............................. 14

CONCLUSION ................................................ 15

i

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States,*
   567 U.S. 387 (2012) .................................................................*passim*

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) ....................................................................12,13

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
   512 U.S. 298 (1994) .................................................................... 10

*Bd. of Tr. of Univ. of Ill. v. United States,*
   289 U.S. 48 (1933) ...................................................................... 10

*Buckman Co. v. Pls.' Legal Comm.,*
   531 U.S. 341 (2001) .................................................................. 5, 6

*California v. United States,*
   104 F.3d 1086 (9th Cir. 1997) ........................................................... 13

*Chamber of Commerce v. Whiting,*
   563 U.S. 582 (2011) ......................................................................7

*Chy Lung v. Freeman,*
   92 U.S. 275 (1875) ...................................................................... 10

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ..................................................................11, 14

*DeCanas v. Bica,*
   424 U.S. 351 (1976) .................................................................. 2, 5

*Ex parte Young,*
   209 U.S. 123 (1908) ...................................................................... 13

*Florida v. United States,*
   660 F. Supp. 3d 1239 (N.D. Fla. 2023) ............................................... 5

*Ga. Latino All. for Human Rights v. Governor of Ga.,*
   691 F.3d 1250 (11th Cir. 2012) ...........................................................4

ii

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ........................................................................... 12

*Head Money Cases*,
    112 U.S. 580 (1884) ........................................................................... 10

*Heckman v. United States*,
    224 U.S. 413 (1912) ........................................................................... 12

*Henderson v. Mayor of New York*,
    92 U.S. 259 (1875) ............................................................................. 10

*In re Debs*,
    158 U.S. 564 (1895) ........................................................................ 2, 12

*Jama v. ICE*,
    543 U.S. 335 (2005) ............................................................................. 6

*Japan Line, Ltd. v. Cnty. of Los Angeles*,
    441 U.S. 434 (1979) ........................................................................... 10

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ............................................................................. 7

*Kraft Gen. Foods, Inc. v. Iowa Dep't of Rev. & Fin.*,
    505 U.S. 71 (1992) ............................................................................. 11

*Lozano v. City of Hazleton*,
    724 F.3d 297 (3d Cir. 2013) ................................................................. 5

*Maine v. Taylor*,
    477 U.S. 131 (1986) ........................................................................... 11

*Mayor of New York v. Miln*,
    36 U.S. (11 Pet.) 102 (1837) ........................................................... 9, 10

*Michelin Tire Corp. v. Wages*,
    423 U.S. 276 (1976) ........................................................................... 11

*Nat'l Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999) ................................................................. 11

iii

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) .................................................................. 13

*Padavan v. United States*,
    82 F.3d 23 (2d Cir. 1996) .................................................................. 13

*Plyler v. Doe*,
    457 U.S. 202 (1982) ...................................................................... 4, 5

*Sanitary Dist. of Chi. v. United States*,
    266 U.S. 405 (1925) ......................................................................... 12

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948) ........................................................................... 2

*Texas v. DHS*,
    23-CV-00055-AM, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023)...................... 5

*Truax v. Raich*,
    239 U.S. 33 (1915) ............................................................................ 2

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ................................................... 8, 9, 12

*United States v. Am. Bell Tel. Co.*,
    128 U.S. 315 (1888) ......................................................................... 12

*United States v. California*
    655 F.2d 914 (9th Cir. 1980) ........................................................... 12

*United States v. Durham*,
    902 F.3d 1180 (10th Cir. 2018) ....................................................... 10

*United States v. Iowa*,
    --- F. Supp. 3d ---, 2024 WL 3035430 (S.D. Iowa June 17, 2024)................*passim*

*United States v. San Jacinto Tin Co.*,
    125 U.S. 273 (1888) ......................................................................... 12

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ........................................................5, 12

*United States v. Supreme Ct. of N.M.*,
    839 F.3d 888 (10th Cir. 2016) .......................................................................... 13

*United States v. Texas*,
    97 F.4th 268 (5th Cir. 2024) ...................................................................*passim*

*United States v. Texas*,
    599 U.S. 670 (2023) ..................................................................................... 3, 6

*United States v. Texas*,
    --- F. Supp. 3d ---, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) ...................*passim*

*United States v. Washington*,
    596 U.S. 832 (2022) ......................................................................................... 12

*Va. Off. For Prot. & Advocacy v. Stewart*,
    563 U.S. 247 (2011) ......................................................................................... 13

*Wyandotte Transp. Co. v. United States*,
    389 U.S. 191 (1967) ......................................................................................... 12

## Constitutional Provisions

U.S. Const. art. I, § 8, cl.3 ................................................................................... 9

U.S. Const. art. I, § 10, cl. 3 ...........................................................................2, 13

## Statutes

8 U.S.C. § 1324 ..................................................................................................... 4

8 U.S.C. § 1325 ..................................................................................................... 6

8 U.S.C. § 1326 .................................................................................................. 4, 6

28 U.S.C. § 1331 ................................................................................................. 12

28 U.S.C. § 1651 ................................................................................................. 12

v

**J.A. 157**

**INTRODUCTION**

Oklahoma fails to rebut the United States' showing that HB 4156 is unconstitutional and that the equities favor enjoining its enforcement. Not only does Oklahoma's opposition ignore the decision preliminarily enjoining Texas's similar immigration law, SB 4, *United States v. Texas*, --- F. Supp. 3d ---, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) (*Texas SB 4*); *see also United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (*Texas SB 4*) (denying stay pending appeal), but also another federal court has since preliminarily enjoined Iowa's version of SB 4—SF 2340—because it too is likely field and conflict preempted, *United States v. Iowa*, --- F. Supp. 3d ---, 2024 WL 3035430, slip op. at 19-23 (S.D. Iowa June 17, 2024) (attached as Ex. 1).

Oklahoma acknowledges (at 21-22) that "the federal government possesses exclusive power to admit … [noncitizens]" and "[f]ederal immigration laws control who should or should not be admitted into the country." The State also does not dispute that the removal of noncitizens is exclusively a federal concern. These concessions foreclose Oklahoma's contention (at 8) that it can enforce a "criminal analogue to federal criminal illegal entry" provisions. The Supreme Court has held that "[w]here Congress occupies an entire field … even complementary state regulation is impermissible." *Arizona v. United States*, 567 U.S. 387, 401 (2012). "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* Regardless of how Oklahoma interprets or enforces HB 4156, the law is field preempted because it seeks to regulate a field occupied by Congress—the entry, presence, and removal of noncitizens.

HB 4156 is also conflict preempted. By creating "a state offense, with state penalties, for a noncitizen who is in the United States illegally," Opp. at 1, HB 4156 interferes with the comprehensive federal scheme that grants federal officials broad enforcement discretion. HB 4156 also exceeds federal limitations on when state officials may assist in enforcing immigration laws, criminalizes unlawful presence

when federal law does not, and frustrates the federal removal scheme.

While Oklahoma asserts (at 20) that enjoining HB 4156 would render undocumented noncitizens "untouchable by state law," that is inaccurate. The State may enforce its generally applicable criminal laws against citizens and noncitizens alike. But HB 4156 is no such law. This suit merely seeks to prevent Oklahoma from creating its own immigration system. To the extent Oklahoma challenges the United States' ability to sue, it has long been established that the United States has a right to seek equitable relief from the courts to defend its sovereign interests. *See In re Debs*, 158 U.S. 564, 582 (1895); *see also Arizona*, 567 U.S. at 393-94. Finally, the State War Clause, which prohibits States from "engag[ing] in War, unless actually invaded," U.S. Const. art. I, § 10, cl. 3, does not justify HB 4156 because there is no invasion and Oklahoma is not engaged in war.

Because the United States has shown that HB 4156 is unconstitutional and because the declarations submitted by the State do not rebut the United States' showing of irreparable harm or establish that the State's purported injuries outweigh those harms, HB 4156 should be enjoined.

## ARGUMENT

### I.    The United States Has Demonstrated that HB 4156 Is Unconstitutional.

#### A.    HB 4156 is field preempted.

Despite Oklahoma's suggestion (at 21) that field preemption in the immigration area is limited to "alien registration," the Supreme Court has long recognized that the admission of noncitizens is exclusively a federal concern, *see, e.g.*, *Truax v. Raich*, 239 U.S. 33, 42 (1915), as is removal, *Arizona*, 567 U.S. at 409; *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (States have no power to determine "the period [noncitizens] may remain"). Oklahoma essentially so concedes. *See* Opp. at 21 ("Federal immigration law controls 'who should or should not be admitted … and the conditions under which a legal entrant may remain.'" (quoting *DeCanas v. Bica*, 424

U.S. 351, 355 (1976))), 21-22 ("[T]he federal government possesses exclusive power to admit [noncitizens]"). The State's creation of "a state offense, with state penalties," for noncitizens who "unlawfully enter, re-enter, or remain in Oklahoma," Opp. at 1, thus intrudes on that exclusive federal field and is preempted even if it were parallel to federal law, *see Arizona*, 567 U.S. at 401; *Texas SB 4*, 97 F.4th at 286; *Iowa*, slip op. at 21.

In addition, as the United States has demonstrated (at 12-13), *Arizona*'s field-preemption holding on alien registration applies equally to HB 4156 because, like the Arizona law, HB 4156 would detract from a comprehensive federal scheme and diminish federal control over its enforcement. Federal courts considering Texas's and Iowa's similar laws have so held. *See Texas SB 4*, 2024 WL 861526, at *14; *Iowa*, slip op. at 20-21. This is particularly true for the field of entry and removal of noncitizens, where Congress has vested broad discretion in federal officials. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 678-79 (2023) (*Texas Priorities*) (recognizing Executive Branch's "discretion over whether to remove a noncitizen from the United States"). Oklahoma argues (at 21-22) that "[t]he fact that the federal government possesses exclusive power to admit … aliens does not deprive states of their concurrent and complementary power to take action against aliens who then violate federal standards." But the premise of field preemption is that "[w]here Congress occupies an entire field," it "foreclose[s] any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.

Oklahoma also argues (at 12) that "the Supreme Court has never recognized 'exclusive' federal authority over all laws touching on immigration." The field the United States identifies (at 11), however, is noncitizen entry, presence, and removal. Oklahoma cites no case suggesting that States have a role to play in that field,[1] nor

---

[1] Congress determined that certain noncitizens convicted of illegal reentry under federal law are eligible for enhanced penalties if they were previously removed from

does it have any response to the cases the United States cited (at 13) holding that state immigration crimes paralleling federal criminal prohibitions against aiding or assisting certain noncitizens to enter the United States, 8 U.S.C. § 1324, are field preempted.

At the other extreme, Oklahoma attempts (at 22) to limit the relevant field to only those noncitizens *lawfully* in the country. But as the United States has explained (at 3), Congress has codified a comprehensive scheme defining who may enter and how, the consequences for violating those provisions, and the procedures by which those consequences are imposed. *See Arizona*, 567 U.S. at 407-08. The field clearly includes the regulation of noncitizens who entered the United States *unlawfully*.

Oklahoma's citations (at 21-23) to authorities addressing concurrent state and federal regulation of noncitizens on other matters are beside the point. Statutes contemplating state involvement in anti-trafficking enforcement do not give States authority to determine whether a noncitizen's entry was lawful. And even where federal law contemplates state officers making arrests for violations of federal law, *see* 8 U.S.C. § 1324(c), States have no authority to prosecute those offenses, *see, e.g.*, *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012).

Equally unhelpful is Oklahoma's citation (at 21) to *Plyler v. Doe*, 457 U.S. 202 (1982). *Plyler* upheld an equal-protection challenge to a state law denying undocumented children access to public schools. 457 U.S. at 205. In doing so, the Supreme Court recognized the federal government's "plenary authority" over entry of noncitizens into the United States and, conversely, States' lack of "direct interest in

---

the country after committing particular crimes. 8 U.S.C. § 1326(b). For purposes of those enhanced penalties, Congress defined "removal" to include a noncitizen's stipulation to removal "during (or not during) a criminal trial under either Federal or State law." Contrary to amicus Immigration Reform Law Institute's assertion (at 5-6), that definition does not indicate that States may punish unlawful entry or banish noncitizens from their territory. It merely ensures that the enhanced-penalty provisions apply to noncitizens who satisfy the conditions in § 1326(b)(1)-(4).

controlling entry," *id.* at 225, 228 n.23. While the Court also acknowledged that States may take some action regulating the *conduct* of undocumented noncitizens so long as it does not conflict with federal law, *see id.* at 225, 228 n.23 (citing *DeCanas*, 424 U.S. at 354-56), it did not suggest that States could enact laws like HB 4156 that seek to regulate noncitizens' entry, presence, and removal.

Lastly, citing irregular migration at the Southern border, Oklahoma argues (at 23) that field preemption does not apply because the federal government is not "actually occupying the field in question." The argument has no basis in fact. *See* Mot. at 6-7; Jacobstein Decl. ¶¶ 17-23, ECF No. 4-1. More importantly, field preemption depends on whether *Congress* has regulated the field comprehensively (which it has), *see, e.g.*, *Arizona*, 567 U.S. at 399, and Oklahoma cites no case to the contrary.[2] For the same reasons, the Fifth Circuit rejected Texas's identical argument when denying a stay pending appeal. *See Texas SB 4*, 97 F.4th at 287-88.

### B.   HB 4156 is conflict preempted.

Oklahoma also fails to rebut the United States' independent showing (at 15-19) that HB 4156 conflicts with federal law and is thus preempted on that basis as well.

First, Oklahoma wrongly suggests (at 13) that a presumption against preemption applies. The presumption is inapplicable because the admission and removal of noncitizens is not "a field which the States have traditionally occupied." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001); *see Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (presumption inapplicable where state law hinged "solely on immigration status" and intruded on area of "significant federal presence"); *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) (similar). Even if the presumption applied, it is rebutted by HB 4156's conflicts with federal law.

---

[2] Neither *Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023), nor *Texas v. DHS*, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023), cited by Oklahoma (at 23), involved field preemption.

Second, Oklahoma contends (at 14-17, 19) that because HB 4156 parallels 8 U.S.C. §§ 1325 and 1326, it is not preempted. However, even if HB 4156 overlapped entirely with federal law (and it does not), it still conflicts with the careful balance that Congress struck concerning entry and removal. *See Arizona*, 567 U.S. at 407-08. The federal framework "entrust[s]" enforcement of the entry and removal provisions "to the discretion of the Federal Government," *id.* at 409, which can balance the "difficult (and often competing) objectives" of immigration law, *Buckman*, 531 U.S. at 350; *see Texas Priorities*, 599 U.S. at 679 ("Executive's enforcement [of immigration law] implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives'"); *Jama v. ICE*, 543 U.S. 335, 348 (2005) (enforcement of immigration law "require[s] consideration of changing political and economic circumstances").[3] This exclusively federal character makes this case an even more straightforward application of conflict-preemption principles than *Buckman*, where the Supreme Court held that a State could not impose tort liability for fraud committed against the Food and Drug Administration and an entity it regulates in light of the "inherently federal" nature of the relationship between the FDA and the regulated entity. 531 U.S. at 347. As the Court reasoned, the "federal statutory scheme amply empowers the FDA to punish and deter fraud against the [FDA]" and allows the FDA to achieve a "somewhat delicate balance of statutory objectives," which the Court found, would be "skewed by allowing fraud-on-the-FDA claims under state tort law." *Id.* at 348. Here, enforcement of HB 4156 would similarly skew the balance struck by Congress in regulating entry, presence, and removal.

---

[3] Oklahoma implies (at 14) that 8 U.S.C. §§ 1325 and 1326's use of the word "shall" somehow withdraws the Executive Branch's prosecutorial discretion. That is incorrect; read in context the word merely indicates the applicable punishment for those convicted of unlawful entry or reentry. Regardless, the Supreme Court has acknowledged that the Executive Branch has authority to make enforcement decisions, including how to allocate resources. *See Texas Priorities*, 599 U.S. at 679-80.

Oklahoma's heavy reliance on *Kansas v. Garcia*, 589 U.S. 191 (2020), is misplaced. That case involved a generally applicable state law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike." *Id.* at 198. Although the law overlapped with a federal law making it unlawful to knowingly hire a noncitizen who is not authorized to work, there was "no suggestion that the [state] prosecutions frustrated any federal interests." *Id.* at 212. To the contrary, the Court noted that the federal government "played a role" in, and "fully support[ed]," the State's prosecution. *Id.* Nothing in that case—which did not involve a State regulating immigration—suggests that a State may create a parallel immigration regime regulating the entry and removal of noncitizens.[4]

Third, contrary to Oklahoma's claims (at 17), HB 4156 neither "comports" nor "harmonizes with federal law." In addition to wresting enforcement discretion from federal officials, HB 4156 § 2 exceeds the limited circumstances in which state officials may assist in the enforcement of immigration law, *see* Mot. at 4-5, 16-17; *see also Arizona*, 567 U.S. at 409; *Texas SB 4*, 97 F.4th at 292-94. Oklahoma argues that it intends to cooperate with federal officials through "regular[]" communications. Opp. at 16. But *Arizona* held that "no coherent understanding of the term ['cooperation'] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." 567 U.S. at 410. HB 4156 is even more problematic because it also authorizes state prosecution and penalties.

Further, HB 4156 punishes conduct that federal law does not. As previously

---

[4] Oklahoma also relies (at 14-15) on *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011). That case concerned only whether a State could require employers to use a federal program to verify whether employees are authorized to work—a program the federal government was itself encouraging employers to use. *See id.* at 609-10. It did not allow state prosecutions of federal immigration crimes.

noted (at 18), federal law does not criminalize unlawful presence, yet Oklahoma acknowledges (at 8-9) that HB 4156 § 2(B)-(C) does so. Even if Oklahoma shares the same goal as federal law, adopting a different "method of enforcement" presents an obstacle to Congress's carefully balanced scheme and is preempted. *Arizona*, 567 U.S. at 406 ("a [c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy").

Oklahoma also argues (at 9) that HB 4156's requirement that convicted noncitizens leave Oklahoma within 72 hours of conviction or release from custody does not conflict with the federal removal scheme because it does not require Oklahoma "to deport anyone to a foreign country" or require anyone "to leave the country." But such a provision presents an obstacle to the federal removal scheme because the exclusive federal authority to determine who should be removed from the United States includes the authority to determine who may remain in the United States, including in Oklahoma. *See United States v. Alabama*, 691 F.3d 1269, 1295-96 (11th Cir. 2012) (States cannot "unilaterally determine that an[] alien unlawfully present in the United States cannot live within the state's territory"). Allowing each State to enact "similar legislation to overburden the lives of [noncitizens]" would turn "the immigration scheme … on its head." *Id.* at 1295 n.21. And imprisonment and banishment would affect the government's conduct of, and noncitizens' participation in, removal proceedings. *See* Hott Decl. ¶¶ 20-21, ECF No. 4-2.

Fourth, contrary to Oklahoma's argument (at 12, 33), this facial, pre-enforcement suit is not premature. Oklahoma seems to suggest that the United States cannot bring a facial preemption challenge here. But a facial challenge on field-preemption grounds is proper because field preemption's "basic premise" is that States are wholly precluded from acting within an area of exclusive federal governance, *Arizona*, 567 U.S. at 400, 402, and here, HB 4156 intrudes into such an area. The United States' pre-enforcement conflict-preemption challenge is also proper because

the identified HB 4156 provisions can never be constitutionally enforced due to their conflicts with federal law. Indeed, *Arizona* was a pre-enforcement challenge where the Supreme Court found several state-law provisions field or conflict preempted. The Court left one provision in place because the conflict with federal law would arise only if state officials abused their authority under the law, and the Court refused to presume such misconduct. 567 U.S. at 411-12, 415 (discussing § 2(B) of the state law). That is not the case here; the "practical result" of HB 4156 will be obstruction of federal law. *Alabama*, 691 F.3d at 1296. HB 4156 is preempted on its face.

Finally, enjoining HB 4156 does not render unlawful entrants "untouchable by state law," as Oklahoma maintains (at 20). Indeed, Oklahoma acknowledges (at 19-20) that this suit does not attempt to restrict any State's enforcement of generally applicable criminal laws and takes no issue with Oklahoma prosecuting anyone "found in violation of other criminal laws within the jurisdiction," *id.* at 19. If Oklahoma wants to enforce its trespass law against citizens and noncitizens alike who enter "a 50,000-acre private farm" without permission, *id.* at 20, this suit and federal immigration law would be no barrier.

### C.    HB 4156 violates the Foreign Commerce Clause.

The United States showed (at 20-21) that HB 4156 violates the Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, because it discriminates against foreign commerce—here, the movement of noncitizens—by penalizing only those noncitizens who unlawfully enter or reenter the United States and then are found in Oklahoma and because it burdens foreign commerce by undermining federal uniformity in this area. *See Texas SB 4*, 2024 WL 861526, at *23-24 (concluding Texas's SB 4 likely violates the Foreign Commerce Clause). Oklahoma's responses lack merit.

First, contrary to its claim (at 25), Oklahoma does not have "the power to exclude unlawfully present persons from its territory." Oklahoma cites (at 25-26) Justice Scalia's *Arizona* dissent and *Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102

9

(1837), as support. But the *Arizona* majority rejected the State's efforts to "achieve its own immigration policy." 567 U.S. at 408. And *Miln* upheld only a state law requiring shipmasters to provide a list of disembarking foreign passengers. *See* 36 U.S. at 133. Whatever the Supreme Court might have suggested in dicta about States' power to exclude noncitizens, *id.* at 132, it subsequently limited *Miln*, *see, e.g.*, *Henderson v. Mayor of New York*, 92 U.S. 259, 269 (1875) ("*Miln* … decide[d] that the requirement of a catalogue of passengers … [wa]s a proper exercise of State authority."). Since *Miln*, the Supreme Court has repeatedly struck down state laws that precluded or burdened noncitizens' entry into the United States. *See, e.g.*, *Henderson*, 92 U.S at 274 (striking down state law requiring shipmaster to pay bond for disembarking noncitizens); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (striking down similar law because "[t]he passage of laws which concern the admission of [noncitizens] to our shores belongs to Congress, and not to the States," due to Congress's "power to regulate commerce"). HB 4156 is similarly unconstitutional.

Second, Oklahoma denies (at 27, 29) that HB 4156 affects commerce, let alone foreign commerce. But the Supreme Court has long recognized that the regulation of noncitizens' entry into this country is regulation of foreign commerce, *see, e.g.*, *Henderson*, 92 U.S. at 270-71; *Chy Lung*, 92 U.S. at 280; *Head Money Cases*, 112 U.S. 580, 591-92 (1884), and that the United States must "speak[] with one voice" in such matters, *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 449 (1979); *see also Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) ("[I]n 'the unique context of foreign commerce,' a State's power is further constrained because of 'the special need for federal uniformity.'"). Indeed, "[t]he principle of duality in our system of government," *i.e.*, federalism, "does not touch the authority of the Congress in the regulation of foreign commerce," *Bd. of Tr. of Univ. of Ill. v. United States*, 289 U.S. 48, 57 (1933); *cf. United States v. Durham*, 902 F.3d 1180, 1199 (10th Cir. 2018) ("The economic-noneconomic distinction arises from federalism concerns."). Thus, courts

have repeatedly rejected arguments, like Oklahoma's (at 27), that the Foreign Commerce Clause prohibits only "protectionist measures," *see, e.g.*, *Kraft Gen. Foods, Inc. v. Iowa Dep't of Rev. & Fin.*, 505 U.S. 71, 79 (1992) ("favoritism is [not] an essential element of a violation of the Foreign Commerce Clause"); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999) (same), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). Here, HB 4156 regulates foreign commerce because it seeks to regulate the movement into Oklahoma of noncitizens who have unlawfully entered the United States. Even if not discriminatory, it at least undermines federal uniformity. Accordingly, it violates the Foreign Commerce Clause.[5]

Finally, Oklahoma errs (at 27) in contending that Congress's extensive regulation of entry and removal obviates the limits imposed by the Foreign Commerce Clause. The Supreme Court "has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.'" *Maine v. Taylor*, 477 U.S. 131, 139-40 (1986). Here, Oklahoma points to no "unmistakably clear" congressional approval for state criminalization of illegal entry or reentry and ignores the case finding that Texas's analogous SB 4 also violates the Foreign Commerce Clause. *Texas SB 4*, 2024 WL 861526, at *23-24.

**D.    The United States may sue in equity to enjoin HB 4156.**

Oklahoma is incorrect (at 30-31) that the United States' claims are

---

[5] The State relies almost exclusively on cases involving domestic commerce. In the one case it cites (at 27) potentially implicating foreign commerce—*Michelin Tire Corp. v. Wages*, 423 U.S. 276 (1976)—the Court merely held that nondiscriminatory *ad valorem* property taxes on imported goods that "had lost their status as imports" did not violate the Import-Export Clause. *Id.* at 302. Rather than suggesting that States may regulate foreign commerce as they pleased, the Court explained that the Commerce Clause corrected "[o]ne of the major defects of the Articles of Confederation"—that "individual States" were "free to burden commerce both among themselves and with foreign countries very much as they pleased," *id.* at 283, 286. That's what Oklahoma seeks to do here with HB 4156.

J.A. 168

nonjusticiable. The United States has a right to sue in equity to enjoin preempted laws.

The Supreme Court has long recognized the United States' authority to apply to its own courts to protect its sovereign interests. *See, e.g.*, *In re Debs*, 158 U.S. at 582; *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888); *United States v. Am. Bell Tel. Co.*, 128 U.S. 315 (1888); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). The United States has, in fact, brought such suits in a variety of contexts. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 837 (2022) (to assert intergovernmental immunity); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 425-26 (1925) (to enforce treaty obligations); *Heckman v. United States*, 224 U.S. 413, 438-39 (1912) (to protect Indian tribes). This includes suits to enjoin preempted state immigration laws. *See, e.g.*, *Arizona*, 567 U.S. 387, *South Carolina*, 720 F.3d at 524-25; *Alabama*, 691 F.3d at 1279. The Fifth Circuit recently rejected this same argument asserted by Texas in defense of Texas's similar law, reasoning that there is "no basis in the precedent … for concluding that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law." *Texas SB 4*, 97 F.4th at 278; *see also Iowa*, slip op. at 18-19 (rejecting Iowa's identical argument).

Oklahoma (at 31) cites *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), for the proposition that the Supremacy Clause itself does not confer a right of action.[6] However, the United States is not contending otherwise; instead, it invokes the Court's equitable jurisdiction. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) (federal courts can grant such relief as "was traditionally accorded by courts of equity"); 28 U.S.C. §§ 1331, 1651. In *Armstrong*, the Supreme Court recognized such an equitable right of action generally exists but held that, in the circumstances of that case (unlike here), it had been displaced by Congress.

---

[6] *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980), also cited by Oklahoma (at 30), is inapposite because it involved an attempt to assert a cause of action under *state law*, not an equitable cause of action like the one asserted here.

575 U.S. at 327, 329. The Tenth Circuit has thus acknowledged that *Armstrong* "counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest," *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016). In any event, the United States can proceed under *Ex parte Young*, 209 U.S. 123 (1908), because it alleges an imminent or "ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Off. For Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011); *see id.* at 256 (*Ex parte Young* action does not "turn on the identity of the plaintiff").

     **E.    The State War Clause does not justify HB 4156.**

     Oklahoma argues summarily (at 30) that the State War Clause authorizes the State to use HB 4156 to combat a "veritable deluge of illegal immigration and criminality." That argument is flawed in multiple respects. *See Texas SB 4*, 2024 WL 861526, at *24-38 (rejecting Texas's reliance on the Clause to defend SB 4). The Clause forbids States to "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay," U.S. Const. art. I, § 10, cl. 3. Here, Oklahoma does not purport to be engaging in war; enactment of a criminal law regarding the general entry and presence of noncitizens is hardly war-making. Moreover, every court to have considered whether irregular migration constitutes "invasion" has concluded that it does not. *See Texas SB 4*, 2024 WL 861526, at *24-38; *California v. United States*, 104 F.3d 1086, 1090-92 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996).

     In any event, while the Clause provides a time-limited emergency authority allowing a State to address circumstances that "will not admit of delay" until the federal government has had a chance to respond, U.S. Const. art. I, § 10, cl. 3, it does not entitle a State to persist in war-related activities indefinitely or disregard a federal determination about whether (and how) to "engage in War" or to pursue other measures in response to particular circumstances. *See Texas SB 4*, 2024 WL 861526, at

*28 (recognizing that "[t]he State War Clause … authorizes states to respond to invasion only as an emergency interim measure" but requires them to "cede authority to the federal government to conduct [any] war once [it] has had time to respond"). Here, Oklahoma has no authority under the Clause because both Congress, through the INA, and the Executive have determined how best to respond to irregular migration, *see* Jacobstein Decl.¶¶ 17-23; *see also* Opp. at 7 (acknowledging recent Executive measures to address irregular migration).

## II.     The Equitable Factors Support Entering an Injunction.

Oklahoma (at 33-35) fails to rebut the United States' showing of irreparable harm. The State does not deny that enforcement of a preempted law would cause irreparable harm; it merely repeats its mistaken belief that HB 4156 is not preempted.

Former Ambassador Landau's declaration does not refute the State Department's showing that HB 4156 would antagonize foreign governments and thus interfere with the Executive's conduct of foreign relations, undermine the United States' comprehensive diplomatic strategy to address irregular migration, and risk retaliatory treatment of U.S. citizens. *See* Jacobstein Decl. ¶¶ 9-26. Rather, Landau posits the unremarkable—albeit circular—proposition that "insofar as a state law is not preempted by federal law under the normal rules of preemption, … a *foreign* government's antipathy to that law provides no basis for invalidating it." Landau Decl. ¶ 6, ECF No. 21-4. Regardless, the State Department's declaration concerns the irreparable harm to the federal government and the public interest (which are relevant factors for the United States' request for injunction relief, *see* Mot. at 10), which Landau does not dispute. Nor can he dispute that the State Department's representation of foreign relations harm is entitled to deference. *See Crosby*, 530 U.S. at 386 (recognizing that the "nuances" of "the foreign policy of the United States … are much more the province" of the political branches, including the capacity to "determin[e] precisely when foreign nations will be offended by particular acts").

14

Likewise, former Border Patrol Chief Scott's declaration does not refute the showing of the U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), that HB 4156 will interfere with ERO's operations. While Scott questioned ERO's statistics as to the noncitizens potentially affected by HB 4156, Scott Decl. ¶¶ 9-10, ECF No. 21-3, he does not deny that ERO has identified the relevant populations or that conviction under HB 4156 could prevent noncitizens from participating in federal immigration proceedings, Hott Decl. ¶ 19. Scott speculates (at ¶ 10) that enforcement of HB 4156 will "reduc[e] the demand on ERO resources." But he never explains how that would be true. Indeed, ERO's resources are taxed whether the noncitizens are in Oklahoma or elsewhere in the United States. If anything, causing noncitizens to leave Oklahoma will likely lead to inefficiency and delays. *See* Hott Decl. ¶¶ 20-21. While Scott, who never served with ICE, baldly asserts that enforcement of HB 4156 would "aid[] ICE," Scott Decl. ¶ 10, the assertion should be given no weight given that the ICE official responsible for the operations at issue here has explained that the contrary is true, *see* Hott Decl. ¶¶ 20-21.

Lastly, Oklahoma's claims of countervailing harm do not withstand scrutiny. No State has an interest in enforcing an unconstitutional law. *See Texas SB 4*, 2024 WL 861526 at *41. Nor is HB 4156 necessary to prevent immigration-related harms. As the United States has previously explained, that is the federal government's responsibility, and States have no legally cognizable interest in asserting such harms, *see* Mot. at 24. To the extent Oklahoma cites harms that relate to "illegal marijuana grow operations," "organized crime such as drug cartels," "fentanyl distribution," and sex and "labor trafficking," HB 4156, § 1; *see also* Drummond Test. at 1-3, ECF No. 21-1; Anderson Decl. ¶¶ 4-7, 9, ECF No. 21-2, the requested injunction does not affect Oklahoma's ability to use generally applicable laws to address them.

## CONCLUSION

The Court should enjoin the enforcement of HB 4156.

J.A. 172

DATED: June 18, 2024        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs
Branch

*/s/ Christopher A. Eiswerth*
CHRISTOPHER A. EISWERTH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 305-0568
Email:  christopher.a.eiswerth@usdoj.gov

*Counsel for the United States*

16

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA, et al.,        )
                                          )
                Plaintiffs,               )
                                          )
v.                                        )        Case No. CIV-24-511-J
                                          )
THE STATE OF OKLAHOMA, et al.,            )
                                          )
                Defendants.               )

**ORDER**

This matter centers around the constitutionality of Oklahoma House Bill 4156 (H.B. 4156), signed into law by Oklahoma Governor Kevin Stitt on April 30, 2024. The law, effective July 1, 2024, imposes state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States. *See* H.B. 4156, 59th Leg., 2d Reg. Sess. (Okla. 2024) (codified at Okla. Stat. tit. 21, § 1795).

On May 21, 2024, the United States filed suit against the State of Oklahoma, Oklahoma Governor Kevin Stitt, Oklahoma Attorney General Gentner Drummond, the Oklahoma Department of Public Safety, and Oklahoma Department of Public Safety Commissioner Tim Tipton (collectively, Oklahoma). [Doc. No. 1]. The United States seeks declaratory and injunctive relief enjoining Oklahoma from enforcing H.B. 4156. On May 22, it formally moved to enjoin enforcement, arguing principally that H.B. 4156 is preempted under federal law. [Doc. No. 4].

On May 23, a similar lawsuit was filed by Padres Unidos de Tulsa and one private individual against Oklahoma Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler. *Padres Unidos de Tulsa v. Drummond*, No. CIV-24-526-J (W.D. Okla.), [Doc. No. 1]. An amended complaint was filed on May 24, adding

**J.A. 174**

three more private individuals as plaintiffs. *Id.*, [Doc. No. 14]. The same day, on grounds similar to those argued by the United States, Padres Unidos de Tulsa and the four private individuals (collectively, the Padres Unidos Plaintiffs) moved to enjoin enforcement of H.B. 4156. *Id.*, [Doc. No. 15].

The Court consolidated the two cases on June 5. [Doc. No. 17].[1] The United States' motion for injunctive relief is presently before the Court.[2] (U.S. Mot.) [Doc. No. 4]. Oklahoma responded, (Okla. Resp.) [Doc. No. 21], and the United States replied, [Doc. No. 28].[3] Upon careful review of the parties' submissions, the Court makes its determination.

## I.   **Background**

### A.   **Federal Statutory Immigration Framework**

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens," authority that rests on its constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). "For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024) (emphasis in original) (collecting cases); *see also*

---

[1] Unless otherwise specified, all subsequent document references are to the electronic case filing system in *United States v. Oklahoma*, No. CIV-24-511-J.

[2] The United States and the Padres Unidos Plaintiffs raise substantially similar arguments in their respective motions for injunctive relief. In response, however, Oklahoma raises a standing argument against the Padres Unidos Plaintiffs that it does not raise against the United States. Given the Court's desire to promptly rule on the underlying constitutionality of H.B. 4156, this Order will address only the United States' motion.

[3] All page citations refer to the Court's CM/ECF pagination.

*DeCanas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404; *Hampton v. Mow Sun Wong*, 426 U.S. 88, 95 (1976) ("Congress and the President have broad power over immigration and naturalization which the States do not possess."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."). It "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks omitted); *see also Lopez v. INS*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("[W]e note that the United States Constitution confers on Congress the power to regulate matters relating to immigration. . . . This broad grant of authority is exclusive to Congress.").

Consistent with this legislative power, in 1952, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The INA provides a comprehensive framework regulating the entry, presence, and removal of noncitizens. *Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal."); *DeCanas*, 424 U.S. at 353 (deeming the INA a "comprehensive federal statutory scheme for regulation of immigration"). This framework is bolstered by a multifaceted enforcement scheme—with both criminal and civil components.

For instance, federal law mandates that entry into the United States occur through designated entry points, where noncitizens must present necessary entry documents and undergo inspection by federal immigration officers. 8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the

3

United States shall be inspected by immigration officers."); 8 C.F.R. § 235.1 (requiring that noncitizens apply for lawful entry in person at designated ports of entry and present required documents for inspection). Under the INA, noncitizens who surreptitiously enter or reenter the United States may face federal criminal prosecution. 8 U.S.C. §§ 1325(a), 1326(a). The law also criminalizes activities that involve smuggling noncitizens into the United States, transporting noncitizens within the United States, or otherwise assisting unlawfully present noncitizens to remain. *Id.* § 1324.

In addition to these criminal penalties, noncitizens who have engaged in certain types of prohibited conduct may be denied admission to the United States or, if already present, face removal. *Id.* § 1182(a) (establishing grounds for denying admission and for removing an unadmitted noncitizen); *id.* § 1227(a) (establishing grounds for removing an admitted noncitizen). Removal proceedings are civil, not criminal, in nature. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). Where a federal immigration officer determines that a noncitizen arriving in the United States is inadmissible because they misrepresented their admission status or lack valid entry documents, the immigration officer must generally order the noncitizen removed from the United States without further hearing or review. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7). Similar expedited proceedings apply to noncitizens already present in the country if they "(1) [are] inadmissible because he or she lacks a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal." *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citing 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(I)-(II)). Conversely, for all other removable noncitizens apprehended within the United States, more standard proceedings apply. 8 U.S.C. § 1229a(a)(3)

4

("Unless otherwise specified . . . , a [standard] proceeding . . . shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").

The INA specifies that "[a]n immigration judge shall conduct [standard] proceedings for deciding the inadmissibility or deportability of an alien." *Id.* § 1229a(a)(1).   During these proceedings, "aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Arizona*, 567 U.S. at 396 (citing 8 U.S.C. §§ 1229a(c)(4), 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)).  "If . . . the alien is [ultimately] ordered removed, the alien can appeal the removal order to the Board of Immigration Appeals and, if that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals." *Thuraissigiam*, 591 U.S. at 108 (citing 8 U.S.C. §§ 1229a(c)(5), 1252(a)).

The INA empowers the Department of Homeland Security (DHS), among other federal agencies, to administer and enforce immigration laws.  The Secretary of DHS is "charged with the administration and enforcement" of the INA "and all other laws relating to the immigration and naturalization of aliens," and "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority."  8 U.S.C. § 1103(a)(1), (3).  DHS's authority extends to immigration enforcement efforts at and within the country's borders.  *Id.* § 1103(a)(5) (granting the Secretary of DHS "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens"); *id.* § 1357 (granting federal immigration officers specific law enforcement powers for enforcing immigration laws).

Subagencies within DHS "play a major role in enforcing the country's immigration laws." *Arizona*, 567 U.S. at 397.  U.S. Customs and Border Protection, in conjunction with other federal

agencies, bears responsibility to "enforce . . . all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, . . . and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement, another DHS subagency, is "responsible for the identification, apprehension, and removal of illegal aliens from the United States." *Arizona*, 567 U.S. at 397 (internal quotation marks omitted). Subagencies within DHS often collaborate with local and state authorities in federal immigration enforcement efforts, and it is evident that Congress contemplated some assistance from state and local officers. *Id.* at 410. Indeed, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408.

**B.     Unlawful Immigration in Oklahoma**

"The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397. Oklahoma undoubtedly "bears many of the consequences of unlawful immigration." *Id.* This Court need look no further than H.B. 4156 itself.

H.B. 4156 declares that a "crisis exists in Oklahoma," one which is "endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local governmental entities." H.B. 4156 § 1(B). "Throughout the state, law enforcement comes into daily and increasingly frequent contact with foreign nationals who entered the country illegally or who remain here illegally." *Id.* "Often, these persons are involved with organized crimes such as drug cartels, they have no regard for Oklahoma's laws or public safety, and they produce or are involved with fentanyl distribution, sex trafficking, and labor trafficking." *Id.* H.B. 4156 provides that "Oklahoma agents and law

enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border." *Id.* Oklahoma places the blame for this crisis squarely on the current presidential administration. *See, e.g.*, Okla. Resp. at 26 ("The current presidential administration and its political appointees are loath to enforce federal law and secure the border, thus making their distaste for H.B. 4156 comprehensible.").

Criminal activity associated with unlawful immigration is not, however, a recent phenomenon. Indeed, in *Arizona*, a preemption case decided in 2012, the Supreme Court acknowledged the "[h]undreds of thousands of deportable aliens . . . apprehended in Arizona" around that time. *Arizona*, 567 U.S. at 397; *see also id.* ("Unauthorized aliens who remain in the State constitute, by one estimate, almost 6% of the population."). The record before the *Arizona* Court evidenced "an epidemic of crime, safety risks, serious property damage, and environmental problems associated with the influx of illegal migration across private land near the Mexican border." *Id.* at 398 (internal quotation marks omitted). Arizona, like Oklahoma, was exceedingly frustrated with the then-presidential administration's enforcement of federal immigration laws—consequences it bore directly. *See* Brief for Petitioners, *Arizona*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 416748, at *2 ("The President fairly describes our Nation's system of immigration regulation and enforcement as 'broken.' Lack of effective enforcement of the existing immigration rules has permitted an estimated 11 million aliens to reside in the United States unlawfully." (footnote omitted)); *id.* at *3 ("Th[e] flood of unlawful cross-border traffic, and the accompanying influx of illegal drugs, dangerous criminals and highly vulnerable persons, have resulted in massive problems for Arizona's citizens and government, leaving them to bear a seriously disproportionate share of the burden of an already urgent national problem."); *id.* at *3–4

("Unlawfully entering aliens include criminals evading prosecution in their home countries and members of Mexican drug cartels—organizations the federal government has called more sophisticated and dangerous than any other organized criminal enterprise.  Such cartels have repeatedly threatened the lives of American police officers working near the border." (footnote and internal quotation marks omitted)); *id.* at *8 ("Arizona has repeatedly asked the federal government for more vigorous federal enforcement, but to no avail." (internal citation omitted)).  And Arizona sought to address its "crisis" with its own state immigration legislation, S.B. 1070.  *See id.* at *60 ("[I]t is the disuniformity of federal immigration enforcement efforts that has funneled unlawful entrants to Arizona and exacerbated the crisis that led to S.B. 1070's enactment.").

Notwithstanding these serious concerns, the Supreme Court in *Arizona* found that most provisions of S.B. 1070 were preempted.  *See Arizona*, 567 U.S. at 400–10.  While making clear that "[t]he problems posed to the State[s] by illegal immigration must not be underestimated," *id.* at 398, the Supreme Court nonetheless constrained the state legislation that it concluded impermissibly intruded into areas of immigration regulation.

### C.   H.B. 4156

For reasons similar to those in *Arizona*, Oklahoma's H.B. 4156 takes aim at illegal immigration.  To that end, the law first criminalizes "impermissible occupations" in Oklahoma.  "A person commits an impermissible occupation if the person is an alien"—meaning "any person not a citizen or national of the United States"—and "willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States."  H.B. 4156 § 2(A)-(B).  A first-time conviction for impermissible occupation is classified as a misdemeanor, "punishable by imprisonment in the county jail for a term of not more

than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment." *Id.* § 2(C)(1). Any second or subsequent conviction for impermissible occupation, or any impermissible occupation "committed during the commission of any other crime," is classified as a felony, "punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." *Id.* § 2(C)(2). And for any impermissible occupation, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* § 2(C)(1)-(2).

A charge of impermissible occupation is subject to certain affirmative defenses, specifically: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; and (3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals Program between certain dates. *Id.* § 2(F).

H.B. 4156 also criminalizes the act of entering or attempting to enter Oklahoma by "[a]ny alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding," unless (1) "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission"; or (2) "[w]ith respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent." *Id.* § 2(D). A noncitizen convicted under § 2(D) is deemed guilty of a

felony, punishable by imprisonment for up to two years, a fine not exceeding $1,000.00, or both. *Id.* And like § 2(C), all those convicted under § 2(D) must leave Oklahoma. *Id.*

## II.   Preliminary Injunction Standard

The United States seeks a preliminary injunction barring Oklahoma's enforcement of H.B. 4156.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "An injunction can issue only if each factor is established."  *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

## III.   Analysis

### A.   Likelihood of Success on the Merits

The United States contends that H.B. 4156 facially[4] violates both the Supremacy Clause and the Commerce Clause of the United States Constitution.  Regarding the Supremacy Clause, the United States argues, among other things, that H.B. 4156 impermissibly regulates conduct comprehensively governed by federal law, undermines the federal government's dominant interest in setting immigration policy, and conflicts with established procedures for state and local participation in immigration enforcement.  *See* U.S. Mot. at 18–27.  As for the Commerce Clause,

---

[4] A litigant "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both."  *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011).  "A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id.* (brackets and internal quotation marks omitted).

it argues that H.B. 4156 discriminates against foreign commerce, disrupts uniform immigration laws, and prevents the federal government from speaking with one voice in foreign relations. *Id.* at 28–29.

### 1.        Preemption Under the Supremacy Clause

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398.  Nonetheless, the Supremacy Clause of "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI, cl. 2).  It is well established that "state law that conflicts with federal law is 'without effect.'" *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  "Congress may . . . pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

Federal law can preempt state law either by an express statement of preemption or by implication. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Only the latter is at issue here.

Implied preemption includes field preemption and conflict preemption. *Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to

11

preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Conflict preemption can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Categories of preemption, however, are not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990). "Indeed, field preemption may be understood as a species of conflict pre-emption," because "[a] state law that falls within a pre-empted field [necessarily] conflicts with Congress' intent . . . to exclude state regulation." *Id.*

### 2.     The United States' Right to Sue in Equity

At the outset, the Court must determine whether the United States has the right to seek equitable relief under the Supremacy Clause. Though Oklahoma recognizes the general availability of equitable relief, it asserts that such relief is unavailable in this case because the United States has not relied on a specific statutory authority or a traditional equitable principle. Okla. Resp. at 38–39. The Court disagrees.

While Oklahoma is correct that the Supremacy Clause does not create a cause of action, it is well established that "in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (ellipses and internal quotation marks omitted); *see also id.* at 324–25 (explaining that "the Supremacy Clause is not the source of any federal rights," and "certainly does not create a cause

of action" (internal quotation marks omitted in first quotation)).  Specifically, courts of equity have

created the "ability to sue to enjoin unconstitutional actions by state and federal officers."  *Id.* at

327.  As such, the federal government may bring an action in equity to enforce federal supremacy.

*See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (discussing *Armstrong*

and noting that, "[t]o the extent that *Armstrong*'s Supremacy Clause holding is motivated by the

desire to preserve the federal government's 'ability to guide the implementation of federal law,'

this counsels in favor of—not against—permitting the United States to invoke preemption in order

to protect its interest" (quoting *Armstrong*, 575 U.S. at 326)); *United States v. Bd. of Cnty. Commr's

of Cnty. of Otero*, 843 F.3d 1208, 1209 (10th Cir. 2016) (affirming grant of summary judgment

premised upon the Supremacy Clause); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201

(1967) (noting "the general rule that the United States may sue to protect its interests").

      Oklahoma is also correct that the Court is limited in its jurisdiction and, specifically as

relevant here, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject

to express and implied statutory limitations."  *Armstrong*, 575 U.S. at 327; *see also Seminole Tribe

of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  Accordingly, for Oklahoma to prevail on its argument

that equitable relief is unavailable, it must identify some law that has displaced the Court's

equitable powers.  *See Armstrong*, 575 U.S. at 329 (noting that "equitable relief . . . is traditionally

available to enforce federal law" unless Congress has "displace[d]" it).  As the Fifth Circuit

recently found when considering this very question, "[t]he United States has broad powers and

rights granted by the Constitution and Congress regarding immigration matters."  *Texas*, 97 F.4th

at 276.  And, as in that case, Oklahoma here "cites to no constitutional or statutory provision that

expressly or impliedly displaces an action arising in equity to enjoin executive action with regard

to the matters at issue in this litigation." *Id.*  The United States thus properly brings its federal preemption claim.

          **3.**      **Assessment of H.B. 4156**

                  **a.**      **Field Preemption**

Looking to H.B. 4156, its objective is clear: to criminally punish noncitizens found in Oklahoma who have entered or reentered the United States unlawfully.  It provides for fines and/or imprisonment of noncitizens in Oklahoma who have entered or reentered the United States without legal authorization.  Additionally, all noncitizens convicted under H.B. 4156 are subject to mandatory expulsion from the state.

The INA addresses virtually all matters related to immigration, but it is especially outspoken on noncitizen entry.  "Policies pertaining to the entry of aliens" are "entrusted exclusively to Congress," *Galvan v. Press*, 347 U.S. 522, 531 (1954), and Congress has legislated quite extensively in that respect, establishing "a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully," *Texas*, 97 F.4th at 283 (emphasis in original) (footnotes omitted).

Unlawful entry and reentry are criminal offenses under 8 U.S.C. §§ 1325 and 1326.  Under § 1325(a), criminal liability attaches when a noncitizen (1) enters or attempts to unlawfully enter the United States at a place other than a designated port of entry, (2) eludes examination and inspection by immigration officers, or (3) attempts to enter or enters the United States by a willfully false or misleading representation or the willful concealment of a material fact.  8 U.S.C. § 1325(a). A noncitizen who has previously been removed or voluntarily departed under an outstanding removal order may be convicted for violating § 1326(a) after reentering or attempting to reenter

the United States or after being "found in" the United States without authorization to enter.  8 U.S.C. § 1326(a).

The prohibitive provisions of H.B. 4156, §§ 2(C) and 2(D), largely resemble §§ 1325(a) and 1326(a).  Comparing § 2(C) and § 1325(a), both provisions criminalize the same underlying conduct—unlawful entry into the United States—but § 2(C) specifically targets noncitizens located in Oklahoma after doing so.[5]  Sections 2(D) and 1326(a) are nearly identical.  Both provisions criminalize the act of entering, attempting to enter, or being found in the United States after having been denied admission, excluded, deported, or removed, or after departing while an order of exclusion, deportation, or removal is outstanding.  Both provisions also provide exceptions for noncitizens who have obtained express consent from the Attorney General to reapply for admission or who were not required to obtain such consent.

Effectively, H.B. 4156 criminalizes conduct already proscribed under federal law.  The parties agree as much.  *See* U.S. Mot. at 21 ("H.B. 4156 seeks to criminalize conduct already proscribed by federal law—the unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325 and 1326—despite the comprehensive federal immigration scheme governing such conduct."); Okla. Resp. at 16 ("In the most basic terms, H.B. 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry.").  The issue, then, is whether federal regulation of noncitizen entry and reentry is sufficiently comprehensive to give rise to a reasonable inference that Congress left no room for similar action by Oklahoma.

---

[5] H.B. 4156 defines an "impermissible occupation" as a noncitizen's entry into Oklahoma "without having first obtained legal authorization to enter the United States."  H.B. 4156 § 2(B).  This definition would naturally encompass the forms of unlawful entry proscribed by 8 U.S.C. § 1325(a).

The Supreme Court's ruling in *Arizona* is instructive. There, the Supreme Court found preempted Section 3 of Arizona state law S.B. 1070, which replicated noncitizen registration requirements under federal law and "add[ed] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400. It reasoned that Congress, through its "comprehensive" and "harmonious" framework for noncitizen registration, left no room for additional state regulation—even state regulation that "ha[d] the same aim as federal law and adopt[ed] its substantive standards." *Id.* at 401–02 (internal quotation marks omitted in second quotation). This is because "[e]ven if a State may make violation of federal law a crime in some instances, it cannot do so in a field . . . that has been occupied by federal law." *Id.* at 402. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* at 401.

This Court acknowledges, to Oklahoma's credit, that the discussion of parallel legislation in *Arizona* focused on noncitizen registration, not noncitizen entry and reentry. *See* Okla. Resp. at 29 ("[T]he federal government lacks exclusive power over the field of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond alien registration."). And this Court is likewise aware that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [the federal government's] constitutional power, whether latent or exercised." *DeCanas*, 424 U.S. at 355. Nevertheless, this Court sees no reason why *Arizona*'s logic does not naturally extend to this case, where H.B. 4156 criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry. Just recently, the Fifth Circuit extended *Arizona*'s reasoning to S.B. 4, a Texas law with two provisions "closely resembl[ing]" 8 U.S.C. §§ 1325(a) and 1326(a). *Texas*, 97 F.4th at 280. The Fifth Circuit discussed at length the

16

comprehensiveness of the INA, particularly its regulation of noncitizen entry and reentry.  *See, e.g.*, *id.* ("The [INA's] central concern is the entry and stay of aliens in the United States.  The [INA] makes it unlawful for any noncitizen to enter the United States other than through a port of entry, and punishes any noncitizen who unlawfully reenters or remains in the United States." (footnotes and internal quotation marks omitted)).  This comprehensiveness, it reasoned, would preclude even parallel state regulation:

> In the same way Arizona S.B. 1070 added a state-law penalty for conduct proscribed by federal law, S.B. 4 criminalizes behavior already prohibited by the INA.  Particularly applicable in the present case, the Supreme Court held in *Arizona* that permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted.  That is just as true regarding the Texas laws regarding entry and removal.

*Id.* (brackets, footnotes, and internal quotation marks omitted).[6]  Other circuit courts have likewise extended *Arizona*'s reasoning to preclude state attempts to criminalize the unlawful transport, concealment, and inducement of unlawfully present noncitizens because such activities are comprehensively regulated under federal law.  *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263–64 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024–26 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 531–32 (4th Cir. 2013).

Thus, there is "strong support" for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation.  *Texas*, 97 F.4th at 288; *see also DeCanas*, 424 U.S. at 359 (acknowledging the "comprehensiveness of legislation governing the entry and stay of aliens"); *Patel*, 596 U.S. at 331 ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the

---

[6] The Fifth Circuit's reasoning came in the form of an extensive interlocutory ruling denying Texas' request for a stay of an injunction issued by the United States District Court for the Western District of Texas.

United States."); *Elkins v. Moreno*, 435 U.S. 647, 664 (1978) (deeming the INA "a comprehensive and complete code covering all aspects of admission of aliens to this country"); *United States v. Texas*, --- F. Supp. 3d ---, 2024 WL 861526, at *13 (W.D. Tex. Feb. 29, 2024) ("Congress has created a comprehensive framework 'of federal statutes criminalizing the acts undertaken by noncitizens and those who assist them in coming to' the United States." (brackets omitted) (quoting *Ga. Latino*, 691 F.3d at 1264)). Again, "[w]here Congress occupies an entire field," as it has in the field of noncitizen entry and reentry, "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. As such, Oklahoma's attempt to parallel federal law must fail.

A similar fate befalls H.B. 4156's expulsion penalty. Expulsion from Oklahoma is a criminal penalty imposed for a conviction of unlawful entry or reentry under H.B. 4156. Having found H.B. 4156's regulation of unlawful entry and reentry field preempted, this expulsion penalty would naturally fail. However, even viewing the expulsion penalty in isolation, there is strong support for a finding of preemption. To Oklahoma's credit, H.B. 4156 mandates expulsion only from Oklahoma, rather than from the United States. But that does not necessarily mean the law avoids intrusion into a federal domain. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (internal quotation marks omitted). Through the INA, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. "[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." *Texas*, 97 F.4th at 285 (emphasis added).

For example, in *United States v. Alabama*, the Eleventh Circuit found preempted a provision of Alabama state law amounting to a "calculated policy of expulsion" from the state.

18

691 F.3d 1269, 1294 (11th Cir. 2012).   The provision prohibited Alabama state courts "from enforcing or recognizing contracts between a party and an unlawfully present alien," *id.* at 1292, effectively barring "undocumented aliens . . . from enforcing contracts for basic necessities," *id.* at 1293.   By imposing "distinct, unusual and extraordinary burdens," the provision was designed "to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state." *Id.* at 1294 (internal quotation marks omitted in first quotation).   The Eleventh Circuit concluded that the law "constitute[d] an impermissible intrusion into the federal domain" of noncitizen expulsion.  *Id.* at 1293; *see also id.* at 1294 (highlighting the "comprehensive statutory framework governing alien removal").   It did not matter that the law served to expel noncitizens only from Alabama: "If every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head.   The federal government—not the fifty states working in concert—retains the power to exclude aliens from the country." *Id.* at 1295 n.21.

Consider as well the Third Circuit's decision in *Lozano v. City of Hazleton*, where it found preempted several city ordinances that made "legal immigration status a condition precedent to entering into a valid lease."  620 F.3d 170, 179 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011).  The *Lozano* court emphasized the comprehensive federal scheme regulating the entry and treatment of noncitizens in the United States, which "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *Id.* at 220.   The city ordinances at issue effectively did just that.   And while the ordinances aimed to "regulate presence only within [the] city limits, not the entire country," the Third Circuit's analysis remained unaffected: "To be meaningful, the federal government's exclusive control over residence in this country must extend to any political subdivision.   Again, it is not only Hazleton's

19

ordinance that we must consider. If Hazleton can regulate as it has here, then so could every other state or locality. *Id.* at 221; *see also id.* at 220 ("[W]e cannot bury our heads in the sand ostrich-like ignoring the reality of what these ordinances accomplish.").

Relatedly, the Supreme Court has recognized that "[t]he federal power to determine immigration policy is well settled." *Arizona*, 567 U.S. at 395; *see also Texas*, 2024 WL 861526, at *15 (finding, in the context of field preemption, that the federal government has a "dominant interest in regulating immigration enforcement"). This power naturally encompasses discretion on enforcement, "where '[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.'" *Biden v. Texas*, 597 U.S. 785, 805–06 (2022) (quoting *Arizona*, 567 U.S. at 397); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (acknowledging that an agency's enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether a violation has occurred," "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all"). "Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101." *Biden*, 597 U.S. at 815 (Kavanaugh, J., concurring).

Oklahoma largely dismisses these broader considerations cited by the United States, insisting that the United States' "claim that H.B. 4156 would harm [its] relationship with foreign nations in multiple ways and antagonize foreign governments can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has

enacted because foreign governments will get angry."  Okla. Resp. at 26 (ellipses, citation, and internal quotation marks omitted).  In support of this position (and others throughout its response), Oklahoma leans heavily on the Supreme Court's decision in *Kansas v. Garcia*, 589 U.S. 191 (2020), which upheld the state convictions of three noncitizens for fraudulently using another person's Social Security number on tax-withholding forms when obtaining employment.  The Supreme Court broadly rejected the noncitizens' claims that their state convictions were preempted by federal immigration laws, finding that "using another person's Social Security number on tax forms threatens harm that has no connection with immigration law," *Garcia*, 589 U.S. at 209, and that the prosecutions were not at odds with federal interests,[7] *id.* at 212.  Indeed, the federal government "fully support[ed]" Kansas' power to prosecute.  *Id.*

Certainly, the same cannot be said in this case, where federal pushback is the genesis of litigation and H.B. 4156 touches so deliberately on matters of immigration regulation.  Nor can this Court simply adopt Oklahoma's political frustrations and ignore *Arizona*'s extensive discussion of the broader implications surrounding immigration policy.  Among other things, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."  *Arizona*, 567 U.S. at 395; *see also id.* ("Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."); *id.* ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one

---

[7] The noncitizens maintained that prosecution would limit the federal government's ability to "obtain[] the cooperation of unauthorized aliens in making bigger cases."  *Garcia*, 589 U.S. at 211.

national sovereign, not the 50 separate States.").[8]  The *Arizona* Court cautioned that "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.  These theoretical concerns appear to be at play in this case, as Mexico has already expressed concern over H.B. 4156.  *See* Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), available at https://perma.cc/E6Z4-HS7W.

Most noteworthy, though, is *Arizona*'s application of these principles to § 3 of S.B. 1070, which criminalized a noncitizen's failure to comply with certain registration requirements under federal law.  *See Arizona*, 567 U.S. at 400.  In finding § 3 field preempted, the Supreme Court reasoned that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Id.* at 402.  If the Supreme Court believed that state prosecution for federal registration violations implicated federal policy considerations, it is hard to fathom how criminal prosecution and expulsion under H.B. 4156 would not pose similar, if not greater, concerns.  *See Texas*, 97 F.4th at 280 ("Equally important, in concluding there was field preemption, the Supreme Court in *Arizona* relied on the fact that were § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determined that prosecution would frustrate federal policies.  The same is true of the Texas laws at issue here." (brackets and internal

---

[8] *Arizona*'s observations are by no means isolated.  *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.").

J.A. 195

quotation marks omitted)).  However well-intentioned, H.B. 4156 authorizes state prosecution for conduct already subject to comprehensive federal regulation and bound within federal immigration policy.  If permitted to stand, each state could give itself "independent authority" to achieve its own immigration policy, *Arizona*, 567 U.S. at 402, undoubtedly "'diminishing the Federal Government's control over enforcement' and 'detracting from the integrated scheme of regulation created by Congress,'" *id.* (brackets omitted) (quoting *Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 288–89 (1986)).

While this Court may very well be sympathetic to the concerns raised by Oklahoma, such concerns should not—and, indeed, cannot—be allowed to undermine the long-standing, comprehensive federal framework that defines immigration policy.  Sensitive matters of immigration policy "must be made with one voice." *Id.* at 409.  And for better or for worse, that voice belongs not to one individual state, but to the United States.  Accordingly, the Court finds that H.B. 4156 is likely field preempted.

### b.    Conflict Preemption

Field preemption aside, the United States argues that H.B. 4156 is likely conflict preempted.  Again, conflict preemption "occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).

Oklahoma argues that "'[t]here can by definition be no conflict' between the laws of two sovereigns where state law 'trace[s] the federal law.'"  Okla. Resp. at 23 (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 601–02 (2011)).  It adds that "[t]he mere fact that state laws . . . overlap to some degree with federal criminal provisions does not even begin to make a case

J.A. 196

for conflict preemption." *Id.* at 27 (quoting *Garcia*, 589 U.S. at 211).  That may be true, but the Supreme Court has recognized that "[c]onflict is imminent when two separate remedies are brought to bear on the same activity." *Crosby*, 530 U.S. at 380 (internal quotation marks omitted). "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions . . . undermines the congressional calibration of force." *Id.*

H.B. 4156 penalizes unlawful entry conduct and targets removable noncitizens with fines, imprisonment, and mandatory expulsion.  Under federal law, however, "there are various avenues by which a noncitizen may ultimately be admitted or receive absolution even though he or she initially entered illegally." *Texas*, 97 F.4th at 289.  A noncitizen who unlawfully enters the United States is removable, 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a, but "[b]eing found removable is not always the end of the story . . . because Congress has authorized relief from removal in certain contexts," *Patel*, 596 U.S. at 332.  Noncitizens may, for example, apply for asylum or cancellation of removal—often for the first time after removal proceedings have begun.  8 U.S.C. §§ 1158(a)(1), 1229b.  And in the case of asylum, the defense can ultimately be raised for the first time during either standard or expedited removal proceedings. *Id.* §§ 1229a(c)(4), 1225(b)(1)(A), 1225(b)(1)(B); 8 C.F.R. §§ 208.2(b), 1240.11(c).

In other words, there are mechanisms under federal law that allow unlawfully present noncitizens to remain in the United States—whether in Oklahoma or elsewhere. *See Holder v. Martinez Gutierrez*, 566 U.S. 583, 586 (2012) ("The immigration laws have long given the Attorney General discretion to permit certain otherwise-removable aliens to remain in the United States.").  H.B. 4156 conflicts with this federal system.  While it offers certain affirmative defenses to those already granted lawful presence or asylum under federal law, *see* H.B. 4156 § 2(F), it ignores the opportunities offered under federal law for discretionary relief once prosecution has

begun.  Oklahoma insists that "[e]ither someone has permission to be here, or they do not."  Okla. Resp. at 33.  But it is just not that simple: "[I]t is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize.  Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen."  *Plyler v. Doe*, 457 U.S. 202, 240 n.6 (1982) (Powell, J., concurring).

But a more sweeping and glaring conflict exists.  "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.  Under 8 U.S.C. § 1357(g), for instance, DHS is authorized to enter into written agreements with state and local jurisdictions, allowing specially trained state or local officers to perform specific functions related to the investigation, apprehension, or detention of noncitizens, under federal supervision.  Additionally, § 1357(g) provides that an agreement is not necessary for any state or political subdivision "to communicate with the Attorney General regarding the immigration status of any individual," or "to otherwise cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  *Id.* § 1357(g)(10)(A)-(B).  Federal law even permits state and local officers to make arrests for immigration crimes in certain defined circumstances.  *See, e.g.*, *id.* § 1324(c) (permitting "all . . . officers whose duty it is to enforce criminal laws" to make arrests for violations of immigration law concerning smuggling, transporting, or harboring); *id.* § 1252c (authorizing state and local law enforcement officers to "arrest and detain" a noncitizen who is "illegally present in the United States" and "has previously been convicted of a felony in the United States and deported or left the United States after such conviction," but "only after the State or local law

25

enforcement officials obtain appropriate confirmation from" federal officials "of the status of such individual and only for such period of time as may be required for" federal officials " to take the individual into Federal custody for purposes of deporting or removing the alien from the United States").  Leaning on these avenues of assistance, Oklahoma insists that "the federal scheme leaves room for enforcement of a state law like H.B. 4156."  Okla. Resp. at 24 (internal quotation marks omitted).

Congress' delineation of these cooperative frameworks, however, "is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present." *Texas*, 97 F.4th at 292.  "Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present." *Id.* at 292–93.  The Supreme Court's decision in *Arizona* is again instructive.  There, Section 6 of S.B. 1070 authorized state officers to arrest a person if the officer had probable cause to believe that person was removable.  *Arizona*, 567 U.S. at 407.  Supporters of § 6 cited to Congress' authorization of cooperation under 8 U.S.C. § 1357(g).  *Id.* at 410.  But the Supreme Court concluded that "no coherent understanding of the term [cooperate] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.* at 410.  By authorizing such unilateral activities that deviated from the procedures established by federal law, § 6 "allow[ed] the State to achieve its own immigration policy" and "create[d] an obstacle to the full purposes and objectives of Congress." *Id.* at 408, 410.

The Supreme Court's reasoning applies with greater force here.  As constructed, H.B. 4156 would grant state officials broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses "absent any request, approval, or other instruction from the Federal

26

Government." *Id.* at 410. "This is not the system Congress created," *id.* at 408, nor can the existing system be expanded to fit Oklahoma's preferred legislative design. For these reasons, the Court finds that H.B. 4156 is also likely conflict preempted.

### c. "Invasion" Defense

Notwithstanding preemption, Oklahoma insists it "retains an inherent, sovereign power of self-defense against invasion." Okla. Resp. at 37. Though it cites scant case law suggesting the defense is applicable here, it derives this "invasion" defense from Article I, Section 10, Clause 3 (the State War Clause) of the United States Constitution, which provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

Neither the Supreme Court nor the Tenth Circuit has recognized the application of the State War Clause as broadly as Oklahoma advocates. And when a similar argument was raised in defense of S.B. 4 in Texas, both the Western District of Texas and the Fifth Circuit rejected its use. The Western District of Texas performed an extensive analysis of the historical and constitutional context of the State War Clause, concluding in detail that the surge in unauthorized immigration did not qualify as an "invasion" under the Constitution and that S.B. 4 was not a wartime measure. *See Texas*, 2024 WL 861526, at *24–37. The Fifth Circuit, in its interlocutory ruling, reasoned that "[c]onstitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered." *Texas*, 97 F.4th at 295. Other courts have similarly rejected application of the State War Clause in the context of immigration. *See California v. United States*, 104 F.3d

**J.A. 200**

1086, 1090–91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996).  In short, this Court is unpersuaded that it should be an outlier in permitting a sweeping application of the State War Clause.[9]

### B.      Irreparable Harm

The second preliminary-injunction factor asks whether irreparable injury is likely to befall the movant without an injunction.  *Winter*, 555 U.S. at 20.  What makes an injury "irreparable" is the inadequacy of a monetary remedy.  *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017).

The United States argues that irreparable harm necessarily results from enforcement of a preempted state law.  U.S. Mot. at 29.  Though the Supreme Court has suggested that may be the case, it has not definitively held that it is.  *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366–67 (1989).  And though some courts have held as much, the Tenth Circuit has not.  *See United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed."); *Alabama*, 691 F.3d at 1301 ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024) (noting the difference between establishing irreparable harm for a claim of deprivation of an individual constitutional right and for a separation of powers claim).  Nonetheless, as recently

---

[9] Because the Court finds that the United States is likely to prevail on its claim under the Supremacy Clause, it need not address the United States' likelihood of prevailing under the Commerce Clause.  *See Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, No. CIV-20-130-D, 2020 WL 13669025, at *2 (W.D. Okla. May 15, 2020) ("To show a substantial likelihood of success on the merits, the movant must, at a minimum, present a prima facie case for prevailing on at least one claim asserted in its pleading." (internal quotation marks omitted)).

found by the Southern District of Iowa when considering this question, "persuasive authority recognizes that the United States clearly would suffer *some* level of significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law." *United States v. Iowa*, --- F. Supp. 3d ---, 2024 WL 3035430, at *14 (S.D. Iowa June 17, 2024).  As that court noted, "[t]his makes sense: the whole point of field preemption, in particular, is that the federal regulatory scheme is 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Id.* (quoting *Arizona*, 567 U.S. at 399).

Here, the United States claims that it and the public will suffer irreparable harm if H.B. 4156 takes effect, specifically noting that the bill would harm the United States' relationship with foreign nations by antagonizing foreign governments; straining diplomatic relations and, thus, making cooperation more difficult on matters such as trade agreements, disaster response arrangements, anti-terrorism efforts, anti-drug-trafficking efforts, and other priorities; undermining long-term strategic partnerships formed to reduce irregular migration; undermining partnerships to provide protections to refugees; and exposing United States citizens abroad to reciprocal and retaliatory treatment that could impair their ability to travel, conduct business, or live abroad.  Additionally, the United States claims that H.B. 4156 will displace the federal exercise of discretion in enforcing immigration laws, as well as interfere with federal immigration proceedings.

Having reviewed the arguments and declarations presented by both sides, including declarations provided by the United States regarding Oklahoma's interference with its comprehensive foreign-policy framework as well as Mexico's expression of its concern over the signing of H.B. 4156, the Court finds the United States' arguments are well-taken.  *See, e.g.*, *Texas*, 97 F.4th at 295 ("In this case, repeated representations by the Executive Branch supported by

formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state [law] stands in the way of Congress's diplomatic objectives." (quoting *Crosby*, 530 U.S. at 386)). Indeed, as the United States notes, Oklahoma's cursory argument against irreparable harm asserts primarily that H.B. 4156 is not preempted without adequately refuting the United States' declarations of harm. Accordingly, the Court finds that the United States has demonstrated it is likely to suffer irreparable injury in the absence of an injunction. *See Iowa*, 2024 WL 3035430, at *14 ("Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief as to . . . the United States . . . ."); *Texas*, 2024 WL 861526, at *38 (finding irreparable harm by virtue of a violation of the Supremacy Clause); *South Carolina*, 720 F.3d at 533 ("The irreparable injury to the nation's foreign policy if the relevant sections take effect has been clearly established by the United States.").

### C.   Equities and Public Interest

The final two factors of the preliminary injunction inquiry are the balance of equities and public interest, but when the United States is a party to a preliminary injunction motion, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Though Oklahoma argues an injunction is not in the public interest because it will suffer greater harm than the United States if it cannot enforce H.B. 4156, *see* Okla. Resp. at 41–42, as the Eleventh Circuit has found, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations. Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301; *see also Texas*, 97 F.4th at 296 (holding that in the areas of immigration and foreign affairs, it is the federal interest that prevails, as "state and local interests are subservient to those of the nation at large"); *South Carolina*, 720 F.3d at 533 (affirming entry

30

of preliminary injunction where state law was likely preempted by federal immigration law, and holding that the balance of equities tipped in favor of the federal government and preliminary injunctive relief was in the public interest); *Iowa*, 2024 WL 3035430, at *15 (finding the factors weigh in favor of injunctive relief where the state law is likely preempted by federal law); *Texas*, 2024 WL 861526, at *40–41 (same). This Court finds these cases persuasive and concludes that the balance of equities and public interest factors weigh in favor of granting injunctive relief when, as here, the state law is likely preempted by federal law.

**IV.     Conclusion**

Oklahoma "may have understandable frustrations with the problems caused by illegal immigration . . . , but the State may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416. Should more explicit guidance foreclose that conclusion, this Court will listen.

But until then, for the reasons set forth herein, the United States' motion for a preliminary injunction [Doc. No. 4] is GRANTED. Oklahoma is hereby ENJOINED from enforcing H.B. 4156 pending further proceedings.

IT IS SO ORDERED this 28th day of June, 2024.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

J.A. 204

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

THE STATE OF OKLAHOMA, *et al.*,

*Defendants.*

Case No:      CIV-24-511-J

## **NOTICE OF APPEAL**

Notice is hereby given that the State of Oklahoma; J. Kevin Stitt, in his official capacity as Governor of Oklahoma; Gentner Drummond, in his official capacity as Attorney General of Oklahoma; the Oklahoma Department of Public Safety; and Tim Tipton, in his official capacity as Commissioner of the Oklahoma Department of Public Safety, Defendants, in the above-named case, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the Order entered in this action on June 28, 2024, at Dkt. No. 39.

Dated this July 17, 2024.

Respectfully submitted,

s/ *Cullen D. Sweeney*

GARRY M. GASKINS, II, OBA # 20212
 *Solicitor General*
ZACH WEST, OBA # 30768
  *Director of Special Litigation*
CULLEN D. SWEENEY, OBA # 30269
 *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants*