# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF OKLAHOMA, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:24-cv-00511-J

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

ISSUES PRESENTED ........................................................................ 2

INTRODUCTION .............................................................................. 3

STATEMENT OF THE CASE ........................................................... 4

    A.  Oklahoma is experiencing an illegal immigration crisis. ......................... 4

    B.  Oklahoma enacted HB 4156 to protect those lawfully present in the State. ......................................................................................... 9

    C.  The United States and other Plaintiffs sued to enjoin HB 4156. ............ 11

    D.  The district court granted a preliminary injunction against HB 4156. 14

STANDARD OF REVIEW .............................................................. 16

SUMMARY OF THE ARGUMENT ................................................. 18

ARGUMENT ................................................................................. 20

    I.  The United States' claims are nonjusticiable and cannot be brought in federal court. ......................................................................... 20

        A.  The Supremacy Clause does not give the United States an equitable cause of action to challenge HB 4156. ......................... 20

        B.  The Private Plaintiffs lack standing to pursue an injunction. ... 23

    II.  Federal immigration law does not preempt HB 4156. ............................ 26

        A.  No part of HB 4156 is field preempted. ......................................... 28

        B.  HB 4156 is not conflict preempted because it readily comports—rather than conflicts—with federal immigration laws. ................................................................................. 37

    III.  Oklahoma is entitled to defend itself against an invasion when the federal government abdicates its own duties. ................................ 44

    IV.  The district court improperly weighed the remaining injunction factors. ...................................................................................... 47

CONCLUSION .............................................................................. 50

STATEMENT REGARDING ORAL ARGUMENT ....................... 51

CERTIFICATE OF COMPLIANCE ............................................... 52

CERTIFICATE OF DIGITAL SUBMISSION ................................ 52

CERTIFICATE OF SERVICE ........................................................ 52

**ATTACHMENTS:**

1. District Court Order [Dkt. 39] granting U.S. Motion for a Preliminary Injunction, filed 06/28/2024.

# TABLE OF AUTHORITIES

## Cases

*Alexander v. S.C. State Conf. of NAACP,*
  144 S. Ct. 1221 (2024) ..................................................................49

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ......................................................................21

*Arizona v. United States,*
  567 U.S. 387 (2012) ...............................................3, 13–15, 18, 19, 26–30,
                                 33, 35–37, 39, 40, 41, 46, 50

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ......................................................................21

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) ......................................................................50

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ......................................................................23

*California v. Texas,*
  593 U.S. 659 (2021) ......................................................................26

*California v. United States,*
  104 F.3d 1086 (9th Cir. 1997) .......................................................45

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997) ......................................................................29

*Chamber of Com. of U.S. v. Whiting,*
  563 U.S. 582, 588 (2011) ..........................................................34, 37

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ......................................................................24

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ......................................................................28

*Davis v. Passman,*
  442 U.S. 228 (1979) ......................................................................20

*DeCanas v. Bica,*
  424 U.S. 351 (1976) ...............................................................29, 31, 32

*DeVillier v. Texas,*
601 U.S. 285 (2024) .................................................................21

*Diamond v. Charles,*
476 U.S. 54 (1986).................................................................22

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) ...........................................49

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001) .......................................16, 17

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) .............................................................17

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .........................................................24, 25

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) .............................................................29

*Florida v. United States,*
660 F. Supp. 3d 1239 (N.D. Fla. 2023).................................32

*Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City,*
861 F.3d 1052 (10th Cir. 2017) ...........................................25

*Free the Nipple–Fort Collins v. City of Fort Collins,*
916 F.3d 792 (10th Cir. 2019) .............................................17

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
505 U.S. 88 (1992).................................................................37

*Gilbert v. Minnesota,*
254 U.S. 325 (1920) .............................................................39

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) .............................................................26

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
527 U.S. 308 (1999) .........................................................20, 22

*GTE Corp. v. Williams,*
731 F.2d 676 (10th Cir. 1984) .............................................17

*Gunn v. Minton,*
568 U.S. 251 (2013) .............................................................20

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ...................................................17

*Hernandez v. Mesa*,
589 U.S. 93 (2020)..........................................................................22

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ........................................................................22

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........................................................................25

*Huron Portland Cement Co. v. City of Detroit*,
362 U.S. 440 (1960) ........................................................................41

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ....................................................25

*Juidice v. Vail*,
430 U.S. 327 (1977) ........................................................................49

*Kansas v. Garcia*,
589 U.S. 191 (2020) ........................19, 26, 29, 30, 36, 37, 39, 41, 43, 44

*Koon v. United States*,
518 U.S. 81 (1996) ..........................................................................17

*Liddell v. Heavner*,
180 P.3d 1191 (Okla. 2008) ..........................................................49

*Maryland v. King*,
567 U.S. 1301 (2012) ......................................................................48

*Merrill Lynch, Pierce, Fenner & Smith v. Ware*,
414 U.S. 117 (1973) ........................................................................50

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ........................................................3, 17, 46

*Mount Olivet Cemetery Ass'n v. Salt Lake City*,
164 F.3d 480 (10th Cir. 1998) ......................................................44

*Murthy v. Missouri*,
144 S. Ct. 1972 (2024) ....................................................................24

*N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*,
854 F.3d 1236 (10th Cir. 2017) ....................................................48

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932) ...................................................................34

*New York v. New Jersey,*
598 U.S. 218 (2023) ...................................................................49

*Parker Drilling Mgmt. Servs. v. Newton,*
139 S. Ct. 1881 (2019) ..............................................................39

*Parker v. Brown,*
317 U.S. 341 (1943) ...................................................................26

*Plyler v. Doe,*
457 U.S. 202 (1982) .............................................. 29, 31, 32, 33

*Prairie Band of Potawatomi Indians v. Pierce,*
253 F.3d 1234 (10th Cir. 2001) ...............................................17

*Ramos v. Louisiana,*
590 U.S. 83 (2020)....................................................................33

*Rice v. Santa Fe Elevator Corp.,*
331 U.S. 218 (1947) ............................................................27, 28

*Schrier v. Univ. of Colo.,*
427 F.3d 1253 (10th Cir. 2005) .........................................16, 17

*Smith v. Turner,*
48 U.S. (7 How.) 283 (1849).....................................................45

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ...................................................................23

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ...................................................................24

*Tandy v. City of Wichita,*
380 F.3d 1277 (10th Cir. 2004) ...............................................23

*Tarrant Reg'l Water Dist. v. Herrmann,*
656 F.3d 1223 (10th Cir. 2011) ...............................................27

*Texas v. DHS,*
No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ........................... 6, 32

*United States v. Abbott,*
110 F.4th 700 (5th Cir. 2024) ..................................................45

*United States v. Abbott,*
92 F.4th 570 (5th Cir. 2024) ................................................... 46

*United States v. Alabama,*
691 F.3d 1269 (11th Cir. 2012) ............................................... 33

*United States v. California,*
655 F.2d 914 (9th Cir. 1980) ................................................... 20

*United States v. Carel,*
668 F.3d 1211 (10th Cir. 2011) ............................................... 46

*United States v. Hansen,*
599 U.S. 762 (2023) ................................................................. 18

*United States v. Supreme Court of New Mexico,*
839 F.3d 888 (10th Cir. 2016) ........................................... 21, 22

*United States v. Texas,*
97 F.4th 268 (5th Cir. 2024) ............................................. 36, 49

*Utah Coal. of LaRaza v. Herbert,*
26 F. Supp. 3d 1125 (D. Utah 2014) ....................................... 30

*Va. Uranium, Inc. v. Warren,*
587 U.S. 761 (2019) ................................................................. 27

*Ward v. Utah,*
398 F.3d 1239 (10th Cir. 2005) ......................................... 17, 18

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ................................................................. 17

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................................... 16, 47

*Wyandotte Transp. Co. v. United States,*
389 U.S. 191 (1967) ................................................................. 21

*Wyeth v. Levine,*
555 U.S. 555 (2009) ................................................................. 44

*Younger v. Harris,*
401 U.S. 37 (1971) ................................................................... 24

## Statutes

8 U.S.C. § 1101 ................................................................. 31, 40

8 U.S.C. § 1182 ................................................................. 38

8 U.S.C. § 1225 ................................................................. 38

8 U.S.C. § 1229 ................................................................. 38

8 U.S.C. § 1253 ................................................................. 39

8 U.S.C. § 1324 ................................................................. 40

8 U.S.C. § 1325 ................................................................. 38, 44

8 U.S.C. § 1326 ................................................................. 38, 44

8 U.S.C. § 1357 ................................................................. 40

18 U.S.C. § 758 ................................................................. 40

18 U.S.C. § 3571 ............................................................... 38

18 U.S.C. § 3559 ............................................................... 38, 39

22 U.S.C. § 7105 ............................................................... 40

28 U.S.C. § 1292 ............................................................... 1

28 U.S.C. § 1331 ............................................................... 1

28 U.S.C. § 1345 ............................................................... 1

28 U.S.C. § 1651 ............................................................... 1

28 U.S.C. § 2201 ............................................................... 1

OKLA. STAT. tit. 21, § 1795 (House Bill 4156) .................. 3, 5, 9–15, 18–20, 26, 28, 31–38, 40–42, 44, 45, 47–50

## Rules

Exec. Order No. GA-41, Governor of State of Texas, (July 7, 2022) ........................................................... 9

## Constitutional Provisions

U.S. CONST. amend. X ....................................................... 34

U.S. CONST. art. I, § 8 ....................................................... 20, 50

U.S. CONST. art. I, § 10, cl. 3 ........................................... 45

U.S. CONST. art. II, § 3.................................................................32

U.S. CONST. art. IV, § 4................................................................46

U.S. CONST. art. VI, cl. 2 .......................................................26, 44

## Other Authorities

Camilo Montoya–Galvez, *Migrant Crossings at the U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 28, 2023) ....................................................6

Christopher J. Curran, *Spillover: Evolving Threats and Converging Legal Authorities in the Fight Against Mexican Drug Cartels*, 6 HARV. NAT'L SEC. J. 344, 364 (2015) ................46

Garrett Yalch, et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market*, THE FRONTIER (March 14, 2024)........... 7, 8

HOUSE JUDICIARY COMM., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*, (Jan. 18, 2024) ...............................................6

John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219 (1993).........................................................................24

Letter from Members of Congress to Attorney General Merrick Garland (Feb. 2, 2024).................................................................................8

Letter to President Joseph R. Biden, Jr., Supporting Texas's Efforts to Secure the Border (Jan. 29, 2024) .................................4

Paul Demko, *'Tokelahoma' at the Crossroads*, POLITICO (March 7, 2023) ...............................................................................7

THE WHITE HOUSE, A Proclamation on Securing the Border (June 4, 2024).................................................................................9

THE WHITE HOUSE, Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations (Jan. 26, 2024) .................................4

## <u>Related Cases</u>

There are no prior or related appeals.

## <u>Statement of Jurisdiction</u>

The United States sued for declaratory and injunctive relief against Defendants under 28 U.S.C. §§ 1651, 2201, and 2202. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. The district court granted preliminary injunctive relief on June 28, 2024, and Defendants filed a notice of appeal on July 17, 2024. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.      Whether the United States has the power to seek equitable relief in this matter under the Supremacy Clause when Congress has not authorized such a suit.

2.      Whether the district court erred in preliminarily enjoining enforcement of Oklahoma's House Bill 4156 (HB 4156) on the ground of field and conflict preemption, even though HB 4156 merely tracks federal law in imposing penalties on noncitizens who enter Oklahoma without previous authorization to enter the United States.

3.      Whether the district court erred in rejecting the point that Oklahoma has been "invaded" in the context of what both parties admit is an illegal immigration crisis.

# INTRODUCTION

In the throes of a crisis of illegal immigration, Oklahoma enacted House Bill 4156 (HB 4156). This simple law makes it a state offense, with state penalties, for a noncitizen who is in the United States illegally to unlawfully enter, re-enter, or remain in Oklahoma. *See* OKLA. STAT. tit. 21, § 1795. HB 4156 in no way conflicts with or undermines federal law. Rather, HB 4156 mirrors federal law by design. Notwithstanding this complementarity, the United States immediately brought a pre-enforcement, facial challenge against the law, even though the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). Without a valid cause of action, the United States relied on speculation about how HB 4156 would be implemented, spurious conclusions about the law's underpinnings, and fundamental misconceptions about a state's sovereign rights and duties in a federalist system of government. Alighting on an overbroad interpretation of *Arizona v. United States*, 567 U.S. 387 (2012), the United States asserted that it alone holds exclusive power over the entire field of immigration, full stop.

The district court gave the United States the sweeping relief it sought, facially enjoining HB 4156 in its entirety just days before it was to take effect and before any Oklahoma court had an opportunity to construe any provision of it. In doing so, the district court admitted it was extending *Arizona* to a new context, beyond what the Supreme Court held in that case. Essentially, the district court made the extraordinary determination that a state law that mirrors federal law and simply governs who may be

present in that state is preempted in *every* application. The district court erred in expanding implied preemption to preclude Oklahoma's lawful sovereign action. This Court should reverse the district court, vacate the district court's facial injunction, and allow Oklahoma to enforce its law.

<u>S</u>TATEMENT OF THE <u>C</u>ASE

**A.      Oklahoma is experiencing an illegal immigration crisis.**

A crisis exists in our Nation, and in the State of Oklahoma: a crisis of unprecedented and uncontrolled illegal immigration. Earlier this year—just before the Oklahoma Legislature began its session—President Biden himself acknowledged that "we all know the border's been broken" for "too long," which has created a "border crisis." THE WHITE HOUSE, Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations (Jan. 26, 2024).[1] Similar sentiments were proclaimed around the same time by more than half of our State Attorneys General, who pointed out that the "federal government has failed to stanch this flow" of "more than six million illegal immigrants," which has "effectively add[ed] the population of Iowa and Utah to our country in less than three years." Letter to President Joseph R. Biden, Jr., Supporting Texas's Efforts to Secure the Border (Jan. 29, 2024).[2] As one

---

[1] *Available at* https://perma.cc/K9S8-TLZV.

[2] *Available at* https://www.iowaattorneygeneral.gov/media/cms/Final__Letter_Supporting_Governor_A_63A1CE73CAB1F.pdf.

response to this "unprecedented border crisis," *id.*, the Oklahoma Legislature enacted HB 4156. *See* HB 4156, § 1(B) ("[A] crisis exists in Oklahoma."). The law is straightforward: if a person lacks authorization to enter or remain in the country—*i.e.*, if that person is here illegally—then that person may not enter or remain in Oklahoma.

The Legislature made clear in the very text of the law why HB 4156 was necessary. The border crisis has swamped Oklahoma with an unprecedented onslaught of criminal activity. This onslaught takes the form of "illegal marijuana grow operations, which have exploded in number in recent years." *Id.* It brings "fentanyl distribution, sex trafficking, and labor trafficking" at the hands of "organized crime, such as drug cartels, [that] have no regard for Oklahoma's laws or public safety." *Id.* As a result, "Oklahoma agents and law enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border." *Id.* Oklahoma communities are being harmed and harassed, while its police are overburdened and overwhelmed. The state's "crisis of unauthorized entry and presence is endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local government entities." *Id.*

Nearly six million migrants unlawfully crossed the southwest land border between January 2021 and September 2023. INTERIM STAFF REPORT, U.S. HOUSE JUDICIARY COMM., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack*

*of Interior Immigration Enforcement*, at 2 (Jan. 18, 2024).[3] "The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). December 2023 saw a new record for monthly encounters with aliens illegally crossing the southwestern border: over 225,000 people, in just one month. Camilo Montoya–Galvez, *Migrant crossings at U.S. southern border reach record monthly high in December*, CBS News (Dec. 28, 2023).[4] The effects of this invasion reverberate beyond the southwest border country: they have found their way to and made an unwelcome home in Oklahoma.

The border crisis is not confined to the massive influx of unlawful immigrants alone. "As expected, organized criminal organizations take advantage of these large numbers." *Texas*, 2023 WL 8285223, at *3. The trafficking of human beings across the United States border "has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* Alarmingly, "the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl." *Id.* Fentanyl "is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *Id.* Oklahoma has not been spared from this deadly epidemic.

---

[3] *Available at* https://perma.cc/5USD-YX6F.

[4] *Available at* https://www.cbsnews.com/news/migrant-crossings-u-s-southern-border-record-monthly-high-december/.

Fentanyl-related deaths in Oklahoma "have increased by nearly 500 percent over the past few years." U.S. HOUSE HOMELAND SEC. COMM., *"Every State Is Now a Border State":* *House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border* *Crisis* (Dec. 7, 2023) (statement of U.S. Rep. Bice of Oklahoma).[5] As it stands now, "fentanyl is the leading substance involved in drug overdoses in Oklahoma." *Id.* And the Office of National Drug Control Policy has designated Oklahoma and Canadian Counties as "high intensity drug trafficking areas," in large part because of their proximity to the intersection of three major highways: Interstates 35, 40, and 44. *Id.*

Although every state in the Nation is threatened by the rampant trafficking activity of the various drug cartels, Oklahoma faces unique problems of its own. The aforementioned explosion of lawless, unchecked, and dangerous marijuana grow operations threatens everyone in Oklahoma—citizen and noncitizen alike. Since 2018, Oklahoma has shut down more than 800 marijuana growing operations that have ties to organized crime and "seized more than 600,000 pounds of illegal weed and made nearly 200 arrests." Paul Demko, *'Tokelahoma' at the Crossroads*, POLITICO (March 7, 2023).[6] Many of the illegal grow operations are directly traceable to Chinese organized crime. *See* Garrett Yalch et al., *Gangsters, money and murder: How Chinese organized crime is* *dominating Oklahoma's illegal medical marijuana market*, THE FRONTIER (March 14, 2024)

---

[5] *Available at* https://perma.cc/HTS5-BP7U.

[6] *Available at* https://www.politico.com/news/magazine/2023/03/07/oklahoma-marijuana-legalization-00085299.

(describing Oklahoma as the "latest and wildest frontier in the marijuana underworld").[7] The victims of this industry include thousands of Chinese migrants (and those of other nationalities) who are often smuggled across the open border in Texas and end up in Oklahoma. *Id.* Foreign workers suffer from rampant physical abuse, trafficking, wage theft, forced prostitution, and more. *Id.* "The federal response, however, has been muted," to say the least, as "enforcement has become a low priority." *Id.*

Oklahoma officials have appealed to the U.S. Department of Justice, seeking assistance in prosecuting the proliferating illegal marijuana operations and the foreign criminal syndicates whose profits depend on the exploitation of a trafficked labor force. *See, e.g.*, Letter from Members of Congress to Attorney General Merrick Garland (Feb. 2, 2024).[8] This is a matter of both public safety and national security: "investigators in Oklahoma discovered illicit marijuana growers engaged in human trafficking, sex trafficking, ketamine trafficking, illegal gambling, and international money laundering." *Id.* at 2. Little help has been offered in return. The drug cartels even have a word for the United States' refusal to enforce immigration law: "the cartels refer to these open-

---

[7] *Available at* https://www.readfrontier.org/stories/gangsters-money-and-murder-how-chinese-organized-crime-is-dominating-oklahomas-illegal-medical-marijuana-market/#:~:text=Gangsters%2C%20money%20and%20murder%3A%20How,Oklahoma's%20illegal%20medical%20marijuana%20market&text=A%20quadruple%20murder%20in%20Oklahoma,ties%20to%20China's%20authoritarian%20regime.

[8] *Available at* https://perma.cc/6K36-YZ3K.

border policies as *la invitación* ('the invitation')." Exec. Order No. GA-41, Governor of State of Texas, at 1 (July 7, 2022).[9]

A scant two weeks after the United States commenced this litigation, and some three-and-a-half years into his administration, President Biden issued an executive proclamation suspending the "entry of any noncitizen into the United States across the southern border" and limiting access to asylum. THE WHITE HOUSE, A Proclamation on Securing the Border (June 4, 2024).[10] According to President Biden, the federal immigration system is not just "simply broken—and not equipped to meet current needs," but also woefully "under-resourced" and plagued by "outdated laws." *Id.* And the system "has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims." *Id.* President Biden emphasized that "[d]oing nothing is not an option." THE WHITE HOUSE, Remarks by President Biden on Securing Our Border (June 4, 2024).[11] Oklahoma agrees. That is why Oklahoma enacted HB 4156.

**B.     Oklahoma enacted HB 4156 to protect those lawfully present in the State.**

In the most basic terms, HB 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry. It contains two principal provisions. First, an alien commits

---

[9] *Available at* https://perma.cc/WJH4-V3RB.

[10] *Available at* https://perma.cc/785C-72KE.

[11]*Available    at*    https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/04/remarks-by-president-biden-on-securing-our-border/

an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States." HB 4156, § 2(B) (codified at OKLA. STAT. tit. 21, § 1795(B)). A violation of this provision is a misdemeanor punishable by imprisonment for up to one year, or by a fine of up to $500, or both. *Id.* § 2(C)(1) (codified at OKLA. STAT. tit. 21, § 1795(C)(1)). Under this provision, any unlawfully present noncitizen "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

Second, HB 4156 makes it a crime for an alien to "enter[], attempt[] to enter, or ... at any time [be] found in Oklahoma" if he or she has previously been "denied admission, excluded, deported, or removed" or has "departed the United States while an order of exclusion, deportation, or removal is outstanding." *Id.* § 2(D) (codified at OKLA. STAT. tit. 21, § 1795(D)). This provision has two exceptions. It does not apply to an alien (1) if "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission," or (2) if the alien was "previously denied admission and removed" and "such alien established that he or she was not required to obtain such advance consent under" HB 4156's Section 2 or "any prior statute." *Id.* § 2(D)(1)–(2) (codified at OKLA. STAT. tit. 21, § 1795(D)(1)–(2)). A violation is a felony punishable by imprisonment for up to two years, or by a fine of not more than $1,000. *Id.* § 2(C)(2) (codified at OKLA.

STAT. tit. 21, § 1795(C)(2)). Under this provision, like the first, the unlawfully present alien "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

Neither provision enables Oklahoma to deport anyone to a foreign country, nor does the law require those unlawfully present to leave the country: the convicted individuals just cannot remain in Oklahoma. If they wish to relocate to another State— one, say, with so-called sanctuary city policies—they are free to do so.

Importantly, HB 4156 provides an affirmative defense to prosecution if (1) "[t]he federal government has granted the defendant ... lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code," or (2) "[t]he defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021." *Id.* § 2(F) (codified at OKLA. STAT. tit. 21, § 1795(F)). In other words, if the alien's conduct does not violate federal illegal-entry or illegal-reentry statutes, or if the federal government has granted the alien lawful presence or asylum in the United States, then HB 4156 disallows a state-law prosecution in Oklahoma. In the meantime, nothing in HB 4156 prevents—or even purports to inhibit in any way—illegal aliens from seeking asylum or other relief under federal law. HB 4156 was set to take effect in Oklahoma on July 1, 2024. *Id.* § 5.

## C.    The United States and other Plaintiffs sued to enjoin HB 4156.

On May 21, 2024, the United States filed a facial challenge to HB 4156 against the State of Oklahoma, along with J. Kevin Stitt, in his official capacity as Governor of

Oklahoma; Gentner Drummond, in his official capacity as Attorney General of Oklahoma; the Oklahoma Department of Public Safety; and Tim Tipton, in his official capacity as Commissioner of the Oklahoma Department of Public Safety. J.A.015. On May 23, 2024, an organization called Padres Unidos de Tulsa and four private individuals (collectively, the Private Plaintiffs) filed suit against Attorney General Drummond and Commissioner Tipton, in their official capacities, in *Padres Unidos de Tulsa v. Drummond*, No. 5:24-cv-526 (W.D. Okla.). The Private Plaintiffs also sued Vicki Behenna and Steve Kunzweiler in their official capacities as the District Attorneys of Oklahoma and Tulsa Counties, respectively. The United States filed a motion for a preliminary injunction on May 22, 2024. J.A.032. The Private Plaintiffs filed a separate motion for a preliminary injunction on May 24, 2024. Doc. 15 in No. 5:24-cv-526. The district court consolidated the two cases on June 5, 2024. *See* J.A.012.

In the main, the United States claimed to possess the "exclusive authority under federal law to regulate the entry, reentry, and presence of noncitizens." J.A.016. The United States broadly alleged on Supremacy Clause grounds that federal immigration law facially preempts HB 4156. *See* J.A.017–20, 025–28. The United States also maintained that HB 4156 violates the dormant Foreign Commerce Clause's purported prohibition on state regulation of illegal entry and reentry. J.A.029–30. In the government's view, "Congress has established a comprehensive scheme governing noncitizens' entry and reentry into the United States." J.A.016. And "HB 4156 intrudes

on that scheme, frustrates the United States' immigration operations, and interferes with U.S. foreign relations." *Id.*

Oklahoma opposed this request for injunctive relief on June 13, 2024. J.A.086. At the outset, Oklahoma argued that the United States' claims were nonjusticiable for lack of a specific statutory authority or equitable principle that would allow its claims to go forward. J.A.123–24. Proceeding to the merits, Oklahoma emphasized that it—just like any other state exercising police power—may exclude aliens who violate federal standards. *See* J.A.105. Oklahoma explained that no provision of HB 4156 is field preempted: the Supreme Court has never recognized exclusive federal authority over all laws touching on immigration, in *Arizona* or elsewhere. *See* J.A.114–18. Likewise, HB 4156 is not facially preempted under conflict-preemption principles: a state law that duplicates federal law does not conflict with that law—it comports with it. *See* J.A.106–13. Finally, Oklahoma pointed to its inherent, sovereign power of self-defense against invasion under the U.S. Constitution. J.A.122–23. Oklahoma also offered the testimony of three current and former public officials on the state, national, and international implications of HB 4156: (1) Donnie Anderson, Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control; (2) Rodney S. Scott, Former Chief, U.S. Border Patrol, of U.S. Customs and Border Protection; and (3) Christopher Landau, former United States Ambassador to Mexico. J.A.138–42; 143–47; 148–51.

**D.    The district court granted a preliminary injunction against HB 4156.**

On June 28, 2024—days before HB 4156 was scheduled to go into effect—the district court granted the United States' motion for a preliminary injunction. J.A.174. As a threshold matter, the court determined that the United States had the right to seek equitable relief on its federal preemption claim. J.A.185–87. Leaning heavily on the Supreme Court decision in *Arizona*, the district court held that HB 4156 is likely field preempted. J.A.187–96. At the same time, the court "acknowledge[d], to Oklahoma's credit, that the discussion of parallel legislation in *Arizona* focused on noncitizen registration, not noncitizen entry and reentry." J.A.189. Despite admitting that *Arizona* is not directly on point, however, the court saw "no reason why *Arizona*'s logic does not naturally extend to this case, where HB 4156 criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry." *Id.*

The Court thus found this law—"[h]owever well-intentioned"—impermissibly "authorizes state prosecution for conduct already subject to comprehensive federal regulation and bound within federal immigration policy." J.A.196. By a similar token, the court found HB 4156 was likely conflict preempted: "[a]s constructed, H.B. 4156 would grant state officials broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses 'absent any request, approval, or other instruction

from the Federal Government.'" J.A.199–200 (quoting *Arizona*, 567 U.S. at 410).[12] The court also rejected Oklahoma's invasion defense. J.A.200–01.

Having concluded that the United States was likely to prevail on the merits of its preemption claims under the Supremacy Clause, the district court proceeded to analyze irreparable harm. Crediting the United States' argument that irreparable harm necessarily results from a state's enforcement of a preempted law, the court held that the United States and its foreign relations would be irreparably harmed by state enforcement of HB 4156. J.A.202–03. The court then wrapped up its preliminary injunction analysis by finding that "the balance of equities and public interest factors weigh in favor of granting injunctive relief when, as here, the state law is likely preempted by federal law." J.A.204. Accordingly, the court enjoined enforcement of HB 4156 in its entirety, before it was ever allowed to take effect or be interpreted by any State court. Oklahoma timely filed its notice of appeal on July 17, 2024. J.A.205.

Before proceeding further, Oklahoma notes one procedural matter for the Court in this appeal. Although the cases were consolidated below, the district court granted *only* the United States' motion for a preliminary injunction—the order on appeal here. *See* J.A.174, 204. The district court noted that the "United States and the Padres Unidos Plaintiffs raise substantially similar arguments in their respective motions for injunctive

---

[12] Because the district court found the United States was likely to prevail on its claim under the Supremacy Clause, it did not address the dormant Foreign Commerce Clause. *See* J.A.201 n.9.

relief." J.A.175 n.2. But the court also wrote that "Oklahoma raises a standing argument against the Padres Unidos Plaintiffs that it does not raise against the United States. Given the Court's desire to promptly rule on the underlying constitutionality of H.B. 4156, this Order will address only the United States' motion." *Id.* The district court then denied the Private Plaintiffs' separate motion for a preliminary injunction as moot, having declined to rule on the Private Plaintiffs' standing. *See* J.A.014. Subsequently, the Private Plaintiffs moved to permissively intervene in this appeal. Doc. 32. Both the United States and Oklahoma opposed their request for intervention. *See* Doc. 34, 35. On September 6, 2024, this Court provisionally allowed intervention "to the extent it is necessary, subject to reconsideration by the panel of judges later assigned to consider this appeal on its merits." Doc. 40. This Court should deny intervention, and it should reverse the district court's grant of an injunction.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). The test for demonstrating entitlement to a preliminary injunction is well-established: a plaintiff must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Dominion Video Satellite v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Put simply, preliminary injunctions

16

are the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). As a result, courts "require more of the parties who request them." *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). "[T]he right to relief must be clear and unequivocal." *Schrier*, 427 F.3d at 1258 (quotation omitted).

This Court reviews a preliminary injunction grant for an abuse of discretion. *Dominion Video Satellite*, 269 F.3d at 1153. "A district court abuses its discretion if it commits an error of law, or is clearly erroneous in its preliminary factual findings." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243 (10th Cir. 2001) (quotation omitted). This Court evaluates the district court's factual findings for clear error, while reviewing its legal determinations de novo. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

When a plaintiff seeks facial relief, "it is necessary to proceed with caution and restraint." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). This is "[b]ecause facial challenges push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). The Supreme Court has "made facial challenges hard to win" because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 144 S. Ct. at 2397 (citation omitted). Thus, facial challenges to laws are "disfavored." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Parties bringing a facial challenge "normally 'must establish that no set of

circumstances exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted). Therefore, "courts must be vigilant in applying a most exacting analysis to such claims." *Ward*, 398 F.3d at 1247.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion when it enjoined Oklahoma from enforcing HB 4156, which, as is utterly commonplace in the field of criminal law, simply creates a state analogue to two existing federal crimes. The United States is not likely to succeed on the merits of its claims. It has not pleaded a justiciable cause of action, and it has not shown that federal law preempts HB 4156 in all plausible applications—as is necessary for a facial challenge.

From the beginning, the district court erred when it found the United States has an equitable cause of action. The United States brings its preemption claims under the Supremacy Clause. But the Supremacy Clause creates a rule of decision only—it does not by itself confer a standalone cause of action. The district court wrongly endorsed the United States' imprecise efforts to locate a freestanding equitable cause of action where none exists. And although the district court did not decide the question of the Private Plaintiffs' standing (making their permissive intervention improper on appeal), those Plaintiffs have failed to present anything beyond vague claims of speculative harm in their pre-enforcement challenge.

On the merits, HB 4156 is neither field nor conflict preempted. The district court admittedly stretched *Arizona* beyond its holding to find that HB 4156 is implicitly field

preempted. In doing so, it wrongly discounted the Supreme Court's subsequent ruling in *Kansas v. Garcia*, 589 U.S. 191 (2020), a decision that clarifies *Arizona*'s scope and cuts against the district court's conclusion. Neither *Arizona* nor *Kansas* holds that all state laws touching on immigration are preempted. And HB 4156 does not intrude on the field of alien registration—the only occupied field the Supreme Court has ever identified. HB 4156 is a proper exercise of Oklahoma's police power, and it only criminalizes actions that are already punishable under federal law. The district court has mistaken an overlapping statute for an obstacle. And Oklahoma has the power to defend itself under the U.S. Constitution, in any event.

The district court also improperly balanced the remaining injunction factors, which favor Oklahoma. Any irreparable injury falls on Oklahoma, which is harmed when its duly enacted laws are enjoined, and when its ongoing crisis—a crisis President Biden has admitted exists—is left unaddressed and unremedied. In any event, federal courts do not assume the unconstitutional enforcement of state laws. Accordingly, it was premature and erroneous for the district court to enjoin HB 4156 "before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objectives." *Arizona*, 567 U.S. at 416. This Court should reverse and vacate the injunction.

# **ARGUMENT**

## I. The United States' claims are nonjusticiable and cannot be brought in federal court.

### A. The Supremacy Clause does not give the United States an equitable cause of action to challenge HB 4156.

Axiomatically, a plaintiff must show it has a cause of action before it can demonstrate any likelihood of success. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). Here, the United States brought nonjusticiable claims that barred an award of relief from the district court. To be sure, the government "may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). And "[f]ederal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (cleaned up); *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (requested relief "depend[s] on traditional principles of equity jurisdiction" and must have been "traditionally accorded by courts of equity").

Before the district court, the United States pointed to neither a specific statutory authority nor a traditional equitable principle that would allow its claims to go forward. Rather, it relied on the Supremacy Clause, U.S. CONST. art. VI, cl. 2, and the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, for its claims. *See* J.A.025–28 (Supremacy Clause-based preemption claims); J.A.029–30 (Foreign Commerce Clause). But "the Supremacy Clause is not the source of any federal rights," and it "certainly does not

20

create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. In short, it "creates a rule of decision" only. *Id.* at 324.

The Supremacy Clause does not "give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States." *Id.* at 325. The same rule holds true when a party other than the United States is the plaintiff: "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). As the Supreme Court just explained earlier this year, "[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts," but instead are "invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024).

The district court acknowledged, as it must, that "Oklahoma is correct that the Supremacy Clause does not create a cause of action." J.A.185. But, in siding with the United States, the court never extended beyond generalities about how "the United States may sue to protect its interests." J.A.186 (quoting *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967)). Certainly, the court cited *United States v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016), for the blanket proposition that "the federal government may bring an action in equity to enforce federal supremacy." J.A.186. That case, however, involved specific findings that the United States had been

harmed by a New Mexico rule of professional conduct that limited when prosecutors could subpoena defense lawyers in grand jury or other criminal proceedings about clients. *Sup. Ct. of N.M.*, 839 F.3d at 893. There, the United States could show actual injury resulting from "several instances in which [federal] prosecutors" had been "hampered ... in the performance of their otherwise lawful duties." *Id.* at 900 (quotation omitted). The United States cannot plead any direct injury even remotely similar or direct in this case. Indeed, although Oklahoma has not focused on this, it does not appear that the United States has standing here at all, much less a cause of action. How, that is, is the United States concretely and directly harmed by Oklahoma's prosecution of a noncitizen unlawfully present in the country? "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)).

In any event, it is not enough for the district court (or the federal government) to simply invoke a freestanding equitable cause of action. Absent legislation from Congress, "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." *Grupo Mexicano*, 527 U.S. at 318 (quotation omitted). Viewed through this lens, the district court's approach is contrary to the judiciary's "traditionally cautious approach to equitable powers." *Id.* at 329; *see also Hernandez v. Mesa*, 589 U.S. 93, 101 (2020) (expressing doubt

"about our authority to recognize any causes of action not expressly created by Congress"). If the district court were correct here, the United States could sue in virtually any situation, so long as it could make some tenuous claim that its foreign affairs are affected by a state law. This is incorrect as a matter of law.

## B. The Private Plaintiffs lack standing to pursue an injunction.[13]

Article III standing is a threshold inquiry. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "First and foremost," "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 338–39 (cleaned up). In a facial pre-enforcement challenge—as here—the Private Plaintiffs must also show an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). No such showing was made by the individual private plaintiffs in the district court.

To access the federal courts, an individual "plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). The alleged "threatened injury must be certainly impending and not merely speculative." *Id.* (quotation omitted);

---

[13] Again, Oklahoma opposes the Private Plaintiffs' intervention in this appeal. Because the Private Plaintiffs' preemption arguments mimic those made by the United States, Oklahoma does not respond to their contentions separately. Oklahoma does, however, include its objections to the Private Plaintiffs' standing.

*see also Younger v. Harris*, 401 U.S. 37, 42 (1971) (no controversy existed as to plaintiffs never threatened with prosecution who could allege only that they "fe[lt] inhibited" by the law). Speculative and subjective fears of state prosecution are simply not enough to establish standing. That is, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Recently, the Supreme Court raised the already high bar for establishing standing even further. *See, e.g.*, *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) ("[a]t the preliminary injunction stage … the plaintiff must make a clear showing that she is likely to establish each element of standing") (quotations and citations omitted). "By limiting who can sue, the standing requirement implements 'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1220 (1993)). "In particular, the standing requirement means that the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process." *Id.*

These standing principles also "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381. Granted, "organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Padres Unidos de Tulsa attempted to do

so below. A membership organization has standing to bring suit if, in pertinent part, "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). But Padres Unidos de Tulsa failed to plead the injury of any individual member with particularity and plausibility, and the organization lacks direct standing as well. "Like an individual," the Supreme Court emphasized just this summer, "an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct." *FDA*, 602 U.S. at 394 (quotation omitted). An alleged injury in the form of a "setback" to Padres Unidos de Tulsa's "abstract social interests" does not support direct standing. *Id.*

Important here, "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc). To the extent that any individual plaintiff is admitting that he or she is in Oklahoma unlawfully under federal law, a ruling in that plaintiff's favor will not eliminate their unlawfulness, as is the typical case with a plaintiff challenging a law. Rather, they are complaining that Oklahoma's actions will make their criminal activity more difficult. This cannot be a ground for standing, as "a court won't use its equitable power to facilitate illegal conduct." *Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City*, 861 F.3d 1052, 1054 (10th Cir. 2017) (Moritz, J.). As for the alternative possibility,

that one or more of the Private Plaintiffs are here with express federal permission, then enforcement of HB 4156 would be precluded altogether because HB 4156 does not go beyond what federal law prohibits. In other words, the lack of a credible threat of prosecution—"whether today or in the future"—equates to a lack of actual or imminent harm for standing purposes. *California v. Texas*, 593 U.S. 659, 670 (2021). In sum, Private Plaintiffs are stuck between a rock and a hard place. Either they are here illegally, in which case standing cannot be conferred based on that illegality, or they are not here illegally, in which case HB 4156 does not apply.[14]

## II.    Federal immigration law does not preempt HB 4156.

We begin with first principles: "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). Under the Supremacy Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Put another way, federal enforcement *priorities* do not preempt state law—only federal *law* does. *See Kansas*, 589 U.S. at 212. "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law ...." *Va. Uranium,*

---

[14] Also, like the United States, the Private Plaintiffs lack a cause of action in this case. And without a cause of action, they cannot sue Oklahoma in federal court.

*Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.). Whether express or implied, the "preemption of state laws represents a serious intrusion into state sovereignty." *Id.* at 773 (cleaned up). Preemption is a powerful tool that should not be imposed lightly to thwart state legislation: "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Federal law can preempt state law either by an express statement of preemption or by implication. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1223, 1241 (10th Cir. 2011). Plainly, Congress has never expressly stated that the separate States are prohibited from enacting any laws touching on immigration, thus making this case solely about implied preemption. Implied preemption encompasses both field preemption and conflict preemption. *Id.* Field preemption takes place when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive … that Congress left no room for the States to supplement it' or where there is a 'federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice*, 331 U.S. 218, 230 (1947)). Conflict preemption may occur in one of two ways: "where compliance with both federal and state regulations is a physical

impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Oklahoma—as a separate, dual sovereign—retains police powers relating to the field of immigration. HB 4156 codifies an analogue to the federal crimes of illegal entry and reentry, thereby complementing federal law instead of obstructing it. Importantly, every act punished by HB 4156 is already a federal crime. It does not create new standards governing the admissibility or removability of aliens, and it does not regulate alien registration, which was the only topic deemed field preempted in *Arizona. See* 567 U.S. at 401. Nor does HB 4156 authorize Oklahoma officials to remove illegal aliens from the country. The district court erred as a matter of law when it held, in effect, that the *entire* field of immigration was preempted under *Arizona* and concomitant principles of implied preemption.

### A.     No part of HB 4156 is field preempted.

Field preemption can be justified only by "a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404, and

*Kansas*, 589 U.S. at 195 (quotations omitted). Nothing less than an "unambiguous congressional mandate" will support a finding of field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616–17 (1997) (Thomas, J., dissenting) (field preemption "is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted"). Only "[i]n rare cases" has the Supreme Court held "that Congress has 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (citation omitted).

This is not such a case. Oklahoma has never disputed that the federal government has broad power to regulate immigration. Federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355. But the Supreme Court "has never held that every state enactment which in any way deals with aliens" is "pre-empted by this constitutional power, whether latent or exercised." *Id.* at 355. And critically, the Supreme Court has also not "conclude[d] that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernable impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982). Indeed, as these Supreme Court quotes show, it has held precisely the opposite.

Immigration law is not field preempted *in toto*. Contrary to the assertions made by the United States below, the federal government lacks exclusive power over the field

of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond a single category: alien registration. In *Arizona*, the Court stated that the government "has occupied the field of alien registration," and then it proceeded to interpret the other challenged Arizona law provisions using a conflict-preemption analysis. *Arizona*, 567 U.S. at 401, 403–16; *see also Kansas*, 589 U.S. at 210 (rejecting argument that *Arizona* requires broad application of immigration field preemption). "At no point" did *Arizona* hold that "state regulation of immigration was *per se* impermissible, despite ample opportunity to do so." *Utah Coal. of LaRaza v. Herbert*, 26 F. Supp. 3d 1125, 1134 (D. Utah 2014). "Instead, the Court opted to engage in a detailed, section-by-section analysis of the challenged provisions" and decided "not that Congress has exclusive power to regulate immigration," "but rather that '[t]he National Government has *significant* power to regulate immigration." *Id.* at 1134–35 (quoting *Arizona*, 567 U.S. at 416).

The fact that the federal government possesses exclusive power to admit and naturalize aliens does not deprive Oklahoma (or any other State) of the concurrent and complementary ability to regulate the presence of aliens—within that State's borders— who then violate federal standards. Indeed, the Supreme Court has expressly recognized that "the States do have some authority to act with respect to illegal aliens, *at least where such action mirrors federal objectives and furthers a legitimate state goal.*" *Plyler*, 457 U.S. at 225 (emphasis added). Both are true here, which eliminates the possibility that Oklahoma is

field preempted. HB 4156 clearly mirrors federal objectives enshrined in law, and it is undeniably a legitimate state goal to penalize lawbreakers who remain in the State.

As a prelude to analyzing field preemption, the district court recounted in detail the congressional enactment of the Immigration and Nationality Act. *See* J.A.176–79; *see also* J.A.176 ("The [Act] provides a comprehensive framework regulating the entry, presence, and removal of noncitizens."). Indisputably, the "central concern" of the Immigration and Nationality Act "is with the terms and conditions of admission to the country and the subsequent treatment of aliens *lawfully* in the country." *DeCanas*, 424 U.S. at 359 (emphasis added). Oklahoma's HB 4156 does not punish aliens lawfully present in the country; instead, it expressly *protects* them. *See* HB 4156, § 1(A) ("it is a compelling public interest of this state to protect its … lawfully present visitors"). HB 4156's criminal provisions deal solely with the alien who is both *unlawfully* present in the country and subsequently found in Oklahoma. Federal immigration law expressly anticipates and acknowledges state authority and involvement in this field. *See, e.g.*, 18 U.S.C. § 758 (making it a crime to "flee[]" from "State[] or local law enforcement" around immigration checkpoints); 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) (contemplating "State[] or local investigation or prosecution" of illegal trafficking in persons); *id.* § 1101(a)(15)(U)(iii) (state and local criminal laws can include trafficking); *id.* § 1324(c) (State law enforcement granted authority to make arrests for violation of alien smuggling prohibition); 22 U.S.C. § 7105(c)(3)(C)(i) (contemplating "State or local" investigation or prosecution of alien "trafficking").

HB 4156 does not intrude on a preempted "field"—an area that courts have narrowly and carefully defined. A court "will not presume that Congress, in enacting the [Immigration and Nationality Act], intended to oust state authority to regulate ... in a manner consistent with pertinent federal laws." *DeCanas*, 424 U.S. at 357. Even if this Court were to define the field more broadly, state law should not be impliedly preempted unless the federal government is actually occupying the field in question. Given the ramifications of the ongoing border crisis, it is difficult to conclude anything other than that the federal government is "obviously derelict in enforcing" its "statutory obligations." *Texas*, 2023 WL 8285223, at *14; *see also Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023) (likening the current administration's actions to "posting a flashing 'Come In, We're Open' sign on the southern border"). The federal executive is entrusted to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. As a matter of equity (and law), the United States should not be allowed to invoke field preemption when it has abandoned the field and failed to "take Care" that basic immigration laws are enforced. These points were left unaddressed by the district court.

Moreover, the United States' rhetoric notwithstanding, HB 4156 does not interfere with foreign relations in any coherent or meaningful way. "Every foreign government that negotiates with the United States understands, or should understand, that the Executive Branch of the Federal Government does not dictate all law and policy in this country." J.A.150. Enforcing an illegal alien's compliance with bedrock federal law should have no bearing on relations with other countries, as those other

countries have no "right" to insert their citizens into the United States illegally, nor do they have a "right" to see that Congress's express mandates are disregarded. *Compare* J.A.071 (indicating that laws like HB 4156 negatively affect "rights"), *with* J.A.150–51 (explaining that a foreign country's "displeasure with federal and state laws and policies" has no "legal force to invalidate any law or policy that was otherwise duly enacted"). In short, HB 4156 permissibly "mirrors federal objectives and furthers a legitimate state goal." *Plyler*, 457 U.S. at 225. HB 4156 thus avoids *Arizona*'s proscription on a state's entry into "an area the Federal Government has reserved for itself." 567 U.S. at 402.

To the extent that *Arizona* sweeps as broadly as the district court held, then the decision should be overruled or narrowed by the Supreme Court. In the twelve years since *Arizona*, the illegal-immigration crisis has grown ever more unmanageable for the states and ever more threatening to state sovereignty. And "*stare decisis* isn't supposed to be the art of methodically ignoring what everyone knows to be true." *Ramos v. Louisiana*, 590 U.S. 83, 105 (2020). Oklahoma's law permissibly adjoins federal immigration law as valid—and necessary—supplementary legislation.

Granted, "a state's decision to impose 'distinct, unusual and extraordinary burdens and obligations upon aliens' *may* constitute an impermissible intrusion into the federal domain." *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) (emphasis added) (citation omitted). But HB 4156 does not deviate from federal law in any novel fashion. Whatever "set of immigrants" is "banish[ed]" from the State will be those whom federal law has deemed banish-able, and not those "lawfully present." HB

4156, § 1(A). And if that number is substantial, then it only shows that federal law is currently being violated with impunity and on a massive scale, *in Oklahoma*. Moreover, "may" does not mean "always," which goes back (again) to the high standard for facial challenges. That a law *might* infringe upon the federal domain does not mean that it always will, which means that facial relief is inappropriate. Here, for example, even if the federal government's foreign relations interest were valid, it could not apply in every case. Surely, there are some persons unlawfully present—murderers, rapists, etc.—for whom neither the United States nor a foreign country would deem a state prosecution under HB 4156 problematic.

The federal government's exclusive authority to naturalize and admit (*i.e.*, legalize) does not necessarily displace the States's police power to exclude *illegal* aliens. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 588 (2011) (federal interest in immigration does not supersede States' "broad authority under their police powers" to enact law relating to immigration) (quotation omitted). In any event, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory ... without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *see also* U.S. CONST. amend. X. Moreover, President Biden himself has admitted that the current system is "broken" and in "crisis." *See supra* pp.4–5. Broken objects often must be picked up and repaired piece by piece. Here, if the federal government will not do its job, then that would mean the brokenness may need to be fixed on a state-by-state basis.

Again, only alien registration has been deemed field preempted under *Arizona*. 567 U.S. at 401. Indeed, the district court "acknowledge[d], to Oklahoma's credit, that the discussion of parallel legislation in *Arizona* focused on noncitizen registration, not noncitizen entry and reentry." J.A.189. The court's acknowledgment was cold comfort, though, because the court thereafter saw "no reason why *Arizona*'s logic does not naturally extend to this case." *Id.* The court misinterpreted both *Arizona*'s reasoning and the text and underlying purpose of HB 4156.

For starters, Oklahoma's law does not actually regulate the entry or reentry of noncitizens into the United States. HB 4156's proper concern is with the presence of aliens who have (1) already violated the admissibility requirements set forth by Congress, and (2) subsequently entered—and remained in—Oklahoma. A State may rightfully exercise its police power to enforce federal admissibility standards within its borders. HB 4156 neither extends federal law nor criminalizes something not already federally criminal. Nor does it extend or even purport to extend beyond Oklahoma's borders to entry and reentry in the United States as a whole. Oklahoma's law is solely concerned with its own borders and protecting those lawfully present within. The district court committed legal error when it indicated otherwise.

In this regard, HB 4156 is much like the law in *Kansas*, 589 U.S. 191, which the district court tried to downplay. *See* J.A.194. *Kansas* upheld an identity-theft statute criminalizing an alien's use of a false identity for work authorization. 589 U.S. at 195. In upholding that law, the Supreme Court distinguished *Arizona*, while underscoring

35

that "in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Id.* at 212. Once more, to overlap is not to "undermine." J.A.196.

If the district court were correct about the "logic" of *Arizona*, J.A.189, then that case should have been much less complicated to decide. Because it is hard to see how that "logic," broadly understood, would not draw in virtually every immigration-related law. If that is so, "[t]he Court would have simply said that immigration implicates federal interests, so the Arizona law was field preempted in its entirety." *United States v. Texas*, 97 F.4th 268, 322 (5th Cir. 2024) (Oldham, J., dissenting). But *Arizona*'s "analysis was much more nuanced." *Id.* at 325. "[T]hat Congress occupied the field of aliens who must register to seek admission says nothing about the field of aliens whom Congress deemed inadmissible." *Id.* at 320. Put differently, *Arizona*'s field preemption concerned legal aliens; HB 4156 concerns illegal aliens. The logic is not the same for both groups.

Moreover, *Arizona* itself upheld one challenged statute involving immigration. 567 U.S. at 415. Then, eight years later, the Supreme Court upheld Kansas's state criminal law even though it plainly concerned immigration as well. *See Kansas*, 589 U.S. at 213. In failing to follow both *Arizona* and *Kansas*, the district court abused its discretion, and this Court's reversal is required.

### B. HB 4156 is not conflict preempted because it readily comports—rather than conflicts—with federal immigration laws.

No provision of HB 4156 is conflict preempted by federal law. Conflict preemption exists only where it is "impossib[le]" to comply with both state and federal law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotations omitted). This is necessarily a high hurdle. "In all cases," the purported "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas*, 589 U.S. at 202. It is not enough to say that "a state statute is in tension with federal objectives." *Whiting*, 563 U.S. at 607 (quotation omitted). And "there is no federal preemption *in vacuo*"—that is, "without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas*, 589 U.S. at 202 (quotation omitted); *see also Whiting*, 563 U.S. at 607 (a "freewheeling judicial inquiry" is an insufficient method for finding preemption). Supreme Court precedent makes it abundantly clear that "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and in the judgment). Federal law preempts state law only when the two stand in irreconcilable contradiction.

The United States has not demonstrated that HB 4156 contradicts federal law; quite the contrary, it has nearly admitted the opposite. HB 4156, the federal government conceded below, "tracks the federal unlawful-entry provision," J.A.046, which generally

bars noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers," 8 U.S.C. § 1325(a). Federally, any alien who commits this crime of illegal entry "shall"—not "may"—be fined up to $5,000, imprisoned for up to 6 months, or both. *Id.* (referencing penalties in 18 U.S.C. §§ 3559(a)(7), 3571(b)(6)).

Congress has also criminalized reentry by aliens who have been "denied admission," have been involuntarily "removed," or have departed the country "while an order of exclusion, deportation, or removal is outstanding." 8 U.S.C. § 1326(a). Federally, an alien who illegally reenters "shall"—not "may"—be imprisoned up to two years, fined $250,000, or both. *Id.* (referencing penalty provisions under 18 U.S.C. §§ 3559(a)(5), 3571(b)(3)). Aliens with certain aggravating factors may face harsher penalties. 8 U.S.C. § 1326(b). Yet again, the United States conceded below that HB 4156 "effectively imposes state criminal penalties on those who violate 8 U.S.C. § 1326(a)." J.A.047. Further, Congress has directed immigration officers to "order ... removed from the United States without further hearing or review" an alien who lacks a "valid entry document." 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7)(A)(i)(I). In lieu of removal proceedings, an alien may agree to a "stipulated order" of removal or "voluntarily to depart the United States." *Id.* §§ 1229a(d), 1229c(a)(1). The failure to comply with these requirements constitutes a felony. *Id.* § 1253(a)(1); 18 U.S.C. § 3559(a)(5). The text of HB 4156 neither contradicts nor conflicts with any of this, nor with any other portion

of federal law. HB 4156 mirrors these provisions, as the United States and district court admitted below. *See* J.A.188.

The federal government may adopt state laws for federal purposes. *See, e.g., Parker Drilling Mgmt. Servs. v. Newton*, 587 U.S. 601, 604 (2019). And, as is uncontroversial, state governments may adopt federal law for state purposes. *See, e.g., Gilbert v. Minnesota*, 254 U.S. 325, 331 (1920). "[T]here can by definition be no conflict" between the laws of two sovereigns where state law "trace[s] the federal law." *Whiting*, 563 U.S. at 601–02; *see also Arizona*, 567 U.S. at 429 (Scalia, J., concurring in part and dissenting in part) ("It is beyond question that a State may make violation of federal law a violation of state law as well. We have held that to be so even when the interest protected is a distinctively federal interest ...."). Indeed, "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap." *Kansas*, 589 U.S. at 212. More specifically here, except in matters of alien registration, the Supreme Court has never held that state laws that overlap with federal criminal immigration statutes are impermissible. *See Arizona*, 567 U.S. at 402 (concluding that the federal government fully occupied the "field of alien registration"); *accord Kansas*, 589 U.S. at 210 ("In *Arizona*, ... we held that federal immigration law occupied the field of alien registration. 'Federal law,' we observed, 'makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.'") (quoting *Arizona*, 567 U.S. at 401–02) (internal citations omitted)). *Arizona*, that is, provides a narrow exception to the broad and unremarkable general

rule that state and federal criminal laws can readily coexist. And that exception should be expanded, if at all, only in the most compelling of situations, which this is not.

As a practical matter, it is worth observing that the effective implementation of HB 4156 will likely require meaningful cooperation with federal authorities. Oklahoma must prove, after all, that an individual lacks legal immigration status, which is admittedly difficult to do without consulting the federal government. This is not unusual: multiple sections of the federal immigration statutes call for State–federal cooperation in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1101(a)(15)(T)(i)(III)(aa), 1101(a)(15)(U)(iii), 1324(c), 1357(g)(1)–(10); 18 U.S.C. § 758; 22 U.S.C. § 7105(c)(3)(C)(i). That is to say, the "federal scheme" "leaves room" for enforcement of a state law like HB 4156, much as it did "for a policy requiring state officials to contact ICE as a routine matter." *Arizona*, 567 U.S. at 412–13 (citation omitted).

Federal law also expressly permits state officials to "'communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" *Id.* at 411–12 (quoting 8 U.S.C. § 1357(g)(10)(A)). They do so regularly. *See* J.A.147 ("in all prior administrations, DHS, and specifically [ICE Enforcement and Removal Operations Branch], actively encouraged assistance from local law enforcement"). Along the same lines, "Congress has made clear that no formal agreement or special training needs to be in place" for state officers to communicate with the federal government about immigration status. *Arizona*, 567 U.S. at 411–12. In sum, under HB

4156, "Oklahoma law enforcement would be aiding ICE by helping clear their Fugitive Docket and reducing the demand on [enforcement] resources." J.A.146. And it would be difficult to enforce the law without the United States' cooperation, at least to some extent. This is yet another reason why facial relief was inappropriate: With the injunction in place, it is impossible to tell if, and how, the law would be enforced and how the State and federal governments would cooperate in regard to its enforcement.

In sum, HB 4156 comports and harmonizes with federal law; it does not conflict with or obstruct its application. "[T]here are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors." *Kansas*, 589 U.S. at 212. HB 4156 does not criminalize under Oklahoma law anything that is not already criminal under federal law. It is no obstacle to federal law to make the violation of federal criminal immigration law a companionate crime in Oklahoma. "To hold otherwise would be to ignore the teaching of [Supreme Court] decisions which enjoin seeking out conflicts between state and federal [law] where none clearly exists." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960). It would also turn the states into little more than federal provinces or vassals, unable to do anything to protect their citizens from lawless intrusions, or even to pick up the slack should the federal government abandon its duty to enforce federal law.

In truth, the only "obstacle" raised by HB 4156 is political, rather than legal— and therefore it is not a valid basis for granting a preliminary injunction. The current presidential administration and its political appointees are loath to enforce federal law

and secure the border, thus making their distaste for HB 4156 comprehensible. Indeed, the United States and its witnesses repeatedly make it plain that they have subordinated the enforcement of clear federal law to the whims of foreign governments. *See, e.g.,* J.A.069 ("This federal law must be employed with sensitivity to the spectrum of foreign relations interests …."). Given the admitted resemblance between HB 4156 and federal law, the United States' claim that enforcement of "HB 4156 would harm the United States' relationship with foreign nations … in multiple ways" and "antagonize foreign governments," J.A.061, can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has enacted because foreign governments might become incensed. That is the only way its staunch opposition to HB 4156 makes any sense. If the United States were enforcing the law as it should be, it would have no problem with what Oklahoma is doing, in the same way that the United States has no problem with both the state and federal governments prosecuting fraud, murder, or bank robberies.[15]

Tellingly, the United States conceded below (albeit illogically) that "Oklahoma remains free to enforce its generally applicable criminal laws that prohibit drug, sex, or labor trafficking, which apply to citizens and noncitizens alike." J.A.063. Plainly so: "The mere fact that state laws like the [] provisions at issue overlap to some degree with

---

[15] Going further, various States have adopted or are considering adopting laws and policies offering additional benefits to illegal immigrants. Oklahoma is not aware that this administration has opposed such laws or claimed that they are preempted.

federal criminal provisions *does not even begin* to make a case for conflict preemption." *Kansas*, 589 U.S. at 211 (emphasis added). "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Id.* at 212. The United States has no choice but to concede this point—even if it undermines their arguments elsewhere—because it knows that states regulate and prosecute unlawfully present individuals *all the time.* They do so whenever those persons are found in violation of other criminal laws within the jurisdiction. "For instance, the Oklahoma Department of Corrections reports that it currently houses nearly 500 illegal immigrants convicted of state crimes." J.A.133–34; *see also, e.g.,* J.A.146–47 ("It is important to note that having [an illegal alien] ... end up in local law enforcement custody is a regular occurrence around the country and there are already [ICE Enforcement and Removal Operations Branch] processes in place to handle such events."); J.A.142 (noting that Oklahoma Bureau of Narcotics "has no independent mechanism to confirm the legal status of an individual in the United States" and therefore "rel[ies] on federal law enforcement ... to determine legal status, especially in investigations of alleged human trafficking"). The logic behind the United States' argument that punishing illegal immigrants would upset foreign relations would clearly extend to these numerous instances, as well. The United States cannot avoid this problem by merely disclaiming, sans any plausible reason, that everything *but* unlawful presence is still on the table for state prosecution.

In the end, the "Supremacy Clause gives priority to 'the laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Kansas*, 589 U.S. at 212 (quoting U.S. CONST. art. VI, cl. 2). That is to say, the United States cannot create conflict preemption with state laws that duplicate federal law by claiming it has the discretion not to enforce laws that Congress has passed. This is especially so when the federal statutes in question are phrased mandatorily—they both *require* ("shall") punishment for these offenses. *See* 8 U.S.C. §§ 1325(a), 1326(a).

The district court erred in finding that HB 4156 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." J.A.196 (quoting *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998)). Obstacle preemption "rests on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law.'" *Kansas*, 589 U.S. at 214 (Thomas, J., concurring) (quoting *Wyeth v. Levine*, 555 U.S. 555, 587 (2009) (Thomas, J., concurring in the judgment)). Federal law preempts state law only when the two contradict each other. The district court's pre-enforcement judicial guesswork notwithstanding, HB 4156 poses no obstacle to the federal immigration laws.

III. **Oklahoma is entitled to defend itself against an invasion when the federal government abdicates its own duties.**

"A sovereign isn't a sovereign if it can't defend itself against invasion." *United States v. Abbott*, 110 F.4th 700, 725 (5th Cir. 2024) (Ho, J., concurring in the judgment

in part and dissenting in part). Like any State, Oklahoma still retains an inherent, sovereign power of self-defense. *See* U.S. CONST. art. I, § 10, cl. 3. Upon entering the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). Today, Oklahoma is in the midst of an illegal immigration crisis, HB 4156, § 1(B), as it faces a veritable deluge of illegal immigration and criminality: desperate traffickers, deadly weapons, and dangerous drugs. *See* J.A.132–33. It is not arrant hyperbole to label this an invasion when, as noted above, a population of unlawfully present persons equivalent to the combined populations of Utah and Iowa has been added to our country in just three years. *See supra* p.4. And it does not violate the Constitution when a State takes proportionate or relatively minor steps to repel such a massive influx that may endanger the health or lives of its citizens.

The district court discounted these significant concerns. J.A.200. True, some courts have indicated "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). That said, it is difficult to deny that "migration can be weaponized by one sovereign to inflict damage on another." *United States v. Abbott*, 92 F.4th 570, 579 (5th Cir. 2024) (en banc) (Ho, J., dissenting) (per curiam). The harm inflicted by foreign cartels in Oklahoma is staggering and sobering. And "these organizations pose a hybrid threat, combining characteristics of organized crime, insurgency, and terrorism." Christopher J. Curran, *Spillover: Evolving Threats and*

45

*Converging Legal Authorities in the Fight Against Mexican Drug Cartels*, 6 HARV. NAT'L SEC. J. 344, 364 (2015).

Oklahoma—in the midst of crisis—seeks at least "an acknowledgment of the States' sovereign interest in protecting their borders." *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part). Oklahoma presented a colorable argument that an illegal invasion is occurring, and that the Constitution allows a state to take legal measures to stop it if the federal government will not act. *See* U.S. CONST. art. IV, Section 4 ("The United States … shall protect each of [the States] against Invasion."). The district court was too hasty in reflexively dismissing this argument. Put differently, the United States cannot succeed on a facial challenge to Oklahoma's "legislative judgment" unless it establishes that "the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (quotation omitted); *see also Moody*, 144 S. Ct. at 2397 ("no set of circumstances under which the [law] would be valid") (quotation omitted). That burden has not been met here, at least in part because the Constitution contemplates States defending themselves from invasions. If the argument is, for example, that an "invasion" under the Constitution requires actions from an organized and cohesive group, is it not the case that Oklahoma could at least enforce its law against Mexican cartel members, or against organized Chinese crime syndicates? The district erred by holding, in effect, that federal statutes—or worse, federal enforcement decisions not to enforce those statutes—can completely preempt a State's effort to defend itself.

**IV.    The district court improperly weighed the remaining injunction factors.**

To recap, the United States brought a pre-enforcement challenge to HB 4156, and the district court enjoined the law just days before it was to go into effect. The United States failed to demonstrate a likelihood of success on the merits, which should have been fatal to its motion for a preliminary injunction. But the federal government also does not face irreparable harm from HB 4156's implementation, and it accordingly failed to establish why it must receive a pre-enforcement preliminary injunction. It could not possibly cause "irreparable harm" to the United States if Oklahoma—a separate sovereign—chooses to enforce a state law against a private individual that is consistent and congruent with the laws of the United States. That is to say, the federal government cannot claim as a harm that its own laws might be enforced, and it certainly cannot stand in the shoes of an illegal immigrant. The district court failed to properly balance the remaining injunction factors, and its decision constitutes an abuse of discretion.

Although the district court gave credence to the government's alleged diplomatic harms, those injuries are purely speculative. "[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). It does not suffice to suggest that HB 4156 may hurt the United States' relationship with Mexico or other nations. As a former ambassador to Mexico testified below: "Disagreements between nations are not inimical to diplomacy; they are the very predicate for diplomacy." J.A.151. At any rate, the Mexican government's views (or that of any other nation) on the wisdom of HB

4156 should carry no legal weight in this Court's analysis of this case. *See* J.A.150. The United States's arguments on this point strongly imply that foreign countries have a say in whether state laws that match federal laws are preempted. This cannot be the case.

The district court also misapplied precedent when it adopted the United States' argument "that irreparable harm necessarily results from enforcement of a preempted state law." J.A.201. "[T]hough some courts have held as much, the Tenth Circuit has not." *Id.* At its core, HB 4156 does not prevent the United States from enforcing (or failing to enforce) immigration law. Allowing HB 4156 to take effect would not have caused the federal government any immediate or irreparable harm. HB 4156 does not presume to do anything more than what federal law allows. At the same time, however, Oklahoma suffers per se irreparable harm when enforcement of one its statutes is enjoined. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1254–55 (10th Cir. 2017). Its injury is rendered even more acute because the law being enjoined was designed to combat an ongoing crisis within the State's borders—a crisis the President has acknowledged.

Here, the equities of the situation plainly favored Oklahoma because Oklahoma's hardship is greater. The State has a manifest and inviolate interest in addressing the border crisis. Oklahoma would suffer irreparable harm if its officials are enjoined from acting to protect those who are lawfully within State borders from those who are not.

*See New York v. New Jersey*, 598 U.S. 218, 225 (2023) (describing "a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders"); HB 4156, § 1(A) ("protecting the health, safety, welfare, and constitutional rights of its citizens, authorized residents, and lawfully present visitors is of utmost importance"). And the unlawful activity associated with illegal immigration harms everyone in Oklahoma, citizen and noncitizen alike. *See Juidice v. Vail*, 430 U.S. 327, 335 (1977) (underscoring importance of "the State's interest in the enforcement of its criminal laws"). The district court erred in concluding that an injunction against HB 4156 serves the public interest in any way.

As a final matter, Oklahoma notes that its statutory enactments are presumed constitutional. *E.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[W]e give all statutes a presumption of constitutionality ...."); *Liddell v. Heavner*, 180 P.3d 1191, 1200 (Okla. 2008) (a "statute will be presumed to conform to the state and federal Constitutions and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution"); *see also Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1236 (2024) (presumption of good faith "reflects the Federal Judiciary's due respect for the judgment of state legislators"); *Texas*, 97 F.4th at 313 (Oldham, J., dissenting) ("[O]ur federal system requires us to presume that state courts will in good faith at least try to honor federal law."). Furthermore, "a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation omitted). A court

should "prefer ... to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Id.* at 328–29 (citations omitted); *see also Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127 (1973) (state statutes should be preempted "only to the extent necessary to protect the achievement of the aims of the [federal law]").

In the end, the United States did not show a likelihood of prevailing on its claims. It did not face irreparable harm from HB 4156's enforcement, and the equities clearly favored Oklahoma. The district court abused its discretion in granting the injunction.

## CONCLUSION

"[I]magine a provision—perhaps inserted right after Art. I, § 8, cl. 4, the Naturalization Clause—which included among the enumerated powers of Congress 'To establish Limitations upon Immigration that will be exclusive and that will be enforced only to the extent the President deems appropriate.' The delegates to the Grand Convention would have rushed to the exits." *Arizona*, 567 U.S. at 436 (Scalia, J., concurring in part and dissenting in part). The district court recognized that Oklahoma "may have understandable frustrations with the problems caused by illegal immigration." J.A.204 (quoting *Arizona*, 567 U.S. at 416). These legitimate frustrations are compounded, not allayed, when the federal courts overextend the principles of implied preemption to thwart the efforts of a State's elected representatives to remedy—unaided by the federal government—an unabated crisis harming that State's citizens. This Court should reverse the district court and vacate the injunction.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oklahoma supports oral argument in this case. The issues of sovereignty and security are highly significant for the State and its citizens, and further questioning and discussion could assist both the parties and this Court moving forward.

Respectfully submitted,

*s/ Cullen D. Sweeney*

GARRY M. GASKINS, II
*Solicitor General*
ZACH WEST
*Director of Special Litigation*
CULLEN D. SWEENEY
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 27, because it contains 12,968 words, excluding the parts exempted.

s/ *Cullen D. Sweeney*
CULLEN D. SWEENEY

**CERTIFICATE OF DIGITAL SUBMISSION**

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with Crowdstrike antivirus updated on July 23, 2024.

s/ *Cullen D. Sweeney*
CULLEN D. SWEENEY

**CERTIFICATE OF SERVICE**

I certify that on September 20, 2024, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. No paper copies are required pursuant to 10th Cir. R. 27.2.

s/ *Cullen D. Sweeney*
CULLEN D. SWEENEY

# ATTACHMENT 1

Order [Dkt. 39]
District Court Order granting
U.S. Motion for a Preliminary Injunction
Filed 06/28/2024

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, et al.,    )
                                     )
                Plaintiffs,          )
                                     )
v.                                   )        Case No. CIV-24-511-J
                                     )
THE STATE OF OKLAHOMA, et al.,       )
                                     )
                Defendants.          )

**ORDER**

This matter centers around the constitutionality of Oklahoma House Bill 4156 (H.B. 4156), signed into law by Oklahoma Governor Kevin Stitt on April 30, 2024. The law, effective July 1, 2024, imposes state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States. *See* H.B. 4156, 59th Leg., 2d Reg. Sess. (Okla. 2024) (codified at Okla. Stat. tit. 21, § 1795).

On May 21, 2024, the United States filed suit against the State of Oklahoma, Oklahoma Governor Kevin Stitt, Oklahoma Attorney General Gentner Drummond, the Oklahoma Department of Public Safety, and Oklahoma Department of Public Safety Commissioner Tim Tipton (collectively, Oklahoma). [Doc. No. 1]. The United States seeks declaratory and injunctive relief enjoining Oklahoma from enforcing H.B. 4156. On May 22, it formally moved to enjoin enforcement, arguing principally that H.B. 4156 is preempted under federal law. [Doc. No. 4].

On May 23, a similar lawsuit was filed by Padres Unidos de Tulsa and one private individual against Oklahoma Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler. *Padres Unidos de Tulsa v. Drummond*, No. CIV-24-526-J (W.D. Okla.), [Doc. No. 1]. An amended complaint was filed on May 24, adding

three more private individuals as plaintiffs. *Id.*, [Doc. No. 14]. The same day, on grounds similar to those argued by the United States, Padres Unidos de Tulsa and the four private individuals (collectively, the Padres Unidos Plaintiffs) moved to enjoin enforcement of H.B. 4156. *Id.*, [Doc. No. 15].

The Court consolidated the two cases on June 5. [Doc. No. 17].[1] The United States' motion for injunctive relief is presently before the Court.[2] (U.S. Mot.) [Doc. No. 4]. Oklahoma responded, (Okla. Resp.) [Doc. No. 21], and the United States replied, [Doc. No. 28].[3] Upon careful review of the parties' submissions, the Court makes its determination.

I.    **Background**

A.    **Federal Statutory Immigration Framework**

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens," authority that rests on its constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). "For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024) (emphasis in original) (collecting cases); *see also*

---

[1] Unless otherwise specified, all subsequent document references are to the electronic case filing system in *United States v. Oklahoma*, No. CIV-24-511-J.

[2] The United States and the Padres Unidos Plaintiffs raise substantially similar arguments in their respective motions for injunctive relief. In response, however, Oklahoma raises a standing argument against the Padres Unidos Plaintiffs that it does not raise against the United States. Given the Court's desire to promptly rule on the underlying constitutionality of H.B. 4156, this Order will address only the United States' motion.

[3] All page citations refer to the Court's CM/ECF pagination.

*DeCanas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404; *Hampton v. Mow Sun Wong*, 426 U.S. 88, 95 (1976) ("Congress and the President have broad power over immigration and naturalization which the States do not possess."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."). It "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks omitted); *see also Lopez v. INS*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("[W]e note that the United States Constitution confers on Congress the power to regulate matters relating to immigration. . . . This broad grant of authority is exclusive to Congress.").

Consistent with this legislative power, in 1952, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The INA provides a comprehensive framework regulating the entry, presence, and removal of noncitizens. *Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal."); *DeCanas*, 424 U.S. at 353 (deeming the INA a "comprehensive federal statutory scheme for regulation of immigration"). This framework is bolstered by a multifaceted enforcement scheme—with both criminal and civil components.

For instance, federal law mandates that entry into the United States occur through designated entry points, where noncitizens must present necessary entry documents and undergo inspection by federal immigration officers. 8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the

United States shall be inspected by immigration officers."); 8 C.F.R. § 235.1 (requiring that noncitizens apply for lawful entry in person at designated ports of entry and present required documents for inspection). Under the INA, noncitizens who surreptitiously enter or reenter the United States may face federal criminal prosecution. 8 U.S.C. §§ 1325(a), 1326(a). The law also criminalizes activities that involve smuggling noncitizens into the United States, transporting noncitizens within the United States, or otherwise assisting unlawfully present noncitizens to remain. *Id.* § 1324.

In addition to these criminal penalties, noncitizens who have engaged in certain types of prohibited conduct may be denied admission to the United States or, if already present, face removal. *Id.* § 1182(a) (establishing grounds for denying admission and for removing an unadmitted noncitizen); *id.* § 1227(a) (establishing grounds for removing an admitted noncitizen). Removal proceedings are civil, not criminal, in nature. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). Where a federal immigration officer determines that a noncitizen arriving in the United States is inadmissible because they misrepresented their admission status or lack valid entry documents, the immigration officer must generally order the noncitizen removed from the United States without further hearing or review. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7). Similar expedited proceedings apply to noncitizens already present in the country if they "(1) [are] inadmissible because he or she lacks a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal." *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citing 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(I)-(II)). Conversely, for all other removable noncitizens apprehended within the United States, more standard proceedings apply. 8 U.S.C. § 1229a(a)(3)

4

("Unless otherwise specified . . . , a [standard] proceeding . . . shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").

The INA specifies that "[a]n immigration judge shall conduct [standard] proceedings for deciding the inadmissibility or deportability of an alien." *Id.* § 1229a(a)(1).  During these proceedings, "aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Arizona*, 567 U.S. at 396 (citing 8 U.S.C. §§ 1229a(c)(4), 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)).  "If . . . the alien is [ultimately] ordered removed, the alien can appeal the removal order to the Board of Immigration Appeals and, if that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals." *Thuraissigiam*, 591 U.S. at 108 (citing 8 U.S.C. §§ 1229a(c)(5), 1252(a)).

The INA empowers the Department of Homeland Security (DHS), among other federal agencies, to administer and enforce immigration laws.  The Secretary of DHS is "charged with the administration and enforcement" of the INA "and all other laws relating to the immigration and naturalization of aliens," and "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority."  8 U.S.C. § 1103(a)(1), (3).  DHS's authority extends to immigration enforcement efforts at and within the country's borders. *Id.* § 1103(a)(5) (granting the Secretary of DHS "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens"); *id.* § 1357 (granting federal immigration officers specific law enforcement powers for enforcing immigration laws).

Subagencies within DHS "play a major role in enforcing the country's immigration laws." *Arizona*, 567 U.S. at 397.  U.S. Customs and Border Protection, in conjunction with other federal

agencies, bears responsibility to "enforce . . . all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, . . . and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement, another DHS subagency, is "responsible for the identification, apprehension, and removal of illegal aliens from the United States." *Arizona*, 567 U.S. at 397 (internal quotation marks omitted). Subagencies within DHS often collaborate with local and state authorities in federal immigration enforcement efforts, and it is evident that Congress contemplated some assistance from state and local officers. *Id.* at 410. Indeed, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408.

## B.    Unlawful Immigration in Oklahoma

"The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397. Oklahoma undoubtedly "bears many of the consequences of unlawful immigration." *Id.* This Court need look no further than H.B. 4156 itself.

H.B. 4156 declares that a "crisis exists in Oklahoma," one which is "endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local governmental entities." H.B. 4156 § 1(B). "Throughout the state, law enforcement comes into daily and increasingly frequent contact with foreign nationals who entered the country illegally or who remain here illegally." *Id.* "Often, these persons are involved with organized crimes such as drug cartels, they have no regard for Oklahoma's laws or public safety, and they produce or are involved with fentanyl distribution, sex trafficking, and labor trafficking." *Id.* H.B. 4156 provides that "Oklahoma agents and law

enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border." *Id.* Oklahoma places the blame for this crisis squarely on the current presidential administration. *See, e.g.*, Okla. Resp. at 26 ("The current presidential administration and its political appointees are loath to enforce federal law and secure the border, thus making their distaste for H.B. 4156 comprehensible.").

Criminal activity associated with unlawful immigration is not, however, a recent phenomenon. Indeed, in *Arizona*, a preemption case decided in 2012, the Supreme Court acknowledged the "[h]undreds of thousands of deportable aliens . . . apprehended in Arizona" around that time. *Arizona*, 567 U.S. at 397; *see also id.* ("Unauthorized aliens who remain in the State constitute, by one estimate, almost 6% of the population."). The record before the *Arizona* Court evidenced "an epidemic of crime, safety risks, serious property damage, and environmental problems associated with the influx of illegal migration across private land near the Mexican border." *Id.* at 398 (internal quotation marks omitted). Arizona, like Oklahoma, was exceedingly frustrated with the then-presidential administration's enforcement of federal immigration laws— consequences it bore directly. *See* Brief for Petitioners, *Arizona*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 416748, at *2 ("The President fairly describes our Nation's system of immigration regulation and enforcement as 'broken.' Lack of effective enforcement of the existing immigration rules has permitted an estimated 11 million aliens to reside in the United States unlawfully." (footnote omitted)); *id.* at *3 ("Th[e] flood of unlawful cross-border traffic, and the accompanying influx of illegal drugs, dangerous criminals and highly vulnerable persons, have resulted in massive problems for Arizona's citizens and government, leaving them to bear a seriously disproportionate share of the burden of an already urgent national problem."); *id.* at *3–4

("Unlawfully entering aliens include criminals evading prosecution in their home countries and members of Mexican drug cartels—organizations the federal government has called more sophisticated and dangerous than any other organized criminal enterprise.  Such cartels have repeatedly threatened the lives of American police officers working near the border." (footnote and internal quotation marks omitted)); *id.* at *8 ("Arizona has repeatedly asked the federal government for more vigorous federal enforcement, but to no avail." (internal citation omitted)).  And Arizona sought to address its "crisis" with its own state immigration legislation, S.B. 1070.  *See id.* at *60 ("[I]t is the disuniformity of federal immigration enforcement efforts that has funneled unlawful entrants to Arizona and exacerbated the crisis that led to S.B. 1070's enactment.").

Notwithstanding these serious concerns, the Supreme Court in *Arizona* found that most provisions of S.B. 1070 were preempted.  *See Arizona*, 567 U.S. at 400–10.  While making clear that "[t]he problems posed to the State[s] by illegal immigration must not be underestimated," *id.* at 398, the Supreme Court nonetheless constrained the state legislation that it concluded impermissibly intruded into areas of immigration regulation.

C.      **H.B. 4156**

For reasons similar to those in *Arizona*, Oklahoma's H.B. 4156 takes aim at illegal immigration.  To that end, the law first criminalizes "impermissible occupations" in Oklahoma. "A person commits an impermissible occupation if the person is an alien"—meaning "any person not a citizen or national of the United States"—and "willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States."  H.B. 4156 § 2(A)-(B).  A first-time conviction for impermissible occupation is classified as a misdemeanor, "punishable by imprisonment in the county jail for a term of not more

than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment." *Id.* § 2(C)(1).  Any second or subsequent conviction for impermissible occupation, or any impermissible occupation "committed during the commission of any other crime," is classified as a felony, "punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." *Id.* § 2(C)(2).  And for any impermissible occupation, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* § 2(C)(1)-(2).

A charge of impermissible occupation is subject to certain affirmative defenses, specifically: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; and (3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals Program between certain dates.  *Id.* § 2(F).

H.B. 4156 also criminalizes the act of entering or attempting to enter Oklahoma by "[a]ny alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding," unless (1) "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission"; or (2) "[w]ith respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent." *Id.* § 2(D).  A noncitizen convicted under § 2(D) is deemed guilty of a

felony, punishable by imprisonment for up to two years, a fine not exceeding $1,000.00, or both. *Id.* And like § 2(C), all those convicted under § 2(D) must leave Oklahoma. *Id.*

## II.   <u>Preliminary Injunction Standard</u>

The United States seeks a preliminary injunction barring Oklahoma's enforcement of H.B. 4156. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

## III.   <u>Analysis</u>

### A.   **Likelihood of Success on the Merits**

The United States contends that H.B. 4156 facially[4] violates both the Supremacy Clause and the Commerce Clause of the United States Constitution. Regarding the Supremacy Clause, the United States argues, among other things, that H.B. 4156 impermissibly regulates conduct comprehensively governed by federal law, undermines the federal government's dominant interest in setting immigration policy, and conflicts with established procedures for state and local participation in immigration enforcement. *See* U.S. Mot. at 18–27. As for the Commerce Clause,

---

[4] A litigant "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011). "A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id.* (brackets and internal quotation marks omitted).

it argues that H.B. 4156 discriminates against foreign commerce, disrupts uniform immigration laws, and prevents the federal government from speaking with one voice in foreign relations.  *Id.* at 28–29.

### 1.    Preemption Under the Supremacy Clause

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."  *Arizona*, 567 U.S. at 398.  Nonetheless, the Supremacy Clause of "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'"  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI, cl. 2).  It is well established that "state law that conflicts with federal law is 'without effect.'"  *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  "Congress may . . . pre-empt, *i.e.*, invalidate, a state law through federal legislation."  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

Federal law can preempt state law either by an express statement of preemption or by implication.  *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Only the latter is at issue here.

Implied preemption includes field preemption and conflict preemption.  *Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to

preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Conflict preemption can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Categories of preemption, however, are not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990). "Indeed, field preemption may be understood as a species of conflict pre-emption," because "[a] state law that falls within a pre-empted field [necessarily] conflicts with Congress' intent . . . to exclude state regulation." *Id.*

## 2.    The United States' Right to Sue in Equity

At the outset, the Court must determine whether the United States has the right to seek equitable relief under the Supremacy Clause. Though Oklahoma recognizes the general availability of equitable relief, it asserts that such relief is unavailable in this case because the United States has not relied on a specific statutory authority or a traditional equitable principle. Okla. Resp. at 38–39. The Court disagrees.

While Oklahoma is correct that the Supremacy Clause does not create a cause of action, it is well established that "in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (ellipses and internal quotation marks omitted); *see also id.* at 324–25 (explaining that "the Supremacy Clause is not the source of any federal rights," and "certainly does not create a cause

12

of action" (internal quotation marks omitted in first quotation)).  Specifically, courts of equity have

created the "ability to sue to enjoin unconstitutional actions by state and federal officers."  *Id.* at

327.  As such, the federal government may bring an action in equity to enforce federal supremacy.

*See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (discussing *Armstrong*

and noting that, "[t]o the extent that *Armstrong*'s Supremacy Clause holding is motivated by the

desire to preserve the federal government's 'ability to guide the implementation of federal law,'

this counsels in favor of—not against—permitting the United States to invoke preemption in order

to protect its interest" (quoting *Armstrong*, 575 U.S. at 326)); *United States v. Bd. of Cnty. Commr's*

*of Cnty. of Otero*, 843 F.3d 1208, 1209 (10th Cir. 2016) (affirming grant of summary judgment

premised upon the Supremacy Clause); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201

(1967) (noting "the general rule that the United States may sue to protect its interests").

Oklahoma is also correct that the Court is limited in its jurisdiction and, specifically as

relevant here, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject

to express and implied statutory limitations."  *Armstrong*, 575 U.S. at 327; *see also Seminole Tribe*

*of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  Accordingly, for Oklahoma to prevail on its argument

that equitable relief is unavailable, it must identify some law that has displaced the Court's

equitable powers.  *See Armstrong*, 575 U.S. at 329 (noting that "equitable relief . . . is traditionally

available to enforce federal law" unless Congress has "displace[d]" it).  As the Fifth Circuit

recently found when considering this very question, "[t]he United States has broad powers and

rights granted by the Constitution and Congress regarding immigration matters."  *Texas*, 97 F.4th

at 276.  And, as in that case, Oklahoma here "cites to no constitutional or statutory provision that

expressly or impliedly displaces an action arising in equity to enjoin executive action with regard

to the matters at issue in this litigation."  *Id.*  The United States thus properly brings its federal preemption claim.

### 3. Assessment of H.B. 4156

#### a. Field Preemption

Looking to H.B. 4156, its objective is clear: to criminally punish noncitizens found in Oklahoma who have entered or reentered the United States unlawfully.  It provides for fines and/or imprisonment of noncitizens in Oklahoma who have entered or reentered the United States without legal authorization.  Additionally, all noncitizens convicted under H.B. 4156 are subject to mandatory expulsion from the state.

The INA addresses virtually all matters related to immigration, but it is especially outspoken on noncitizen entry.  "Policies pertaining to the entry of aliens" are "entrusted exclusively to Congress," *Galvan v. Press*, 347 U.S. 522, 531 (1954), and Congress has legislated quite extensively in that respect, establishing "a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully," *Texas*, 97 F.4th at 283 (emphasis in original) (footnotes omitted).

Unlawful entry and reentry are criminal offenses under 8 U.S.C. §§ 1325 and 1326.  Under § 1325(a), criminal liability attaches when a noncitizen (1) enters or attempts to unlawfully enter the United States at a place other than a designated port of entry, (2) eludes examination and inspection by immigration officers, or (3) attempts to enter or enters the United States by a willfully false or misleading representation or the willful concealment of a material fact.  8 U.S.C. § 1325(a).  A noncitizen who has previously been removed or voluntarily departed under an outstanding removal order may be convicted for violating § 1326(a) after reentering or attempting to reenter

the United States or after being "found in" the United States without authorization to enter.   8 U.S.C. § 1326(a).

The prohibitive provisions of H.B. 4156, §§ 2(C) and 2(D), largely resemble §§ 1325(a) and 1326(a).   Comparing § 2(C) and § 1325(a), both provisions criminalize the same underlying conduct—unlawful entry into the United States—but § 2(C) specifically targets noncitizens located in Oklahoma after doing so.[5]   Sections 2(D) and 1326(a) are nearly identical.   Both provisions criminalize the act of entering, attempting to enter, or being found in the United States after having been denied admission, excluded, deported, or removed, or after departing while an order of exclusion, deportation, or removal is outstanding.   Both provisions also provide exceptions for noncitizens who have obtained express consent from the Attorney General to reapply for admission or who were not required to obtain such consent.

Effectively, H.B. 4156 criminalizes conduct already proscribed under federal law.   The parties agree as much.   *See* U.S. Mot. at 21 ("H.B. 4156 seeks to criminalize conduct already proscribed by federal law—the unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325 and 1326—despite the comprehensive federal immigration scheme governing such conduct."); Okla. Resp. at 16 ("In the most basic terms, H.B. 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry.").   The issue, then, is whether federal regulation of noncitizen entry and reentry is sufficiently comprehensive to give rise to a reasonable inference that Congress left no room for similar action by Oklahoma.

---

[5] H.B. 4156 defines an "impermissible occupation" as a noncitizen's entry into Oklahoma "without having first obtained legal authorization to enter the United States."   H.B. 4156 § 2(B).   This definition would naturally encompass the forms of unlawful entry proscribed by 8 U.S.C. § 1325(a).

The Supreme Court's ruling in *Arizona* is instructive.  There, the Supreme Court found preempted Section 3 of Arizona state law S.B. 1070, which replicated noncitizen registration requirements under federal law and "add[ed] a state-law penalty for conduct proscribed by federal law."  *Arizona*, 567 U.S. at 400.  It reasoned that Congress, through its "comprehensive" and "harmonious" framework for noncitizen registration, left no room for additional state regulation— even state regulation that "ha[d] the same aim as federal law and adopt[ed] its substantive standards."  *Id.* at 401–02 (internal quotation marks omitted in second quotation).  This is because "[e]ven if a State may make violation of federal law a crime in some instances, it cannot do so in a field . . . that has been occupied by federal law."  *Id.* at 402.  "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."  *Id.* at 401.

This Court acknowledges, to Oklahoma's credit, that the discussion of parallel legislation in *Arizona* focused on noncitizen registration, not noncitizen entry and reentry.  *See* Okla. Resp. at 29 ("[T]he federal government lacks exclusive power over the field of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond alien registration.").  And this Court is likewise aware that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [the federal government's] constitutional power, whether latent or exercised."  *DeCanas*, 424 U.S. at 355.  Nevertheless, this Court sees no reason why *Arizona*'s logic does not naturally extend to this case, where H.B. 4156 criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry.  Just recently, the Fifth Circuit extended *Arizona*'s reasoning to S.B. 4, a Texas law with two provisions "closely resembl[ing]" 8 U.S.C. §§ 1325(a) and 1326(a).  *Texas*, 97 F.4th at 280.  The Fifth Circuit discussed at length the

comprehensiveness of the INA, particularly its regulation of noncitizen entry and reentry.  *See, e.g.*, *id.* ("The [INA's] central concern is the entry and stay of aliens in the United States.  The [INA] makes it unlawful for any noncitizen to enter the United States other than through a port of entry, and punishes any noncitizen who unlawfully reenters or remains in the United States." (footnotes and internal quotation marks omitted)).  This comprehensiveness, it reasoned, would preclude even parallel state regulation:

> In the same way Arizona S.B. 1070 added a state-law penalty for conduct proscribed by federal law, S.B. 4 criminalizes behavior already prohibited by the INA.  Particularly applicable in the present case, the Supreme Court held in *Arizona* that permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted.  That is just as true regarding the Texas laws regarding entry and removal.

*Id.* (brackets, footnotes, and internal quotation marks omitted).[6]  Other circuit courts have likewise extended *Arizona*'s reasoning to preclude state attempts to criminalize the unlawful transport, concealment, and inducement of unlawfully present noncitizens because such activities are comprehensively regulated under federal law.  *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263–64 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024–26 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 531–32 (4th Cir. 2013).

Thus, there is "strong support" for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation.  *Texas*, 97 F.4th at 288; *see also DeCanas*, 424 U.S. at 359 (acknowledging the "comprehensiveness of legislation governing the entry and stay of aliens"); *Patel*, 596 U.S. at 331 ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the

---

[6] The Fifth Circuit's reasoning came in the form of an extensive interlocutory ruling denying Texas' request for a stay of an injunction issued by the United States District Court for the Western District of Texas.

United States."); *Elkins v. Moreno*, 435 U.S. 647, 664 (1978) (deeming the INA "a comprehensive and complete code covering all aspects of admission of aliens to this country"); *United States v. Texas*, --- F. Supp. 3d ---, 2024 WL 861526, at *13 (W.D. Tex. Feb. 29, 2024) ("Congress has created a comprehensive framework 'of federal statutes criminalizing the acts undertaken by noncitizens and those who assist them in coming to' the United States." (brackets omitted) (quoting *Ga. Latino*, 691 F.3d at 1264)). Again, "[w]here Congress occupies an entire field," as it has in the field of noncitizen entry and reentry, "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. As such, Oklahoma's attempt to parallel federal law must fail.

A similar fate befalls H.B. 4156's expulsion penalty. Expulsion from Oklahoma is a criminal penalty imposed for a conviction of unlawful entry or reentry under H.B. 4156. Having found H.B. 4156's regulation of unlawful entry and reentry field preempted, this expulsion penalty would naturally fail. However, even viewing the expulsion penalty in isolation, there is strong support for a finding of preemption. To Oklahoma's credit, H.B. 4156 mandates expulsion only from Oklahoma, rather than from the United States. But that does not necessarily mean the law avoids intrusion into a federal domain. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (internal quotation marks omitted). Through the INA, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. "[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." *Texas*, 97 F.4th at 285 (emphasis added).

For example, in *United States v. Alabama*, the Eleventh Circuit found preempted a provision of Alabama state law amounting to a "calculated policy of expulsion" from the state.

18

691 F.3d 1269, 1294 (11th Cir. 2012).  The provision prohibited Alabama state courts "from enforcing or recognizing contracts between a party and an unlawfully present alien," *id.* at 1292, effectively barring "undocumented aliens . . . from enforcing contracts for basic necessities," *id.* at 1293.  By imposing "distinct, unusual and extraordinary burdens," the provision was designed "to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state." *Id.* at 1294 (internal quotation marks omitted in first quotation).  The Eleventh Circuit concluded that the law "constitute[d] an impermissible intrusion into the federal domain" of noncitizen expulsion. *Id.* at 1293; *see also id.* at 1294 (highlighting the "comprehensive statutory framework governing alien removal").  It did not matter that the law served to expel noncitizens only from Alabama: "If every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head.  The federal government—not the fifty states working in concert—retains the power to exclude aliens from the country." *Id.* at 1295 n.21.

Consider as well the Third Circuit's decision in *Lozano v. City of Hazleton*, where it found preempted several city ordinances that made "legal immigration status a condition precedent to entering into a valid lease."  620 F.3d 170, 179 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011).  The *Lozano* court emphasized the comprehensive federal scheme regulating the entry and treatment of noncitizens in the United States, which "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *Id.* at 220.  The city ordinances at issue effectively did just that.  And while the ordinances aimed to "regulate presence only within [the] city limits, not the entire country," the Third Circuit's analysis remained unaffected: "To be meaningful, the federal government's exclusive control over residence in this country must extend to any political subdivision.  Again, it is not only Hazleton's

ordinance that we must consider.  If Hazleton can regulate as it has here, then so could every other state or locality.  *Id.* at 221; *see also id.* at 220 ("[W]e cannot bury our heads in the sand ostrich-like ignoring the reality of what these ordinances accomplish.").

Relatedly, the Supreme Court has recognized that "[t]he federal power to determine immigration policy is well settled."  *Arizona*, 567 U.S. at 395; *see also Texas*, 2024 WL 861526, at *15 (finding, in the context of field preemption, that the federal government has a "dominant interest in regulating immigration enforcement").  This power naturally encompasses discretion on enforcement, "where '[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.'"  *Biden v. Texas*, 597 U.S. 785, 805–06 (2022) (quoting *Arizona*, 567 U.S. at 397); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (acknowledging that an agency's enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether a violation has occurred," "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all").  "Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently.  That is Administrative Law 101."  *Biden*, 597 U.S. at 815 (Kavanaugh, J., concurring).

Oklahoma largely dismisses these broader considerations cited by the United States, insisting that the United States' "claim that H.B. 4156 would harm [its] relationship with foreign nations in multiple ways and antagonize foreign governments can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has

enacted because foreign governments will get angry."  Okla. Resp. at 26 (ellipses, citation, and internal quotation marks omitted).  In support of this position (and others throughout its response), Oklahoma leans heavily on the Supreme Court's decision in *Kansas v. Garcia*, 589 U.S. 191 (2020), which upheld the state convictions of three noncitizens for fraudulently using another person's Social Security number on tax-withholding forms when obtaining employment.  The Supreme Court broadly rejected the noncitizens' claims that their state convictions were preempted by federal immigration laws, finding that "using another person's Social Security number on tax forms threatens harm that has no connection with immigration law," *Garcia*, 589 U.S. at 209, and that the prosecutions were not at odds with federal interests,[7] *id.* at 212.  Indeed, the federal government "fully support[ed]" Kansas' power to prosecute. *Id.*

Certainly, the same cannot be said in this case, where federal pushback is the genesis of litigation and H.B. 4156 touches so deliberately on matters of immigration regulation.  Nor can this Court simply adopt Oklahoma's political frustrations and ignore *Arizona*'s extensive discussion of the broader implications surrounding immigration policy.  Among other things, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."  *Arizona*, 567 U.S. at 395; *see also id.* ("Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."); *id.* ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one

---

[7] The noncitizens maintained that prosecution would limit the federal government's ability to "obtain[] the cooperation of unauthorized aliens in making bigger cases."  *Garcia*, 589 U.S. at 211.

national sovereign, not the 50 separate States.").[8]  The *Arizona* Court cautioned that "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.  These theoretical concerns appear to be at play in this case, as Mexico has already expressed concern over H.B. 4156.  *See* Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), available at https://perma.cc/E6Z4-HS7W.

Most noteworthy, though, is *Arizona*'s application of these principles to § 3 of S.B. 1070, which criminalized a noncitizen's failure to comply with certain registration requirements under federal law.  *See Arizona*, 567 U.S. at 400.  In finding § 3 field preempted, the Supreme Court reasoned that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.  If the Supreme Court believed that state prosecution for federal registration violations implicated federal policy considerations, it is hard to fathom how criminal prosecution and expulsion under H.B. 4156 would not pose similar, if not greater, concerns.  *See Texas*, 97 F.4th at 280 ("Equally important, in concluding there was field preemption, the Supreme Court in *Arizona* relied on the fact that were § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determined that prosecution would frustrate federal policies.  The same is true of the Texas laws at issue here." (brackets and internal

---

[8] *Arizona*'s observations are by no means isolated.  *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.").

quotation marks omitted)).  However well-intentioned, H.B. 4156 authorizes state prosecution for conduct already subject to comprehensive federal regulation and bound within federal immigration policy.  If permitted to stand, each state could give itself "independent authority" to achieve its own immigration policy, *Arizona*, 567 U.S. at 402, undoubtedly "'diminishing the Federal Government's control over enforcement' and 'detracting from the integrated scheme of regulation created by Congress,'" *id.* (brackets omitted) (quoting *Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 288–89 (1986)).

While this Court may very well be sympathetic to the concerns raised by Oklahoma, such concerns should not—and, indeed, cannot—be allowed to undermine the long-standing, comprehensive federal framework that defines immigration policy.  Sensitive matters of immigration policy "must be made with one voice." *Id.* at 409.  And for better or for worse, that voice belongs not to one individual state, but to the United States.  Accordingly, the Court finds that H.B. 4156 is likely field preempted.

### b.      Conflict Preemption

Field preemption aside, the United States argues that H.B. 4156 is likely conflict preempted.  Again, conflict preemption "occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).

Oklahoma argues that "'[t]here can by definition be no conflict' between the laws of two sovereigns where state law 'trace[s] the federal law.'"  Okla. Resp. at 23 (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 601–02 (2011)).  It adds that "[t]he mere fact that state laws . . . overlap to some degree with federal criminal provisions does not even begin to make a case

for conflict preemption." *Id.* at 27 (quoting *Garcia*, 589 U.S. at 211).   That may be true, but the Supreme Court has recognized that "[c]onflict is imminent when two separate remedies are brought to bear on the same activity." *Crosby*, 530 U.S. at 380 (internal quotation marks omitted). "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions . . . undermines the congressional calibration of force." *Id.*

H.B. 4156 penalizes unlawful entry conduct and targets removable noncitizens with fines, imprisonment, and mandatory expulsion.   Under federal law, however, "there are various avenues by which a noncitizen may ultimately be admitted or receive absolution even though he or she initially entered illegally." *Texas*, 97 F.4th at 289.   A noncitizen who unlawfully enters the United States is removable, 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a, but "[b]eing found removable is not always the end of the story . . . because Congress has authorized relief from removal in certain contexts," *Patel*, 596 U.S. at 332.   Noncitizens may, for example, apply for asylum or cancellation of removal—often for the first time after removal proceedings have begun.   8 U.S.C. §§ 1158(a)(1), 1229b.   And in the case of asylum, the defense can ultimately be raised for the first time during either standard or expedited removal proceedings. *Id.* §§ 1229a(c)(4), 1225(b)(1)(A), 1225(b)(1)(B); 8 C.F.R. §§ 208.2(b), 1240.11(c).

In other words, there are mechanisms under federal law that allow unlawfully present noncitizens to remain in the United States—whether in Oklahoma or elsewhere. *See Holder v. Martinez Gutierrez*, 566 U.S. 583, 586 (2012) ("The immigration laws have long given the Attorney General discretion to permit certain otherwise-removable aliens to remain in the United States.").   H.B. 4156 conflicts with this federal system.   While it offers certain affirmative defenses to those already granted lawful presence or asylum under federal law, *see* H.B. 4156 § 2(F), it ignores the opportunities offered under federal law for discretionary relief once prosecution has

begun. Oklahoma insists that "[e]ither someone has permission to be here, or they do not." Okla. Resp. at 33. But it is just not that simple: "[I]t is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize. Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen." *Plyler v. Doe*, 457 U.S. 202, 240 n.6 (1982) (Powell, J., concurring).

But a more sweeping and glaring conflict exists. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408. Under 8 U.S.C. § 1357(g), for instance, DHS is authorized to enter into written agreements with state and local jurisdictions, allowing specially trained state or local officers to perform specific functions related to the investigation, apprehension, or detention of noncitizens, under federal supervision. Additionally, § 1357(g) provides that an agreement is not necessary for any state or political subdivision "to communicate with the Attorney General regarding the immigration status of any individual," or "to otherwise cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(A)-(B). Federal law even permits state and local officers to make arrests for immigration crimes in certain defined circumstances. *See, e.g.*, *id.* § 1324(c) (permitting "all . . . officers whose duty it is to enforce criminal laws" to make arrests for violations of immigration law concerning smuggling, transporting, or harboring); *id.* § 1252c (authorizing state and local law enforcement officers to "arrest and detain" a noncitizen who is "illegally present in the United States" and "has previously been convicted of a felony in the United States and deported or left the United States after such conviction," but "only after the State or local law

25

enforcement officials obtain appropriate confirmation from" federal officials "of the status of such individual and only for such period of time as may be required for" federal officials " to take the individual into Federal custody for purposes of deporting or removing the alien from the United States"). Leaning on these avenues of assistance, Oklahoma insists that "the federal scheme leaves room for enforcement of a state law like H.B. 4156." Okla. Resp. at 24 (internal quotation marks omitted).

Congress' delineation of these cooperative frameworks, however, "is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present." *Texas*, 97 F.4th at 292. "Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present." *Id.* at 292–93. The Supreme Court's decision in *Arizona* is again instructive. There, Section 6 of S.B. 1070 authorized state officers to arrest a person if the officer had probable cause to believe that person was removable. *Arizona*, 567 U.S. at 407. Supporters of § 6 cited to Congress' authorization of cooperation under 8 U.S.C. § 1357(g). *Id.* at 410. But the Supreme Court concluded that "no coherent understanding of the term [cooperate] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.* at 410. By authorizing such unilateral activities that deviated from the procedures established by federal law, § 6 "allow[ed] the State to achieve its own immigration policy" and "create[d] an obstacle to the full purposes and objectives of Congress." *Id.* at 408, 410.

The Supreme Court's reasoning applies with greater force here. As constructed, H.B. 4156 would grant state officials broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses "absent any request, approval, or other instruction from the Federal

Government." *Id.* at 410.  "This is not the system Congress created," *id.* at 408, nor can the existing system be expanded to fit Oklahoma's preferred legislative design.  For these reasons, the Court finds that H.B. 4156 is also likely conflict preempted.

**c.      "Invasion" Defense**

Notwithstanding preemption, Oklahoma insists it "retains an inherent, sovereign power of self-defense against invasion."  Okla. Resp. at 37.  Though it cites scant case law suggesting the defense is applicable here, it derives this "invasion" defense from Article I, Section 10, Clause 3 (the State War Clause) of the United States Constitution, which provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

Neither the Supreme Court nor the Tenth Circuit has recognized the application of the State War Clause as broadly as Oklahoma advocates.  And when a similar argument was raised in defense of S.B. 4 in Texas, both the Western District of Texas and the Fifth Circuit rejected its use. The Western District of Texas performed an extensive analysis of the historical and constitutional context of the State War Clause, concluding in detail that the surge in unauthorized immigration did not qualify as an "invasion" under the Constitution and that S.B. 4 was not a wartime measure. *See Texas*, 2024 WL 861526, at *24–37.  The Fifth Circuit, in its interlocutory ruling, reasoned that "[c]onstitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered." *Texas*, 97 F.4th at 295.  Other courts have similarly rejected application of the State War Clause in the context of immigration.  *See California v. United States*, 104 F.3d

27

1086, 1090–91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996). In short, this Court is unpersuaded that it should be an outlier in permitting a sweeping application of the State War Clause.[9]

### B.    Irreparable Harm

The second preliminary-injunction factor asks whether irreparable injury is likely to befall the movant without an injunction. *Winter*, 555 U.S. at 20. What makes an injury "irreparable" is the inadequacy of a monetary remedy. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017).

The United States argues that irreparable harm necessarily results from enforcement of a preempted state law. U.S. Mot. at 29. Though the Supreme Court has suggested that may be the case, it has not definitively held that it is. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366–67 (1989). And though some courts have held as much, the Tenth Circuit has not. *See United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed."); *Alabama*, 691 F.3d at 1301 ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024) (noting the difference between establishing irreparable harm for a claim of deprivation of an individual constitutional right and for a separation of powers claim). Nonetheless, as recently

---

[9] Because the Court finds that the United States is likely to prevail on its claim under the Supremacy Clause, it need not address the United States' likelihood of prevailing under the Commerce Clause. *See Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, No. CIV-20-130-D, 2020 WL 13669025, at *2 (W.D. Okla. May 15, 2020) ("To show a substantial likelihood of success on the merits, the movant must, at a minimum, present a prima facie case for prevailing on at least one claim asserted in its pleading." (internal quotation marks omitted)).

found by the Southern District of Iowa when considering this question, "persuasive authority recognizes that the United States clearly would suffer *some* level of significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law." *United States v. Iowa*, --- F. Supp. 3d ---, 2024 WL 3035430, at *14 (S.D. Iowa June 17, 2024).  As that court noted, "[t]his makes sense: the whole point of field preemption, in particular, is that the federal regulatory scheme is 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Id.* (quoting *Arizona*, 567 U.S. at 399).

Here, the United States claims that it and the public will suffer irreparable harm if H.B. 4156 takes effect, specifically noting that the bill would harm the United States' relationship with foreign nations by antagonizing foreign governments; straining diplomatic relations and, thus, making cooperation more difficult on matters such as trade agreements, disaster response arrangements, anti-terrorism efforts, anti-drug-trafficking efforts, and other priorities; undermining long-term strategic partnerships formed to reduce irregular migration; undermining partnerships to provide protections to refugees; and exposing United States citizens abroad to reciprocal and retaliatory treatment that could impair their ability to travel, conduct business, or live abroad.  Additionally, the United States claims that H.B. 4156 will displace the federal exercise of discretion in enforcing immigration laws, as well as interfere with federal immigration proceedings.

Having reviewed the arguments and declarations presented by both sides, including declarations provided by the United States regarding Oklahoma's interference with its comprehensive foreign-policy framework as well as Mexico's expression of its concern over the signing of H.B. 4156, the Court finds the United States' arguments are well-taken.  *See, e.g.*, *Texas*, 97 F.4th at 295 ("In this case, repeated representations by the Executive Branch supported by

29

formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state [law] stands in the way of Congress's diplomatic objectives." (quoting *Crosby*, 530 U.S. at 386)).  Indeed, as the United States notes, Oklahoma's cursory argument against irreparable harm asserts primarily that H.B. 4156 is not preempted without adequately refuting the United States' declarations of harm.  Accordingly, the Court finds that the United States has demonstrated it is likely to suffer irreparable injury in the absence of an injunction.  *See Iowa*, 2024 WL 3035430, at *14 ("Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief as to . . . the United States . . . ."); *Texas*, 2024 WL 861526, at *38 (finding irreparable harm by virtue of a violation of the Supremacy Clause); *South Carolina*, 720 F.3d at 533 ("The irreparable injury to the nation's foreign policy if the relevant sections take effect has been clearly established by the United States.").

### C.    Equities and Public Interest

The final two factors of the preliminary injunction inquiry are the balance of equities and public interest, but when the United States is a party to a preliminary injunction motion, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Though Oklahoma argues an injunction is not in the public interest because it will suffer greater harm than the United States if it cannot enforce H.B. 4156, *see* Okla. Resp. at 41–42, as the Eleventh Circuit has found, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.  Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301; *see also Texas*, 97 F.4th at 296 (holding that in the areas of immigration and foreign affairs, it is the federal interest that prevails, as "state and local interests are subservient to those of the nation at large"); *South Carolina*, 720 F.3d at 533 (affirming entry

of preliminary injunction where state law was likely preempted by federal immigration law, and holding that the balance of equities tipped in favor of the federal government and preliminary injunctive relief was in the public interest); *Iowa*, 2024 WL 3035430, at *15 (finding the factors weigh in favor of injunctive relief where the state law is likely preempted by federal law); *Texas*, 2024 WL 861526, at *40–41 (same). This Court finds these cases persuasive and concludes that the balance of equities and public interest factors weigh in favor of granting injunctive relief when, as here, the state law is likely preempted by federal law.

**IV.    Conclusion**

Oklahoma "may have understandable frustrations with the problems caused by illegal immigration . . . , but the State may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416. Should more explicit guidance foreclose that conclusion, this Court will listen.

But until then, for the reasons set forth herein, the United States' motion for a preliminary injunction [Doc. No. 4] is GRANTED. Oklahoma is hereby ENJOINED from enforcing H.B. 4156 pending further proceedings.

IT IS SO ORDERED this 28th day of June, 2024.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE