**[ORAL ARGUMENT REQUESTED]**

**No. 24-6144**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA, *et al.*,

Plaintiffs-Appellees,

v.

STATE OF OKLAHOMA, *et al.*,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Western District of Oklahoma
District Court Case No. 5:24-cv-00511-J (Judge Bernard M. Jones)

_____

**BRIEF FOR THE UNITED STATES**
_____

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY
LEIF OVERVOLD
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED APPEALS ...................................................... x

GLOSSARY ............................................................................................. xi

INTRODUCTION....................................................................................... 1

STATEMENT OF JURISDICTION .............................................................. 2

STATEMENT OF THE ISSUE ..................................................................... 2

PERTINENT STATUTES AND REGULATIONS........................................... 2

STATEMENT OF THE CASE ...................................................................... 2

    A.    Statutory Background ................................................................. 2

    B.    Factual Background.................................................................... 5

    C.    Prior Proceedings ..................................................................... 8

SUMMARY OF ARGUMENT .................................................................... 11

STANDARD OF REVIEW......................................................................... 14

ARGUMENT ........................................................................................... 14

I.    The United States is likely to succeed on the merits. .......................... 14

    A.    Congress has preempted the field of regulating the entry and
           removal of noncitizens............................................................. 15

    B.    HB 4156 impermissibly conflicts with federal law.................... 22

    C.    Oklahoma's defenses are meritless........................................... 29

           1.    The United States may sue in equity to enjoin federally
                   preempted state laws. ...................................................... 29

2.      Oklahoma cannot evade preemption principles by asserting
        that HB 4156 is a response to an alleged "invasion.".................... 34

II.     The balance of harms and the public interest warrant a preliminary
        injunction. ............................................................................................. 40

CONCLUSION ............................................................................................. 43

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*American Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ............................................................. 30

*Arizona v. United States,*
   567 U.S. 387 (2012) ..................................... 1, 2, 3, 9, 14, 15, 16, 17, 18, 19,
                                                   20, 22, 23, 24, 25, 27, 29, 32, 35, 40

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ........................................................... 30

*Attorney-General v. Corporation of Poole,*
  (1838) 41 Eng. Rep. 7 (High Ct. Ch.), *aff'd sub nom.*
  *Parr v. Attorney-General,* (1842) 8 Eng. Rep. 159 (H.L.) ............................. 31

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ........................................................... 20

*California v. United States,*
  104 F.3d 1086 (9th Cir. 1997) .................................................. 37

*California v. Zook,*
  336 U.S. 725 (1949) ........................................................... 20

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) ........................................................ 23, 41

*CSX Transp., Inc. v. Easterwood,*
  507 U.S. 658 (1993) ........................................................... 22

*Debs, In re*
  158 U.S. 564 (1895) ........................................................... 32

*DeCanas v. Bica,*
  424 U.S. 351 (1976) ...................................................... 2-3, 3, 19

*Fox v. Ohio,*
  46 U.S. (5 How.) 410 (1847) .................................................... 21

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ........................................................... 31

*Galvan v. Press,*
  347 U.S. 522 (1954) ............................................................ 8

*Gilbert v. Minnesota*,
    254 U.S. 325 (1920) ................................................................ 21

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................ 30

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................ 27

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................ 16

*Hughes v. Trustees of Morden Coll.*,
    (1748) 27 Eng. Rep. 973 (High Ct. Ch.) ..................................... 31

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ............................................................ 28, 29

*Loney, In re*,
    134 U.S. 372 (1890) ............................................................ 20, 21

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) ...................................................... 37

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989) ................................................................ 40

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 14

*Osborn v. Bank of the U.S.*,
    22 U.S. (9 Wheat.) 738 (1824) ................................................. 34

*Padavan v. United States*,
    82 F.3d 23 (2d Cir. 1996) ..................................................... 37, 39

*Patel v. Garland*,
    596 U.S. 328 (2022) ................................................................ 16

*Perpich v. Department of Def.*,
    496 U.S. 334 (1990) ................................................................ 34

*Planned Parenthood of Kan. v. Andersen*,
    882 F.3d 1205 (10th Cir. 2018) ................................................ 14

*Plyler v. Doe,*
    457 U.S. 202 (1982) ................................................................ 25

*Rowe v. New Hampshire Motor Transp. Ass'n,*
    552 U.S. 364 (2008) ................................................................ 42

*Sanitary Dist. of Chi. v. United States,*
    266 U.S. 405 (1925) ................................................................ 33

*SEC v. Scoville,*
    913 F.3d 1204 (10th Cir. 2019) ............................................. 14

*Terrett v. Taylor,*
    13 U.S. (9 Cranch) 43 (1815) ................................................ 31

*Torres v. Texas Dep't of Pub. Safety,*
    597 U.S. 580 (2022) ........................................................ 34, 37

*Truax v. Raich,*
    239 U.S. 33 (1915) ......................................................... 16, 31

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) .......................................... 18, 26

*United States v. American Bell Tel. Co.,*
    128 U.S. 315 (1888) ................................................................ 32

*United States v. Colorado Supreme Court,*
    87 F.3d 1161 (10th Cir. 1996) ............................................... 33

*United States v. Iowa,* --- F. Supp. 3d ---,
    Nos. 4:24-cv-00162-SHL-SBJ:24-cv-00161-SHL-SBJ,
    2024 WL 3035430 (S.D. Iowa June 17, 2024), *appeal pending,*
    Nos. 24-2263, 24-2265 (8th Cir. filed June 20, 2024) .................... 10, 18, 26

*United States v. Maloid,*
    71 F.4th 795 (10th Cir. 2023), *cert. denied,*
    144 S. Ct. 1035 (2024) ........................................................... 29

*United States v. Missouri,*
    114 F.4th 980 (8th Cir. 2024) ................................................ 30

*United States v. Rosales-Aguilar,*
    818 F.3d 965 (9th Cir. 2016) ................................................... 7

*United States v. San Jacinto Tin Co.*,
125 U.S. 273 (1888) ................................................................. 31, 32

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) ............................................. 17, 22, 42

*United States v. Supreme Court of New Mexico*,
839 F.3d 888 (10th Cir. 2016) .......................................................... 33

*United States v. Texas*:
97 F.4th 268 (5th Cir. 2024) ..................... 1, 18, 22, 23, 25, 26, 29, 35
719 F. Supp. 3d 640 (W.D. Tex. 2024) .................................... 21, 36, 38, 39

*United States v. Texas*,
599 U.S. 670 (2023) ................................................................. 22, 27

*United States v. Texas*,
143 U.S. 621 (1892) ............................................................................ 32

*Villas at Parkside Partners v. City of Farmers Branch*,
726 F.3d 524 (5th Cir. 2013) .......................................... 24-25, 25

*Virginia Office for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011) ........................................................................ 34

*Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
475 U.S. 282 (1986) ..............................................................20, 24, 26

*Wyandotte Transp. Co. v. United States*,
389 U.S. 191 (1967) ........................................................................ 32

*Young, Ex parte*,
209 U.S. 123 (1908) ................................................................. 33, 34

## U.S. Constitution:

Art. I, § 9, cl. 2 ............................................................................... 38

Art. I, § 10, cl. 3 ............................................................ 9, 12, 35, 36, 38

Art. IV, § 4 ...................................................................................... 34

Amend. III ....................................................................................... 38

**Statutes:**

Immigration and Nationality Act (INA):

8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) .................................................. 20
8 U.S.C. § 1101(a)(15)(U)(iii) ........................................................... 20
8 U.S.C. § 1103(a)(1) .......................................................................... 3
8 U.S.C. § 1103(g) ............................................................................... 3
8 U.S.C. § 1158(a) ............................................................................. 22
8 U.S.C. § 1158(a)-(b) ......................................................................... 4
8 U.S.C. § 1158(a)(2)(A) ...................................................................... 4
8 U.S.C. §§ 1181-1182 ......................................................................... 3
8 U.S.C. §§ 1181-1188 ....................................................................... 16
8 U.S.C. § 1182 ................................................................................. 16
8 U.S.C. § 1182(a) .......................................................................... 4, 25
8 U.S.C. § 1182(a)(9)(C)(ii) ................................................................. 7
8 U.S.C. § 1188 ................................................................................... 3
8 U.S.C. §§ 1201-1204 ....................................................................... 16
8 U.S.C. §§ 1223-1225 ......................................................................... 3
8 U.S.C. § 1225 .............................................................................. 4, 16
8 U.S.C. §§ 1225-1229a ..................................................................... 16
8 U.S.C. § 1225(b) ............................................................................. 25
8 U.S.C. § 1227 ................................................................................. 25
8 U.S.C. § 1227(a) ............................................................................... 4
8 U.S.C. § 1229 .............................................................................. 4, 25
8 U.S.C. § 1229a ............................................................................. 4, 25
8 U.S.C. § 1229a(a)(3) ..................................................................... 3, 16
8 U.S.C. § 1231(a)-(b) ....................................................................... 25
8 U.S.C. § 1231(b) .......................................................................... 4, 22
8 U.S.C. § 1231(b)(3) ...................................................................... 4, 22
8 U.S.C. § 1231 note ........................................................................... 4
8 U.S.C. § 1232 ................................................................................. 25
8 U.S.C. § 1252c ................................................................................. 4
8 U.S.C. § 1252c(a) ............................................................................. 5
8 U.S.C. § 1304(e) ............................................................................. 19
8 U.S.C. § 1306(a) ............................................................................. 19
8 U.S.C. § 1324(c) ............................................................................... 4
8 U.S.C. § 1325 ............................................................................ 24, 27
8 U.S.C. §§ 1325-1326 ......................................................................... 3
8 U.S.C. § 1325(a) ............................................................................... 6
8 U.S.C. § 1325(a)-(b) ................................................................... 16, 24
8 U.S.C. § 1326 ................................................................. 16, 17, 24, 27

8 U.S.C. § 1326(a) ............................................................................ 7

8 U.S.C. § 1326(a)(2) ....................................................................... 7

8 U.S.C. § 1326(a)(2)(A) .................................................................. 7

8 U.S.C. § 1326(b) ........................................................................... 28

8 U.S.C. § 1357(g) ............................................................. 5, 20, 23

8 U.S.C. § 1357(g)(1)-(9) ................................................................. 5

8 U.S.C. § 1357(g)(3) ....................................................................... 5

8 U.S.C. § 1357(g)(10) ..................................................................... 5

Pub. L. No. 105-277, div. G, tit. XXII, § 2242,
    112 Stat. 2681, 2681-822 to 2681-823 (1998) ............................. 4

6 U.S.C. § 202 ................................................................................. 3

6 U.S.C. § 251 ................................................................................. 5

6 U.S.C. § 279 ................................................................................. 25

6 U.S.C. § 557 ................................................................................. 5

18 U.S.C. § 758 ............................................................................... 20

22 U.S.C. § 7105(b)(1)(E)(iv) ........................................................ 20

28 U.S.C. § 1292(a)(1) .................................................................... 2

28 U.S.C. § 1331 ......................................................................... 2, 30

28 U.S.C. § 1345 ............................................................................. 2

28 U.S.C. § 1651 ............................................................................. 30

**Regulations:**

8 C.F.R. §§ 208.16(c)-208.18 ......................................................... 4

8 C.F.R. § 1208.16(c) ...................................................................... 22

8 C.F.R. § 1208.16(c)-1208.18 ....................................................... 4

8 C.F.R. § 241.15 ............................................................................ 4

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................ 2

**Legislative Material:**

H.B. 4156, 59th Leg., 2nd Reg. Sess. (Okla. 2024) ............................ 1

§ 2(B) ...................................................................... 6, 17
§ 2(C)(1) ................................................................. 6, 17
§ 2(C)(1)-(2) .......................................................6, 7, 24, 25
§ 2(C)(2) ...................................................................... 7
§ 2(D) .......................................................................... 7
§ 2(F) .......................................................................... 6
§ 2(F)(1) ...................................................................... 24
§ 2(G) ......................................................................... 24

2024 La. Sess. Law Serv. 670 (West) ............................................ 26

Ariz. Proposition 314, § 4 (2024) ............................................... 26

**Other Authorities:**

Samuel L. Bray & Paul B. Miller, *Getting into Equity*,
   97 Notre Dame L. Rev. 1763 (2022) ....................................... 31

James Madison, *The Report of 1800* (Jan. 7, 1800),
   https://perma.cc/3XV9-2MEE ............................................. 36

Press Release, Secretaría de Relaciones Exteriores
   (Apr. 30, 2024), https://perma.cc/E6Z4-HS7W .......................... 40

The Federalist No. 3 (John Jay) (Clinton Rossiter ed. 2003) .................. 35

U.S. Dep't of Homeland Sec., *Fact Sheet: President Biden's
   Presidential Proclamation and Joint DHS-DOJ Interim Final
   Rule Cut Encounters at Southwest Border by 55 Percent*
   (July 24, 2024), https://perma.cc/YA3H-CVQ9 .......................... 21

## STATEMENT OF RELATED APPEALS

Counsel for the United States is not aware of any prior or related appeals.

*See* 10th Cir. R. 28.2(C)(3).

# GLOSSARY

| | |
|---|---|
| Convention Against Torture | Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |
| DHS | Department of Homeland Security |
| HB 4156 | Oklahoma House Bill 4156 |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix |

## INTRODUCTION

In *Arizona v. United States*, the Supreme Court held that an Arizona law purporting to mirror federal criminal provisions regarding registration of noncitizens was preempted. 567 U.S. 387 (2012). As the district court recognized, Oklahoma's House Bill 4156 (HB 4156) undermines federal immigration law even more profoundly because it interferes with the federal government's exclusive control over the core subjects of entry and removal of noncitizens and directly conflicts with federal law. *See* H.B. 4156, 59th Leg., 2nd Reg. Sess. (Okla. 2024). A recent ruling from the Fifth Circuit addressing a similar Texas law confirms that HB 4156 is preempted. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (denying stay pending appeal).

Allowing HB 4156 to go into effect would upset the status quo between the United States and the States in the context of immigration that has existed for almost 150 years. It would cause the United States to suffer immediate and irreparable harm. It would interfere with the federal government's ability to conduct foreign relations at a time when the United States is seeking diplomatic solutions to ameliorate irregular migration at the southern border. And it would interfere with the United States' treaty obligations, federal law-enforcement efforts, and the orderly processing of noncitizens entering the United States. Oklahoma cannot show comparable harm, and the district court correctly entered a preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 over the United States' constitutional challenge. JA16.[1] The district court issued an order preliminarily enjoining HB 4156 on June 28, 2024, JA204, and defendants-appellants timely appealed from that order on July 17, 2024, JA205; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court acted within its discretion in preliminarily enjoining an Oklahoma law that would impose state criminal penalties on noncitizens who enter Oklahoma without having first obtained legal authorization to enter the United States, or after having previously been excluded or removed from the country, and would require noncitizens convicted of the new offenses to leave the State.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

"The federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012); *see also, e.g.*, *DeCanas v. Bica*, 424 U.S. 351, 354

---

[1] Citations to "JA" refer to the one-volume Joint Appendix.

(1976) (recognizing that the "[p]ower to regulate immigration is unquestionably exclusively a federal power"). Pursuant to this "broad, undoubted power over the subject of immigration and the status of [noncitizens]," *Arizona*, 567 U.S. at 394, Congress has enacted the Immigration and Nationality Act (INA) as "the comprehensive federal statutory scheme for [the] regulation of immigration," *DeCanas*, 424 U.S. at 353, to be administered and enforced by the Secretary of Homeland Security and the Attorney General, 6 U.S.C. § 202; 8 U.S.C. § 1103(a)(1), (g).

This comprehensive framework sets forth detailed rules governing the entry and removal of noncitizens. It identifies who may or may not be admitted, *see, e.g.*, 8 U.S.C. §§ 1181-1182, 1188, indicates how noncitizens may enter the country lawfully, *see, e.g., id.* §§ 1223-1225, and imposes criminal and civil penalties on those who unlawfully enter, *see id.* §§ 1325-1326.

Federal law also comprehensively regulates the removal of noncitizens. Congress provided for removal proceedings to be conducted before an immigration judge, with the right to petition to an Article III court for review. With specified exceptions for other federally initiated procedures, these proceedings are the "sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3). Federal law also establishes, among other things, the grounds on which a noncitizen may be ordered removed, the requirements for commencing and administering proceedings, and the procedural protections

afforded to noncitizens.  *See, e.g.*, *id.* §§ 1182(a), 1225, 1227(a), 1229, 1229a.  It

establishes the grounds on which a noncitizen may apply for relief or protection from

removal, including asylum, withholding of removal, and protections under regulations

implementing U.S. obligations under Article 3 of the Convention Against Torture and

Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against

Torture).  *See, e.g.*, *id.* §§ 1158(a)-(b), 1231(b)(3), 1231 note (Pub. L. No. 105-277, div.

G, tit. XXII, § 2242, 112 Stat. 2681, 2681-822 to 2681-823 (1998)); 8 C.F.R.

§§ 208.16(c)-208.18, 1208.16(c)-1208.18.  And federal law establishes the process for

selecting and coordinating with the country to which a noncitizen may be removed.

*See* 8 U.S.C. § 1231(b); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A).

    Federal law also addresses how state and local officers may assist or cooperate

with federal officials in their enforcement of federal immigration law.  The INA

expressly authorizes state and local law-enforcement officers to make arrests for

violations of a narrow subset of the INA's prohibitions, concerning smuggling,

transporting, or harboring noncitizens.  *See* 8 U.S.C. § 1324(c).  And where state and

local officers have received prior confirmation from federal immigration officials

regarding a noncitizen's immigration status, they may also (if authorized by state law)

arrest and detain a noncitizen who is unlawfully present in the United States if the

noncitizen was previously convicted of a felony in the United States and then was

removed from or left the United States.  *Id.* § 1252c.  That detention, however, may

extend no longer than necessary for federal officers to take the noncitizen into custody for purposes of removal proceedings. *Id.* § 1252c(a).

Congress has also authorized the Department of Homeland Security (DHS) to enter into written cooperative agreements with States and localities. 8 U.S.C. § 1357(g). Under those agreements, appropriately trained and qualified state and local officers may perform specified functions of a federal immigration officer relating to the investigation, apprehension, or detention of noncitizens, *id.* § 1357(g)(1)-(9), "subject to the direction and supervision of the [Secretary]," *id.* § 1357(g)(3).[2] Even absent such an agreement, the INA provides that state and local officers may "communicate with the [Secretary] regarding the immigration status of any individual" or "otherwise . . . cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not lawfully present in the United States." *Id.* § 1357(g)(10).

## B.     Factual Background

In the face of this comprehensive scheme, Oklahoma enacted HB 4156, which was scheduled to take effect on July 1, 2024. The law would impose state criminal penalties on noncitizens who enter Oklahoma if they have not first obtained legal authorization to enter the United States or if they have previously been excluded or

---

[2] Section 1357 refers to the Attorney General, but those functions have been transferred to the Secretary. *See* 6 U.S.C. §§ 251, 557.

removed from the country.  It would also require noncitizens convicted of such state offenses to leave the State.

As relevant here, the Oklahoma law has two principal provisions, each of which is similar to analogous provisions of Texas's now-enjoined law.  First, HB 4156 creates a state crime of "impermissible occupation," which bars a noncitizen from "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States." HB 4156, § 2(B), (C)(1).  This provision effectively makes it a state crime for a noncitizen to be present in Oklahoma if they did not have authorization to enter the United States, tracking to some degree the federal unlawful-entry provision, 8 U.S.C. § 1325(a), but punishing only those noncitizens who subsequently enter and continue to be present in Oklahoma.  The law creates certain affirmative defenses, including that the noncitizen has been granted asylum or "lawful presence" by the federal government.  HB 4156, § 2(F).  Violations of the impermissible-occupation provision are generally misdemeanors, "punishable by imprisonment" for up to one year and a fine of up to $500, but could, under certain circumstances, constitute a "felony punishable by imprisonment" for up to two years and a fine of up to $1,000.  *Id.* § 2(C)(1)-(2).  HB 4156 requires a convicted noncitizen "to leave [Oklahoma] within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later."  *Id.*

Second, HB 4156 creates a state crime resembling 8 U.S.C. § 1326(a), the

federal unlawful-reentry provision, by barring noncitizens from "enter[ing],

attempt[ing] to enter, or . . . at any time [being] found in Oklahoma" if they previously

have been "denied admission, excluded, deported, or removed" or have "departed the

United States while an order of exclusion, deportation, or removal is outstanding."

HB 4156, § 2(D).  HB 4156's unlawful-reentry provision contains two exceptions,

which appear to be attempts to track provisions in 8 U.S.C. § 1326(a)(2).  The

provision does not apply if (i) prior to a noncitizen's departing for the United States,

"the United States Attorney General has expressly consented to such [noncitizen's]

reapplying for admission";[3] or (ii) if the noncitizen was "previously denied admission

and removed," the noncitizen "established that he or she was not required to obtain

such advance consent under" Section 2 of HB 4156 "or any prior statute."  HB 4156,

§ 2(D).  A violation of HB 4156's unlawful reentry provision is a felony punishable by

imprisonment for up to two years and a fine of up to $1,000.  *See id.* § 2(C)(2), (D).

And a person convicted of violating this provision must also "leave the state within

seventy-two (72) hours following his or her conviction or release from custody,

whichever comes later."  *Id.* § 2(C)(1)-(2).

---

[3] Although the federal statutory counterpart to this exception refers to the
Attorney General, *see* 8 U.S.C. § 1326(a)(2)(A), the relevant authority to consent to a
noncitizen's application for admission has been transferred to the Secretary of
Homeland Security as well.  *See, e.g., United States v. Rosales-Aguilar*, 818 F.3d 965, 971
n.1 (9th Cir. 2016); *see also* 8 U.S.C. § 1182(a)(9)(C)(ii).

### C.    Prior Proceedings

In separate lawsuits, the United States and a set of private plaintiffs sued to challenge HB 4156. JA174-75. The United States and the private plaintiffs each sought a preliminary injunction, and the district court consolidated the cases. JA174-75. The district court granted the United States' motion and preliminarily enjoined enforcement of HB 4156. JA204.

The district court held that the United States is likely to prevail on the merits because federal law preempts HB 4156. It concluded that HB 4156 is likely field preempted, noting that "'[p]olicies pertaining to the entry of [noncitizens]' are 'entrusted exclusively to Congress,'" JA187 (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)), and that, consistent with the Fifth Circuit's conclusion that a similar Texas law was preempted, the court saw "no reason why *Arizona*'s logic does not naturally extend to this case, where H.B. 4156 criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry," JA189. It concluded that the state law's provisions requiring noncitizens to leave the State of Oklahoma were independently field preempted as well, intruding into the federal government's exclusive control over the field of noncitizen removal. JA191. The district court also held that principles of conflict preemption prevent Oklahoma from enforcing HB 4156. It recognized that the "broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses" that HB 4156 purports to confer on Oklahoma officials far exceeds the role for state cooperation in

8

immigration enforcement that Congress has specified and would "allow[] the State to achieve its own immigration policy" in a manner that the Supreme Court has made clear conflicts with the purposes and objectives of the federal immigration laws. JA199 (quoting *Arizona*, 567 U.S. at 408).  And it concluded that the State's enactment would deprive noncitizens prosecuted under the state law with opportunities to seek discretionary relief provided by federal law.  JA197-98.

The district court rejected Oklahoma's assertion that the United States lacked the ability to sue in equity to enjoin HB 4156, reasoning that the federal government generally "may bring an action in equity to enforce federal supremacy" and that Oklahoma had identified no constitutional or statutory provision that displaced the court's equitable powers in this regard.  JA186.  And it dismissed Oklahoma's argument that the State War Clause—which provides that States may not "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay," U.S. Const. art. I, § 10, cl. 3—somehow authorized HB 4156.  It noted that the Fifth Circuit had rejected a similar effort by Texas to invoke this Clause to defend its analogous law, JA200, and declined to become "an outlier in permitting a sweeping application of the State War Clause" in this context, JA201.

The district court further concluded that the remaining preliminary-injunction factors favor the United States.  Adopting the conclusion of a district court addressing a similar law enacted by Iowa, the court recognized that the United States suffers "significant harm when a state tries to enforce its own immigration laws that are likely

9

preempted by federal law." JA202 (quoting *United States v. Iowa*, --- F. Supp. 3d ----, Nos. 4:24-cv-00162-SHL-SBJ, 4:24-cv-00161-SHL-SBJ, 2024 WL 3035430, at *14 (S.D. Iowa June 17, 2024), *appeal pending*, Nos. 24-2263, 24-2265 (8th Cir. filed June 20, 2024)). The court credited the United States' declarations asserting that letting HB 4156 take effect would harm the United States' relationships with foreign nations, displace the federal exercise of discretion in enforcement of the immigration laws, and interfere with federal immigration proceedings. JA202. And turning to the balance of equities, it held, consistent with numerous other decisions addressing similar preemption challenges, "that the balance of equities and public interest factors weigh in favor of granting injunctive relief when, as here, the state law is likely preempted by federal law." JA204.

Accordingly, the district court granted the United States' motion and preliminarily enjoined defendants from enforcing HB 4156. JA204. The court did not reach the United States' separate argument that the state enactment was inconsistent with the Foreign Commerce Clause. *See* JA201 n.9.

Oklahoma timely appealed. JA205.[4]

---

[4] The district court's order granting the United States' motion did not resolve the private plaintiffs' motion for a preliminary injunction, which the court noted raised a standing question not raised by the United States' motion. JA175 n.2. In a separate order, the district court denied the private plaintiffs' motion as moot. *See* Dkt. No. 40 (Order). While this Court has provisionally granted the private plaintiffs' motion to participate as intervenors in this appeal, for the reasons given in the United States' opposition to their motion to intervene, the private plaintiffs are not parties to

*Continued on next page.*

## SUMMARY OF ARGUMENT

**I.** The United States is likely to succeed on the merits of its claim. HB 4156 is preempted by federal law, and Oklahoma's defenses are meritless.

**A.** As the Supreme Court has long recognized, Congress has wholly occupied the field of regulating the entry and removal of noncitizens. Congress's comprehensive and highly reticulated scheme leaves no room for state regulation—even if the State attempts to complement federal law. The federal government must exercise exclusive prosecutorial discretion in this field to preserve a single national immigration policy. HB 4156 impermissibly intrudes into an exclusively federal field and is thus preempted.

**B.** HB 4156 also conflicts with federal law in multiple respects. In addition to interfering with the federal government's ability to conduct foreign affairs, the law would fundamentally disrupt the federal immigration regime by allowing a single State to make unilateral determinations regarding unlawful entry and removal, far in excess of the carefully limited circumstances in which Congress has authorized state officials to perform or assist in the functions of federal immigration officers. HB 4156's specifics only confirm its incompatibility with the federal scheme. They include that HB 4156 seeks to punish not just unlawful entry itself but also a noncitizen's

---

this appeal and have not demonstrated a basis to conclude that their participation as permissive intervenors is warranted. *See* U.S. Resp. in Opp'n to Private Pls.' Mot. to Intervene (Aug. 26, 2024).

subsequent presence in Oklahoma, even though unlawful presence is not generally a criminal offense, and that the enactment requires state judges to order noncitizens to leave the State, in conflict with the carefully calibrated federal removal scheme.

**C.**  Oklahoma's defenses to the United States' claims are meritless.

**1.**  Oklahoma cannot square its argument that the United States lacks a right of action with the long tradition of equitable suits for prohibitory injunctions to prevent governmental officials from directly injuring a plaintiff in violation of the Constitution, including the materially identical suit in *Arizona*.  That equitable right of action exists unless Congress has displaced it, and Oklahoma makes no argument that Congress has precluded the United States from suing in equity to vindicate its sovereign interests.

**2.**  In response to HB 4156's obvious legal infirmities, Oklahoma takes the extraordinary position that at least some applications of HB 4156 are valid under the Constitution's State War Clause, which generally provides that States may not "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10, cl. 3.  But enforcement of HB 4156 is unconstitutional because it is preempted under the Supremacy Clause, not because it constitutes prohibited war-making.  Nothing in the State War Clause offers States a broad exemption to other constitutional provisions, much less entitles States to interfere with the comprehensive framework that Congress has enacted to address what Oklahoma characterizes as an "invasion."

In any event, Oklahoma has no plausible claim that any asserted "invasion" should be recognized. The State War Clause does not provide a justiciable defense against the United States, and the Clause's text and context preclude treating irregular migration or criminal cartels' smuggling activities as an "invasion" justifying Oklahoma's engaging in "War."

**II.** The balance of equities and the public interest support the preliminary injunction, and Oklahoma's contrary argument largely rehashes its mistaken argument on the merits. The United States inherently suffers harm when a State enforces a preempted law. Beyond that inherent harm, enforcement of HB 4156 would interfere with the federal government's efforts to find diplomatic solutions to irregular migration across the southern border, as evidenced by Mexico's objections to the State's enactment. Enforcement would risk retaliation against U.S. nationals abroad, likely cause the United States to violate its treaty obligations, and hamper the federal government's efforts to process noncitizens who have unlawfully entered the United States. Oklahoma has offered no evidence whatsoever to support its speculative claims of countervailing harm. And because HB 4156 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico, vacating the district court's injunction could worsen irregular migration, rather than improving it. The district court did not abuse its discretion in entering the preliminary injunction.

13

## STANDARD OF REVIEW

To obtain a preliminary injunction, the movant must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of a preliminary injunction, (3) that the balance of the equities favor an injunction, and (4) that an injunction is in the public interest. *SEC v. Scoville*, 913 F.3d 1204, 1213-14 (10th Cir. 2019). When the government is a party, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

On appeal from the grant of a preliminary injunction, this Court reviews the district court's factual findings for clear error, its legal conclusions de novo, and its ultimate decision to grant relief for abuse of discretion. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018) ("We will overturn a preliminary injunction order only if it is arbitrary, capricious, whimsical, or manifestly unreasonable.").

## ARGUMENT

### I.     The United States is likely to succeed on the merits.

As relevant here, state law is preempted either when Congress occupies a field leaving no room for state regulation or when state law creates an express or implicit conflict with federal law, including when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks omitted). Both field and conflict preemption preclude Oklahoma from enforcing HB 4156.

14

Oklahoma cannot avoid these conclusions by asserting that the United States cannot

sue to enjoin a preempted law or that HB 4156 is a response to a supposed

"invasion."  HB 4156 is invalid in all its applications, and the district court correctly

enjoined it.

A.    **Congress has preempted the field of regulating the entry and removal of noncitizens.**

**1.**  "States are precluded from regulating conduct in a field that Congress,

acting within its proper authority, has determined must be regulated by its exclusive

governance." *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether

can be inferred from a framework of regulation so pervasive that Congress left no

room for the States to supplement it or where there is a federal interest so dominant

that the federal system will be assumed to preclude enforcement of state laws on the

same subject." *Id.* (cleaned up).

Applying these principles in *Arizona*, the Supreme Court held that federal law

preempted a state criminal statute relating to noncitizen registration.  567 U.S. at 403.

HB 4156 undermines federal immigration law even more directly by intruding into the

field of admitting and removing noncitizens and enforcing the associated sanctions

that the INA prescribes, functions that lie at the core of the federal government's

sovereign prerogatives to regulate immigration.

The *Arizona* decision followed from basic principles regarding the division of

authority between the federal government and the States.  "The authority to control

immigration—to admit or exclude [noncitizens]—is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also Arizona*, 567 U.S. at 409-10. The regulation of noncitizens "is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," state law must yield to federal. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). "[I]nternational controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Id.* at 64.

Here, Congress has created a comprehensive and highly reticulated scheme governing the admission and removal of noncitizens. *See Patel v. Garland*, 596 U.S. 328, 331 (2022). Congress decided which noncitizens may be admitted to the United States and how to admit them. 8 U.S.C. §§ 1181-1188, 1201-1204, 1225. Congress decided which noncitizens may be removed from the United States and how to remove them. *Id.* §§ 1182, 1225-1229a; *see id.* § 1229a(a)(3) (providing that, except as otherwise specified in the INA, federal removal proceedings are "the sole and exclusive procedure" for determining whether to admit or remove a noncitizen). And Congress decided when a noncitizen's entry into the United States is—and is not—a crime. *Id.* §§ 1325(a)-(b), 1326.

That "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," such that "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 399, 401 (cleaned up). Otherwise, "the State

would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

HB 4156 cannot be reconciled with these principles. Although regulation of entry and removal is the purview of the national government, Oklahoma has created a crime of "impermissible occupation," purporting to criminalize presence in Oklahoma for a category of noncitizens who Oklahoma courts determine to have entered the United States in violation of federal law. HB 4156, § 2(B), (C)(1). And Oklahoma seeks to criminalize conduct already proscribed by federal law—unlawful reentry into the United States, 8 U.S.C. § 1326—despite the comprehensive federal immigration scheme governing such conduct. The district court thus properly held that "H.B. 4156 authorizes state prosecution for conduct already subject to comprehensive federal regulation and bound within federal immigration policy," and that its enforcement would "undoubtedly diminish[] the Federal Government's control over enforcement and detract[] from the integrated scheme of regulation created by Congress." JA196 (quotation marks omitted).

This holding echoed decisions of multiple courts of appeals that have applied similar reasoning to state analogs to other aspects of the federal immigration scheme, *e.g.*, *United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013), as well as a decision of the Fifth Circuit concluding that a Texas law similar to HB 4156 was likely

preempted, *United States v. Texas*, 97 F.4th 268, 291 (5th Cir. 2024) (denying stay

pending appeal); *see also United States v. Iowa*, --- F. Supp. 3d ---, Nos. 4:24-cv-00162-

SHL-SBJ, 4:24-cv-00161-SHL-SBJ, 2024 WL 3035430, at *11-13 (S.D. Iowa June 17,

2024) (concluding a similar Iowa prohibition on reentry is likely preempted), *appeal

pending*, Nos. 24-2263, 24-2265 (8th Cir. filed June 20, 2024).

Oklahoma also intrudes on the unique federal prerogative to determine which

noncitizens should be permitted to remain in the country by asserting the authority to

banish noncitizens from Oklahoma. *See Arizona*, 567 U.S. at 402. It is no answer to

this argument that Oklahoma merely purports to force noncitizens to move to

another State, rather than leaving the country entirely: a uniform federal removal

scheme cannot be reconciled with a patchwork of state enactments that shuffle

noncitizens around the country if the national government has not made a

determination that they should no longer be permitted to remain here.

*See United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) (holding preempted

indirect efforts to expel noncitizens from Alabama).

**2.** Despite acknowledging that "the federal government possesses exclusive

power to admit and naturalize" noncitizens, Br. 30, Oklahoma asserts authority to

punish noncitizens for entering the United States in violation of federal law.

Oklahoma contends, in particular, that its enactment cannot be preempted because

"HB 4156 clearly mirrors federal objectives enshrined in law, and it is undeniably a

legitimate state goal to penalize lawbreakers who remain in the State." Br. 31. The

Supreme Court rejected this precise argument in *Arizona*, holding that a state enactment that purported to punish under state law conduct that was a federal crime—in that case, failure to register or carry a registration card, *see* 8 U.S.C. §§ 1304(e), 1306(a)—was preempted. The Court specified that the state enactment was "impermissible" even if it was a "complementary state regulation." *Arizona*, 567 U.S. at 401. Oklahoma's argument here thus cannot be reconciled with *Arizona*.

Oklahoma fares no better in pointing out that States may take some actions that relate in some way to immigration—a fact that was also true in *Arizona*. While it is common ground that Congress has not preempted "every state enactment which in any way deals with [noncitizens]," *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), if Oklahoma were correct that this fact alone precluded field preemption, *Arizona* would have come out the other way. Indeed, all Oklahoma's arguments, at bottom, reduce to the proposition that while Congress preempted parallel state prosecutions in the area of noncitizen registration, it intended to allow States to directly enforce federal prohibitions on entry and reentry. Oklahoma offers no support whatsoever for that implausible proposition or for confining *Arizona* to its facts. If anything, Congress's desire to maintain federal control over the core immigration determinations regarding entry and removal is more evident than its need to preclude complementary state regulation of ancillary matters like noncitizen registration.

Far from allowing States to unilaterally usurp the core federal prerogatives of prosecuting the unlawful entry of noncitizens and ordering their removal, Congress

provided a much more limited role for States in immigration enforcement.  States may

cooperate with the federal government in the apprehension and detention of

noncitizens.  8 U.S.C. § 1357(g); *see also* 18 U.S.C. § 758 (recognizing that state law-

enforcement agents may be at federal immigration checkpoints).  States may also

enforce their own generally applicable laws to the conduct of noncitizens.  *See, e.g.*,

22 U.S.C. § 7105(b)(1)(E)(iv) ("kidnapping" and "forced labor offenses"); 8 U.S.C.

§ 1101(a)(15)(T)(i)(III)(aa) ("acts of trafficking"); *id.* § 1101(a)(15)(U)(iii) (various state

"criminal law[s]").  But that does not mean that States may enforce their own

immigration schemes independent of the federal government.

  In this respect, the Court in *Arizona* followed a long line of decisions barring

parallel state-law enforcement in fields fully occupied by federal law.  567 U.S. at 402

(first citing *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S.

282, 288-89 (1986); then citing *California v. Zook*, 336 U.S. 725, 730-31 (1949); then

citing *In re Loney*, 134 U.S. 372, 375-76 (1890); and then citing *Buckman Co. v. Plaintiffs'*

*Legal Comm.*, 531 U.S. 341, 347-48 (2001)).  For instance, the Court held in *Loney* that

States have no power to punish perjury before a federal tribunal.  The state

prosecution was impermissible not because federal and state perjury laws were

substantively different, but because a federal witness's breach of his duty of

truthfulness does not impair "any authority derived from the State."  *Loney*, 134 U.S.

at 374.  And *Loney* distinguished that circumstance from cases where the Court had

recognized that "the same act" may validly constitute "a violation of the laws of the

State, as well as of the laws of the United States." *Id.* at 375. In those cases, unlike in *Loney*, the state statutes addressed questions of legitimate local concern distinct from the federal offense. *Id.* (citing *Fox v. Ohio*, 46 U.S. (5 How.) 410 (1847)); *see also Gilbert v. Minnesota*, 254 U.S. 325 (1920).

The same principles apply here. Whether or not a noncitizen violated federal law by unlawfully entering the United States, Oklahoma may prosecute a noncitizen who commits violent crimes, possesses illegal drugs, or otherwise violates the State's generally applicable criminal laws that do not turn on noncitizens' immigration status. By contrast, ensuring compliance with federal entry and reentry provisions does not lie within any traditional police power of the State but is instead a field of national concern—implicating national sovereignty, national security, and foreign affairs—occupied by Congress. Even parallel state regulation, therefore, is preempted.

Finally, Oklahoma's argument (Br. 32, 34) that the United States has abandoned the field is both incorrect and irrelevant. The federal government "removed 472,000 individuals between May through December of 2023—more than any single year since 2015." *United States v. Texas*, 719 F. Supp. 3d 640, 666 n.14 (W.D. Tex. 2024); *see also* U.S. Dep't of Homeland Sec., *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS-DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), https://perma.cc/YA3H-CVQ9 ("DHS removed or returned over 740,000 individuals in the 12 months after the end of the Title 42 public health Order, more than any year since 2010."). Moreover, the relevant

question is whether Congress has regulated a field, not the degree to which Congress has appropriated enforcement resources or the Executive Branch has exercised its enforcement discretion.  *See Texas*, 97 F.4th at 287-88 ("'Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue,' not enforcement decisions by the Executive.'  (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993))); *see also South Carolina*, 720 F.3d at 533 (holding that a state law was both "field preempted" because Congress had comprehensively regulated and "conflict preempted because enforcement of these federal statutes necessarily involves the discretion of federal officials").

### B.    HB 4156 impermissibly conflicts with federal law.

**1.**  HB 4156 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona*, 567 U.S. at 399 (quotation marks omitted).  Determinations related to the entry and removal of citizens of foreign nations must be based on the implementation of the complex immigration regime, which includes provisions regarding asylum, *see* 8 U.S.C. § 1158(a), withholding of removal, *id.* § 1231(b)(3), protection under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture, *e.g.*, 8 C.F.R. § 1208.16(c), and the proper country of removal, 8 U.S.C. § 1231(b).  *See Texas*, 97 F.4th at 289-91 (outlining considerations under federal law).  They must also take account of the federal government's foreign-relations interests.  *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 679 (2023) (recognizing that "the Executive's enforcement [of

immigration law] implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives'").

As in *Arizona*, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted."  567 U.S. at 402.  Enforcement of federal immigration law, which necessarily imposes consequences for foreign nationals based on acts committed in violation of federal law, involves a sensitive balancing of federal interests.  *See id.* at 395.  In this circumstance, "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379 (2000).  To the contrary, allowing a single State to imprison foreign nationals for unlawfully entering the United States or order them to leave the State, without regard to the interests of the Nation as a whole, would fundamentally undermine that congressional scheme and "compromise the very capacity" of the federal government "to speak for the Nation with one voice in dealing with other governments."  *Id.* at 381; *see also Texas*, 97 F.4th at 289-91 (concluding Texas's analogous law blocked federal officials from exercising broad discretion conferred by the INA).  In short, by allowing Oklahoma to unilaterally engage in its own immigration-enforcement efforts, HB 4156 vastly exceeds the "limited circumstances in which state officers may" assist and cooperate with federal enforcement.  *Arizona*, 567 U.S. at 408; *see* 8 U.S.C. § 1357(g); *see also Texas*, 97 F.4th at 292-93; JA199 (recognizing that the Supreme Court's reasoning in *Arizona* "applies with greater force here" where HB 4156 "would grant state officials

broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses"); *supra* pp. 4-5, 19-20.

HB 4156's specifics underscore its incompatibility with the federal scheme. For example, HB 4156 does not punish unlawful entry itself—which will almost invariably take place in a State other than Oklahoma—but rather seeks to punish the noncitizen's subsequent presence in Oklahoma.  Unlawful presence is not, as a general matter, a criminal offense, *see Arizona*, 567 U.S. at 407, so HB 4156 parallels federal law only to the extent that it asserts authority to punish, belatedly, a federal crime that occurred in a different State at a different time.  Moreover, even if HB 4156's provisions did parallel 8 U.S.C. §§ 1325 and 1326, they authorize different punishments.  *Compare, e.g.*, 8 U.S.C. § 1325(a)-(b), *with* HB 4156, § 2(C)(1)-(2), (G). And the Supreme Court has recognized that when "two separate remedies are brought to bear on the same activity," "conflict is imminent."  *Gould*, 475 U.S. at 286 (quotation marks omitted); *see also Arizona*, 567 U.S. at 402-03 (noting inconsistency in penalties provided for by Arizona noncitizen registration provision and federal law).

In addition, HB 4156's impermissible-occupation provision includes an affirmative defense when "[t]he federal government has granted" a noncitizen "lawful presence in the United States."  HB 4156, § 2(F)(1).  But federal law does not supply one definition of "lawful presence," and, as the district court recognized, *see* JA198, there are "significant complexities" in determining immigration status.  *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc)

(plurality opinion) (quoting *Arizona*, 567 U.S. at 409); *see also Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which [noncitizens] are entitled to residence, and which eventually will be deported.").  Allowing state judges to determine noncitizens' immigration status, purportedly based on their reading of federal law, is impermissible under this framework, where "[t]he federal government alone . . . has the power to classify non-citizens," *Farmers Branch*, 726 F.3d at 536 (citing *Arizona*, 567 U.S. at 409-10), and state determinations of whether the federal government has conferred "lawful presence" on a particular noncitizen would "open[] the door to conflicting state and federal rulings," *id.*; *see also Texas*, 97 F.4th at 290 (concluding that an analogous Texas law would impermissibly provide for "state courts [to] determine if a noncitizen has entered illegally" and indeed "grants Texas judges significantly more power than the ordinance at issue in *Farmers Branch*").[5]

Oklahoma's requirement that any noncitizen convicted of violating HB 4156 must "leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later," HB 4156, § 2(C)(1)-(2), also conflicts with the carefully calibrated federal removal scheme, *e.g.*, 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1229a, 1231(a)-(b).  *See Texas*, 97 F.4th at 291.  It is immaterial in this

---

[5] To the extent, moreover, that Oklahoma seeks to arrest, detain, or prosecute unaccompanied children, HB 4156 also conflicts with the protections Congress has provided to such noncitizens.  *See, e.g.*, 6 U.S.C. § 279; 8 U.S.C. § 1232.

regard that HB 4156 requires removal only from the State of Oklahoma rather than the United States.  The Constitution does not contemplate a patchwork of immigration regulations across the country, which would have a cumulative impact of driving noncitizens from the country without regard to the federal removal process required by federal law.  To the contrary, only "[t]he federal government—not the fifty states working in concert—retains the power to exclude aliens from the country." *Alabama*, 691 F.3d at 1295 n.21; *see also, e.g.*, *Gould*, 475 U.S. at 288-89 (noting that, if a particular State's law were upheld, "nothing prevents other States from taking similar action," with each additional action "further detract[ing] from the 'integrated scheme of regulation' created by Congress").

Even one state-specific immigration regime upsets the balance Congress struck in addressing the presence, status, and removal of noncitizens.  *See Alabama*, 691 F.3d at 1295 & n.21.  And here, the concerns about multiple States adopting the same approach are not hypothetical, as several States such as Texas and Iowa have adopted similar laws.  *See Texas*, 97 F.4th at 272-73; *Iowa*, 2024 WL 3035430, at *1-2; *see also* 2024 La. Sess. Law Serv. 670 (West) (S.B. 388) (creating new state criminal provisions similar to the Texas law that become effective if the Supreme Court upholds Texas's law or the Constitution is amended to "restore[] or increase[] the authority of the state of Louisiana to prohibit or limit the unlawful entry or reentry by an alien without lawful presence"); Ariz. Proposition 314, § 4 (2024) (creating similar state criminal

provisions that may be enforced once Texas's law or a similar state law has been in effect for a period of 60 consecutive days).

**2.**  Oklahoma takes issue with the district court's conflict-preemption holding primarily by asserting (Br. 37-39) that, because HB 4156 attempts to parallel 8 U.S.C. §§ 1325 and 1326, it is not preempted.  This argument simply ignores the district court's holding recognizing that the unilateral authority Oklahoma purports to confer on itself through HB 4156 to arrest, prosecute, and punish noncitizens for immigration offenses cannot be squared with the Supreme Court's decision in *Arizona*, *see* JA199-200, or the "careful framework Congress adopted," *Arizona*, 567 U.S. at 402.  And it fails even on its own terms, as Oklahoma has no response to the inconsistencies between its enactment and federal law identified by the district court and above.  *See* JA198-99; *supra* pp. 4-7, 19-20.

Oklahoma is mistaken to suggest (Br. 48) that the use of "shall" in 8 U.S.C. §§ 1325 and 1326 means that the federal government somehow lacks discretion in enforcing these statutes—even if that would be relevant to whether a State is entitled to create a parallel scheme of enforcement.  As the Supreme Court has explained, this type of language "is commonly found in the criminal provisions of Title 18 of the United States Code," but there is "no indication in case law" that it "mandates criminal prosecution of every violator" of a criminal statute.  *Heckler v. Chaney*, 470 U.S. 821, 835 (1985); *see also Texas*, 599 U.S. at 679 (stating that the "principle of

27

enforcement discretion over arrests and prosecutions extends to the immigration context").[6]

Oklahoma's suggestion (Br. 39-43) that parallel state and federal enforcement schemes are generally permissible has no relevance to a State's effort to regulate in an area that Congress has addressed through federal standards and definitive enforcement procedures, particularly where parallel state enforcement could compromise foreign relations. The Supreme Court did not *sub silentio* overrule *Arizona* and the cases on which *Arizona* relied in *Kansas v. Garcia*, 589 U.S. 191 (2020). *Kansas* involved a generally applicable law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike." *Id.* at 198. Nothing in that case— which again involved a generally applicable law and not an immigration regulation— suggests that a State may create a parallel state immigration regime regulating the entry and removal of noncitizens.

Oklahoma closes its argument on conflict preemption by resisting binding Supreme Court precedent. It urges, in particular, that obstacle preemption improperly

---

[6] Oklahoma properly has not joined the argument by *amicus* Immigration Reform Law Institute that 8 U.S.C. § 1326(b) somehow authorizes States to issue unilateral removal orders. *See Amicus* Br. 8-10. That provision makes clear that removals for purposes of federal law include stipulations of removal that noncitizens may enter with federal officials to avoid further criminal prosecution either by a State or by the federal government. *See* 8 U.S.C. § 1326(b) ("[T]he term 'removal' includes any agreement in which [a noncitizen] stipulates to removal during (or not during) a criminal trial under either Federal or State law."). It does not contemplate that state officials can enter into stipulations of removal, and *amicus* identifies no circumstance in which the provision has been interpreted in that fashion.

relies on "judicial guesswork," Br. 44 (quoting *Kansas*, 589 U.S. at 214 (Thomas, J.,

concurring)), citing a concurring opinion that suggested that the Court should

"explicitly abandon [its] 'purposes and objectives' pre-emption jurisprudence," *Kansas*,

589 U.S. at 213 (Thomas, J., concurring); *see also Arizona*, 567 U.S. at 439-40 (Thomas,

J., concurring in part and dissenting in part) (expressing same view that the Supreme

Court's obstacle-preemption case law is constitutionally unsound).  While Oklahoma

may argue to the Supreme Court that it should overturn its precedent in this area, that

case law remains binding on this Court.  *See, e.g.*, *United States v. Maloid*, 71 F.4th 795,

808 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 1035 (2024).

### C.    Oklahoma's defenses are meritless.

#### 1.    The United States may sue in equity to enjoin federally preempted state laws.

Oklahoma mistakenly suggests that the United States lacks a right to sue in

equity to enjoin actions by state officials that harm the national government's

interests.  The United States' right to bring equitable suits of this kind went essentially

unchallenged for more than a century, and courts of appeals to address the issue

recently have rejected arguments like the one Oklahoma puts forth here.  The Fifth

Circuit denied a stay pending appeal of an injunction against Texas's analogous law

and explained that the United States was entitled to bring an equitable action to enjoin

a law that interfered with federal control over immigration and foreign relations.  *See*

*Texas*, 97 F.4th at 278 ("We see no basis in the precedent of this court or the Supreme

29

Court for concluding that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law.").  And the Eighth Circuit recently upheld the federal government's right to sue "to enjoin a state law's implementation and enforcement or for other appropriate relief" when the United States argued that the state law was preempted and thus invalid under the Supremacy Clause.  *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024).  These decisions are correct, and Oklahoma provides no basis for this Court to create a circuit conflict.

    **a.**  Congress has empowered federal courts to exercise equity jurisdiction and to grant such relief as "was traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999); *see* 28 U.S.C. §§ 1331, 1651.  The United States has presented a classic equitable grievance—that the defendant is causing it direct harm through unlawful acts, here by interfering with federal operations and responsibilities.  *See, e.g.*, *American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).

    In these circumstances, "equitable relief . . . is traditionally available to enforce federal law," unless Congress has "displace[d]" it.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015).  That principle is especially true in a suit brought by the United States to vindicate its sovereign interests.  In focusing (Br. 20-22) on *Armstrong*'s rejection of the notion that the Supremacy Clause itself provides a right of action, Oklahoma ignores the relevant inquiry.  It must demonstrate that Congress has

displaced equitable remedies in the circumstances of this case, and it has made no effort to do so.

To invoke an equitable right of action, a party must present the type of grievance for which an equitable remedy lies for that party. *See* Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763 (2022); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (injunctions may be sought to halt unconstitutional activity even without a "private right of action" (quotation marks omitted)). In line with this principle, courts have long used injunctions—with or without express statutory authorization—to prevent governmental officials from violating the law. *See, e.g., Truax*, 239 U.S. at 36; *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43 (1815); *Hughes v. Trustees of Morden Coll.*, (1748) 27 Eng. Rep. 973 (High Ct. Ch.). The historical tradition also reflects that courts may entertain equitable actions brought by governmental actors to prevent other governmental actors from acting unlawfully. *See, e.g., Attorney-General v. Corporation of Poole*, (1838) 41 Eng. Rep. 7 (High Ct. Ch.) (equitable action by Crown against local officials), *aff'd sub nom. Parr v. Attorney-General*, (1842) 8 Eng. Rep. 159 (H.L.).

**b.** History and precedent also confirm that the United States has authority to seek injunctive relief of the kind at issue here. *See United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888). Like a private party, the United States may seek a prohibitory injunction to shield itself from direct injury. *Id.* at 286. Of particular relevance here, federal courts undoubtedly may grant injunctions to the United States

to protect its sovereign interests.  The United States has frequently sued in equity

when those interests were threatened or harmed.  *See, e.g.*, *id.* (invalidation of land

grant); *Arizona*, 567 U.S. 387 (preemption of state immigration law); *United States v.*

*Texas*, 143 U.S. 621 (1892) (boundary dispute); *United States v. American Bell Tel. Co.*,

128 U.S. 315 (1888) (invalidation of patent).

The Supreme Court unanimously recognized that the United States may bring

such suits in *In re Debs*, 158 U.S. 564 (1895), when it held that the federal government

may obtain an injunction to "enforce in any part of the land the full and free exercise

of all national powers," *id.* at 582.  *Debs* endorsed and embodied the "general rule that

the United States may sue to protect its interests."  *Wyandotte Transp. Co. v.*

*United States*, 389 U.S. 191, 201 (1967).  And any contention that *Debs* turned on the

United States' proprietary interest in the mails or its authority to abate a public

nuisance is inconsistent with the Court's own explanation of its holding in *Debs* itself.

The Court noted the government's proprietary interest in the mails but then stated:

"We do not care to place our decision upon this ground alone."  *Debs*, 158 U.S. at 584.

And rather than limiting its holding to public nuisance, the Court stated that the

United States, "entrusted, by the very terms of its being, with powers and duties to be

exercised and discharged for the general welfare, has a right to apply to its own courts

for any proper assistance in the exercise of the one and the discharge of the other."

*Id.*

Subsequent decisions have recognized the United States' right to sue to protect other sovereign interests. *See, e.g.*, *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 425 (1925) (authority to sue "to carry out treaty obligations"). At an absolute minimum, the United States' authority to bring the long-established right of action to enjoin constitutional violations that directly harm the plaintiff should be beyond dispute.

Oklahoma is mistaken to suggest that the government lacks a sufficient interest in this case to support a claim in equity. *See* Br. 21-22 (attempting to distinguish *United States v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016)); *see also United States v. Colorado Supreme Court*, 87 F.3d 1161, 1165 (10th Cir. 1996). Here, as in *Arizona*, the United States has a sovereign interest in its ability to enforce federal immigration law uniformly, free from state interference. The United States also has a sovereign interest in preserving its ability to carry out its treaty obligations and conduct diplomacy with foreign nations, including its neighbors. The declarations filed in this case established, as the district court recognized, the specific and concrete harms to the government's ability to enforce federal law and to conduct foreign relations. *See infra* Part II. The United States may sue in equity to vindicate those interests.

**c.** The doctrine of *Ex parte Young*, 209 U.S. 123, 167 (1908), leaves no doubt that the United States may pursue relief here. *Ex parte Young* endorsed the longstanding practice of permitting actions to enjoin state officials from violating the

federal Constitution in a manner that directly harms a plaintiff. *See id.* (citing *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738 (1824)). Oklahoma offers no response to the United States' argument that *Ex parte Young* supports the government's ability to prevent the named official defendants from enforcing HB 4156. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 252 (2011).

> **2. Oklahoma cannot evade preemption principles by asserting that HB 4156 is a response to an alleged "invasion."**

Faced with the clear holdings of the Supreme Court's case law, Oklahoma resorts to the remarkable defense that HB 4156 may be enacted and enforced in the face of controlling preemption principles because, according to the State, either the movement of migrants across the border or the activities of foreign cartels constitutes an "invasion." Br. 45. Following the Fifth Circuit's rejection of a similar defense raised by Texas in defending its analogous law, the district court correctly rejected Oklahoma's invitation to become the first court to adopt its sweeping defense. *See* JA200-01.

**a.** The constitutional structure generally reflects a "complete delegation of authority to the Federal Government to provide for the common defense" along with a "divest[ment from] the States of like power." *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022). This structure reflects "the supremacy of federal power in the area of military affairs," *Perpich v. Department of Def.*, 496 U.S. 334, 351 (1990); *see also* U.S. Const. art. IV, § 4 (conferring on the federal government the duty to "protect

each of [the States] against Invasion"), prompted in part by the Framers' concerns

that a contrary approach would allow individual States to spark foreign-relations

incidents or even wars, *see* The Federalist No. 3, at 39 (John Jay) (Clinton Rossiter ed.

2003) (observing that federal power would be necessary in part because "bordering

States[] . . . under the impulse of sudden irritation, and a quick sense of apparent

interest or injury, will be most likely, by direct violence, to excite war" with other

countries), *cited in Arizona*, 567 U.S. at 395.  The Constitution thus generally forbids

States to "engage in War," subject to a narrow exception if a State is "actually invaded,

or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10, cl. 3.

**b.**  The Framers did not conceal a broad license to override fundamental

federal-supremacy principles in that narrow exception to a clause divesting power

from the States.  By its terms, the provision on which Oklahoma relies is an exception

to the State War Clause's general prohibition on "engag[ing] in War."  U.S. Const.

art. I, § 10, cl. 3.  It is not that prohibition, however, that renders HB 4156 invalid.

Enforcement of HB 4156 is unconstitutional because it is preempted under the

Supremacy Clause, not because it qualifies as prohibited war-making.  Nothing in the

State War Clause offers States a broad exemption to other constitutional provisions,

much less entitles them to interfere with the comprehensive framework that Congress

has enacted to address what Oklahoma characterizes as an "invasion."  *See Texas*,

97 F.4th at 295 (reasoning that "[c]onstitutional text, structure, and history provide

35

strong evidence that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered").

Relatedly, it is apparent as a matter of ordinary understanding that prosecution and removal of noncitizens for unlawfully entering the country does not constitute "engag[ing] in War." *See Texas*, 719 F. Supp. 3d at 687-89. That common-sense notion is consistent with the understanding of the Framers. *See id.* (citing James Madison, *The Report of 1800* (Jan. 7, 1800), https://perma.cc/3XV9-2MEE (rejecting argument that removal of noncitizens could be justified as a means of preventing an invasion)). Oklahoma offers no response to the point that HB 4156 cannot meaningfully be squared with the constitutional text in this regard.

Moreover, the State War Clause's text makes clear that it provides a time-limited emergency authority to allow a State to respond to circumstances that "will not admit of delay" until the federal government has had an opportunity to respond, U.S. Const. art. I, § 10, cl. 3—which, at the time of the Founding, could have taken substantial time. *See Texas*, 719 F. Supp. 3d at 691. It does not confer authority to ignore congressional enactments that foreclose state legislation under the Supremacy Clause, nor does it entitle States to contradict the federal government's considered decision about whether (and how) to "engage in War" in response to particular circumstances. The suggestion in this case that the ongoing situation at the border would authorize Oklahoma to engage in armed hostilities with another nation or with

36

a group of foreign nationals from Mexico or China, without regard to the foreign policy of the United States as a whole, is extraordinary.

Here, Congress has enacted a statutory scheme that comprehensively addresses immigration, including the unlawful entry of noncitizens. And, in this suit, the United States is invoking that scheme and seeking to enjoin Oklahoma's enforcement of HB 4156, which would seriously harm the Nation's foreign relations. Under these circumstances, the State War Clause provides no basis for allowing Oklahoma to enforce HB 4156 over the United States' explicit opposition. *See Torres*, 597 U.S. at 592 ("The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy.").

**c.** Oklahoma's reliance on the State War Clause is thus misplaced without regard to whether Oklahoma has been "actually invaded." But Oklahoma in any event has no plausible claim that such an asserted "invasion" should be recognized.

First, as cases from several other courts of appeals cited by the district court held, the State War Clause does not provide a justiciable defense against the United States. *See* JA200-01 (first citing *California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997); then citing *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); and then citing *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996)). Oklahoma does not meaningfully address these cases except to offer (Br. 45) its own view that immigration or certain organized criminal activity may, at least in some circumstances, constitute an "invasion" to which Oklahoma can respond by "engag[ing] in War."

37

That response provides no basis, however, for a court to conclude that a State's "colorable argument" that a purported "invasion is occurring," Br. 46, allows the State to incarcerate noncitizens and order them to leave the State, when the ordinary operation of the Supremacy Clause would prohibit such proceedings.

Second, under no reasonable understanding can irregular migration or criminal cartels' smuggling activities amount to an "invasion" justifying Oklahoma's engaging in "War." As the district court addressing Texas's analogous law thoroughly demonstrated, "[c]ontemporary definitions of 'invasion' and 'actually invaded' as well as common usage of the term in the late Eighteenth Century predominantly referred to an 'invasion' as a hostile and organized military force, too powerful to be dealt with by ordinary judicial proceedings." *Texas*, 719 F. Supp. 3d at 680; *see also id.* at 680-89 (surveying contemporaneous dictionaries and usage).

Context confirms this understanding. The State War Clause reflects an intent generally to prohibit States from "engag[ing] in War." U.S. Const. art. I, § 10, cl. 3. In recognizing an exception from that prohibition, it was natural for the Framers to refer to circumstances in which the States' police powers would be inadequate. In other circumstances, there would have been no need to authorize States to take an action as extreme as "engag[ing] in War"—and, pursuant to other constitutional provisions, to authorize the federal government to suspend the writ of habeas corpus or provide for the quartering of soldiers, *see id.* art. I, § 9, cl. 2; *id.* amend. III. It is thus no surprise that courts have consistently understood that the term "actually

invaded" under this Clause must mean armed hostilities rising to the level of those typically implicated in war, as opposed to irregular migration or criminal activity by private actors. *See, e.g.*, *Padavan*, 82 F.3d at 28; *see also Texas*, 719 F. Supp. 3d at 682-83.

Oklahoma's efforts to focus its argument on the activities of "Mexican cartel members" or "organized Chinese crime syndicates," Br. 46, is no more availing. Even setting aside that criminal activity cannot reasonably be deemed an "invasion," Oklahoma provides no support whatsoever for the idea that such activity authorizes it to "engage in War" against such groups through criminal prosecutions and removals in circumstances in which a state judicial officer concludes that an individual noncitizen has participated in conduct that (allegedly) rises to the level of an "invasion." Unsurprisingly, HB 4156 does not on its face contemplate any such inquiry, which would embroil the state courts in sensitive foreign-relations determinations about which particular acts by noncitizens constitute an invasion that would authorize the State to engage in war with a foreign country.

And Oklahoma cannot in any event seriously maintain that misdemeanor prosecution and removal under HB 4156 is an appropriate response to violent crime by members of cartels or organized crime syndicates. Indeed, it is entirely unclear why HB 4156 would be necessary in circumstances in which a noncitizen committed acts that could plausibly qualify as part of an "invasion." Oklahoma does not explain, for example, how a noncitizen could do so without violating any preexisting and generally applicable state laws. And the commission of violent crime or membership

in a cartel has nothing to do with whether HB 4156 is violated, so it is unclear why the application of HB 4156 to distinct conduct would be any more justified if those circumstances happened to be present.

## II.    The balance of harms and the public interest warrant a preliminary injunction.

**1.**  The Supreme Court has suggested that irreparable harm inherently results from the enforcement of a preempted state law.  *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *see also* JA201-02 (collecting cases). Beyond those inherent harms, enforcement of HB 4156 would directly and irreparably harm core federal interests.

Internationally, enforcement of HB 4156 would antagonize foreign partners, including Mexico.  When a country believes its nationals have been mistreated in the United States, it may respond with "harmful reciprocal treatment of American citizens abroad."  *Arizona*, 567 U.S. at 395; *see* JA76-77 (declaration of Deputy Assistant Secretary of State in the Bureau of Western Hemisphere Affairs).  Indeed, Mexico has already expressed concern about HB 4156, *see* Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), https://perma.cc/E6Z4-HS7W, just as it did with Texas's and Iowa's comparable laws.  For this and other reasons, the State Department explained, if Oklahoma enforces HB 4156, it will seriously injure the United States' diplomatic relationships with Mexico and other nations.  *See* JA71-73.  Far from helping to stem the tide of irregular migration over the southern border, HB 4156

would hamper federal efforts to address irregular migration and its root causes by interfering with the United States' relationship with Mexico, whose cooperation is important to addressing irregular migration. *See* JA73-76. The "representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate" as a matter of law that a state law interferes with federal foreign policy. *Crosby*, 530 U.S. at 386.

Oklahoma's reliance (Br. 47-48) on a declaration from outside the government to assess U.S. foreign-policy interests underscores the degree to which its position would undermine the federal government's ability to speak with one voice in foreign-relations matters. And on its merits, the declaration's suggestion that "[d]isagreements between nations . . . are the very predicate for diplomacy," Br. 47 (quoting JA151), highlights Oklahoma's assertion of authority for a single State to create international disagreements. Oklahoma misses the point when it suggests that the Mexican government's views should not carry legal weight; the point is that it is the national government that is charged with maintaining relations with the governments of foreign nations and to formulate U.S. immigration policy in keeping with foreign-relations priorities.

HB 4156 would also interfere with the federal government's orderly processing of noncitizens who have unlawfully entered the United States. As the declarant from U.S. Immigration and Customs Enforcement explained, prosecution under HB 4156 may prevent some noncitizens from fully participating in federal immigration

41

proceedings, which "result[s] in them being ordered removed even when they have valid claims for protection from removal or other relief." JA84. HB 4156 would thus impede the federal government's enforcement of federal immigration law.

These harms are compounded by the fact that, if HB 4156 is allowed to stand, other States could be emboldened to impose similar restraints. *See Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same"). The resulting "patchwork" of laws would impede the federal government's ability to carry out its core immigration functions and to implement U.S. foreign policy. JA69-70, 85; *see South Carolina*, 720 F.3d at 533 ("[T]he likelihood of chaos resulting from [a State] enforcing its separate immigration regime is apparent.").

**2.** In response Oklahoma largely rehashes its mistaken merits arguments. *See* Br. 47-48. In contrast to the significant harms the United States would face if Oklahoma enforced HB 4156, Oklahoma would not face significant harm from an injunction that merely maintains the status quo that has been in place for nearly 150 years. *See* JA202-04 (holding that public interest and balance of harms favors federal government). Oklahoma has no legitimate state interest in intruding upon federal immigration enforcement. Finally, because HB 4156 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico and other nations, *see* JA73-76, reversing the district court's injunction could worsen

irregular migration, not improve it. Oklahoma, therefore, cannot show harm from the injunction.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY
LEIF OVERVOLD

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

November 2024

## REQUEST FOR ORAL ARGUMENT

The United States believes that oral argument would be of assistance to this Court, and respectfully requests oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,608 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

No privacy redactions are required in this brief. *See* Fed. R. App. P. 25(a)(5); 10th Cir. R. 25.5. This document was scanned with antivirus software prior to filing.

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi

**ADDENDUM**

# TABLE OF CONTENTS

Okla. Stat. tit. 21, § 1795......................................................................................... A1

**Okla. Stat. tit. 21, § 1795**

**§ 1795. Impermissible occupation**

**A.** As used in this section, the term "alien" means any person not a citizen or national of the United States.

**B.** A person commits an impermissible occupation if the person is an alien and willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States.

**C.**

    **1.** Any person found to have committed an impermissible occupation pursuant to the provisions of subsection B of this section and who enters this state without having obtained the legal authorization to enter the United States shall, upon conviction, be guilty of a misdemeanor punishable by imprisonment in the county jail for a term of not more than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment. In addition, the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later.

    **2.** Any second or subsequent offense for an impermissible occupation pursuant to the provisions of subsection B of this section, or any such offense committed during the commission of any other crime shall, upon conviction, be guilty of a felony punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment. In addition, the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later.

**D.** Any alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter enters, attempts to enter, or is at any time found in Oklahoma shall, upon conviction, be guilty of a felony and shall be punished in accordance with the provisions set forth in paragraph 2 of subsection C of this section, unless:

    **1.** Prior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission; or

**2.** With respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent under this section or any prior statute.

**E.** The arresting law enforcement agency shall collect all available identifying information of the person including all fingerprints and any other applicable photographic and biometric data to identify the person. Once obtained, the law enforcement agency shall cross-reference the collected information with:

**1.** All relevant local, state, and federal criminal databases; and

**2.** Federal lists or classifications used to identify a person as a threat or potential threat to national security.

The Oklahoma State Bureau of Investigation shall have the authority to collect and maintain the identifying information collected by law enforcement agencies pursuant to the provisions of this subsection.

**F.** It shall be an affirmative defense to prosecution under the provisions of paragraphs 1 and 2 of subsection C of this section that:

**1.** The federal government has granted the defendant:

**a.** lawful presence in the United States, or

**b.** asylum under Section 1158 of Title 8 of the United States Code; or

**2.** The defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021.

**G.** Any person convicted of an offense pursuant to the provisions of this section shall not be eligible for probation or delayed sentencing.

**H.** The Legislature finds that the presence of persons who are unauthorized to be present within the State of Oklahoma is a matter of statewide concern. Therefore, the Legislature hereby occupies and preempts the entire field of legislation in this state regarding the presence of persons who have entered and remained in this state without first having obtained the legal authorization to do so. Any municipality or other political subdivision of this state shall be prohibited from adopting any ordinance, regulation, resolution, rule, or policy that conflicts with the provisions of this act.