No. 24-06144

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA, ET AL.
*Plaintiff-Appellee,*

v.

STATE OF OKLAHOMA, ET AL.
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Western District of Oklahoma, Case No. 5:24-cv-00511-J

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

## ORAL ARGUMENT IS REQUESTED

Nicholas Espíritu
Tanya Broder
National Immigration Law Center
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
T: (213) 639-3900
F: (213) 639-3911
*espiritu@nilc.org*
*broder@nilc.org*

Megan Lambert
Devraat Awasthi
American Civil Liberties Union of
Oklahoma Foundation
P.O. Box 13327

Noor Zafar
Wafa Junaid
Omar Jadwat
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
*nzafar@aclu.org*
*wjunaid@aclu.org*
*ojadwat@aclu.org*

Spencer Amdur
Oscar Sarabia Roman
Cody Wofsy

Oklahoma City, OK 73113
T: (405) 525-3831
*mlambert@acluok.org*
*dawasthi@acluok.org*

American Civil Liberties Union
Foundation, Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*


*Attorneys for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Tenth Circuit Rule 26.1A, Intervenor-Appellee Padres Unidos de Tulsa states that it has no parent corporation and that no publicly held corporation owns more than ten percent of its stock.

*/s/ Noor Zafar*
Noor Zafar
November 19, 2024

## TABLE OF CONTENTS

**STATEMENT OF ISSUES** ........................................................................1

**INTRODUCTION**..................................................................................1

**STATEMENT OF THE CASE** ...............................................................3

   **I.   CONGRESS'S PERVASIVE REGULATION OF IMMIGRATION** .....3

   **II.  H.B. 4156 REGULATES ENTRY AND BANISHES CERTAIN NONCITIZENS FROM OKLAHOMA** .......................................................6

   **III.  PARTIES AND PROCEDURAL HISTORY**………………………………7

**SUMMARY OF THE ARGUMENT** ...................................................10

**ARGUMENT** .......................................................................................13

   **I.   STANDARD OF REVIEW** .......................................................13

   **II.  PRIVATE PLAINTIFFS ARE PROPER PARTIES TO THE APPEAL AND HAVE STANDING AND A CAUSE OF ACTION** ..............................13

   **III.  PRIVATE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**...................................................................................................20

     **A.  H.B. 4156 Is Preempted** ........................................................ 20

       **1.  H.B. 4156 Intrudes on the Exclusively Federal Field of Entry**……21

       **2.  H.B. 4156 Creates an Unlawful Scheme of State Expulsion**…..…32

       **3.  H.B. 4156 Conflicts with Federal Immigration Law**………..…..35

       **4.  Oklahoma's Invasion Defense is Meritless**……………………....…45

     **B.  H.B. 4156 Violates the Commerce Clause**............................. 47

**IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES** ............................................................50

   **A.  H.B. 4156 Will Irreparably Harm Private Plaintiffs** ...........................50

   **B.  The Balance of Equities and Public Interest Support an Injunction** ..52

   **C.  Facial Relief is Appropriate** ...................................................54

**CONCLUSION** ............................................................................55

**STATEMENT REGARDING ORAL ARGUMENT** ........................................55

**CERTIFICATE OF COMPLIANCE** ....................................................56

**CERTIFICATE OF DIGITAL SUBMISSION** ..........................................57

**CERTIFICATE OF SERVICE** ...........................................................57

## TABLE OF AUTHORITIES

**Cases**

*Aptive Environmental, LLC v. Town of Castle Rock, Colorado*,
  959 F.3d 961 (10th Cir. May 15, 2020)..................................................17

*Arizona v. United States*,
  567 U.S. 387 (2012) ....................................3, 5, 21-28, 33, 35-44, 47, 53

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015) ............................................................................19

*Biden v. Texas*,
  597 U.S. 785 (2022) ......................................................................5, 41

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011)............................................................................29

*Chamber of Com. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010)...................................................... 13, 20

*Chy Lung v. Freeman*,
  92 U.S. 275 (1875) ................................................................ 22, 23, 41

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978) ............................................................................48

*Consumer Data Indus. Ass'n v. King*,
  678 F.3d 898 (10th Cir. 2012).............................................................16

*De Canas v. Bica*,
  424 U.S. 351 (1976) .............................................................. 22, 23, 29

*Dennis v. Higgins*,
  498 U.S. 439 (1991) ............................................................................20

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008) ............................................................................48

*Edwards v. California*,
  314 U.S. 160 (1941) ............................................................... 48, 49, 50

*Evans v. Utah*,
  21 F. Supp. 3d 1192 (D. Utah 2014) ..................................................51

*Ex parte Young*,
  209 U.S. 123 (1908) ..................................................................19

*Farmers Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
  726 F.3d 524 (5th Cir. 2013) ............................................. 18, 43, 44, 45

*Farmworker Ass'n of Fla., Inc. v. Moody*,
  No. 23-CV-22655, 2024 WL 2310150 (S.D. Fla. May 22, 2024) ......................51

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893) ..................................................................23

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................. 16, 17

*Frank v. Lee*,
  84 F.4th 1119 (10th Cir. 2023)........................................................20

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
  916 F.3d 792 (10th Cir. 2019)........................................................13

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
  691 F.3d 1250 (11th Cir. 2012) ("*GLAHR*")........................................ 21, 35, 51

*Galvan v. Press*,
  347 U.S. 522 (1954) ..................................................................22

*Gen. Motors Corp. v. Urb. Gorilla*,
  LLC, 500 F.3d 1222 (10th Cir. 2007) ..................................................13

*Griess v. Colorado*,
  841 F.2d 1042 (10th Cir.1988)........................................................47

*Heartland Acad. Cmty. Church v. Waddle*,
    335 F.3d 684 (8th Cir. 2003) ..................................................................51

*Hines v. Davidowitz*,
    30 F. Supp. 470 (1939) .........................................................................31

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ............................................... 17, 22, 23, 27, 31, 43

*Initiative & Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) ............................................................16

*INS v. Yueh-Shaio Yang*,
    519 U.S. 26 (1996) ................................................................................5

*Jama v. ICE*,
    543 U.S. 335 (2005) .............................................................................23

*Kane Cnty v. United States*,
    928 F.3d 877 (10th Cir. 2019) .............................................................15

*Kane Cnty., Utah v. United States*,
    94 F.4th 1017 (10th Cir. 2024) ............................................................14

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ................................................................. 29, 30, 41

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) .............................................................................15

*Lozano v. City of Hazleton*,
    724 F.3d 297 (3d Cir. 2013) ........................................................ 24, 32

*Make the Rd. N.Y. v. Pompeo*,
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) .................................................54

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) .........................................................................17

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ...................................................................17

*Nishimura Ekiu v. United States*,
    142 U.S. 651 (1892) ...................................................................22

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................52

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ...................................................53

*Ore. Waste Sys., Inc. v. Dep't of Env't Quality of Ore.*,
    511 U.S. 93 (1994) ................................................................ 48, 50

*Padres Unidos de Tulsa v. Drummond*,
    5:24-cv-00526-J (W.D. Okla. 2024) ...................... 8, 16, 18, 40, 50, 51

*Plyler v. Doe*,
    457 U.S. 202 (1982) ...................................................................30

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ...................................................................38

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1990) ...................................................................21

*Roe No. 2 v. Ogden*,
    253 F.3d 1225 (10th Cir. 2001) ...................................................20

*Safe Streets All. v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) .....................................................19

*Speech First, Inc. v. Shrum*,
    92 F.4th 947 (10th Cir. 2024) ......................................................20

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...................................................................16

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ......................................................................22

*Texas v. United States*,
  805 F.3d 653 (5th Cir. 2015)...........................................................15

*Toll v. Moreno*,
  458 U.S. 1 (1982) ...........................................................................23

*Town of Castle Rock, Colorado v. Gonzales*,
  545 U.S. 748 (2005) ........................................................................38

*Town of Chester v. Laroe Estates, Inc.*,
  581 U.S. 433 (2017) ........................................................................15

*Trans World Airlines, Inc. v. Mattox*,
  897 F.2d 773 (5th Cir. 1990) ...........................................................52

*Trbovich v. United Mine Workers of Am.*,
  404 U.S. 528 (1972) ........................................................................18

*Truax v. Raich*,
  239 U.S. 33 (1915) .............................................................. 22, 32, 42

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012)............................. 32, 33, 34, 35, 52, 53

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ........................................................................23

*United States v. Guest*,
  383 U.S. 745 (1966) ........................................................................48

*United States v. Hardman*,
  297 F.3d 1116 (10th Cir. 2002).................................................. 13, 19

*United States v. Texas*,
  |144 S. Ct. 797 (2024)......................................................................46

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................................38

*United States v. Texas*,
    719 F. Supp. 3d 640 (W.D. Tex. 2024) ...................................... 46, 54

*United States v. Texas*,
    97 F.4th 268 (5th Cir. 2024)...........5, 18, 19, 21, 23-27, 29, 32, 37, 39, 42, 43, 46

*US Airways, Inc. v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) ........................................................31

*Utah Ass'n of Ctys. v. Clinton*,
    255 F.3d 1246 (10th Cir. 2001) ........................................................14

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ................................................... 18, 51

**Constitutional Provisions**

Commerce Clause. U.S. Const. art. I, § 8, cl. 3 ......................................48

**Statutes**

18 U.S.C. § 758 ...................................................................................26

8 U.S.C. § 1101 .....................................................................................3

8 U.S.C. § 1101(a)(15)(T)......................................................................4

8 U.S.C. § 1101(a)(15)(T)(i)..................................................................26

8 U.S.C. § 1101(a)(15)(U) .....................................................................4

8 U.S.C. § 1101(a)(15)(U)(iii) ...............................................................26

8 U.S.C. § 1101(a)(27)(J) .......................................................................5

8 U.S.C. § 1151-1382.............................................................................3

8 U.S.C. § 1153 ................................................................................................24

8 U.S.C. § 1158 ............................................................................................4, 33

8 U.S.C. § 1158(d)(2) .....................................................................................34

8 U.S.C. §§ 1181-82 .........................................................................................3

8 U.S.C. § 1182(a) ............................................................................................4

8 U.S.C. § 1182(a)(2)(C) .................................................................................47

8 U.S.C. § 1182(a)(2)(H) .................................................................................47

8 U.S.C. § 1182(a)(3) .......................................................................................47

8 U.S.C. § 1182(a)(9)(A) ...................................................................................4

8 U.S.C. § 1182(a)(9)(C) ...................................................................................4

8 U.S.C. § 1182(d)(5)(A) .................................................................................24

8 U.S.C. § 1184 ...............................................................................................24

8 U.S.C. § 1188 .................................................................................................3

8 U.S.C. §§ 1223-25 ..........................................................................................3

8 U.S.C. § 1225 ......................................................................................... 24, 33

8 U.S.C. § 1225(b) .......................................................................................4, 24

8 U.S.C. § 1225(b)(1) ......................................................................................39

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................................34

8 U.S.C. § 1226(a)-(c) .....................................................................................24

8 U.S.C. § 1227 .................................................................................................4

8 U.S.C. § 1229 ..................................................................................................4, 33

8 U.S.C. § 1229(a)(1)(F)(i) ......................................................................................35

8 U.S.C. § 1229a ........................................................................................ 24, 33, 39

8 U.S.C. § 1229a(a)(3) .............................................................................................4

8 U.S.C. § 1229b(b) ..................................................................................................4

8 U.S.C. § 1229b(b)(1) ............................................................................................40

8 U.S.C. §§ 1231(a)-(b) ............................................................................................4

8 U.S.C. § 1231(a)(1)(A) ........................................................................................34

8 U.S.C. § 1231(b) ....................................................................................................4

8 U.S.C. § 1231(b)(3) ..............................................................................................33

8 U.S.C. § 1231(b)(3)(A) ..........................................................................................4

8 U.S.C. § 1254a ....................................................................................................4, 5

8 U.S.C. § 1323 ......................................................................................................24

8 U.S.C. § 1324 ......................................................................................................24

8 U.S.C. § 1325 .......................................................................................... 4, 24, 38

8 U.S.C. § 1325(a) ..................................................................................................38

8 U.S.C. § 1326 .......................................................................................... 4, 24, 38

8 U.S.C. § 1326(a) ..................................................................................................38

8 U.S.C. § 1327 ......................................................................................................24

8 U.S.C. § 1328 ......................................................................................................24

8 U.S.C. § 1329 ................................................................................24

8 U.S.C. § 1357(g)(1)-(10) ..............................................................26

8 U.S.C. § 1357(g)(10)(A)................................................................28

8 U.S.C. § 1357(g)(10)(B)................................................................28

18 U.S.C. § 1590 ..............................................................................26

22 U.S.C. § 7105(c)(3)(C)(i)............................................................26

42 U.S.C. § 1983 ..............................................................................20

Ariz. Rev. Stat. Ann. § 13-1509(A), (F) (2010) ........................ 25, 27

Okla. Stat. Ann. tit. 21, § 1795 (H.B. 4156) ....6, 7, 16, 25, 31, 33, 34, 43-45, 49, 52

**Other Authorities**

David Bier*, Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022), https://perma.cc/8RTW-MENH ...............53

KOKH Staff,
   *Oklahoma Association of Chiefs of Police Release Joint Statement on HB 4156*, OKC Fox 25 (May 14, 2024), https://perma.cc/PR5E-L4F6. .............................54

Statement of Brian Sulc, Executive Director, Transnational Organized Crime Mission Center, Office of Intelligence and Analysis, Department of Homeland Security (May 18, 2022), https://perma.cc/76WQ-4YTU....................................53

U.S. Sent'g Comm'n, *Quick Facts: Fentanyl Trafficking Offenses* (2022), https://perma.cc/XDY9-S49M................................................................................53

**Regulations**

8 C.F.R. § 208.7 ..............................................................................34

**RELATED CASES**

There are no prior or related appeals.

**STATEMENT OF ISSUES**

1. Whether the motions panel's grant of intervention should be reversed, where Private Plaintiffs were parties to the consolidated case below, request the same relief as the United States, and the State has asserted no prejudice or delay; whether as intervenors seeking the same relief Private Plaintiffs must show standing and a cause of action; and, if so, whether they have done so.

2. Whether H.B. 4156 is preempted, where 150 years of Supreme Court precedent prohibits states from regulating entry and presence, and where H.B. 4156 conflicts with multiple aspects of Congress's entry scheme.

3. Whether H.B. 4156 violates the Commerce Clause by restricting the movement of certain noncitizens at Oklahoma's borders.

4. Whether the district court acted within its discretion when it determined the remaining equitable factors favor an injunction.

**INTRODUCTION**

Oklahoma asks this Court to disregard more than 150 years of bedrock Supreme Court precedent establishing that the regulation of noncitizen entry and presence is a quintessentially federal field. The district court correctly rejected this

argument and held that H.B. 4156 is field and conflict preempted. This Court should affirm.

H.B. 4156 allows Oklahoma to arrest, prosecute, detain, and banish from the State large categories of noncitizens. It intrudes on Congress's comprehensive statutory scheme governing noncitizen entry and presence and contradicts a fundamental teaching of *Arizona*: In a preempted field, even complementary legislation is prohibited. H.B. 4156 also conflicts with federal law by empowering state officials to unilaterally prosecute entry and reentry violations, overriding federal discretion regarding the enforcement of immigration law, and interfering with foreign relations. And, it violates the federal government's authority over interstate commerce by expelling certain immigrants from the State.

Unable to muster any case law to support its usurpation of federal immigration power, Oklahoma first offers strained interpretations of *Arizona* that either defy commonsense or that *Arizona* itself rejected. Oklahoma then asks this Court to overrule *Arizona* altogether—which, of course, this Court may not do—and resorts to dissenting opinions to make its case. And in a final desperate attempt to save H.B. 4156, Oklahoma asks this Court to bless its invocation of the State War Clause to flout federal law and set up a state immigration system—a limitless vision of state supremacy that no court has ever accepted.

Oklahoma's threshold arguments fare no better. It offers *no* reason for this Court to reject the motions panel's grant of intervention, which was correct as a matter of law and common sense. Oklahoma vaguely contests standing and cause of action. But as intervenors, Individual plaintiffs and Padres Unidos members need not establish independent standing and a cause of action. And in any case, they have standing because they are arguably subject to prosecution under the plain text of H.B. 4156. They also have an equitable cause of action under a straightforward application of *Ex parte Young*.

Finally, the equities favor an injunction. Plaintiffs face irreparable harm, including separation from family and banishment from the State, whereas Oklahoma has no cognizable interest in enforcing a preempted law. H.B. 4156 is patently unconstitutional, and this Court should uphold the district court's injunction.

## STATEMENT OF THE CASE

### I.   CONGRESS'S PERVASIVE REGULATION OF IMMIGRATION

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a comprehensive system governing entry, removal, and authorization to remain in the United States. *See generally* 8 U.S.C. §§ 1101, 1151-1382. Congress

3

has specifically identified categories of noncitizens who may enter the United States, *see*, *e.g.*, 8 U.S.C. §§ 1181-82, 1188, and how they may enter, *see*, *e.g.*, 8 U.S.C. §§ 1223-25. These federal laws govern the grounds for removal, requirements for commencing or administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See, e.g.*, 8 U.S.C. §§ 1229, 1231(b). Proceedings under the INA are "the sole and exclusive procedure" for issuing removal orders. *Id.* § 1229a(a)(3).

Through this statutory framework, Congress delegated authority to federal agencies to administer and enforce the intricate system of laws governing entry. For those entering without authorization, Congress has provided officers with a range of enforcement tools, including civil and criminal penalties for unlawful entry and reentry, 8 U.S.C. §§ 1325, 1326, 1182(a)(9)(A), (C), as well as an array of different removal procedures, 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229, 1231(a)-(b).

Congress has also provided numerous protections for noncitizens who entered without authorization, such as the opportunity to seek asylum, withholding of removal, cancellation of removal, and protections under programs like Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS). 8 U.S.C. §§ 1158, 1231(b)(3)(A), 1229b(b), 1254a. Noncitizens who have entered

4

without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, *id*. § 1101(a)(15)(U), 1101(a)(15)(T); Temporary Protected Status, *id*. § 1254a; and classification as a Special Immigrant Juvenile for noncitizens under 21 years of age, *id*. § 1101(a)(27)(J). The federal government retains exclusive authority over determining whether an individual qualifies for these forms of relief.

Federal discretion is essential to Congress's complex entry and removal scheme. As the Supreme Court has emphasized, a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Federal officials "decide whether it makes sense to pursue removal at all." *Id.* Federal officials choose among the several removal processes Congress established. *See Biden v. Texas*, 597 U.S. 785, 792 (2022). Federal officials decide whether to deploy the associated criminal immigration charges. *See United States v. Texas*, 97 F.4th 268, 281 (5th Cir. 2024). And federal officials decide whether to extend immigration relief to noncitizens despite an unlawful entry. *See, e.g., INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996). Federal officers can thus decide which tools to deploy and how, taking into account various federal policy objectives, including family unity, humanitarian concerns, and the protection of national security.

By contrast, under "the system Congress created," state officers may assist federal efforts in certain "limited circumstances," but only "subject to the [federal government's] direction and supervision." *Arizona*, 567 U.S. at 408-09.

## II. H.B. 4156 REGULATES ENTRY AND BANISHES CERTAIN NONCITIZENS FROM OKLAHOMA

H.B. 4156 significantly disrupts this intricate and exclusively federal system. It establishes two new state crimes that criminalize irregular entry and reentry, and authorizes banishment from Oklahoma, without any involvement or oversight from federal authorities.

H.B. 4156's first provision criminalizes entry into the United States. It creates a new state crime of "impermissible occupation," which is defined as a noncitizen "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States." H.B. 4156, § 2(B) (codified at Okla. Stat. Ann. tit. 21, § 1795(B)). A violation of this provision is a misdemeanor, punishable by imprisonment for up to one year or a fine of up to $500. *Id*. § 2(C)(1). Subsequent violations are felonies punishable by up to two years imprisonment in state prison. *Id*. § 2(C)(2).

H.B. 4156 recognizes limited affirmative defenses to "impermissible occupation," such as when the federal government has "granted" the noncitizen "lawful presence," "asylum," or "benefits under the federal Deferred Action for Childhood Arrivals program." *Id.* § 2(F). The law provides no protection for

6

noncitizens whose applications for relief are pending or whose legal status is still under review by federal immigration authorities. This means that individuals lawfully residing in the United States under federal law, but not yet granted formal status, may be prosecuted and forced to leave the state under H.B. 4156.

The second provision of H.B. 4156 criminalizes re-entry into the United States. It applies to individuals who enter, attempt to enter, or are present in Oklahoma after a previous denial of admission, exclusion, deportation, or removal from the United States, or any departure under a removal order. H.B. 4156 § 2(D). The statute provides exceptions for those who obtained federal consent to reenter before their arrival, or who can show consent was not required; it provides no affirmative defenses based on legal status or protection the federal government has granted since the person entered the United States. A violation of this provision is a felony, with penalties of up to two years in prison and a fine of up to $1,000.

After a conviction under either provision, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." H.B. 4156 §§ 2(C)(1), (2); *see also id.* § 2(D).

## III.    PARTIES AND PROCEDURAL HISTORY

This appeal arises from two parallel challenges to H.B. 4156 that were consolidated in district court. One of the suits was brought by the United States,

and the other by Padres Unidos de Tulsa and a group of individuals—collectively the "Private Plaintiffs."

Plaintiff Padres Unidos de Tulsa is a membership-based advocacy organization in Tulsa, Oklahoma, comprised of students, parents, and teachers who advocate for equal access to education for Latine and immigrant families in local schools. Padres Unidos members, such as M.A., are directly impacted by H.B. 4156. Declaration of Michelle Lara, *Padres Unidos de Tulsa v. Drummond*, 5:24-cv-00526-J (W.D. Okla. 2024), Dkt. 15-5, ¶¶ 3-13; Declaration of M.A., Dkt. 15-6, ¶¶ 7-12.

Plaintiff Ximena Monserrat Lopez Mena is a 20-year-old Mexican national who was brought to the United States as a baby and has lived in Oklahoma since. Despite applying for DACA in 2016 and 2020, she remains undocumented. Declaration of Ximena Monserrat Lopez Mena, 5:24-cv-00526-J, Dkt. 15-1, ¶¶ 2-11.

Plaintiff Jordy Madrigal Martinez is a 30-year-old Nicaraguan national who lives in Oklahoma City. He entered the U.S. in 2018 and is seeking asylum while awaiting adjudication of his green card application. Declaration of Jordy Madrigal Martinez, 5:24-cv-00526-J, Dkt. 15-2, ¶¶ 2-11.

Plaintiff Antonio Marquez is a 50-year-old Mexican national living in Oklahoma City with his wife, stepdaughter, and granddaughter. After a prior

removal, he reentered the U.S. in 2010. He is currently in removal proceedings, but has an approved petition for an immigrant visa and a pending application for cancellation of removal relief. Declaration of Antonio Marquez, 5:24-cv-00526-J, Dkt. 15-3, ¶¶ 2-12.

Plaintiff Rene Doroteo Hernandez is a 31-year-old national of Mexico residing in Oklahoma City with his wife and daughters. He entered the U.S. without inspection in 2009. His I-130 petition and application for parole in place are pending. Declaration of Rene Doroteo Hernandez, 5:24-cv-00526-J, Dkt. 15-4, ¶¶ 2-9.

Defendants in the Private Plaintiffs' suit are Gentner Drummond in his official capacity as the Attorney General of the State of Oklahoma, Tim Tipton in his official capacity as the Commissioner of Public Safety for the Oklahoma Department of Public Safety ("DPS"), and Vicki Behenna and Steve Kunzweiler in their official capacities as the District Attorneys of Oklahoma and Tulsa Counties, respectively.

Both the United States and the Private Plaintiffs sought a preliminary injunction. The district court granted the United States' motion for a preliminary injunction, enjoining enforcement of H.B. 4156. The district court held the law was field and conflict preempted, noting that "Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for

9

supplementary state legislation." J.A. 190. The court further explained that the

Supreme Court's reasoning in *Arizona* applied with even "greater force" to H.B.

4156, which "would grant state officials broad power to unilaterally arrest,

prosecute, and punish noncitizens for immigration offenses" absent any request or

instruction from the Federal Government. J.A. 199. Because it had already

enjoined the law pursuant to the federal government's request, the district court

denied the Padres Unidos plaintiffs' motion for the same preliminary relief as

moot. J.A. 014 at Dkt. 40.

Oklahoma filed a timely appeal on July 17, 2024. J.A. 205. While the

Private Plaintiffs were designated as plaintiffs-appellees, Dkt. 33, the district

court's disposition of the two preliminary injunction motions led the Private

Plaintiffs to seek intervention if necessary to ensure they could continue to

participate in this litigation as parties. The State offered no practical reason to deny

intervention other than the effort that was required to respond to the intervention

motion. A motions panel of this Court provisionally granted intervention "to the

extent it is necessary." Dkt. 40 at 2.

## SUMMARY OF THE ARGUMENT

The district court correctly enjoined H.B. 4156 as a preempted regulation of

noncitizen entry and presence.

10

As an initial matter, Private Plaintiffs are proper parties to this appeal. A panel of this Court has granted them provisional intervention, and Oklahoma offers *no* argument for revisiting that ruling. Moreover, common sense supports intervention here, as Private Plaintiffs were parties to the consolidated action below, sought relief intertwined with the injunction the district court issued, and raise nearly identical claims as the United States. Nor is standing a barrier to their participation. As intervenors seeking no additional relief, Private Plaintiffs need not establish independent standing. But even if they were required to, their standing is clear: Individual plaintiffs and Padres Unidos member M.A. are subject to arrest, prosecution, and banishment under the plain text of H.B. 4156. And, while Plaintiffs do not need an independent cause of action as intervenors, they nonetheless satisfy that requirement as well because they have an equitable cause of action under *Ex parte Young*.

On the merits, H.B. 4156 is both field and conflict preempted. Over 150 years of Supreme Court precedent establishes that the regulation of entry and presence is an *exclusively* federal field. *Arizona* reaffirms that states cannot enforce their own parallel immigration regimes and makes clear that even complementary state regulation in a preempted field is prohibited. The State is incorrect to assert that H.B. 4156 does not regulate entry to the United States: the key elements of the crimes are linked to entry into the country and, in any event, even indirect

11

regulations of noncitizens' entry and presence are preempted. H.B. 4156's banishment provision further heightens its illegality because it authorizes expulsions of noncitizens from Oklahoma.

H.B. 4156 is also conflict preempted because it authorizes state officials to unilaterally prosecute entry and reentry violations, in direct contradiction of *Arizona*; undermines federal discretion to consider a broad range of interests—including foreign affairs and humanitarian concerns—when engaging in immigration enforcement; and empowers state officials to make complex determinations about immigration status. Oklahoma's invocation of the State War Clause is meritless, and no court has ever held that it allows states to set up their own immigration systems.

In addition to being preempted, H.B. 4156 also violates the Commerce Clause because it bans noncitizens who irregularly entered the United States from the State of Oklahoma and expels those convicted under the statute from the State.

Finally, the district court acted well within its discretion in weighing the balance of equities and public interest. H.B. 4156 will irreparably harm Private Plaintiffs, who face prosecution and banishment from the State and separation from their loved ones. Oklahoma faces no comparable harm—indeed, it has no cognizable interest in wresting control over immigration away from the federal government.

**ARGUMENT**

## I.    STANDARD OF REVIEW

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urb. Gorilla*, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). This Court reviews a district court's grant of a preliminary injunction for abuse of discretion. *See Chamber of Com. v. Edmondson*, 594 F.3d 742, 764 (10th Cir. 2010). Conclusions of law are reviewed *de novo*, and factual findings for clear error. *See Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019).

## II.    PRIVATE PLAINTIFFS ARE PROPER PARTIES TO THE APPEAL AND HAVE STANDING AND A CAUSE OF ACTION

As a threshold matter, the State half-heartedly asks the Court to revisit its permission for the Private Plaintiffs to intervene in this appeal. Yet it offers effectively *no* argument at all in support. *See* Br. 16 (background section, simply asserting intervention should be denied); *id*. at 23 n.13 (noting its opposition to intervention without argument). The motions panel of this Court provided that its intervention order was "subject to reconsideration" by the merits panel. Dkt. 40 at 2. But "[a]rguments raised in a perfunctory manner, such as in a footnote, are

13

waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc). By failing to make any developed argument for reconsideration, the State has waived its argument against the Private Plaintiffs' continuing participation in the appeal. *Id*.

In any event, common sense strongly supports intervention. Private Plaintiffs were parties to the consolidated action below, raise nearly identical claims as the United States, and offer a unique perspective on the impact of H.B. 4156 on noncitizens in Oklahoma. Moreover, and critically, they sought the same relief as the injunction at issue here, and were denied that relief *only* because a second order was unnecessary in light of this injunction. These circumstances—consistent with the Court's designation of Private Plaintiffs as appellees, Dkt. 40—represent an ample basis for permissive intervention. *See, e.g., Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1250 (10th Cir. 2001) (federal courts should allow intervention "where no one would be hurt and greater justice could be attained") (citation omitted); *Kane Cnty., Utah v. United States*, 94 F.4th 1017, 1033-34 (10th Cir. 2024) (noting this Court's "relaxed intervention requirements in cases raising significant public interests").

In originally opposing intervention, the State's only concrete complaint was that it had "expended time and resources in responding to the" intervention motion. Dkt. 35 at 11. That was never relevant to whether to *grant* intervention, but in any

14

event it certainly is not a reason to *now* reconsider intervention. And at this point, the closest the State comes to offering any reason to undo the prior intervention order is a parenthetical aside suggesting that intervention is "improper" because the Private Plaintiffs lack standing. Br. 18. But that is wrong on multiple levels.

First, an intervenor need not independently establish standing if it seeks the same relief as one of the parties. *See, e.g., Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (intervenor need only "independently demonstrate Article III standing if it pursues relief that is *broader than or different* from the party invoking a court's jurisdiction") (emphasis added); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017) (same). In this appeal, the only relief Private Plaintiffs seek is affirmance of the preliminary injunction—the same as the United States seeks. *Little Sisters*, 591 U.S. at 674 n.6 (no standing required where both intervenor and federal government sought to dissolve injunction on appeal); *Kane Cnty v. United States*, 928 F.3d 877, 886 (10th Cir. 2019) (holding that nonprofit intervenor could invoke United States' standing where it was pursuing same relief).

Second, even if standing were required, Plaintiffs have demonstrated it. As individuals who would be subject to arrest, prosecution, and banishment under H.B. 4156, Private Plaintiffs have a "concrete, personalized interest" in the outcome of this case. *Texas v. United States*, 805 F.3d 653, 660 (5th Cir. 2015)

15

(granting intervention by regulated parties eligible for DAPA with interest in avoiding deportation and familial harms if program were enjoined). They are noncitizens who have "enter[ed] and remain[ed] in the State of Oklahoma without having first obtained legal authorization to enter the United States." H.B. 4156 § 2(B); *see Padres Unidos*, 5:24-cv-00526-J, Lopez Mena Decl., Dkt. 15-1, ¶¶ 6-8, 10-12; Martinez Decl., Dkt. 15-2, ¶¶ 3, 5-6, 10-13; Marquez Decl., Dkt. 15-3, ¶¶ 4, 9-10, 12-14; Hernandez Decl., Dkt. 15-4, ¶¶ 5, 8-10; M.A. Decl., Dkt. 15-6, ¶¶ 4, 8-10.[1] And while Defendants vaguely suggest that some plaintiffs may be immune from prosecution, *see* Br. 26, none of H.B. 4156's affirmative defenses are available to them. § 2(F). Thus, Private Plaintiffs have engaged in conduct that is "arguably proscribed by the statute they wish to challenge," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (cleaned up), and they are "among the direct targets of" H.B. 4156. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006).

Nor are Private Plaintiffs' injuries "speculative." Br. 23-24. There "are no doubts" that "the challenged provision will be enforced against them." *Initiative & Referendum Inst.*, 450 F.3d at 1097. "[T]he existence of the statute implies the

---

[1] Oklahoma challenges Padres Unidos' "direct standing," but the organization only asserts standing on behalf of its members (i.e. associational standing), not organizational standing based on its own injuries. Br. 25. The Supreme Court's decision in *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) is thus inapplicable.

threat of its enforcement" and Plaintiffs are "entitled to bring a pre-enforcement challenge based on the probability of future injury." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (cleaned up); *see also Aptive Environmental, LLC v. Town of Castle Rock, Colorado,* 959 F.3d 961, 975 (10th Cir. May 15, 2020) (finding standing where plaintiff has "in the past" engaged in proscribed conduct and demonstrated a "present desire" to do so).[2]

Oklahoma next argues that Private Plaintiffs cannot have standing to challenge H.B. 4156 because they are "in Oklahoma unlawfully under federal law" and therefore they have no "legally protected" interest in this case. Br. 25. Not so. Plaintiffs have a significant legally protected interest in not being arrested, imprisoned, and banished from the State of Oklahoma by a state entity that lacks the constitutional power to engage in such action against them. *See Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (explaining that preemption represents a legally protected "federal right to be free from" impermissible state regulation). Even if individual plaintiffs were "unlawfully" in the country under federal law, Br. 25, that would not defeat their standing to challenge a *state* prosecution under a law

---

[2] Contrary to Oklahoma's suggestion, *Murthy v. Missouri*, 144 S. Ct. 1972 (2024) and *All. for Hippocratic Med.*, 602 U.S. 367, do not change the Court's standing analysis here. *Cf.* Br. 24. Both cases involved "speculation" about how the actions of third parties not before the court would impact plaintiffs' standing. *All. for Hippocratic Med.*, 602 U.S. at 383; *Murthy*, 144 S.Ct. at 1993. By contrast, Private Plaintiffs are the direct targets of the challenged regulation.

that is preempted. Indeed, Oklahoma's sweeping theory would eliminate standing
in any case that challenges parallel state prosecutions. *Cf. Hines v. Davidowitz*, 312
U.S. 52 (1941) (allowing suit by private plaintiff alleging that state noncitizen
registration law was preempted by federal scheme); *Valle del Sol Inc. v. Whiting*,
732 F.3d 1006, 1015 (9th Cir. 2013) (finding individual had standing to challenge
preempted state law criminalizing transporting and harboring of undocumented
individuals); *Farmers Villas at Parkside Partners v. City of Farmers Branch, Tex*.,
726 F.3d 524, 529 (5th Cir. 2013) (similar).

    In any event, any suggestion that plaintiffs are surreptitiously violating
federal law is simply false: The federal government is aware of each Plaintiff's
presence in the country, is considering applications for immigration relief from
several of them, and may choose what steps to take as provided in federal law. *See
Padres Unidos*, 5:24-cv-00526-J, Lopez Mena Decl., Dkt. 15-1, ¶¶ 10-11;
Martinez Decl., Dkt.15-2, ¶¶ 8-11; Marquez Decl., Dkt. 15-3, ¶¶ 10-12; Hernandez
Decl., Dkt. 15-4, ¶¶ 8-9; M.A. Decl., Dkt. 15-6, ¶ 10. There is nothing inequitable
about permitting them to challenge the State's attempt to seize control of that
decision.

    Relatedly, the State also argues in passing that Private Plaintiffs lack a cause
of action. Br. 26 n.14. Again, the Court need not address that question. The district
court correctly held that the United States can "bring an action in equity to enforce

18

federal supremacy." J.A. 186; *see Texas*, 97 F.4th at 277. Intervenors need no independent cause of action. *See Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 530-34 (1972). Even if that were not the case, the State has waived any argument about Private Plaintiffs' cause of action by raising the issue only in a cursory footnote. *Hardman*, 297 F.3d at 1131.

In any event, there is no real doubt that Private Plaintiffs may sue in equity under *Ex parte Young*, 209 U.S. 123 (1908). *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) (reaffirming such traditional "power of federal courts of equity"). Even advocates for the narrowing of *Ex parte Young* acknowledge that those who are directly subject to prosecution may sue to enjoin preempted state laws. *See Texas*, 97 F.4th at 309-10 (5th Cir. 2024) (Oldham, J., dissenting) (recognizing availability of a suit in equity under *Ex parte Young* for those "directly affected by the regulations they sought to enjoin"). Likewise, this Court has reaffirmed that a "court may issue an injunction upon finding the state regulatory actions preempted," "if an individual claims federal law immunizes him from state regulation." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 906 n.19 (10th Cir. 2017) (quoting *Armstrong*, 575 U.S. at 324, and *Ex parte Young*, 209 U.S. at 155-56) (emphasis omitted); *id*. at 892 n.5 (same).

Private Plaintiffs are in just that position. The individual plaintiffs and Padres Unidos members face prosecution under a state statute they maintain is

19

preempted by federal law.[3] That is the classic *Ex parte Young* situation. And the Private Plaintiffs clearly satisfy the other requirements of *Young*: They seek prospective relief against Defendants, who are state officers, and who have "a demonstrated willingness" to "enforce" H.B. 4156. *Frank v. Lee*, 84 F.4th 1119, 1132 (10th Cir. 2023) (citation omitted); *see also Edmondson*, 594 F.3d at 760 (holding that plaintiffs satisfied *Ex parte Young*'s exception in preenforcement preemption suit challenging state law regulating noncitizen employment).[4]

## III. PRIVATE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A. H.B. 4156 Is Preempted

The district court rightly held that H.B. 4156 is preempted under "long-standing" field and conflict preemption principles. J.A. 196. Nothing that Oklahoma offers on appeal can avoid the law's patently unlawful usurpation of federal authority over immigration.

---

[3] Padres Unidos stands in the shoes of its members, such as M.A., who are directly regulated. *See Edmondson*, 594 F.3d at 760 (chambers of commerce and trade associations could raise preemption claim under *Ex parte Young* on behalf of their members); *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1230, 1233-34 (10th Cir. 2001) (similar); *see also Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) (organization with members only identified through pseudonym can establish standing under "[l]ongstanding an well-established doctrine . . . that anonymous persons may have standing to bring claims").

[4] In addition, Private Plaintiffs' interstate commerce claim can be brought under 42 U.S.C. § 1983. *See Dennis v. Higgins*, 498 U.S. 439, 446, 451 (1991).

### 1.  H.B. 4156 Intrudes on the Exclusively Federal Field of Entry

Through H.B. 4156, Oklahoma has created a new state immigration system that regulates noncitizen entry and presence in the United States. In doing so, it has bypassed Congress's comprehensive statutory scheme and encroached on the federal government's exclusive power over noncitizens' entry and presence in the United States. Oklahoma's assertion that H.B. 4156 is valid because it merely tracks federal law ignores the well-settled principle that "states may not enter, *in any respect*, an area that the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402 (emphasis added). Noncitizen entry and presence is one such area, and the district court was correct to hold that H.B. 4156 is field preempted.

Field preemption may be inferred from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1990)). H.B. 4156 fails under both prongs.

The federal interest in noncitizen entry and presence is "overwhelmingly dominant." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("*GLAHR*"). "For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of

noncitizens—is *exclusively* a federal power." *Texas*, 97 F.4th at 278-79 & n.64;

*see, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws

which concern the admission of citizens and subjects of foreign nations to our

shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33,

42 (1915) ("The authority to control immigration—to admit or exclude aliens—is

vested solely in the Federal government."); *Hines*, 312 U.S. at 62 & n.10 (noting

the "continuous recognition by this Court" of "the supremacy of the national power

. . . over immigration . . ."); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410,

419 (1948) ("The Federal Government has broad constitutional powers in

determining what aliens shall be admitted to the United States, [and] the period

they may remain," and "the states are granted no such powers"); *De Canas v. Bica*,

424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably

exclusively a federal power."); *Arizona*, 567 U.S. at 409 ("Policies pertaining to

the entry of aliens and their right to remain here are entrusted exclusively to

Congress.") (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)) (cleaned up); J.A.

041-42 (collecting cases).

This dominant federal interest is "inherent in [the] sovereignty" of the

United States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659

(1892). That sovereign authority includes the power "to forbid the entrance of

foreigners within its dominions, or to admit them only in such cases and upon such

conditions as it may see fit to prescribe." *Id.*; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893); *Arizona*, 567 U.S. at 394-95. States, by contrast, are not endowed with "powers of external sovereignty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936) (citing *Fong Yue Ting*, 149 U.S. at 705).

Decisions about entry, presence, and expulsion are so closely entwined with foreign relations that they "must be made with one voice." *Arizona*, 567 U.S. at 409; *see Jama v. ICE*, 543 U.S. 335, 348 (2005). The Supreme Court has reiterated this again and again. *See, e.g., Chy Lung*, 92 U.S. at 279-280 (warning that state immigration regulation would allow "a single State . . . , at her pleasure, [to] embroil us in disastrous quarrels with other nations"); *Hines*, 312 U.S at 64 (emphasizing "the supremacy of the national power in the general field of foreign affairs, including power over immigration"); *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (tying the national government's immigration control to its authority "'to establish a uniform Rule of Naturalization,' its power 'to regulate Commerce with foreign Nations,' and its broad authority over foreign affairs") (cleaned up).

Consistent with this dominant federal interest, Congress, through the INA, has enacted a "comprehensive framework" governing the entry and presence of noncitizens. *Texas*, 97 F.4th at 283; J.A. 176. "The Act's 'central concern' is the 'entry and stay of aliens' in the United States." *Texas*, 97 F.4th at 280 (citing

23

*DeCanas*, 424 U.S. at 359). It contains detailed rules about "*who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully." *Id*. at 283; *see, e.g.,* 8 U.S.C. §§ 1153, 1184, 1225, 1229a. For people who enter the country without authorization, the federal scheme contains a variety of enforcement mechanisms: Congress has criminalized entry and re-entry between ports of entry, as well as efforts to assist or facilitate entry between ports. *See* 8 U.S.C. §§ 1325, 1326, 1323, 1324, 1327, 1328, 1329. Congress has provided a detailed set of standards and procedures to determine when people who enter without inspection may be arrested and detained by federal officials. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A). And Congress has provided a detailed process to determine whether people who enter between ports may remain in the United States. *See supra* Statement of the Case Part I. The federal entry scheme is as complex and "pervasive" as it gets, and therefore leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399; *Texas*, 97 F.4th at 286 (Congress's "detailed statutory scheme" governing the "unlawful entry and reentry of noncitizens" "occupies the entire field.") (cleaned up); *Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) (similar).[5]

---

[5] Because entry and removal are an area of dominant—indeed, exclusive— federal interest, and because of longstanding exhaustive federal regulation in this area, no presumption against preemption applies. *See* Br. 32; *United States v. Locke*, 529 U.S. 89, 90 (2000).

Oklahoma concedes that "the federal government possesses exclusive power to admit and naturalize" noncitizens and has no answer to 150 years of Supreme Court precedent affirming that principle. Br. 30. Nor does it dispute that the "central concern" of the INA is the admission and treatment of noncitizens. *Id*. at 31. Instead, Oklahoma contends that H.B. 4156 is valid because it "complement[s]" and "mirrors" federal law. *Id.* at 28, 31. But the Supreme Court squarely rejected this line of argument in *Arizona*.

"Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401; *see also Texas*, 97 F.4th at 283-84. Like H.B. 4156, Section 3 of the Arizona law created a new state criminal offense that "add[ed] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400; *compare id.* (penalizing the failure to carry a registration document "in violation of 8 United States Code § 1304(e) or 1306(a)") (citing Ariz. Rev. Stat. Ann. § 13-1509(A) (2010)), *with* H.B. 4156 § 2(B) (penalizing entry into Oklahoma by noncitizens who have not "first obtained legal authorization to enter the United States," in violation of 8 U.S.C. § 1325). Arizona argued, as Oklahoma does here, that the state law was not preempted because it "adopts federal law without modification . . . and simply adds a parallel enforcement track." Brief for Petitioners at 52, *Arizona v. United States*, No. 11-182; *see* Br. 35 ("HB 4156 neither extends federal law nor criminalizes something

not already federally criminal."); Br. 30 (asserting Oklahoma has the "ability to regulate the presence of aliens" who "violate federal standards"). But the Court faulted this argument for "ignor[ing] the basic premise of field preemption—that States may not enter, *in any respect*, an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402 (emphasis added). Just as in *Arizona*, "[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with the careful framework Congress adopted." *Id.* at 402; *see also Texas*, 97 F.4th at 280.[6]

Oklahoma's attempts to cabin *Arizona* are unavailing. First, the State contends that *Arizona*'s field preemption analysis is limited to noncitizen registration. Br. 35. However, the district court rightly found that the "logic" of *Arizona* applies with even "greater force" to H.B. 4156, which "criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry." J.A. 189, 199. Everything the Supreme Court said about

---

[6] Nor is there any truth to Oklahoma's assertion that federal law "expressly anticipates and acknowledges" state regulation of entry. Br. 31. The statutes it cites involve domestic conduct and at most give states a small and peripheral role in assisting *federal* enforcement. Id. Oklahoma "fails to explain how these laws are relevant to the entry" and reentry provisions of H.B. 4156. *Texas*, 97 F.4th at 287; *id*. at 286-87 (rejecting nearly identical argument). *See* 8 U.S.C. § 1357(g)(1)-(10) (subjecting state officers to federal control and discretion); *see also* 18 U.S.C. § 758 (addressing state assistance in pursuing fleeing vehicles fleeing checkpoints, which are typically not at the border); 22 U.S.C. § 7105(c)(3)(C)(i) (addressing trafficking, which often involves purely domestic conduct, *see* 18 U.S.C. § 1590); 8 U.S.C. § 1101(a)(15)(T)(i) (same); 8 U.S.C. § 1101(a)(15)(U)(iii) (similar).

registration applies "to the sensitive topic of noncitizens entering the country."
*Texas,* 97 F.4th at 279-83; J.A. 195. The federal scheme governing entry is even
more "extensive and complex" than the registration scheme and more significantly
implicates "foreign relations." *Arizona*, 567 U.S. at 395-97 (citing *Hines*, 312 U.S.
at 64); *see id.* at 400-02. If a state cannot punish immigrants for failing to fill out
registration paperwork, surely it cannot regulate entry directly and order people to
leave the state.

Next, Oklahoma argues that *Arizona*'s field preemption analysis was limited
to "legal aliens," whereas H.B. 4156 concerns "illegal aliens." Br. 36. That is flat
wrong. Like H.B. 4156, Section 3 of the Arizona law applied to noncitizens who
did not have federal authorization to be in the United States. Indeed, Section 3
expressly had "no application at all to persons lawfully authorized to be in the
United States," and "this exception was intended in part to avoid punishing
lawfully present aliens who have validly registered, but have not yet received their
registration documents." Brief for Petitioners at 17, *Arizona v. United States*, No.
11-182; *see also* Ariz. Rev. Stat. § 13-1509(F) (statutory exception). Therefore, the
logic of *Arizona* squarely applies: "Federal law makes a single sovereign
responsible for maintaining a comprehensive and unified system" to regulate
noncitizen entry and presence, and "even complementary state regulation is
impermissible" because it "diminishes the Federal Government's control over

27

enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Arizona*, 567 U.S. at 401-02 (cleaned up).[7]

Oklahoma seeks to limit *Arizona*'s field preemption holding by emphasizing that the Court invalidated two provisions based on conflict—not field—preemption, and upheld one provision. Br. 30, 36. But nothing about the Court's analysis remotely undermines the district court's field preemption analysis. One of the provisions *Arizona* struck down regulated employment, not entry. *See* 567 U.S. at 403-07. Employment is an arena in which—as explained below—the Supreme Court has expressly permitted state regulation alongside federal rules, in sharp contrast to the exclusive federal authority over core immigration matters of entry and presence. The other invalid provision involved an attempt to use federal permission "to cooperate" with federal officials, which the Court struck down because unilateral state arrests were not cooperation. *Id*. at 410 (quoting 8 U.S.C. § 1357(g)(10)(B)). And the provision the Court upheld was construed to allow mere "communicat[ion]," as Congress had authorized. *Id*. at 411-13 (quoting 8 U.S.C. § 1357(g)(10)(A)). None of these involved an attempt to regulate entry directly or banish people from a state.

---

[7] Relatedly, Oklahoma claims that the INA is only concerned with noncitizens "lawfully" in the country. Br. 31 (quoting *DeCanas*, 424 U.S. at 359). This too is incorrect. Significant portions of the statute pertain to the arrest, detention, prosecution, and removal of noncitizens who have entered the country without authorization. *See, e.g.*, 8 U.S.C. §§ 1225, 1226, 1229a, 1231, 1325, 1326.

Oklahoma repeatedly asserts that not *every* state law that touches on immigration is preempted. Br. 19, 29, 34, 35. But Plaintiffs never made such a general argument. Rather, H.B. 4156 is field preempted because it specifically regulates noncitizen entry and presence—an "*exclusively* [] federal power." *Texas*, 97 F.4th at 279.

This sets H.B. 4156 apart from cases on which Defendants rely in which the Court upheld state regulations that concerned fields far removed from the quintessentially preempted field of noncitizen entry and presence. *DeCanas*, for example, involved employment, not entry: It involved a challenge to a California law that prohibited employment of noncitizens without lawful residence. 424 U.S. at 352. The law had a "purely speculative and indirect impact on immigration" and, unlike H.B. 4156, did not implicate the "central concern of the INA"—namely, "the terms and conditions of admission to the country." *Id*. at 355, 359; *see also Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011) (upholding state noncitizen employment law in part because "[r]egulating in-state businesses through licensing laws has never been" an "area of dominant federal concern"). Likewise, *Kansas v. Garcia* involved prosecutions for submitting a false tax-withholding form, under a generally-applicable state law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike." 589 U.S. 191, 198 (2020). It too did not involve or address the core immigration field of

29

entry and presence. In fact, the Court noted that there was no dominant federal

interest or comprehensive federal scheme governing state tax withholding. *Id*. at

208-10.

Defendants also cite *Plyler v. Doe*, which concerned an equal protection

challenge to a Texas law restricting education for undocumented children. 457

U.S. 202, 224 (1982). The Court held that the state restrictions were unlawful, and

as part of its analysis repeatedly emphasized that states have "no power with

respect to the classification of noncitizens" and "no direct interest in controlling

entry into this country, that interest being one reserved by the Constitution to the

Federal Government." *Id*. at 225, 228 n.23.[8] None of these cases addressed laws

infringing on the federal government's core immigration and foreign affairs

powers, and they certainly did not suggest that states may create a parallel

immigration regime regulating the entry, presence, and removal of noncitizens.

Oklahoma attempts to save H.B. 4156 by arguing that "it does not actually

regulate the entry or reentry of noncitizens into the United States" and is instead

---

[8] Oklahoma claims that *Plyler* "expressly recognized 'the States do have some authority to act with respect to illegal aliens, *at least where such action mirrors federal objectives and furthers a legitimate state goal*.'" Br. 30 (citing *Plyler*, 457 U.S. at 225). But whatever authority states may have in other contexts—like employment—the Court never suggested that the states can regulate core immigration functions, whether or not their actions mirror federal law. Moreover, the Court struck down the Texas law because it did *not* "operate harmoniously within the federal program." *Plyler*, 457 U.S. at 225. Likewise, as explained below, H.B. 4156 undermines Congress's carefully calibrated scheme.

"solely concerned with its own borders." Br. 35. That is simply not true. H.B. 4156 is a conceded attempt to create a direct state analogue to the federal entry and re-entry crimes—copying the language of those statutes almost verbatim. Br. 9 (H.B. 4156 is "an Oklahoma criminal analogue to federal criminal illegal entry"). The key elements of its crimes are all about entry into the United States. *See* H.B. 4156 § 2(B) (defining entry violation with reference to not having "obtained legal authorization to enter the United States"); § 2(D) (defining reentry crime with reference to prior removal from the United States and presence without permission to reenter the United States). It thus plainly *does* regulate entry and reentry into the United States. The fact that it also addresses presence in Oklahoma is irrelevant— little more than a jurisdictional hook for prosecution by the State. *See, e.g.*, *Hines*, 312 U.S. at 59-69 (state law solely concerned with registration of noncitizens in Pennsylvania was nonetheless preempted by comprehensive federal scheme); *Hines v. Davidowitz*, 30 F. Supp. 470, 474 (1939) (law "place[d] conditions upon the right of an alien to reside in" the state); *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1322, 1327 (10th Cir. 2010) (New Mexico licensing law regulating sale of alcohol "to travelers on … airplanes within the state" was preempted because it "directly implicate[d] the field of aviation safety regulated by federal law").[9]

---

[9] Even if Oklahoma had enacted such a statute that only regulated entry and reentry into the State, it would still violate the Commerce Clause, as discussed below. *See infra* Sec. III.B.

In any event, even state laws that *indirectly* regulate entry and presence are preempted. *See, e.g.*, *Truax*, 239 U.S. at 42 (state regulation of noncitizens' "opportunity of earning a livelihood" amounted to an impermissible regulation of their "entrance and abode"); *United States v. Alabama*, 691 F.3d 1269, 1294-95 (11th Cir. 2012) (state law limits on noncitizens' ability to enter into contract were "preempted by the inherent power of the federal government to regulate immigration"); *Lozano*, 724 F.3d at 315-18 (preempted municipal housing regulations were "thinly veiled attempt to regulate residency" even though they did not "control actual, physical entry into, or expulsion from [the City] or the United States"). H.B. 4156 is an even greater intrusion into the federal scheme because it *directly* criminalizes entry and reentry by certain noncitizens.[10]

2.  H.B. 4156 Creates an Unlawful Scheme of State Expulsion

H.B. 4156's criminalization of state entry and reentry is enough to render the law preempted. If those crimes are enjoined, the remaining provisions of the law must fall because they have no independent effect. *See* J.A. 191.

---

[10] Oklahoma alleges that the federal government has "abandoned" enforcement of immigration law. Br. 32. That is not true: thousands of federal officials implement Congress's entry and removal statutes every day. And in any event, the critical fact is that *Congress* has preempted the field of entry and removal. *Texas*, 97 F.4th at 287 (rejecting similar argument because "[e]vidence of pre-emptive purpose is sought in the text and structure of the statute at issue," not enforcement decisions by the Executive").

However, H.B. 4156 is a further "intrusion into a federal domain" because it banishes noncitizens from Oklahoma. J.A. 191. The law requires anyone convicted of an entry or re-entry crime to leave the State within 72 hours of completing their sentence. *See* H.B. 4156 §§ 2(C)(1), (2); 2(D). This threatens to banish thousands of asylum seekers, visa applicants, and others who have a federal right to remain in the United States, and whom the federal government may grant lawful status, permanent residence, and citizenship.

Oklahoma barely attempts to defend this provision of the law, and for good reason. Br. 33-34. "The power to expel aliens has long been recognized as an exclusively federal power." *Alabama*, 691 F.3d at 1293; *see Arizona*, 567 U.S. at 409 ("[T]he removal process is entrusted to the decision of the Federal Government."). Congress has provided a detailed set of standards and procedures to determine whether a noncitizen may remain in the United States. *See, e.g.*, 8 U.S.C. §§ 1225, 1229, 1229a, 1158, 1231(b)(3); *supra* Statement of the Case Part I. This leaves no room for states to enact their own expulsion schemes and choose for themselves which noncitizens can remain within their borders.

It is of no moment, as Oklahoma contends, that H.B. 4156 expels noncitizens from the State rather than the United States. Br. 11. Such a "policy of expulsion" "conflicts with Congress's comprehensive statutory framework governing alien removal." *Alabama*, 691 F.3d at 1293-95. As explained above,

33

even indirect regulations of noncitizen presence are preempted. *Id.* (invalidating

attempt to indirectly force a category of immigrants from a state, because states

cannot "unilaterally determine that an[] alien unlawfully present in the United

States cannot live within the state's territory"). H.B. 4156 goes further because it

mandates the *actual* banishment of individuals convicted under the statute. §§

2(C)(1)-(2). Oklahoma has unilaterally decided that certain noncitizens simply

"cannot be tolerated within its territory, without regard for" the "comprehensive

statutory framework" Congress enacted governing removal and permission to

remain in the country. *Alabama*, 691 F.3d at 1294-95.

Indeed, Oklahoma acknowledges that H.B. 4156 "imposes distinct, unusual

and extraordinary burdens" on noncitizens and may lead to the banishment of

"substantial" numbers of people. Br. 33-34 (quoting *Alabama*, 691 F.3d at 1293).

Yet, it waves away these concerns by suggesting that the law "does not deviate

from federal law in any novel fashion." Br. 33. But federal law contains no concept

of banishing a person from a particular state, and it does not impose any kind of

banishment as punishment for a crime. To the contrary, federal law permits

noncitizens to remain in the United States while their federal immigration

proceedings are pending. *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1231(a)(1)(A). Many

have explicit federal authorization to work in the United States. *See id*.

§ 1158(d)(2); 8 C.F.R. § 208.7. And federal law allows them to live and work in

any state, including Oklahoma. *See* 8 U.S.C. § 1229(a)(1)(F)(i) (allowing

noncitizens to specify their address anywhere in the United States). Yet H.B. 4156

provides that these same noncitizens *cannot* live in Oklahoma, and instead must

leave. This stark mismatch again "underscore[s] the reason for field preemption."

*Arizona*, 567 U.S. at 403.

If every state could choose for itself which categories of noncitizens to

banish from their state, the result would be a chaotic patchwork of 50 separate

immigration systems, where states would unilaterally decide which immigration

statuses were permissible within their borders. This would "threaten the uniform

application of the INA," severely burden federal operations, and erode federal

control over immigration and foreign relations. *GLAHR*, 691 F.3d at 1266. And if

each state adopted a similar policy, the cumulative effect would be removal from

the United States. "[T]he immigration scheme would be turned on its head."

*Alabama*, 691 F.3d at 1295 n.21.

### 3.  H.B. 4156 Conflicts with Federal Immigration Law

H.B. 4156 is conflict preempted because it "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress."

*Arizona*, 567 U.S. at 399 (cleaned up). As the district court correctly held, H.B.

4156 "conflicts with [the] federal system" by "ignor[ing] opportunities offered

under federal law for discretionary relief" and granting state officials "broad power

to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses." J.A. 197, 199.

1.    Oklahoma's primary argument against conflict preemption is that "H.B. 4156 does not criminalize under Oklahoma law anything that is not already criminal under federal law." Br. 41. But this misses the point. H.B. 4156 allows Oklahoma to "achieve its own immigration policy" by permitting the State to unilaterally prosecute entry and reentry violations. *Arizona*, 567 U.S. at 408. This contradicts the core teaching of *Arizona* that undergirds every part of its analysis: States cannot enforce federal immigration law on their own, without federal "direction and supervision." *Id*. at 413.

Section 6 of the challenged Arizona law, which, like H.B. 4156, allowed state officers to make warrantless arrests of noncitizens, was preempted because it allowed "unilateral state action" that disregarded the "significant complexities involved in enforcing federal immigration law" and usurped the federal government's ability to exercise discretion. *Arizona*, 567 U.S. at 407-10. Section 3, the registration scheme discussed above, was similarly preempted because, like H.B. 4156, it allowed unilateral state prosecutions for what were effectively violations of federal law. Such "independent authority to prosecute" would "diminish the federal government's control over enforcement," upend the "careful framework Congress adopted," and "frustrate federal policies." *Id.* at 402 (cleaned

36

up). And Section 2(B), which directed state police officers to contact immigration authorities during traffic stops, *would* have been preempted if it allowed unilateral detention "without federal direction and supervision." *Id*. at 413. The "same logic" prohibiting unilateral state action that runs through *Arizona* also applies here. *Texas*, 97 F.4th at 293. If unilateral *arrests* alone were enough for preemption in *Arizona*, then unilateral arrests, prosecutions, and detention under H.B. 4156 must be preempted as well. *See Arizona*, 567 U.S. at 410.

Oklahoma attempts to downplay this unilateral state immigration enforcement by claiming that "effective implementation of H.B. 4156 will likely require meaningful cooperation with federal authorities." Br. 40. But nothing in the text of H.B. 4156 suggests that the federal government—and not the State—will choose which noncitizens to arrest, detain, and prosecute.

Nothing in federal law or *Arizona* remotely invites states to set up their own criminal immigration schemes. To be sure, federal law provides limited permission to state officers to "cooperate" and "communicate" with federal agents. *See Arizona*, 567 U.S. at 410-12; *supra* note 6. But "no coherent understanding of the term [cooperate] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410; J.A. 199. Enforcement of

H.B. 4156, in every instance, would require state officials to unilaterally determine whether to arrest and prosecute based on a person's immigration status.

2.      H.B. 4156 additionally frustrates Congress's statutory scheme because, in every case, it prevents federal authorities from balancing a range of interests in deciding how to process noncitizens who enter the United States. A "principal feature" of the immigration system is the "broad discretion" Congress gave to federal officials. *Arizona*, 567 U.S. at 396. Such federal discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives,'" and "immediate human concerns." *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91, (1999)); *Arizona*, 567 U.S. at 395-96.[11]

Congress has provided federal Executive Branch officials a range of tools to address noncitizens who enter without legal authorization. Federal prosecutors may choose to bring criminal charges under 8 U.S.C. §§ 1325 or 1326; immigration

---

[11] Oklahoma suggests that there is no conflict because federal officials have *no* discretion regarding the enforcement of the federal entry and reentry provisions. Br. 44 (arguing that 8 U.S.C. §§ 1325(a) and 1326(a) "are phrased mandatorily" and "*require* ('shall') punishment for these offenses"). But the Supreme Court has explained that the well-established principle of law enforcement discretion is not so easily overcome. *See Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 761 (2005) (holding that "given the deep-rooted nature of law-enforcement discretion," a "true mandate of police action would require some stronger indication" than the bare use of the word "'shall'" in a statutory directive); *see also Texas*, 599 U.S. at 679 (explaining that the "principle of enforcement discretion over arrests and prosecutions extends to the immigration context . . .").

officials may initiate ordinary removal proceedings, *id*. § 1229a, or expedited

proceedings if applicable, *id*. § 1225(b)(1); and immigration agents or

administrative hearing officers may exercise discretion to forego removal

proceedings, defer removal, or take other discretionary action to ameliorate the

potential harshness of the immigration laws. *See Arizona*, 567 U.S. at 396, 409.

These tools allow the federal government to balance complex and interrelated

domestic and international policies and priorities.

H.B. 4156 jettisons this careful balance that federal discretion is meant to

ensure. Whereas the "INA provides the federal government discretion to decide

whether to initiate criminal proceedings or civil immigration proceedings once a

noncitizen is apprehended," Oklahoma's scheme "blocks this exercise of

discretion." *Texas*, 97 F.4th at 289. Under the State's law, noncitizens are arrested

and charged with a crime "and the federal government has no voice" in the matter.

*Id*. Even if federal officials conclude that a particular prosecution or set of

prosecutions would harm relations with a foreign country, or would undermine

humanitarian protections, or jeopardize a "criminal investigation," or conflict with

our international obligations, such considerations can be cast aside. *Arizona*, 567

U.S. at 396-97, 408 (citing these as reasons why unilateral state action is

preempted).

Consider the case of Plaintiff Martinez, who is married to a U.S. citizen and has a pending green card application. Under H.B. 4156, Oklahoma could prosecute, convict, and banish him from the State even if the federal government will ultimately decide to grant him lawful permanent resident status—and even eventual citizenship. *Padres Unidos*, 5:24-cv-00526-J, Dkt. 15-2, ¶¶ 10-11. Or consider Plaintiff Marquez, who has an approved immigrant visa petition, employment authorization, and a pending application for cancellation of removal. Id., Dkt. 15-3, ¶¶ 12-14. H.B. 4156 would allow Oklahoma to banish him from the State even if federal officials determine that he should not be removed because of his marriage to a U.S. citizen, or that hardship that would befall his U.S. citizen children if he were removed. *See* 8 U.S.C. 1229b(b)(1). While the federal system requires careful consideration by federal agents of the equities involved in such cases, H.B. 4156 seizes that decision for *state* officers, who will get to decide whether noncitizens are arrested and charged with a crime. "This is not the system Congress created." *Arizona*, 567 U.S. at 408.

Nor can Oklahoma find support in *Kansas*. As explained above, that case involved state prosecutions for tax-withholding fraud under a generally-applicable statute with no express focus on immigration or immigrants. While there was some overlap between those tax-withholding prosecutions and the federal employment verification scheme, the Court found that the state prosecution did not "threaten[]

40

serious disruption" of the federal system. *Kansas*, 589 U.S. at 212; *id.* at 208 ("The submission of tax withholding forms is *fundamentally unrelated* to the federal employment verification system . . . ."); *see also* J.A. 194. Here, by contrast, Oklahoma is attempting to regulate a core immigration function. Far from mere "overlap" between H.B. 4156 and 8 U.S.C. §§ 1325 and 1326, Br. 39, 42, prosecutions under the state law "frustrate [] … federal interests" by displacing the carefully balanced statutory regime of federal control over the immigration system, including the regulation of entry, presence, and removal. *Kansas*, 589 U.S. at 212. This was not true of the identity fraud prosecutions in *Kansas*. *See* 589 U.S. at 211 (prosecutions interfered with no federal "considered decision" about tax-withholding issues).

Moreover, as the district court noted, this usurpation of federal discretion is especially harmful because of the "broader implications surrounding immigration policy." J.A. 194. The Supreme Court has noted time and time again that immigration decisions are so deeply intertwined with the United States' foreign relations that they "must be made with one voice." *Arizona*, 567 U.S. at 409; *see also Biden v. Texas*, 597 U.S. 785 (2022) at 805-06. The danger that unilateral state immigration regulation could "embroil us in disastrous quarrels" undergirds 150 years of Supreme Court precedent confirming that immigration regulation "is *exclusively* a federal power." *Chy Lung*, 92 U.S. at 279-80; *Texas*, 97 F.4th at 278-

41

79. Nor is this concern theoretical. Mexico has expressed concern over the mistreatment of its nationals were H.B. 4156 to go into effect. *See* J.A. 195 (citing press release form Consulate of Mexico in Oklahoma); *see also Arizona*, 567 U.S. at 395 ("Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."); *Texas*, 97 F.4th at 295 n.208 (noting concerns by the Mexican government that enforcement of a similar Texas law would "frustrate bilateral efforts").

Indeed, the Supreme Court invalidated Section 6 of the Arizona law in part because of just those foreign-policy concerns. As explained above, that law permitted "the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. The Court explained: "Decisions of this nature touch on foreign relations," and are "vested solely on the Federal Government." *Id*. at 409-10 (citing *Truax*, 239 U.S. at 42). As already explained, H.B. 4156 does exactly this—and more.

The State suggests that, because it can prosecute noncitizens for non-immigration crimes, it can also usurp federal discretion over immigration prosecutions. Br. 42. But as Oklahoma acknowledges, H.B. 4156 imposes "distinct, unusual, and extraordinary burdens" on noncitizens—raising precisely the risk of adverse treatment and foreign policy consequences that the Supreme

Court has long warned against. Br. 33; *see also Hines,* 312 U.S. at 64; *Arizona*, 567 U.S. at 408 (unilateral state enforcement could lead to "unnecessary harassment of some aliens"); *Texas*, 97 F.4th at 292 (similar).

3.      Finally, in every potential prosecution, H.B. 4156 is conflict preempted because it authorizes state officials to unilaterally make determinations about a noncitizen's immigration status. "The federal government alone . . . has the power to classify non-citizens." *Farmers Branch, Tex.*, 726 F.3d at 536. Given the "significant complexities involved in enforcing federal immigration law," Congress has entrusted the process to "federal officers who have received training." *Arizona*, 567 U.S. at 408, 409. The new Oklahoma law places state officials in the "impermissible position" of enforcing state law "based on their immigration status [determinations] without federal direction and supervision." *Farmers Branch, Tex.,* 726 F.3d at 532 (citing *Arizona*, 567 U.S. at 413).

Indeed, Oklahoma admits that state officers would have to decide whether "an individual lacks legal immigration status." Br. 40. To arrest, prosecute, detain, and banish people under H.B. 4156, state officials will have to decide whether "the federal government has granted . . . lawful presence in the United States." H.B. 4156 § 2(F)(1)(a). That term has no general meaning in immigration law that applies to the question of whether a noncitizen should be permitted to enter or remain in the United States; rather, those questions are answered through federal

removal proceedings as well as Executive discretion. *See supra* Statement of the

Case Part I. And with no federal "definition that would be applicable" in this

context, H.B. 4156 "open[s] the door to conflicting state and federal rulings."

*Farmers Branch, Tex.*, 726 F.3d at 533, 536. Other provisions of the law likewise

raise the possibility of conflict with federal determinations. *See, e.g.,* H.B. 4156 §

2(D)(1), (2) (whether exceptions to 8 U.S.C. § 1326(a) apply); § 2(D) (whether

someone was "denied admission" or departed "while an order of exclusion,

deportation, or removal is outstanding"); § 2(B) (whether someone "obtained legal

authorization to enter the United States"). Given the "significant complexities

involved" in making such determinations, Congress has entrusted them to the

federal government. *Arizona*, 567 U.S. at 409; *accord. Farmers Branch, Tex.*, 726

F.3d at 531-34.

Oklahoma has no response to this point, other than to maintain that it *might*

consult with the federal government. Br. 40. But nothing in H.B. 4156 predicates

state officers' powers on such possible consultation. And the law pointedly

provides no defense to prosecution for people who are in the process of seeking

federal immigration relief. *See* H.B. 4156 § 2(F) (listing limited affirmative

defenses). Even if state officials were to communicate with the federal

government, under H.B. 4156 it is *state* authorities that will choose whether

noncitizens are arrested, prosecuted, or banished, and *state* courts that will decide

whether a noncitizen has "legal authorization to enter the United States." § 2(B).

The Fifth Circuit rejected similar promises of federal cooperation in

*Farmers Branch*. There, a state ordinance specifically provided that the question of

lawful presence would be "determined under federal law" and provided that state

courts would be bound by certain federal determinations. 726 F.3d at 536. The

court held that despite these nods to federal control, the ordinance "allow[ed] state

courts"—not the federal government—"to assess the legality of a non-citizen's

presence," raising the prospect of conflicting decisions that rendered the ordinance

preempted. *Id*. As in that case, H.B. 4156 ultimately refuses to "confine the state

court to [a] federal determination," rendering it a preempted system of state

officers making preempted immigration classifications. *Id*.

### 4. Oklahoma's Invasion Defense is Meritless

In a last-ditch attempt to save the statute, Oklahoma advances a sweeping

argument that it may disregard federal law and take immigration into its own hands

under the State War Clause of the Constitution, Article I, Section 10, Clause 3. Br.

44-46. The district court was correct to reject this, pointing out that "[n]either the

Supreme Court nor the Tenth Circuit has recognized" this sweeping argument. J.A.

200. Indeed, *no* court has accepted this breathtaking assertion of state supremacy,

which would give states a blank check to disregard Congress and federal authority

and "enact and enforce state legislation regulating immigration otherwise preempted by federal law." *Texas*, 97 F.4th at 295; *id*. (rejecting Texas's invasion defense and explaining "that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered"); *United States v. Texas*, 719 F. Supp. 3d 640, 652 (W.D. Tex. 2024), *vacated,* 144 S. Ct. 797 (2024) (allowing a state to "permanently supersede federal directives on the basis of an invasion would amount to nullification of federal law and authority—a notion that is antithetical to the Constitution and has been unequivocally rejected by federal courts since the Civil War"); J.A. 200 (citing cases that have "rejected application of the State War Clause in the context of immigration").

On appeal, Oklahoma seems to walk back its claim that asylum seekers constitute an "invasion" by instead framing the issue as one of facial relief, arguing that it has the authority to "at least enforce its law" against "cartel members" and "crime syndicates." Br. 46. While the State is free to address crimes committed by these groups though its ordinary criminal laws, it cannot regulate entry and presence. Federal immigration laws already specifically address the type of criminal conduct Oklahoma mentions—reinforcing that Congress has exhaustively regulated this field. *See, e.g.*, 8 U.S.C. §§ 1182(a)(2)(C) (grounds of

inadmissibility and removability for drug trafficking); 1182(a)(2)(H) (human trafficking); 1182(a)(3) (security and terrorism).

Oklahoma invites the Court to accept a series of implausible assertions stacked on top of each other: that the State could permissibly declare war on some small number of individuals who will enter the country to commit crimes; that the federal government gets no say; that H.B. 4156 is a permissible tool of war against them; and that therefore the statute should go into effect for *everyone*, even though it reaches far beyond those individuals and is obviously preempted. This flawed logic cannot be enough to unlock sweeping state authority free from any federal control. While Oklahoma may have "frustrations with the problems caused by illegal immigration," it "may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416.

## B. H.B. 4156 Violates the Commerce Clause[12]

Finally, not only is H.B. 4156 preempted, but its restriction on interstate movement and expulsion from the state also run afoul of the Commerce Clause.

---

[12] The district court did not reach any issues related to the Commerce Clause or International Commerce Clause. J.A. 201 n.9. However, this Court can affirm on any ground supported by the record. *See Griess v. Colorado,* 841 F.2d 1042, 1047 (10th Cir.1988) (appellate court is free to affirm on grounds supported by record, even those upon which district court did not rely). Here, Private Plaintiffs briefed the dormant Commerce Clause claim in their case below, which was consolidated with the United States' case. Thus, this claim is part of the record and the Court may affirm on this basis.

U.S. Const. art. I, § 8, cl. 3. The dormant component of the Commerce Clause prevents a State from passing laws that discriminate against interstate commerce. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (citation omitted); *see also Ore. Waste Sys., Inc. v. Dep't of Env't Quality of Ore.*, 511 U.S. 93, 99 (1994). "The clearest example of [discriminatory] legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). The federal commerce power "encompasses the movement in interstate commerce of *persons* as well as commodities." *United States v. Guest*, 383 U.S. 745, 758-59 (1966) (emphasis added). Thus, in *Edwards v. California*, the Supreme Court held that the Commerce Clause was violated where California attempted to "fenc[e] out indigent immigrants"—that is, people seeking to move there from out of state. *City of Philadelphia*, 437 U.S. at 627 (citing *Edwards*, 314 U.S. 160, 173-74 (1941)).

Similarly, H.B. 4156 "overtly blocks the flow of interstate commerce at a State's borders" by banning noncitizens who irregularly entered the United States from the State of Oklahoma. *City of Philadelphia*, 437 U.S. at 624. It reinforces this ban by forcing noncitizens convicted under the statute to leave the state within three days. Oklahoma emphasizes that H.B. 4156 does not deport people to a foreign country, but that is irrelevant. "The burden upon interstate commerce is intended and immediate:" those convicted under the law "cannot remain in

48

Oklahoma" and must "relocate to another State." *Edwards*, 314 U.S. at 174; Br. 11.
This is impermissible under the Commerce Clause.

The Supreme Court, in *Edwards*, confronted a similar argument to the one
Oklahoma makes here. California asserted that "the huge influx" of out-of-state
migrants "has resulted in problems of health, morals, and especially finance."
*Edwards*, 314 U.S. at 173. Oklahoma, too, claims that immigration into the State is
causing health and safety problems. Br. 4-9; H.B. 4156 § 1 ("fentanyl distribution"
and other problems). Not only are these concerns overblown, *see infra* note 13, but
they are also irrelevant to the clear teaching of *Edwards*: The Commerce Clause
prohibits "attempts on the part of any single State to isolate itself from difficulties
common to all of them by restraining the transportation of persons and property
across its borders." *Edwards*, 314 U.S. at 173. So too here, Oklahoma cannot
"isolate itself from difficulties common to all" states by penalizing certain
noncitizens for crossing state lines and expelling them from the State into other
states upon conviction under H.B. 4156. *Id.*

The regulation of noncitizens within the country "does not admit of diverse
treatment by the several States." *Edwards*, 314 U.S. at 176. Such barriers against
the movement of certain noncitizens at Oklahoma's borders are an "open invitation
to retaliatory measures" by other states. *Id*. And if all 50 states were to enact such
laws, the burdens on interstate commerce would become "cumulative" and it

would be a "virtual impossibility" for certain noncitizens to reside anywhere in the United States. *Id*.

Because H.B. 4156 discriminates against interstate commerce by banning certain categories of immigrants from entering Oklahoma, and expelling them upon conviction, it is "virtually per se invalid" under the Commerce Clause. *Ore. Waste Sys., Inc.*, 511 U.S. at 99. Thus, even if H.B. 4156 did not "purport to extend beyond Oklahoma's borders," Br. 35, it nonetheless violates the dormant Commerce Clause by blocking the movement of certain people at the State's borders.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES

### A. H.B. 4156 Will Irreparably Harm Private Plaintiffs

The individual plaintiffs and members of Padres Unidos will suffer irreparable harm by being placed at risk of arrest, prosecution, and detention under a state statute preempted by federal law. As explained above, the Plaintiffs and members of Padres Unidos are subject to prosecution under the terms of H.B. 4156. *See generally Padres Unidos*, 5:24-cv-00526-J, Dkt. 15. It is well established that "the threat of criminal prosecution" under a preempted state law "constitutes irreparable harm for purposes of a preliminary injunction." *Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-CV-22655, 2024 WL 2310150, at

50

*17 (S.D. Fla. May 22, 2024) (citation omitted); *see also, e.g., GLAHR* 691 F.3d at
1269; *Valle del Sol*, 732 F.3d at 1029.

That harm is exacerbated by the statute's banishment provision, which
threatens to expel the plaintiffs and others like them from the State. They would
face the trauma of being separated from their families, who would lose needed
medical care and financial support. Mr. Martinez would be unable to care for his
wife, who has diabetes and heart problems that require constant care and hospital
visits. *See Padres Unidos*, 5:24-cv-00526-J, Dkt. 15-2, ¶¶ 14-15. Mr. Marquez,
who frequently travels out-of-state for his job, is the primary breadwinner for his
family and worries that he would be unable to support them if he were banished
from Oklahoma. Id., Dkt. 15-3, ¶¶ 14-15. Likewise, Mr. Hernandez is the sole
financial provider for his wife and children and shares similar concerns. Id., Dkt.
15-4, ¶ 11. And Ms. Lopez Mena is a student financially dependent on her family
and H.B. 4156 would cause a severe disruption to her education. Id., Dkt. 15-1, ¶¶
14-15, 17-18; *see also* Lara Decl., Dkt. 15-5, ¶ 13; M.A. Decl., Dkt. 15-6, ¶ 12.
Preventing people from caring for themselves and their families constitutes
irreparable injury. *See Evans v. Utah*, 21 F. Supp. 3d 1192, 1210 (D. Utah 2014);
*see also Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir.
2003) (irreparable harm based on the risk of "trauma to already troubled
children").

**B. The Balance of Equities and Public Interest Support an Injunction**

The balance of equities tips decisively in favor of the Plaintiffs, and an injunction is strongly in the public interest. When the Defendants are governmental actors, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court correctly concluded that when a state law is likely preempted by federal law, the balance of equities and public interest generally favors granting injunctive relief, as states have no legitimate interest in enforcing laws that are preempted by federal law. J.A. 203-04.

In contrast to the real and severe harms faced by Plaintiffs, the State has no legitimate interest in enforcing an unconstitutional law or regulating in an exclusively federal arena. *See Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation"); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (states faced no injury from injunction of preempted regulation). While Oklahoma raises concerns about drug trafficking and organized crime, it fails to explain why the State's existing criminal laws cannot address these issues or how H.B. 4156 would mitigate them.[13] Ultimately,

---

[13] Oklahoma's attempt to blame these problems on undocumented people is factually baseless. H.B. 4156 § 1. For example, fentanyl overwhelmingly enters the United States through ports of entry, not through irregular migration, and is smuggled by U.S. citizens, not migrants. *See* David Bier*, Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022) ("[F]entanyl is smuggled through official crossing points specifically because it is

while Oklahoma may have "frustrations with the problems caused by illegal immigration," it "may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416.

The public interest also clearly favors an injunction. States' "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301. That is particularly so where state action invades federal domains and interferes with federal foreign relations. *See, e.g.*, *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).

Additionally, if implemented, H.B. 4156 threatens to damage the relationship between immigrant communities and law enforcement, reducing noncitizens' willingness to report crimes due to fear of prosecution and banishment. Indeed, the Oklahoma Association of Chiefs of Police and Metro Law Enforcement Agency Leaders has stated that H.B. 4156 "places crime victims at risk by increasing the fear of reporting to law enforcement" and threatens to "deteriorate public trust in law enforcement in already vulnerable communities,

---

easier to conceal it on a legal traveler or in legal goods than it is to conceal a person crossing the border illegally."), https://perma.cc/8RTW-MENH; *see* U.S. Sent'g Comm'n, *Quick Facts: Fentanyl Trafficking Offenses* (2022), https://perma.cc/XDY9-S49M; Statement of Brian Sulc, Executive Director, Transnational Organized Crime Mission Center, Office of Intelligence and Analysis, Department of Homeland Security (May 18, 2022), https://perma.cc/76WQ-4YTU.

ultimately resulting in increased public safety concerns."[14] The Association warned that H.B. 4156 will "destroy the connections and relationships we have built within our local immigrant communities and set us back for many years to come." *See Texas*, 719 F. Supp. 3d at 698 ("Because SB 4 authorizes state police officers to arrest many unauthorized noncitizens, victims of abuse or human trafficking will risk arrest and removal if they report their crimes," making "noncitizen crime victims less likely to report violent crimes."); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (enjoining rule in part because of chilling effect on immigrants seeking services).

### C. Facial Relief is Appropriate

Finally, the district court was correct to enjoin H.B. 4156 in full. Facial relief is appropriate in the United States' case and is likewise appropriate with respect to Private Plaintiffs. Oklahoma urges this Court to "enjoin only unconstitutional applications" of the law. Br. 49-50. But field preemption invalidates every application of H.B. 4156. The law therefore has no constitutional applications. In addition to field preemption, as already explained, H.B. 4156 conflicts with federal law in every application. Unilateral state enforcement will happen every time H.B. 4156 is enforced: state police will arrest, state prosecutors will bring charges, and

---

[14] KOKH Staff, *Oklahoma Association of Chiefs of Police Release Joint Statement on HB 4156*, OKC Fox 25 (May 14, 2024), https://perma.cc/PR5E-L4F6.

state judges will convict people and ultimately subject them to banishment. And every time Oklahoma enforces the law, it deprives the federal government of its exclusive control over the wide range of tools Congress provided to the immigration authorities to deploy in their discretion, balancing various domestic and international considerations. Nor is H.B. 4156 severable. Br. 50. If the substantive entry and reentry crimes provisions are enjoined, the remaining provisions are also invalid because they have no independent effect. *See* J.A. 190-91.

## CONCLUSION

The Court should affirm the district court's preliminary injunction order.

## STATEMENT REGARDING ORAL ARGUMENT

Private Plaintiffs support oral argument in this case, and request that they be allotted the same amount of argument time as the United States. In addition to the critical issue of federal supremacy over immigration regulation, this case also raises complex issues regarding the Commerce Clause and Plaintiffs' standing that could benefit from further questioning and discussion.

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the limitation set forth in Federal Rules of Appellate Procedure 27(b)(3) because it contains 12,900 words, exclusive of the portions of the brief that are exempted by Rule 32(f). I certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Noor Zafar*
Noor Zafar
November 19, 2024

**CERTIFICATE OF DIGITAL SUBMISSION**

All required privacy redactions have been made as required by 10th Cir. R.

25.5 and the ECF Manual. Additionally, this filing was scanned with AVG

antivirus software on November 19, 2024.

*/s/ Noor Zafar*
Noor Zafar
November 19, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2024, I electronically filed the foregoing

Motion with the Clerk for the United States Court of Appeals for the Tenth Circuit

by using the CM/ECF system. A true and correct copy of this brief has been served

via the Court's CM/ECF system on all counsel of record.

*/s/ Noor Zafar*
Noor Zafar
November 19, 2024

Dated: November 19, 2024

Respectfully submitted,

Nicholas Espíritu
Tanya Broder
National Immigration Law Center
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
T: (213) 639-3900
F: (213) 639-3911
*espiritu@nilc.org*
*broder@nilc.org*

Megan Lambert
Devraat Awasthi
American Civil Liberties Union of
Oklahoma Foundation
P.O. Box 13327
Oklahoma City, OK 73113
T: (405) 525-3831
*mlambert@acluok.org*
*dawasthi@acluok.org*

*/s/ Noor Zafar*
Noor Zafar
Wafa Junaid
Omar Jadwat
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
*nzafar@aclu.org*
*wjunaid@aclu.org*
*ojadwat@aclu.org*

Spencer Amdur
Oscar Sarabia Roman
Cody Wofsy
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*

*Attorneys for Plaintiffs-Appellees*