No. 24-6144

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF OKLAHOMA, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:24-cv-00511-J

## REPLY BRIEF OF DEFENDANTS-APPELLANTS

GARRY M. GASKINS, II
 *Solicitor General*
ZACH WEST
 *Director of Special Litigation*
CULLEN D. SWEENEY
 *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

## ORAL ARGUMENT IS REQUESTED

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

    I.   **Plaintiffs have failed to bring justiciable claims against Oklahoma, and this suit does not belong in federal court.** ......................2

        A.  **The United States lacks a cause of action because its suit is not grounded in traditional equity practice.** ...................................2

        B.  **The Private Plaintiffs lack standing to pursue an injunction, and their permissive intervention is improper in this case.** .......................5

   II.  **Federal immigration law does not preempt HB 4156.** ...........................10

        A.  **HB 4156 does not regulate within an exclusive federal field.** ..........11

        B.  **HB 4156 does not conflict with federal immigration law.** .................14

  III. **HB 4156 does not violate the Commerce Clause because the regulated conduct is illegal and unrelated to foreign commerce.** ..........17

  IV. **Oklahoma has a constitutional power of self-defense from invasion.** .................................................................................................21

    V.  **The remaining preliminary-injunction factors support Oklahoma.** ............................................................................................28

        A.  **No plaintiff has shown irreparable harm.** ............................................28

        B.  **The equities and public interest strongly favor Oklahoma.** ..............29

CONCLUSION .....................................................................................................29

CERTIFICATE OF COMPLIANCE ...................................................................31

CERTIFICATE OF DIGITAL SUBMISSION ...................................................31

CERTIFICATE OF SERVICE ............................................................................31

## TABLE OF AUTHORITIES

### Cases

*Am. Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) .................................................................................3

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................1, 10, 11, 12, 13, 15, 16, 18

*Atlas Life Ins. Co. v. W. I. Southern, Inc.,*
  306 U.S. 563 (1939) .............................................................................2

*Attorney-General v. Corp. of Poole,*
  (1837) 48 Eng. Rep. 601 (High Ct. Ch.) ............................................4

*California v. Texas,*
  593 U.S. 659 (2021) ..............................................................................9

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997) ...........................................................................19

*Chamber of Comm. of U.S. v. Whiting,*
  563 U.S. 582 (2011) ...........................................................................16

*City of Stilwell v. Ozarks Rural Elec. Coop. Corp.,*
  79 F.3d 1038 (10th Cir. 1996) ..............................................................8

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...........................................................................10

*DeVillier v. Texas,*
  601 U.S. 285 (2024) ..............................................................................8

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ............................................................................21

*Edwards v. California,*
  314 U.S. 160 (1941) ......................................................................20, 21

*EEOC v. Nat'l Child.'s Ctr., Inc.,*
  146 F.3d 1042 (D.C. Cir. 1998) ...........................................................9

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.,*
  407 F.3d 1091 (10th Cir. 2005) ............................................................8

*Ex parte Young,*
  209 U.S. 123 (1908) .........................................................................4, 10

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963) .................................................................15

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
    861 F.3d 1052 (10th Cir. 2017) .................................................9

*Gen. Motors Corp. v. Tracy*,
    519 U.S. 278 (1997) .................................................................19

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) .............................................................. 3, 5

*Hall v. Hall*,
    584 U.S. 59 (2018) .....................................................................7

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ...................................................................15

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .................................................8

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ...................................................................8

*In re Debs*,
    158 U.S. 564 (1895) ...................................................................4

*In re Loney*,
    134 U.S. 372 (1890) .................................................................13

*Initiative & Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) .................................................9

*Johnson v. Manhattan Ry. Co.*,
    289 U.S. 479 (1933) ...................................................................7

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ............................. 11, 12, 13, 15, 16, 17

*Mann v. Boatright*,
    477 F.3d 1140 (10th Cir. 2007) .................................................6

*Maryland v. King*,
    567 U.S. 1301 (2012) ...............................................................29

*Mayor of New York v. Miln*,
    36 U.S. (11 Pet.) 102 (1837).....................................................18

*Michelin Tire Corp. v. Wages,*
    423 U.S. 276 (1976) .........................................................................19

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024) ..........................................................1, 17, 26

*N.M. Dep't of Game & Fish v. U.S. Dep't of Interior,*
    854 F.3d 1236 (10th Cir. 2017) ......................................................29

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
    491 U.S. 350 (1989) .........................................................................28

*Philadelphia Indem. Ins. Co. v. Lexington Ins. Co.,*
    845 F.3d 1330 (10th Cir. 2017) ........................................................8

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) .........................................................................19

*Plyler v. Doe,*
    457 U.S. 202 (1982) .........................................................................14

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) .........................................................................12

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
    325 U.S. 761 (1945) .........................................................................19

*Safe Streets All. v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017) ..........................................................9

*Sanitary Dist. of Chicago v. United States,*
    266 U.S. 405 (1925) ...........................................................................3

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) .........................................................................21

*Tandy v. City of Wichita,*
    380 F.3d 1277 (10th Cir. 2004) ......................................................10

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
    588 U.S. 504 (2019) .........................................................................19

*Terrett v. Taylor,*
    13 U.S. 43 (1815).................................................................................4

*Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n,*
    787 F.3d 1068 (10th Cir. 2015) ........................................................8

*Truax v. Raich,*
  239 U.S. 33 (1915)................................................................................3

*United States v. Am. Bell Tel. Co.,*
  128 U.S. 315 (1888)..............................................................................4

*United States v. California,*
  655 F.2d 914 (9th Cir. 1980)................................................................3

*United States v. Colo. & E. R.R. Co.,*
  882 F.3d 1264 (10th Cir. 2018)............................................................9

*United States v. San Jacinto Tin Co.,*
  125 U.S. 273 (1888)..............................................................................4

*United States v. Texas,*
  143 U.S. 621 (1892)..............................................................................3

*United States v. Texas,*
  97 F.4th 268 (5th Cir. 2024)........................................................16, 20

*United Steelworkers of Am. v. United States,*
  361 U.S. 392, 80 S. Ct. 177 (1959).....................................................4

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021)....................................................................2, 4, 10

*Wyandotte Transp. Co. v. United States,*
  389 U.S. 191 (1967).............................................................................3

*Younger v. Harris,*
  401 U.S. 37 (1971).............................................................................10

## Statutes

8 U.S.C. § 1101....................................................................................16

8 U.S.C. § 1324....................................................................................16

8 U.S.C. § 1357....................................................................................16

8 U.S.C. § 1373....................................................................................16

18 U.S.C. § 758....................................................................................16

22 U.S.C. § 7105..................................................................................16

## Other Authorities

7C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND
    PROCEDURE § 1913 (3d ed.)..................................................................7

Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 NOTRE
    DAME L. REV. 699 (2022) ..............................................................5

BLACK'S LAW DICTIONARY (12th ed. 2024) ........................................22

James Madison, *The Report of 1800*
    (Jan. 7, 1800), *available at* https://perma.cc/3XV9-2MEE .........................24

THE FEDERALIST NO. 3 ....................................................................23

THE FEDERALIST NO. 28 ..................................................................27

THE FEDERALIST NO. 43 ..................................................................23

THE FEDERALIST NO. 44 ..................................................................24

## Constitutional Provisions

U.S. CONST. art. IV, § 4 ..................................................................22

## INTRODUCTION

The Supreme Court has "made facial challenges hard to win" by requiring plaintiffs to establish "that no set of circumstances exists under which the [claw] would be valid." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted). Despite *Moody*'s admonishment, the district court made the extraordinary determination that an Oklahoma law that indisputably mirrors federal law and criminalizes persons who are unlawfully present in the United States is invalid as a facial matter. The district court's sweeping injunction of House Bill 4156 (HB 4156) was inappropriate.

Both the United States and Private Plaintiffs broadly assail HB 4156—a reasonable self-protection measure for a sovereign state—as impertinent overreach. But their arguments falter on every level. For example, they ignore *Moody* and its sky-high standard for facial challenges. And they admit—as did the district court—that the Supreme Court has never extended immigration field preemption beyond laws governing alien registration—either in *Arizona v. United States*, 567 U.S. 387 (2012), or elsewhere. Instead of taking *Arizona* at its stated limits, they wrongly treat the application of field preemption to laws governing entry, reentry, and removal as a self-evident judicial *fait accompli*. But this Court should not carry field preemption where the Supreme Court has not. And because HB 4156 mirrors federal law by making violations of federal criminal law a violation of Oklahoma law, there is no conflict.

To be clear, this Court need not reach the merits of this appeal. The United States lacks a cause of action to pursue its claims, full stop. This Court should cast a wary eye

on the United States' suggestion, without *any* stated limiting principle, that it has the general equitable right to enjoin any state action that it does not like in federal court. For their part, the Private Plaintiffs (who are participating in this appeal only provisionally) lack standing under any of their scattershot theories. This Court should reverse, vacate the facial injunction, and allow Oklahoma to enforce its law.

## ARGUMENT

I.   **Plaintiffs have failed to bring justiciable claims against Oklahoma, and this suit does not belong in federal court.**

   A.   **The United States lacks a cause of action because its suit is not grounded in traditional equity practice.**

"The equitable powers of federal courts"—whether invoked by the United States or otherwise—"are limited by historical practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (citing *Atlas Life Ins. Co. v. W. I. Southern, Inc.*, 306 U.S. 563, 568 (1939)). Any claim in equity must be "grounded in traditional equity practice." *Id.* at 39. Here, the United States asserts that it "has presented a classic equitable grievance—that the defendant is causing it direct harm." U.S. Br. at 30. But it is preposterous for the United States to claim that it is *directly* harmed now by Oklahoma prosecuting a hypothetical illegal alien in the future. And regardless, equitable jurisdiction has never been so broad, not even for the government. To be sure, the government "may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980).

2

Below, the United States pointed neither to a specific statutory authority nor a traditional equitable principle that would allow its claims. The government does no better here. It does not even attempt to argue that specific statutory authority enables this lawsuit. That leaves the realm of traditional equity practice as the only possible ground for a justiciable cause of action. Courts have found that a plaintiff has an equitable cause of action when its claim sounds in public-nuisance abatement, enforcement of property or contract rights, or anti-suit injunctions, because the relief sought in those cases "was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). Plainly, this suit does not land in any of those categories.

Tellingly, the United States cites not a single case actually holding that it has a freestanding equitable right in federal court to enjoin any action it believes is causing it harm. Rather, the cases it relies on uniformly fall within the historical bounds of traditional equity jurisdiction. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 193–94 (1967) (suit at law; statutory cause of action; public nuisance); *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 423–24 (1925) (public nuisance; statutory cause of action); *Truax v. Raich*, 239 U.S. 33, 37–38 (1915) (restraint of criminal prosecution when essential to safeguarding property rights); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) (property and mails); *United States v. Texas*, 143 U.S. 621(1892) (property); *United States v. Am. Bell Tel. Co.*, 128 U.S. 315, 350 (1888) (fraud); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 275 (1888) (fraud and property); *Attorney-General v. Corp. of*

*Poole*, (1837) 48 Eng. Rep. 601 (High Ct. Ch.) (same); *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 54–55 (1815) (anti-suit injunction).[1]

The United States next attempts to recast the holding in *In re Debs*, 158 U.S. 564 (1895), but to no avail. *See* U.S. Br. at 32. This is because "[t]he crux of the *Debs* decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest." *United Steelworkers of Am. v. United States*, 361 U.S. 392, 80 S. Ct. 177, 186 (1959) (Frankfurter, J., concurring); *see also Debs*, 158 U.S. at 587 ("[T]he obstruction of a highway is a public nuisance, and a public nuisance has always been held subject to abatement at the instance of the government.") (citation omitted). Lastly, the government makes the astonishing claim that *Ex parte Young*, 209 U.S. 123 (1908), "leaves no doubt that the United States may pursue relief here." U.S. Br. at 33. The Supreme Court has never held that the *federal government* could pursue a claim under *Ex parte Young*. Fundamentally, that avenue has always been limited to private parties. *See Whole Woman's Health*, 595 U.S. at 39 (describing the doctrine as "a narrow exception … that allows certain private parties to seek judicial orders in federal court"). Expanding this traditional equitable remedy for use by the United States would run afoul of *Grupo Mexicano*, which (once again) prohibits courts

---

[1] The United States includes a cite to *Arizona* itself for the proposition that the United States may sue in equity when its sovereign interests are "threatened or harmed." U.S. Br. at 32. But the parties in *Arizona* did not discuss whether the United States had a cause of action, and the existence of a cause of action clearly can be waived. And *Arizona* nowhere says that the United States has a cause of action in similar cases.

from invoking "equity" to create causes of action and remedies that did not exist when the original Judiciary Act was enacted in 1789. 527 U.S. at 318.

There is no tradition under which the United States may sue whenever it feels a need "to vindicate its sovereign interests." U.S. Br. at 30. In response, the United States ignores Oklahoma's argument that, "[i]f the district court were correct here, the United States could sue in virtually any situation, so long as it could make some tenuous claim that its foreign affairs are affected by a state law." Okla. Br. at 23. The government does not even *try* to articulate a limiting principle on its self-proclaimed ability to sue in equity. The United States' failure to explain how it can exercise a "litigation superpower" while disregarding "the historic limits on that superpower" is troubling, to say the least. Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 NOTRE DAME L. REV. 699, 737 (2022). Neither a statute nor a traditional equitable cause of action authorizes the United States to sue Oklahoma to enjoin HB 4156.

**B.    The Private Plaintiffs lack standing to pursue an injunction, and their permissive intervention is improper in this case.**

A motions panel provisionally granted the Private Plaintiffs leave to participate in this appeal. Dkt. 40. This Court should now find that the Private Plaintiffs have not demonstrated any basis for the Court to conclude that their participation is warranted.[2] *See Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) ("Motions panel decisions are tentative and subject to reexamination by the merits panel."). Although the Private

---

[2] The United States also opposes their participation. U.S. Br. at 10–11 n.4.

Plaintiffs were parties to a lawsuit that was consolidated into this action below, those plaintiffs—as argued below—were never properly in federal court. They lacked a cause of action, and they could not demonstrate standing. J.A. 123–26. In granting the United States' motion for a preliminary injunction, the district court expressly declined to decide Private Plaintiffs' standing and denied their request for an injunction as moot. *See* J.A. 175 n.2. For this reason alone, the Private Plaintiffs cannot properly be designated as parties to this appeal.

As a threshold matter, the Private Plaintiffs contend that Oklahoma has waived its objection to their intervention by not adequately briefing the matter in its opening brief. *See* Private Br. at 13–14. This is absurd. The sole issue on appeal concerns the correctness of the injunction of HB 4156 awarded to the United States. The ancillary question of the Private Plaintiffs' intervention was briefed before the motions panel, which provisionally granted intervenor status "subject to reconsideration by the panel of judges later assigned to consider this appeal on its merits." Dkt. 40. The grounds for Oklahoma's opposition to intervention were set forth at length in its response to the motion to intervene. *See* Dkt. 35. Oklahoma's position has not changed, and repetition of its argument in the opening brief was not required.

Even so, Oklahoma again emphasizes that the only parties properly before the Court in this appeal are the United States (which obtained the relief it sought) and Oklahoma (which is appealing the granting of that relief). The consolidation of the cases below does not alter this fact. *See Hall v. Hall*, 584 U.S. 59, 72 (2018) ("the parties to

one case d[o] not become parties to the other by virtue of consolidation"); *see also Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97 (1933) ("[C]onsolidation … does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."). In granting the United States a preliminary injunction, the district court made plain that—based on "the Court's desire to promptly rule" preliminarily—it would not consider Oklahoma's standing argument as to the Private Plaintiffs. J.A. 175 n.2. This led the district court to *deny* the Private Plaintiffs' motion for a preliminary injunction. At this stage of litigation, the district court has granted no direct, affirmative relief to the Private Plaintiffs, and they have not appealed.

Federal Rule of Civil Procedure 24(b) contemplates a party's permissive intervention in an ongoing action. But both courts and commentators have cautioned that the discretion to grant permissive intervention should be exercised "carefully." 7C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1913 (3d ed.) (citation omitted). This Court has also instructed, in related circumstances, that "intervention on appeal will be permitted only in an exceptional case for imperative reasons." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005) (citation and internal marks omitted). Permissive intervention is simply not warranted here; nothing is imperative or exceptional. *See Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*, 787 F.3d 1068, 1075 (10th Cir. 2015) (affirming denial of permissive intervention because defendant would adequately

represent applicant's interests); *City of Stilwell v. Ozarks Rural Elec. Coop. Corp.*, 79 F.3d 1038, 1043 (10th Cir. 1996) (similar).

More fundamentally, the Private Plaintiffs lack standing to pursue an injunction. At the preliminary injunction stage, plaintiffs "must make a clear showing that they have standing." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (en banc) (Matheson, J., concurring in part and dissenting in part) (cleaned up); *see also DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts," but instead are "invoked defensively in cases arising under other sources of law"). "Standing is a threshold issue in every case before a federal court ...." *Philadelphia Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1334 (10th Cir. 2017) (citation omitted). Along the same lines, "*any person* invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (emphasis added).

In their response, the Private Plaintiffs claim they do not need to independently establish standing because they seek the same relief as the United States. Private Br. at 15. But "[a]ny party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims." *United States v. Colo. & E. R.R. Co.*, 882 F.3d 1264, 1269 (10th Cir. 2018) (citation omitted). "Article III's requirements apply to *all* intervenors, whether they intervene to assert a claim or defend an interest." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 912 (10th Cir. 2017); *see also, e.g., EEOC v. Nat'l*

*Child.'s Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) ("Permissive intervention … has always required an independent basis for jurisdiction.").

The Private Plaintiffs also continue to rely on a flawed interpretation of HB 4156 to manufacture their own standing. "[A] person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (citation omitted); *see also Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1054 (10th Cir. 2017) (Moritz, J.) ("a court won't use its equitable power to facilitate illegal conduct"). Likewise, the lack of a credible threat of prosecution—"whether today or in the future"—equates to a lack of actual or imminent injury for standing purposes. *California v. Texas*, 593 U.S. 659, 670 (2021).

The bare fact that the Private Plaintiffs allege they are unlawfully present in the country is insufficient to confer standing to challenge HB 4156, which merely codifies an analogue to the federal crimes of illegal entry and reentry. In other words, every act punished by HB 4156 is already a federal crime. And, importantly, "nothing in HB 4156 prevents—or even purports to inhibit in any way—illegal aliens from seeking asylum or other relief under federal law." Okla. Br. at 11. Here, each individual plaintiff has purportedly applied for asylum or other relief. *See* Private Br. at 8–9. Setting the Private Plaintiffs' arrant hyperbole aside, nothing in HB 4156 threatens or thwarts the ability of any individual Plaintiff to seek (and, if qualified, obtain) asylum or any other federal relief from federal authorities. For the same reason, a suit in equity under *Ex parte Young*

would also be unavailable to the Private Plaintiffs. *See Whole Woman's Health*, 595 U.S. at 39 (explaining that "narrow" *Ex parte Young* exception "prevent[s] state executive officials from enforcing state laws that are *contrary to* federal law" (emphasis added)).

Moreover, an alleged "threatened injury must be 'certainly impending' and not merely speculative." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (citation omitted); *see also Younger v. Harris*, 401 U.S. 37, 42 (1971) (no controversy existed as to plaintiffs never threatened with prosecution who alleged only that they "fe[lt] inhibited" by the law). Speculative and subjective fears of state prosecution are simply not enough to establish standing. At the end of the day, the Private Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

## II. Federal immigration law does not preempt HB 4156.

The United States' response runs into trouble from the first page. The brief's opening sentence recognizes that "[i]n *Arizona v. United States*, the Supreme Court held that an Arizona law purporting to mirror federal criminal provisions regarding *registration* of noncitizens was preempted." U.S. Br. at 1 (citing 567 U.S. 387) (emphasis added). The United States then explains that HB 4156's "core subjects" are "entry and removal." *Id.* To succeed with their facial challenges, the United States and Private Plaintiffs must establish that field preemption extends beyond alien registration—the *only* occupied immigration field ever identified by the Supreme Court. Either that, or

they must show that HB 4156's mirroring of federal law conflicts with federal law governing entry and removal. Both the United States and Private Plaintiffs fail to do so.

### A.    HB 4156 does not regulate within an exclusive federal field.

The Supreme Court has declined to expand immigration field preemption beyond alien registration. *See generally Arizona*, 567 U.S. 387; *Kansas v. Garcia*, 589 U.S. 191 (2020). Only "[i]n rare cases" have courts found that Congress has "'legislated so comprehensively' in a particular field that it 'left no room for supplementary legislation.'" *Kansas*, 589 U.S. at 208 (citation omitted). Here, neither the United States nor the Private Plaintiffs can identify any case where the Supreme Court has held that any part of immigration law beyond alien registration is field preempted. The reason is simple: *Arizona* never held that entry or removal constitutes an exclusive federal field. *See, e.g.*, *Kansas*, 589 U.S. at 210 (explaining that *Arizona* addressed "the field of alien registration"). Therefore, what the United States and Private Plaintiffs are really seeking is an extension of *Arizona*. But even if this Court finds—for the first time—that entry or removal is exclusively federal, HB 4156 causes no "intrusion upon the federal scheme." *Arizona*, 567 U.S. at 402.

The United States' and the Private Plaintiffs' efforts to distinguish *Arizona* and *Kansas* go nowhere. *Arizona*'s preempted criminal law concerned warrantless arrest based on removability. 567 U.S. at 407. The Supreme Court held the law was preempted because "[b]y authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principles that the removal process is entrusted to

the discretion of the federal government." *Id.* at 409 (citations omitted). Nobody disputes that Congress is charged with granting lawful immigration status and that alien registration relates to such status. But the protection of Oklahoma's borders, as contemplated by HB 4156, does not involve the granting or withdrawing of lawful status, nor does it involve entry or removal from the country.[3] Rather, the purpose of Oklahoma's statute is to prevent and prosecute crimes in Oklahoma and protect Oklahomans who live in Oklahoma. And courts rarely infer field preemption because states are sovereigns, and their police powers are essential to the safeguarding of that sovereignty. *See, e.g.*, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). HB 4156 is a criminal statute, and "[f]rom the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas*, 589 U.S. at 212.

To try getting around *Kansas*'s rejection of expanded preemption, the United States argues that *Kansas* "involved a generally applicable law about 'fraud, forgeries, and identify theft.'" U.S. Br. at 28. This completely ignores that case's central dispute— the interplay between Kansas's law and the Immigration Reform and Control Act's

---

[3] The United States acknowledges that "HB 4156 does not punish unlawful entry itself," U.S. Br. at 24, but argues that this Court still cannot allow "a patchwork of state enactments that shuffle noncitizens around the country if the national government has not made a determination that they should no longer be permitted to remain here." U.S. Br. at 18. But the national Congress *has* made this determination, and HB 4156 merely effectuates that determination in Oklahoma. And again, HB 4156 *does not apply* if the government has granted "lawful presence" to any particular defendant. HB 4156, § 2(F).

effect on work authorizations. The challenge in *Kansas* was based on an essentially identical argument to that presented in the response briefs—"that field preemption in these cases 'follows directly' from our decision in *Arizona*." 589 U.S. at 210. "[B]ut that is not so." *Id.* In fact, neither *Kansas*'s majority nor its dissenting Justices showed any appetite for expanding field preemption in the immigration context. *See id.* (rejecting immigration field preemption); *id.* at 215 (Breyer, J., concurring in part and dissenting in part) (arguing only that "Congress has occupied at least the narrow field of policing fraud committed to demonstrate federal work authorization").

The United States also points to a case from 135 years ago, *In re Loney*, 134 U.S. 372 (1890), for the implied proposition that States cannot enforce immigration laws. U.S. Br. at 20–21. But *Loney* does not involve immigration at all. It holds only that state law enforcement is impermissible when the underlying conduct does not impair "any authority derived from the State." *Id.* at 374. The Court in *Loney* expressly distinguished cases in which States can enforce "a violation of the laws of the State, as well as of laws of the United States," *id.*, because those laws may have legitimate local concerns distinct from the federal offense, *id.* at 375. Such is the case here. This basic principle, in turn, was echoed by the Supreme Court in *Plyler v. Doe*: "[W]e cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." 457 U.S. 202, 228 n.23 (1982). In *Plyler*, the Supreme Court expressly recognized that "the States do have some authority to act with respect to illegal aliens,

*at least where such action mirrors federal objectives and furthers a legitimate state goal.*" *Id.* at 225 (emphasis added). The United States offers no response to this critical, binding statement from *Phyler*. The Private Plaintiffs, in a footnote, briefly insinuate that this quote does not apply to "core immigration functions," Private Br. at 30 n.8, but they offer no support for this argument, they do not detail what is and is not a "core immigration function," and they do not explain why a state law regulating only Oklahoma's borders constitutes an "immigration function."

HB 4156 mirrors federal objectives enshrined in law. Indeed, even the United States admits that HB 4156 "track[s] to some degree the federal unlawful-entry provision" and "creates a state crime resembling … the federal unlawful reentry provision." U.S. Br. at 6–7. It is not field preempted.

## B.    HB 4156 does not conflict with federal immigration law.

HB 4156 also does not conflict with federal law. As did the district court, the United States and Private Plaintiffs base their conflict preemption arguments on incorrect interpretations and faulty assumptions about the relationship between HB 4156 and federal law. The federal government claims HB 4156 is conflict preempted because "the law would fundamentally disrupt the federal immigration regime by allowing a single State to make unilateral determinations regarding unlawful entry and removal." U.S. Br. at 11. At the same time, however, the United States recognizes that "States may cooperate with the federal government in the apprehension and detention of noncitizens." *Id.* at 20. And it admits that "States may also enforce their own generally

14

applicable laws to the conduct of noncitizens." *Id.* And it concedes that Oklahoma's law does not apply to or require removal from the United States. *Id.* at 24.

The United States and Private Plaintiffs have misconstrued *Arizona.* A conflict between two sovereigns' laws arises only when it is "impossib[le]" to comply with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. "The mere fact that state laws like" HB 4156 "overlap to some degree with federal criminal provisions" on immigration "does not even begin to make a case for" preemption. *Kansas*, 589 U.S. at 211. In this case, HB 4156 does not "'stand[] as an obstacle'" to any federal objective related to removal or foreign affairs because there is not an "actual conflict between the two schemes" such that "both cannot stand in the same area." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As Oklahoma has previously explained, it is readily possible to comply with Oklahoma and federal law because HB 4156 comports—rather than conflicts—with Congress's enacted language and its purposes and objectives.

HB 4156 does nothing more than criminalize conduct that is already criminal under federal law. In addition, HB 4156 leaves federal immigration defenses intact, and therefore it does not conflict with federal laws providing those defenses. HB 4156 also does not conflict with federal laws governing State–federal cooperation in immigration enforcement, and instead operates within these laws. *See, e.g.*, 8 U.S.C. §§

15

1101(a)(15)(T)(i)(III)(aa), 1101(a)(15)(U)(iii), 1324(c), 1357(g)(1)–(10); 18 U.S.C. § 758; 22 U.S.C. § 7105(c)(3)(C)(i). State–federal cooperation provisions do not preclude States from enacting and enforcing state-law arrest provisions. *See Kansas*, 589 U.S. at 202–213; *United States v. Texas*, 97 F.4th 268, 325 (5th Cir. 2024) (Oldham, J., dissenting). The "federal scheme thus leaves room" for enforcement of laws such as HB 4156. *Arizona*, 567 U.S. at 412–13 (citing *Chamber of Comm. of U.S. v. Whiting*, 563 U.S. 582, 609–610 (2011)); *see also Texas*, 97 F.4th at 326 (Oldham, J., dissenting). In sum, HB 4156 authorizes state law enforcement to do what it already had the power to do. Federal law permits state officials to "'communicate with the [federal government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" *Arizona*, 567 U.S. at 411–12 (quoting 8 U.S.C. § 1357(g)(10)(A)); *see also* 8 U.S.C. §§ 1373(a), 1644.

True, the United States touts the importance of "the federal government's ability to speak with one voice in foreign-relations matters," including immigration issues. U.S. Br. at 41. But Congress itself has already decided what the United States should say when it comes to illegal entry and reentry. And *Kansas*, in turn, makes it emphatically clear that "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." 589 U.S. at 212. HB 4156 poses no obstacle to the federal immigration laws.

Even if HB 4156 conflicted with the United States' foreign relations in any given case, or with the federal laws' allowable punishments, surely it would not do so in every

16

case, or even close. For example, the United States openly admits (albeit incoherently) that despite its arguments Oklahoma may enforce "generally applicable laws" against illegal aliens. U.S. Br. at 20. So if Oklahoma were prosecuting an illegal alien who raped and murdered an Oklahoma citizen, how exactly would it conflict with federal prerogatives to add in an HB 4156 prosecution for illegal presence, as well? How would *that* specific aspect of the case "interfere with the United States' treaty obligations, federal law-enforcement efforts, and the orderly processing of noncitizens entering the United States"? U.S. Br. at 1. How would it "fundamentally disrupt the federal immigration regime"? *Id.* at 11. It would not. Per *Moody* and the high standard for facial challenges, the total injunction here was erroneous.

## III.    HB 4156 does not violate the Commerce Clause because the regulated conduct is illegal and unrelated to foreign commerce.[4]

As a sovereign entity, Oklahoma has the power to exclude unlawfully present persons from its territory, subject to the limitations of the Constitution and applicable federal law. The power predates the Constitution, and "the Constitution did not strip states of that authority." *Arizona*, 567 U.S. at 418 (Scalia, J., concurring in part and dissenting in part). The Private Plaintiffs contend that HB 4156 is unconstitutional because it interferes with the United States' power to regulate foreign commerce. This

---

[4] The district court did not discuss the Commerce Clause. J.A. 201 n.9. Nor does the United States here. But the Private Plaintiffs included Commerce Clause arguments "because this claim is part of the record." Private Br. at 47 n.12. Out of caution, Oklahoma addresses them.

argument relies on a spectacularly overbroad interpretation of "dormant" Commerce Clause jurisprudence. The Private Plaintiffs never convincingly explain how a state law that merely prohibits illegal entry and presence will negatively affect international commerce. The reason for this is obvious: by its very nature, illegal immigration is not legitimate international commerce.

Historically, the primary function of the dormant Foreign Commerce Clause dealt with the taxation or regulation of entities transporting immigrants to the United States, not regulation of the immigrants themselves. Early on, the Supreme Court distinguished between the regulation of people as commerce, and the regulation of people through a state's police power. *See Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102 (1837). *Miln* involved a state immigration statute that required each immigrant arriving at the Port of New York to be listed in a report to the mayor; the master of the ship would be fined for each unreported immigrant. *Id.* at 130–32. The Court upheld the statute as "a regulation, *not of commerce*, but police." *Id.* at 132 (emphasis added).

The Supreme Court has explained that "the dormant Commerce Clause's fundamental objective [is] preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). A state statute is valid, even if it burdens foreign commerce, unless the burden imposed "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). States are allowed to regulate local matters, including commerce. *S. Pac. Co. v. Ariz. ex rel.*

18

*Sullivan*, 325 U.S. 761, 766 (1945) ("Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation."); *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976) (nondiscriminatory tax, when applied to imported goods, did not impact federal regulation of foreign commerce). Here, Oklahoma's interest far outweighs any potential burden on foreign commerce even when viewed through a purely economic lens.

Again, the purpose of the dormant Commerce Clause is to "prevent[] the States from adopting protectionist measures and thus preserve[] a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) ("economic isolationism" is "the very evil that the dormant Commerce Clause was designed to prevent"). And at root, HB 4156 "is not about economic protectionism; it is about unlawful immigration." *Texas*, 97 F.4th at 332 (Oldham, J., dissenting). In other words, the law is an expression of a state's police power to punish those who are committing a crime, much in the same way that a state could punish an illegal immigrant for trespassing on the property of a private citizen. And the state may properly deploy its police power to take something undeniably illegal under federal law and criminalize the same act under state law—especially when doing so "protect[s] and enhance[s]" the "essential rights ... of its citizens, authorized residents, and lawfully present visitors." HB 4156, § 1(A). That these actions are criminal under federal law renders a dormant

Foreign Commerce Clause violation impossible. Nothing is dormant: Congress has spoken, and it has outlawed the behavior.

Below, the United States complained that Oklahoma's legislation will "antagonize foreign governments," "undermin[e] … long-term strategic partnerships," and "expos[e] United States citizens abroad to reciprocal and retaliatory treatment." J.A. 61. But these allegations do not revolve around *commercial* harm. Ultimately, any burden the United States (or any foreign nation) may have due to HB 4156 does not involve commerce and cannot outweigh Oklahoma's interest in public safety.

Here, the Private Plaintiffs allege they will be harmed because HB 4156 might impede their free movement in and out of Oklahoma—in their view, a condition that interferes with interstate commerce. For this, they principally rely on *Edwards v. California*, 314 U.S. 160 (1941). *Edwards* invalidated a California statute that prohibited "bringing into the State any indigent person who is not a resident of the State," *id.* at 171, holding that such was "an unconstitutional burden upon interstate commerce," *id.* at 177. The Court's reasoning was straightforward: amid the Dust Bowl and Great Depression, no "single State [could] isolate itself from difficulties common to all of them." *Id.* at 173.

In discussing *Edwards*, the Private Plaintiffs omit the critical fact that the person California sought to exclude was "a citizen of the United States and a resident of Texas." *Id.* at 170. "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all *citizens* be free to travel throughout the length

20

and breadth of our land ....” *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 671 (1974) (emphasis added). Nothing in *Edwards* suggests—and the Court likely would have been astounded to contemplate—that a noncitizen *unlawfully in the country* could enjoy unfettered freedom of movement across state lines without any objection from affected states.[5]

## IV.    Oklahoma has a constitutional power of self-defense from invasion.

On the Invasion Clause, the federal government expends much energy emphasizing its power “to provide for the common defense” of the States. U.S. Br. at 34 (citation omitted). It spends little time, however, analyzing Oklahoma’s dilemma here: what can a State do when the government neglects, for whatever reason, to provide for that common defense? Put differently, the United States admits the Constitution gives “the federal government the *duty* to ‘protect each of [the States] against Invasion,’” U.S. Br. at 34–35 (quoting U.S. CONST. art. IV, § 4) (emphasis added), but then it declines to grapple with the implications of this admission vis-à-vis state authority. *See, e.g.*, BLACK’S LAW DICTIONARY (12th ed. 2024) (defining “duty” as the “legal obligation that is owed or due to another and that needs to be satisfied … *and for which somebody else has a corresponding right*” (emphasis added)).

---

[5] Similarly, the United States repeatedly and wrongly conflates noncitizens who are in the country lawfully, which HB 4156 protects, with those who are here illegally, which HB 4156 criminalizes. *See, e.g.*, U.S. Br. at 26 (arguing that HB 4156 and other laws like it would drive “noncitizens from the country”).

Instead, quite remarkably, the federal government indicates that even if an invasion is occurring, "[n]othing" in the Invasion Clause "offers States a broad exemption to other constitutional provisions" like the Supremacy Clause. U.S. Br. at 35. The Invasion Clause, the United States contends, "does not confer authority to ignore congressional enactments that foreclose state legislation under the Supremacy Clause, nor does it entitle States to contradict the federal government's considered decision about whether (and how) to 'engage in War' in response to particular circumstances." *Id.* at 36. The Invasion Clause apparently means nothing once the federal government has done anything at all, even if that anything is to turn a blind eye as an invasion is occurring. This is mistaken, for several reasons.

First, the only party "ignor[ing] congressional enactments" here, *id.*, is the federal executive, which has subordinated enforcement of congressional statutes to the whims of foreign governments. (These governments apparently have a right to insert their citizens into Oklahoma, a sovereign State, unlawfully without receiving any pushback from state authorities. *See* Okla. Br. at 32–33.) Oklahoma, on the other hand, is *duplicating* federal laws—as is commonplace in criminal law—that insist the federal executive "shall" prosecute certain criminals. *See id.* at 38.

Second, the United States' attempt to support its position from text and history falls flat. The government quotes Federalist No. 3 for its position that a national government, through "wisdom and prudence," can better "obviate" the danger of "excit[ing] war" with foreign nations by controlling war powers. THE FEDERALIST NO.

3, at 44–45 (John Jay) (Clinton Rossiter ed., 1961). But nothing in Jay's essay even hinted at the idea that states would be rendered powerless if the federal government refused to repel an invasion or refused to enforce congressional enactments that could help repel an invasion. And the idea that the Founders would endorse such an intrusion into state sovereignty is meritless; they did not believe the federal government would forever and always be wise and prudent. Presumably that is why they enshrined in the Constitution the States' authority to react when "actually invaded, or in such imminent Danger as will not admit of delay." U.S. CONST. art. I, § 10. That language is just as much a part of the Constitution as anything else, including the Supremacy Clause. Moreover, in Federalist No. 43, James Madison explained that a "protection against invasion is due from every society to the parts composing it." THE FEDERALIST NO. 43, at 275. And in Federalist No. 44, Madison did not offer an interpretation of the State Invasion Clause because the "particulars of this clause fall within reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark." THE FEDERALIST NO. 44, at 283. To Madison, it was practically beyond the need of explanation that *every* society is responsible to repel invasions—not just the federal government.

The federal government next tries to rely on an 1800 report from Madison, arguing that he believed the "prosecution and removal of noncitizens for unlawfully entering the country does not constitute 'engag[ing] in War.'" U.S. Br. at 36 (citation omitted). But this report is far more complex than the government has acknowledged.

*See* James Madison, *The Report of 1800* (Jan. 7, 1800), *available at* https://perma.cc/3XV9-2MEE. To begin, even if the report stood for the position the government claims, the "Editorial Note" at the beginning of the cited version acknowledges the report was "little commented upon outside of Virginia, and even there it seems to have had limited impact." *Id.* Regardless, the United States' reading of the report is cherry-picking at its finest. Significantly, the report was a broadside against the actions of the *federal* government in passing the Alien and Sedition Acts of 1798. And in launching this attack, Madison repeatedly defended the authority and sovereignty of the States. *See, e.g.*, *id.* (rejecting the view that "the powers supposed to be necessary which are not so given to the state governments, must reside in the government of the United States"). Moreover, Madison pushed back against an argument that a particular Virginia law was similarly vulnerable to his withering attacks on federal law. Madison deemed the Virginia law appropriate even though it allowed the State to remove "subjects of any foreign power or state, who shall have made a declaration of war, or actually commenced hostilities." *Id.*

In short, Madison's view was "that the removal of alien enemies is an incident to the power of war; that the removal of alien friends, is not an incident to the power of war." *Id.* This makes sense. A war did not provide an excuse for the federal government to banish noncitizen "friends" who were not part of the war. But that critique of the federal government says nothing about whether a *state* can remove noncitizens who have entered or invaded *in violation of federal and state law*. Deeming such lawbreakers as

falling within Madison's category of "alien friends" is a bridge too far. Indeed, Madison himself indicated that even "alien friends" could be "punished" or "secured by pledges or imprisonment" for serious crimes "in like manner with permanent citizens," and that "banishment" of such persons was only forbidden if it was through an "arbitrary and unusual process" by the State or federal governments. *Id.* Nothing about Oklahoma's law is arbitrary or unusual—again, it mirrors federal law. Nor would it be a stretch to say that a drug cartel or organized crime member unlawfully in Oklahoma has "actually commenced hostilities" against the State and country.

To be sure, Oklahoma does not argue it has a right to engage in a full-scale war here. This is a strawman. Rather, Oklahoma's argument is that it retains the authority to engage in actions that are *proportionate* to repel lawless intrusions into its sovereign territory. The government scoffs at this, calling it "extraordinary" that Oklahoma would claim the ability "to engage in armed hostilities with another nation or with a group of foreign nationals from Mexico or China." U.S. Br. at 36–37. But if foreign nationals from China invade Oklahoma and start a gun battle or build a rural compound and start a sex-and-drug-trafficking enterprise, *of course* Oklahoma is allowed to "engage in armed hostilities" if the circumstances call for it. These are not wild hypotheticals. *See* J.A. 131 ("[L]law enforcement responded to a quadruple homicide after a Chinese national allegedly entered a garage on a 10-acre marijuana farm in Kingfisher County …. According to investigators, the assailant killed three men, execution-style, with gunshots to the back of the head, and one woman with two shots to the abdomen."); *id.* at 133

25

("In the short seven months since its creation, the [Oklahoma] Organized Crime Task Force has investigated and is prosecuting more than 50 complex, multi-jurisdictional criminal cases. The vast majority of these cases involve Mexican or Chinese drug syndicates."). And the federal government does not really dispute Oklahoma's ability to respond. *See, e.g.*, U.S. Br. at 20, 39. Rather, it just claims that one specific response—enforcing an unlawful presence law—is somehow beyond the pale, even though far more severe responses would clearly be appropriate.

Presumably, the United States takes the view that HB 4156 is unlawful even *if* Oklahoma is being invaded because to admit otherwise would be to concede HB 4156 is lawful in certain circumstances. And if that is the case, then the United States' facial challenge (and injunction) must fail, as the U.S. Supreme Court explained recently. *See Moody*, 603 U.S. at 723 ("a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid'"). Whatever the case, the United States also argues that no real "invasion" is occurring here that would trigger the Invasion Clause. U.S. Br. at 38–39. But even President Biden has admitted that our country's "broken" border has created a "crisis." Okla. Br. at 9. The United States never acknowledges these important admissions, much less explains how a nation's border can be "broken" and in "crisis" without there being a colorable argument that an invasion of some sort is occurring. If there is no invasion, then what exactly is the crisis? The government does not say.

26

Instead, the government bizarrely claims that "under no reasonable understanding can irregular migration or criminal cartels' smuggling activities amount to an 'invasion.'" U.S. Br. at 38. Organized crime cartels running roughshod over our Southern border can constitute a state "invasion," colloquially speaking, just as much as a cartel member breaking into someone's house and using it to store drugs and guns would obviously qualify as a home invasion. Only those who are not themselves victims of these situations could claim otherwise. The United States may be correct that the predominant understanding of "invasion" in this context would focus on a foreign government's military, but that does not automatically exclude the word also applying to lesser invasions. In the Federalist Papers, for example, the writers deployed the term in multiple ways. Relevant here, in Federalist No. 28, Alexander Hamilton wrote that it is an "axiom in our political system that the State governments will, in all possible contingencies, afford complete security against *invasions* of the public liberty by the national authority." THE FEDERALIST NO. 28, at 181 (emphasis added). He added that certain "insurrections and rebellions" may constitute "violent invasions" of the "peace of the community" and the "just authority of the laws." *Id.* at 179. Invasion, even then, was hardly reserved exclusively for foreign nations. Nor is the federal government consistent in its terminology. It is apparently rank exaggeration to say that death-dealing foreign cartels operating within Oklahoma are an "invasion," but perfectly normal to say that Oklahoma could "excite war" with Mexico if it enforces a simple law that

mirrors current federal law and prosecutes persons who have entered the United States illegally. U.S. Br. at 35 (citation omitted). This is nonsensical.

In the end, Oklahoma acknowledges the relative novelty of its Invasion Clause argument. But the United States has done little to show that Oklahoma is wrong that states retain the sovereignty to exclude illegal aliens from their territory whom the federal government has deemed excludable.

## V.    The remaining preliminary-injunction factors support Oklahoma.

### A.    No plaintiff has shown irreparable harm.

The United States will not suffer irreparable harm if HB 4156 is allowed to go into effect. The United States observes that the "Supreme Court has suggested that irreparable harm inherently results from the enforcement of a preempted state law." U.S. Br. at 40 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366–67 (1989)). But a suggestion is not law. At any rate, HB 4156 is not preempted.

For its part, Mexico speculates that HB 4156 will harm Mexican nationals. Mexico Amicus Br. at 2–3. These speculative harms are unfounded—and Mexico's concerns about profiling are misplaced. Meanwhile, the gist of the Private Plaintiffs' alleged harms stems from their potentially unlawful conduct under federal laws that Oklahoma's statute simply mirrors. To reiterate, Oklahoma will not prevent or impede access to any federal proceedings—including immigration proceedings. These assertions of speculative harm underscore why the district court's injunctive relief on a facial challenge was inappropriate in the first place. Any evidence of intent of unlawful

28

application would be far greater if HB 4156 were allowed to go into effect, *and then* Oklahoma disregarded the U.S. Constitution in its enforcement. The United States and Private Plaintiffs know this will not happen. Now, with the injunction in place, it is impossible to tell if—and how—the law would be enforced and how the State and federal governments would cooperate in its enforcement.

**B.      The equities and public interest strongly favor Oklahoma.**

Neither the United States, nor any Private Plaintiff, has rebutted that the equities of this case favor Oklahoma. By the same token, the harm to Oklahoma is plainly apparent because enjoining a constitutional State law is per se irreparable harm: "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1254–55 (10th Cir. 2017). Rampant, unchecked illegal immigration has brought a crisis of criminal activity and violence to Oklahoma. Despite the Private Plaintiffs' callous characterization, these concerns are not "overblown." Private Br. at 49. Oklahoma, and Oklahomans, are suffering real harm every day—and will suffer irreparable harm if HB 4156 remains facially enjoined. The equities overwhelmingly favor Oklahoma.

**CONCLUSION**

This Court should reverse the district court and vacate the injunction.

Respectfully submitted,

s/Cullen D. Sweeney
_____

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

## Certificate of Compliance

This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation permitted by the Court, Dkt. 75, because it contains 7,981 words, excluding the parts exempted.

s/ *Cullen D. Sweeney*
CULLEN D. SWEENEY

## Certificate of Digital Submission

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with Crowdstrike antivirus updated on January 2, 2025.

s/ *Cullen D. Sweeney*
CULLEN D. SWEENEY

## Certificate of Service

I certify that on January 3, 2025, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system.

s/ *Cullen D. Sweeney*
CULLEN D. SWEENEY